IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:14-CV-81250-KAM

MARTIN E. O'BOYLE,

    Plaintiff,

v.

ROBERT A. SWEETAPPLE
and TOWN OF GULF STREAM,

    Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff Martin E. O'Boyle ("Plaintiff") sues Defendants Robert A. Sweetapple ("Sweetapple") and the Town of Gulf Stream ("Town"), and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff brings this action under 18 U.S.C. §1983 and the Florida common law of Defamation which will necessarily raise questions of the First Amendment as incorporated by the Fourteenth Amendment.

2. This Court has jurisdiction under 28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitutional laws or treaties of the United States. This Court has supplemental or pendant jurisdiction over the Florida common law claims pursuant to 28 U.S.C. §1367.

3. This Court has jurisdiction under 28 U.S.C §1443(2), which gives district court's jurisdiction over actions to secure civil rights extended by the United States government.

4. Venue is appropriate in this judicial district under 28 U.S.C. §1391(b) because the events that gave rise to this complaint occurred in this district.

5. The Plaintiff, MARTIN O'BOYLE is now and at all times pertinent was a resident of the Town of Gulf Stream, Palm Beach County, Florida which is located in the United States, Southern District of Florida.

6. The Defendant, ROBERT SWEETAPPLE, is now and at all times pertinent was residing in the Southern District of Florida.

7. The Defendant, TOWN OF GULF STREAM ("Town") is a municipal corporation of the State of Florida seated in the Southern District of Florida.

## BACKGROUND

Plaintiff's History of First Amendment Activities with the Town

7. The Town is a relatively small municipality with approximately 1,000 residents located within its approximately 500 acres of land.

8. Plaintiff is a resident of the Town, owning and occupying the home located at 23 N. Hidden Harbour Drive, Gulf Stream, Florida 33483.

9. Plaintiff is an avid supporter of Florida's Public Records Law and, in an exercise of his Constitutional and statutory rights, has over the years submitted numerous public records requests to the Town and various other municipalities/agencies.

10. Occasionally, Plaintiff's public records requests are not complied with and Plaintiff has exercised his right under Fla. Stat. § 119 to bring a lawsuit to enforce his rights under the Public Records Law.

11. Plaintiff has filed approximately 29 lawsuits against the Town for alleged violations of the Public Records Law.  As of the date of this lawsuit, Plaintiff is currently

engaged in 12 lawsuits against the Town relating to alleged violations of the Public Records Law.  Plaintiff has also filed one lawsuit for violations of 268.0114, Fla. Stat. because he was not afforded any opportunity to speak before the Town passed a parking ordinance in response to the Plaintiff parking his truck at Town Hall, a truck which contained politically charged banners critical of the Mayor.

12. Plaintiff likewise engages in various forms of Constitutionally-protected acts/speech with respect to the Town.  For example, in 2013 Plaintiff painted the façade of his Gulf Stream house with various political messages criticizing the Town, its then-mayor, and its commissioners as the result of the Town denying Plaintiff's request for a building permit.  The Town ultimately settled the dispute, which made its way to federal court, issuing an apology to Plaintiff and agreeing to pay him $180,000.00.

13. In February 2014, Plaintiff announced that he would run for a council seat in Gulf Stream and subsequently began campaigning throughout the Town and neighboring municipalities.  Plaintiff placed numerous campaign signs throughout the Town, many of which were conclusively removed by Gulf Stream agents/officials.  The signs were targeted for removal at the request of Town Manager Thrasher because the signs displayed political content.

14. During this same time period, Plaintiff engaged in Constitutionally-protected speech by flying banners and displaying signs that were critical of his opponents or otherwise carried political messages.  In response, the Town threatened Plaintiff with adverse action, including code enforcement hearings carrying daily fines not to exceed $500 per sign per day, if he did not remove his signs and otherwise cease such political speech.

15. As a result of the removal of his campaign signs, the threats of official adverse action if his political signs were not removed, and other conduct by the Town, Plaintiff filed

another federal action against the Town in March 2014.

16. After the March 2014 election, the Plaintiff continued to criticize Town officials with banners on the side of his truck, which he would park from time to time at Town Hall to ensure maximum visibility and political effectiveness because Town Hall is the seat of the Town's legislative, judicial, and executive branches.

17. These are just a few of many examples of Plaintiff's exercise of Constitutionally-protected speech as it relates to the Town. For at least the past two years, Plaintiff has displayed numerous signs and flown numerous banners critical of the Town, its mayor, its commissioners, and other agents of the Town. Plaintiff has likewise attended numerous Town meetings and events during which he has personally voiced his criticism of this same group.

18. Plaintiff's above-described Constitutional speech and lawsuits were not undertaken/filed to harass the Town or for any improper purpose – rather, each of the lawsuits filed by Plaintiff against the Town was filed to enforce a specific Constitutional or statutory right which Plaintiff contends was violated by the Town and/or its officials, and the above-described speech was undertaken to voice legitimate concerns with the Town's administration.

19. Plaintiff views the above-described lawsuits as meritorious and necessary to enforce State and federal laws, and, with respect to at least some of the public records lawsuits filed by Plaintiff, the Town's current mayor, Scott Morgan ("Morgan"), has stated on the record that he agrees the cases have merit.

20. In response to Plaintiff's lawsuits, the Town (through the actions of its mayor, its town manager, the town police force, and Sweetapple) has endeavored to forego defending Plaintiff's various cases on the merits and has opted instead to engage in threats, intimidation, and harassment designed to cause Plaintiff to dismiss his lawsuits against the Town, cease his

Constitutionally-protected speech critical of the Town and its agents, and ultimately move from the Town due to the pressure against Plaintiff and his family.

### Morgan's June 2, 2014 Letter

21. In a June 2, 2014 letter from Morgan to *all* Town residents, Morgan noted that the Town's general fund reserves had fallen below an acceptable number and blamed this occurrence on the lawsuits filed by Plaintiff and another Town resident.

22. With respect to the public records requests filed by Plaintiff and the other Town resident, Morgan stated that, in his opinion, they "have little purpose other than to harass and financially damage our town."

23. Morgan's letter then goes on to state that the money to defend these lawsuits would likely have to come from increased taxes to the residents of the Town – a premonition that the Town made good on in July 2014 when Town commissioners voted unanimously to approve a tax hike for Town residents.

24. The letter then states that, in an effort to 'step up its defense' of the lawsuits referenced therein, the Town had hired special counsel to take a "firm stance" in opposing the lawsuits.

25. The special counsel referenced in the letter is Sweetapple, an attorney with Sweetapple, Broeker & Varkas, P.L.

26. Although "stepping up its defense" can mean several things, it quickly became apparent to Plaintiff that the Town's newfound strategy in dealing with him did not involve litigating the merits of his lawsuits in a court of law.

27. Rather, Morgan and Sweetapple (and likely other Town officials unknown to Plaintiff at this time) devised a plan to smear Plaintiff's name among his friends and colleagues

5

and to assert undue pressure on Plaintiff by lashing out against his family.

28. By acting together, the mayor (Morgan) and the attorney (Sweetapple) decided that they could accomplish what neither one of them could accomplish on their own – systematic and pervasive pressure on Plaintiff designed to silence and/or extinguish Plaintiff's exercise of statutory/Constitutional rights.

29. Morgan and Sweetapple devised their plan to defame, harass, intimidate, and antagonize Plaintiff during a private meeting on April 3, 2014 and continued their scheming during further meetings on at least the following dates: 4/17/14, 5/4/14, 6/5/14 and 6/10/14.

30. During this meeting and in subsequent conversations between the two, Morgan and Sweetapple decided on a course of action of (1) falsely and maliciously publishing to others that Plaintiff is violating the civil and criminal provisions of the federal and Florida RICO (Racketeer Influenced and Corrupt Organization) Acts by his filing and pursuit of public records cases; (2) falsely and maliciously publishing to others that Plaintiff's pursuit of public records cases against the Town is a 'scheme' devised by Plaintiff to 'line his pockets' with profit; and (3) putting pressure on Plaintiff's son and business associates in an effort to gain an undue advantage over Plaintiff in Plaintiff's lawsuits against the Town.

31. Both Sweetapple and Morgan have overtly acted in support of the above-described agreement to falsely accuse Plaintiff of various state and federal crimes, disparage Plaintiff's character, and weaken Plaintiff by exerting pressure over his son.

32. For example, on several occasions over the last four months, Sweetapple has spoken to friends, colleagues, business associates, and attorneys for Plaintiff and conveyed the same message to each – Plaintiff is a criminal, he has violated the federal and Florida RICO Acts, and that he is engaging in a for-profit scheme by having the audacity to file public records

requests and the willpower to enforce them through lawsuits.

33. Sweetapple has for months boasted to each of these individuals that Plaintiff was 'finished' and that Sweetapple would soon file suit against Plaintiff for the various alleged RICO violations. Sweetapple further suggested in these conversations that Plaintiff's friends/attorneys should sever their ties with Plaintiff so as not to be caught in the impending litigation (implicitly threatening them in the process).

34. With respect to one such individual, Sweetapple's threats were more explicit and bordering on extortion (if not in fact extortion) – Sweetapple demanded that this individual drop his lawsuits against the Town or else he would also be named as a defendant in the supposedly forthcoming RICO lawsuit against Plaintiff. Sweetapple further called a 'confidential' meeting with this individual where, upon information and belief, Sweetapple further defamed Plaintiff by making additional RICO allegations and additional threats.

35. These comments (which were completely false), together with Morgan's June 2, 2014 letter, were not made during the course of any judicial proceeding or in connection therewith. Rather, the above-described comments were each made out of court and solely in connection with Morgan and Sweetapple's plan to harass, defame, and ultimately dissuade Plaintiff from continuation of his various lawsuits against the Town and his political speech critical of the Town and its agents.

36. As stated above, Morgan and Sweetapple's plan did not stop with the spreading false and malicious lies about Plaintiff's purported involvement in criminal activities and violation of the RICO Acts, but also included plans to exert pressure on Plaintiff's son and business associates wholly unrelated to the merits of any of Plaintiff's lawsuits against the Town.

37. On or about April 24, 2014, Sweetapple himself publicly proclaimed that, as a

result of Plaintiff's multiple lawsuits against the Town, Sweetapple was going to investigate and go after Plaintiff's son.

38. Sweetapple has made these statements directly to various members of the Town's population as well as friends, advisors, and business associates of Plaintiff. The statements were not made to voice some legitimate concern but rather to force Plaintiff into dropping his lawsuits against the Town and refrain from exercising rights guaranteed by the Florida and the U.S. Constitution. Again, these statements were not made in connection with any judicial proceeding, but rather in furtherance of Morgan and Sweetapple's plan to silence Plaintiff.

39. As just one example of Morgan and Sweetapple's efforts in this regard, on August 25, 2014, Morgan filed a Florida Bar complaint (which, upon information and belief, was substantially prepared by Sweetapple) against Plaintiff's son (who is an attorney licensed to practice in other states and awaiting admission to the Florida Bar), Plaintiff's longtime business associate William Ring (a Florida attorney), and substantially all of the attorneys working (or that had worked at any time) at the law firm which represents Plaintiff in many of his lawsuits against the Town.

40. The Bar complaint was submitted by Morgan purportedly in his capacity as mayor of the Town, yet the Town does not appear to have taken any action (as required) to authorize such action.

41. The Bar complaint uses a broad brush to make numerous false allegations against Plaintiff's son, Plaintiff's longtime business associate, and the various attorneys which are or were representing Plaintiff in his litigation against the Town, and is just the latest tool employed by Morgan and Sweetapple to dissuade Plaintiff from his litigation against the Town and his Constitutionally-protected speech critical of the Town and its agents (including, but not limited

to, Morgan and Sweetapple).  The Bar complaint against Plaintiff's son before the UPL division of the Florida Bar was dismissed on May 20, 2015, no adverse action was taken by the Bar.

42. By attacking Plaintiff's reputation in the community and threatening Plaintiff's son and business associates, Morgan and Sweetapple 'stepped up their defense' of Plaintiff's lawsuits by doing everything in their power – under color of law – to avoid actually litigating the merits of the lawsuits.  Rather, they set off on a course of intimidation, harassment, and retaliation with a singular purpose of silencing Plaintiff at any cost.

43. All conditions precedent to this action have been performed or have been waived

## COUNT I – SLANDER PER SE
### (Sweetapple)

44. Plaintiff re-alleges and incorporates paragraphs 1 through 43 as set forth above.

45. As described herein, Sweetapple has, on numerous occasions over the past four months, falsely stated to Plaintiff's friends, colleagues, business associates, and attorneys (among other individuals and agency representatives) that Plaintiff is a 'criminal' and is violating the civil and criminal provisions of the federal and Florida RICO Acts through his filing of public records requests and pursuit of lawsuits to enforce alleged violations of the Public Records Law.

46. Further, Sweetapple has further stated to numerous individuals that Plaintiff's pursuit of public records lawsuits is a 'money-making scheme' designed by Plaintiff to line his pockets with profit.

47. Sweetapple did not present these statements as if they were merely his opinion – rather, Sweetapple, as an attorney experienced in both state and federal matters, conveyed these statements as fact.  He did not state it was his or the Town's opinion that Plaintiff had committed several felonies or that he would ultimately prove such in a court of law – rather, he left no room

DESOUZA LAW, P.A.
101 NE THIRD AVENUE, SUITE 1500 • FORT LAUDERDALE, FL  33301
TELEPHONE (954) 603-1340

for doubt in emphatically stating that Plaintiff had committed these crimes, that he had assembled 'piles' of evidence of such crimes, and that anyone standing with Plaintiff would likewise be named as defendants when these actions were filed.

48. In truth, at the time these statements were made, Sweetapple had not assembled any evidence which would support his accusations that Plaintiff violated the civil or criminal provisions of the federal or Florida RICO statutes, let alone 'piles' of evidence. Sweetapple, an attorney with substantial experience in federal and state matters, knew at the time that he made these statements that they were wholly unsupported by the evidence, and therefore were made with reckless disregard for the truth.

49. The above-described false and malicious statements were made with the purpose of causing harm to Plaintiff's reputation, both in the Town and among his friends, colleagues, business associates, and attorneys, and in furtherance of Sweetapple and Morgan's scheme to silence Plaintiff's Constitutionally-protected speech and dissuade Plaintiff from continuing with his litigation against the Town.

50. As a result of Sweetapple's false and malicious statements, Plaintiff has sustained substantial damages resulting from the loss of reputation, the full amount of which will be established at trial.

### COUNT II – RETALIATION (42 U.S.C. § 1983)
### (Municipal Liability)

51. Plaintiff re-alleges and incorporates paragraphs 1 through 43 as set forth above.

52. The Town, either through the decisions of its top policymakers, Mayor Morgan, the Town Commission, Town Manager Thrasher or Police Chief Ward have chosen to use the Town's municipal powers to engage in a pattern of First Amendment retaliation against the Plaintiff. Additionally, the Town has possessed a pervasive and widespread custom, usage, or

policy of retaliating against residents for First Amendment activities, including the Plaintiff.

53. In early 2014, the Town cited a fellow resident Christopher O'Hare for displaying objects d'art at his home under Sec. 70-268. The "objects of art" were several political signs that were critical of Town Officials.  The Town notified O'Hare that he would be brought to a code enforcement hearing if he did not remove his signs.  When resident O'Hare replaced his political signage with holiday signage, the Town did not cite him.  In fact, Town Manager Thrasher admitted that for as long as he could remember (his employment with the Town dates back to the mid-late 90's), the Town did not cite people for displaying holiday accoutrements that typically are displayed at holidays such as Halloween or Easter decorations.  The Town's enforcement was brought because Mr. O'Hare was critical of the Government; the Town did not cite Mr. O'Hare under the Town's sign ordinance, which treated real estate signs more favorably than political.  The Town admitted such in a March 26, 2015 letter sent out to all residents of the Town.

54. As part of the Town's pervasive culture of retaliation, the Town again cited Mr. O'Hare in the spring of 2014 for displaying similar political signs on a small boat that was moored in the center of a large turning basin called "Polo Cove" behind then Mayor, and current commissioner, Joan Orthwein.  O'Hare was cited under the portion of the Town's old sign ordinance which regulated only political signs, for displaying signs in the Town's right of way, not for displaying Object d'art.

55. When Plaintiff ran for Town Commissioner in 2014, the Town cited the Plaintiff for placing signs in the Town's right of way when he displayed banners from him truck that were critical of Town Officials.  Plaintiff was also cited for placing campaign signs in the Town's right-of-way when they were displayed on property owners' homes in the neighborhood of Place

Au Soleil. None of the property owners displaying the signs were cited, the obvious explanation is that Plaintiff's opponents who were running as a slate, all high level Town officials, would rather label the Plaintiff as a lawbreaker than instigate adverse actions against the property owners themselves, who were the electorate and potential voters.

56. After the March 2014, municipal election, the Plaintiff continued to fly banner planes and display banners on his truck. All forms of speech on the ground and in the air were politically charged and critical of Town officials and those who had the ability to speak on behalf of the Town.

57. Shortly thereafter on March 14, 2014, the Town instituted a decorum policy for speaking at public meetings in response to the critiques of O'Boyle and O'Hare at Town Meetings. The policy prohibited "personal verbal attacks toward any individual members of the Town Commission" and afforded the Mayor/Chair the ability to physically remove anyone who violated the policy. On April 11, 2014 at the next Town Commission meeting, the Town held a regular meeting where 4 armed police officers were present.

58. On April 14, 2014, Mayor Morgan called a special meeting of the Town to pass an emergency ordinance to regulate the parking at Town Hall. On April 29, 2014 at another special meeting Ordinance 14/1 was passed unanimously. The ordinance was to take effect immediately. Although the Town always has allotted time for public input prior to passing ordinances, the Town did not allot any time for residents, including O'Boyle, to comment on the "emergency" ordinance before it was passed unanimously, an ordinance that was directed at removing O'Boyle's truck from displaying banners.

59. The Coastal Star in May, a popular local paper read by many Town residents, observed, "Morgan didn't waste time beginning his aggressive defense against the town's critics.

He called a special meeting of the commission for April 14 to consider an ordinance against overnight parking at Town Hall – regulation aimed at vehicles displaying political signs that criticize town officials." The article also noted that Morgan ran "on a platform that called for an aggressive legal defense against the towns detractors."

60. In the summer of 2014, the Town attempted to use the state court system to sanction and/or restrain the Plaintiff for flying politically charged banner planes in the federal airspace – a privilege or immunity possessed by Plaintiff under the Fourteenth Amendment's guarantee that State's refrain from attempting to prohibit access to federal privileges.

61. In June, as discussed above, the Town via Mayor Morgan sent out a "poison pen" letter accusing the Plaintiff of the Town's woes. The letter was clearly created to incite social ostrcization, directing resident's to treat the Plaintiff as a pariah. The letter had another purpose, to quell any dissent and to prevent other Town residents from challenging the Town's actions, just as the Coastal Star predicted.

62. To further the Town's North Korean approach to speech, the Town cited the Plaintiff's wife, as Plaintiff's Truck was in her name, for parking the banner clad truck in one of the highly visible parking spots at Town Hall on June 20, 2014. Shortly thereafter, Plaintiff's truck was towed at the direction of the Town.

63. The Town's public parking ordinance 14/1 placed special restrictions on the parking spaces in the front of Town Hall and the Police Station which were visible from the main road. Those spaces were reserved for Town employees, who had reserved spaces in the back of Town Hall, and for those conducting business at Town Hall. It is worth noting that the disability entrance and handicapped parking spaces were in the back of Town Hall. Shortly after the parking ordinance was passed, the Town built large hedges that hid the back parking spaces from

view at Town Hall, ostensibly to prevent the public from seeing Plaintiff's banners if the Plaintiff parked his vehicle at the rear of Town Hall for the day.

64. The Town passed the parking ordinance, installed the hedges, and towed Plaintiff's truck because Town officials disagreed with the messages on Plaintiff's truck. To the best of Plaintiff's knowledge other vehicles necessarily have violated the Town's parking ordinance, because Town Hall is reserved for beach parking under the Town's comprehensive land use plan and the front Town Hall parking spaces are closest to the beach access point. Plaintiff's vehicle was not obstructing or inhibiting anyone from parking at Town Hall, especially those with disabilities.

65. On October 10, 2014, the Town unanimously voted to initiate a RICO complaint against the Plaintiff at a regular commission meeting. The theories of RICO were not discussed nor were the parties. The likelihood of success was not discussed either. The only thing that was discussed was the motivations and consequences of filing such an action. To wit, Mayor Morgan stated, "I think as it has been discussed today, we can either take the approach of defending these individual cases as they come in, and bleed to death by a thousand cuts, or we can takes steps necessary to stop those cases by advancing this case … And by putting a stop to it with this RICO action, we then put a stop to the individual lawsuits on the public records requests. I'm confident that would be the result of this case." Commissioner Orthwein followed up, "I agree, because I don't see an end just defending one by one. I think we have to take it all as a group and go forward because just defending is not doing anything."

66. The Town's sole reason for advancing the RICO case was to chill the Plaintiff's right to petition in the courts for redress as protected by the First Amendment and also 768.295, Fla. Stat. After the RICO case was filed in February, the Town's attorney Richman engaged in a

media campaign that included newspaper and television interviews to publicize the filing of the RICO and to besmirch the Plaintiff and chill him from bringing public records litigation when he felt the Town was violating the law and Florida Constitution.

67.     Lastly as part of the Town's pervasive campaign of retaliation against petitioners and political advocates, Mayor Morgan send out a letter to residents on March 26, 2015.  The letter was another poison pen sent out on Gulf Stream official letterhead contained within official Gulf Stream envelopes.  In this new letter Mayor Morgan admitted that the reason the old sign ordinance was changed (in early 2015) was because of Plaintiff's legal actions.  Morgan stated "This change will primarily affect real estate signs, which had previously been treated differently from other signs because of the importance of sign visibility to our residents when selling their homes."  Morgan went on tell Town residents that the RICO complaint and video depositions of Plaintiff and O'Hare could be found at the Town's website.  Those videos are also posted by the Town on its official page on youtube.com.

68.     Further in that letter, the Town accused Plaintiff of misconduct.  In addition, the Town notified all residents that O'Hare had made complaints against certain enumerated residents/properties under the new sign ordinance.  Morgan later admitted under oath that he included that portion into his letter in an attempt to stop O'Hare from petitioning, i.e. sending the Town complaints regarding selective code enforcement.

69.     As demonstrated above, the Town possesses a policy of speech (both by content and viewpoint) favoritism and has engaged in a campaign of retaliation against the Plaintiff.  In the Town, if a resident speaks out, that resident can expect an aggressive responsive that is designed to chill if not freeze First Amendment activities.  This method of operation is designed to punish and deter dissent against Town Officials.  Plaintiff has suffered because of this custom,

policy or usage of retaliation.

70.     Particularly, Plaintiff incurred damages because his truck was towed and has not been able to display banners on his truck at the public forum of the Town Hall parking spaces. His truck was signed out because of the viewpoint espoused on it.  Plaintiff had to pay money to retrieve his truck and suffered the loss of the opportunity to publically criticize government officials by using his truck at Town Hall.  Plaintiff has been chilled from engaging in banner plane speech as a result of the Town's actions.  He has incurred great damages in the form of garden variety emotional distress, reputation, and economic hardship as a result of the RICO action being filed solely to chill Plaintiff from petitioning from redress in the courts when he feels aggrieved.

## Demand For Jury Trial

Plaintiff demands a trial by jury on all issued so triable.

WHEREFORE, Plaintiff demands judgment against the Town of Gulf Stream:

(i)   Direct, incidental, and consequential damages, interest, and costs, in an amount to be determined at trial;

(ii)  Attorneys' fees and costs incurred in pursuit of this action;

(iii) A finding that the Town has taken any one of the aforementioned actions in whole or in part in derogation of Plaintiff's First Amendment rights.

(iv)  An injunction against the Town for attempting to use any instrumentality of the State of Florida for regulating Plaintiff's access to the federal sovereign airspace (49 U.S.C. § 40103(a)(1)) for speech purposes under either the First or Fourteenth Amendment's Due Process or Privileges or Immunities Clauses.

(v)   Issuance of such other relief as the Court deems just and proper.

Dated: June 19, 2015.                                    DESOUZA LAW, P.A.

        1515 N. University Drive
        Suite 209
        Coral Springs, FL 33071
        Telephone:  (954) 551-5320
        DDesouza@desouzalaw.com


By: /s/ Daniel DeSouza, Esq._____
     Daniel DeSouza, Esq.
     Florida Bar No.:  19291

### CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will electronically serve all counsel of record.

        /s/ Daniel DeSouza___
        Daniel DeSouza