FILED BY _____ D.C.

JUL 21 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:14-CV-81250-KAM

MARTIN E. O'BOYLE

     Plaintiff,

v.

ROBERT SWEETAPPLE and,
TOWN OF GULF STREAM,

     Defendants.

_____/

## PLAINTIFF'S AMENDED[1] OPPOSITION TO [D.E. 143] SWEETAPPLE MOTION FOR SUMMARY JUDGMENT

     The Plaintiff, Martin E. O'Boyle ("I"), *a pro se litigant,* opposes Defendant's, ROBERT A. SWEETAPPLE ("Defendant") Motion for Summary Judgment and in furtherance thereof states the following:

### Preliminary Statement

     As the Court reads Defendant's motion, the court will notice a lot of irrelevant barbs that are taken out of context and designed to make me look bad. However, for this Court's sake, I have foregone responding to each and every barb that is a misstatement, incomplete or otherwise, that place me in a false light, in order to – as Detective Sergeant Joe Friday from *Dragnet* would say – give this court "strictly the facts."

     In sum, I will note that Defendant has failed to carry his burden on Summary Judgment, as he has nearly wholly refused to allege *material* facts – i.e. facts that have some bearing on

---

[1] We are amending this paper to reflect certain modifications and clarifications as well as correcting multiple scrivenor's errors in the original filing.

1

disproving Plaintiff's claim. Summary judgment **must** be denied as well, because those material facts asserted are hotly in dispute.

### Response to Defendant's Statement of Material Facts

Pursuant to Local Rule 56.1(b), all *material* facts not objected are thereby deemed admitted for the purposes of this motion.

1.      Not disputed.

2.      Disputed. Paragraph 2 is argumentative and a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

3.      Disputed in part. Paragraph 3 is argumentative and a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). It is not disputed that I have made numerous public records requests, FOIA requests, and OPRA or common law right to know requests in many jurisdictions.

4.      Disputed in part. This is not a material fact because it does not bear on my case. Longport ended up admitting wrongdoing. *See* Affidavit of Martin E. O'Boyle, attached hereto and incorporated herein as Exhibit "2" at Paragraph 13.

5.      Disputed. Paragraph 5 is argumentative and a legal conclusion. In addition, it is not a material fact because it does not bear on my case. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

6.      Disputed. Paragraph 6 is argumentative and a legal conclusion. In addition it is not a material fact because it does not bear on my case. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). That order was vacated. *See* Exhibit 2 at Paragraph 14.

7.      Disputed. I make public record requests in order to obtain information. *See* Exhibit "2" at Paragraph 5.

2

8.      Disputed. Paragraph 8 is argumentative and a legal conclusion. In addition, it is not a material fact because it does not bear on my case. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). The Town admitted it was wrong and apologized. *See* Exhibit 2 at Paragraph 8.

9.      Disputed. I sought to obtain information about my denial which resulted in the Town apologizing. *See* Exhibit 2 at Paragraph 8. In addition, this is not a material fact because it does not bear on my case, is argumentative and a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Also, Composite Exhibit 5 is illegible.

10.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). The Town apologized for its actions in 2013. *See* Exhibit 2 at Paragraph 8.

11.     Disputed, this is not a material fact because it does not bear on my case, is argumentative and a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). The Town apologized and recognized I made the Town a better place in which to live. *See* Exhibit 2 at Paragraph 8.

12.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and calls for a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). The Town paid $180,000.00 to settle all litigation and damages as well as attorney's fees and expert fees, $40,000.00 less than what was being sought. *See* Exhibit 2 at Paragraph 8. It is further disputed because I made requests to get information related the election in 2014 and the stealing of my campaign signs as well as generally to investigate all wrongdoing of the Town. *See* Exhibit 2 at Paragraphs 8-11.

13.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

14.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

15.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

16.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

17.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

18.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

19.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

20.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Jonathan O'Boyle was admitted to the Florida Bar in September, 2015.

21.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

22.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

23.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Defendant was hired on March 28, 2014 to handle certain existing public records cases brought by Christopher O'Hare and myself. Defendant never handled a request in his life otherwise.

24.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

25.     Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

26.     N/A – Defendant failed to provide a paragraph 26.

5

27.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

28.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

29.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

30.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

31.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

32.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Moreover, sometime in late 2014 or early 2015, Mr. Joel Chandler offered to "settle" with me and others for the amount of $2,750,000.00. This offer was rejected. *See* Exhibit 2 Paragraph 15.

33.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). Moreover, sometime in late 2014 or early 2015, Mr. Joel Chandler offered to

"settle" with me and others for the amount of $2,750,000.00. This offer was rejected. *See* Exhibit 2 Paragraph 15.

      34.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

      35.    Disputed. Defendant said he was working with the State Attorney in his capacity as Special Counsel for the Town.

      36.    Disputed. The September 3, 2014 meeting is no longer a confidential settlement conference. *See* Affidavit of Christopher O'Hare, attached hereto and incorporated herein as Exhibit "1" at Paragraphs 8-14.

      37.    Disputed. *See* Affidavit of Christopher O'Hare, attached hereto and incorporated herein as Exhibit "1" generally.

      38.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000). *See* Exhibit 1 generally.

      39.    Disputed. This is not a material fact because it does not bear on my case, is argumentative and is a legal conclusion. *See Leigh v. Warner Bro. Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

      40.    Admitted.

## New Matters

1.   An inference is to be drawn that Defendant told Mr. Chandler or gave reassurances to Mr. Chandler, that I was a criminal.  On July 1, 2014, Mr. Chandler noted that he left because of ethical reasons; there was no mention of criminality.   However, on October 27, 2014 Mr. Chandler signed an affidavit which mysteriously appeared in the November 9, 2014 issue of the Florida Center for Investigative Reporting ("FCIR") newspaper.   Therein, Chandler upped his concerns from merely ethical to criminal.   Interestingly enough, Defendant's first usage of the word RICO in his bills was the day he met with Mr. Chandler in July 23, 2014.   The inference to be drawn is that Defendant concocted the RICO allegations with Mr. Chandler, which in turn emboldened Mr. Chandler to perform the harm that Defendant intended to cause. *See* Exhibit 2-1 and Exhibit 6.

2.   In 2014, I ran against Mayor Morgan in a heated election. I sought to obtain records regarding Mayor Morgan pursuant to that election.  Over 1400 documents were turned over the day after the election. When Morgan was deposed, Defendant was his personal attorney. During that March, 2014 deposition, Defendant exhibited his personal animus by raising his voice several times, stating that I needed a psychiatrist, insinuating that he had Judge McCarthy on "speed dial" and insulting my son by telling him that kids who went to the Gulf Stream School had more class. *See* Exhibit 4; Exhibit 5; and Exhibit 2, Para 16-17.

3.   Morgan decided to go after me for my political speech after the campaign and ensured that Defendant was hired by the Town to deal with public records matters in state court. Morgan promised the Town that Defendant had experience in public records litigation when in fact he had none.  Defendant was not hired to do the RICO case, Mr. Richman was. *See* Exhibit 4; Exhibit 8; Exhibit 3 at P. 21/L. 15-14; and Exhibit 7.

4.  At the September 3, 2014 meeting, Defendant did not act in good faith under any circumstances.  He used words like 'indictment' and referenced an investigation by the State Attorney.  Defendant's statements were gravely serious and not proffered as opinions under any circumstance.  Furthermore, Defendant stated that he would ensure the outcome of a vote if there was a settlement by speaking to each commissioner individually prior to a public meeting.  This flies in the face of Florida's Sunshine Laws; moreover, Mr. O'Hare was lured into that meeting under the false pretense of discussing cases that were not with the O'Boyle Law Firm so that Mr. O'Hare would not invite any of the member of that firm so that the Town could talk to Mr. O'Hare about dropping those cases by claiming those attorneys were criminals. *See* Exhibit 1.

<div align="center">

**MEMORANDUM OF LAW**

</div>

**I.      Standard of Review**

The Court reviews a motion for summary judgment under Rule 56.  Summary judgment is a tool which allows courts to examine whether the defendant has prevailed as a matter of law.  Summary judgment is serious business because it deprives a litigant of a constitutional right to a trial where matters are fully fleshed out before the eyes of the Court and the Public as contemplated by the U.S. Constitution.  The standard does not allow the Court to foreclose access to the Courthouse because the Court believes the Plaintiff cannot meet its burden of proof at trial after witnesses are observed and the 'feel of the case' has been fully ascertained, live and in-person.  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The defendant must prove two things in order to succeed on Summary Judgment.  Under Rule 56(a), "The court shall grant summary judgement if the *movant shows* that there is no

genuine dispute as to any material fact **and** the movant is entitled to judgment as a matter of law." A failure on either prong will result in Summary Judgement being denied. Rule 56(c) lays out the type of evidence that is appropriate for summary judgment, this includes, "depositions, document, ESI, affidavits or declarations, stipulations, admissions, interrogatory answers, and other materials; or that the materials cited do not establish the absence or presence of a genuine dispute ..."

Importantly, the burden always remains with the movant, "the burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). That means I am not required to state anything about my case in order to succeed at summary judgment because [plaintiffs] must come forward with competent evidence to support its theory of liability, regardless of what showing the movant has made." *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir. 1991). Any "unexplained gaps" will preclude summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970).

In determining summary judgment, the Court must construe "all facts and [make] all reasonable inferences in the light most favorable to the non-moving party" using the entire record. *Childs v. Dekalb County*, 286 Fed. Appx. 687, 691 (11th Cir. 2011). "Generally when there are disputed issues of fact, qualified immunity [or any immunity] must be denied because the court, at this stage of the proceedings, must view the facts most favorable to the plaintiff." *Id.* the Court must take care to ensure that reasonable inferences are not drawn against a nonmoving party. *Diaz v. U.S.*, 165 F.3d 1337 n.2. (11th Cir. 1999). "The Court is not permitted to weigh the evidence or pass on the credibility of witnesses when ruling on a motion for summary judgment.

To do so would be an impermissible invasion of the province of the jury." *Molina v. Montoya Holdings, Inc.*, 2012 U.S. Dist. LEXIS 81323 at *6 (S.D. Fla. Jul 12, 2012)(King.,J.).

"As to materiality, the substantive law will identify which facts are materials. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). While the denial of summary judgement is not discretionary, the grant of summary judgment ultimately lies with the trial court "where there is reason to believe that the better course would be to proceed to a full trial." *Id.* at 255 citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948).

Here, the Defendant has burdened this Court with oodles of irrelevant facts as part and parcel to the mud-slinging that has been the custom of the Defendant. We are here to determine whether Defendant communicated to others that I was engaged in criminal behavior for making public records requests to the Town of Gulf Stream. Since this is Defamation per se, the harm is presumed. Defendant clearly wants to argue that my reputation was such that the fruits of his statements did not have the greatest impact on my reputation, but that is not an argument for summary judgment, that is an argument for the jury to reduce damages. Defendant cannot meet the burden of proving that he did not disparage me to win on this summary judgment.

## II. It is a Disputed Material Fact Whether Defendant Published to Mr. Chandler That I Was a Racketeer.

Defendant knows he has made derogatory comments about me but cannot remember to whom those statements were made at his deposition after going on fiery jeremiads about me, speeches with quips and soundbites that seemed all-to rehearsed and familiar (as if he had made to others in the past). (Sweetapple 2016 Dep. P. 139:L 20-24; P. 154:L 5-9). *See* Exhibit 9. Defendant cannot remember the derogatory comments he has made about me or to whom he has

11

published them, "offhand." (Sweetapple 2016 Dep. P. 153:L 4-11). *See* Exhibit 9.  That comment shows that Defendant made derogatory publications about me to more than just his "staff" his wife or his tennis partner who also apparently is his lawyer (the attorney-client assertion made in person came across dubious and an afterthought). (Sweetapple 2016 Dep. P. 153-54:L 21-3). *See* Exhibit 9.  In addition, he made those allegedly privileged communications "right before [he] hit[s] the tennis ball." *Id.* One could only imagine yelling privileged material across an open tennis court is not the hallmark of maintaining the attorney-client privilege. In addition, those derogatory comments published by Defendant, that he could remember, he refused to tell me. (Sweetapple 2016 Dep. P. 154:L 5-9) *See* Exhibit 9. Thus it is clear that Defendant was stonewalling.

However, a strong inference can be made that Defendant told Joel Chandler that I was engaged in racketeering.  I draw this inference from the fact that Mr. Chandler told newspapers that published on July 1, 2014 that he had "ethical" concerns.  And after talking to Defendant, those "ethical" allegations turned to "criminal" allegations. *See* Exhibit 6. In addition, RICO first appears on Defendant's bills the day he met with Chandler face-to-face on July 23, 2014. (Exhibit 2-1).  Thus, there is a genuine issue of material fact regarding Defendant's publication to Mr. Chandler which would not be privileged nor made in good faith since it was in Defendant's interest to have Mr. Chandler publish that I was criminal in furtherance of the goal of destroying my character.

### III.    Defendant has Asserted no Viable Qualified Privilege.

It is not disputed that this case involves slander per se, it is disputed that Defendant possessed a qualified privilege and if so, whether there is a genuine issue of material fact regarding malice.  "When the evidence is conflicting as to the existence or non-existence of

privilege there is a mixed question of law and fact, and the fact issue is to be determined by the jury." *Hartley v. Hartley and Parker v. Copeland*, 51 So.2d 789 (Fla. 1951). If the privilege is conditional or qualified, and there is sufficient evidence to indicate that the privilege may have been exceeded or abused, the issue of fact must be submitted to the jury." *Pledger v. Burnup & Sims*, 432 So.2d 1323, 1328 (Fla. 4th DCA 1983).

Defendant is not entitled to a conditional or qualified privilege has failed to satisfy the good faith requirement spelled *Pledger*.   It is clear that the very scheduling of the purported settlement conference was based upon false statements made by Defendant.   Furthermore, the statements made by Defendant at the purported "settlement conference" of September 3, 2014 were not made in good faith, nor were they made for the purpose of settlement.   The purpose of Defendant's statements was merely to denigrate me and intimidate Mr. O'Hare and coerce O'Hare into dropping the O'Boyle Law Firm.   Third, given his failure to procure any settlement authority approval from the Town Commission, Defendant had no authority to discuss settlement on behalf of the Town.

### Defendant's False Statements Fraudulently Induce O'Hare to attend Purported Settlement Conference in bad faith.

Despite Defendant's contentions it is clear that he had no intention of acting in good faith at the meeting of September 3, 2014.   Prior to September 3rd, Defendant, as Town Attorney, advised Mark Hanna, O'Hare's former counsel, that the settlement conference was to discuss settlement cases of those in which Mr. Hanna represented him.   As a result of Defendant's, offer O'Hare did not invite attorneys with the O'Boyle Law Firm to be present despite the fact that they represent O'Hare in many cases against the Town.   However at the meeting, and despite his assurances, proceeded to discuss all of O'Hare's cases, including those in which attorneys at The O'Boyle Law Firm served as his counsel.   See Exhibit 1.   Defendant proceeded to accuse me of

13

being anti-social and mentally unstable. He also accused me of engaging in an illegal scheme to extort the Town. *Id.* Defendant's actions were unethical, dishonest, and in bad faith. Defendant's purpose was not to have good faith settlement discussions with Mr. O'Hare, but to lure Mr. O'Hare into a trap in order to bully him into dismissing his lawsuits against the Town, all without his counsel being present. The Fourth District has stated, "fraud occurs in the connection with misrepresentations, statements or omissions which cause the complaining party to enter into a transaction, then such fraud is fraud in the inducement and survives as in independent tort. *D&M Jupiter, Inc. v. Friedopfer*, 853 So.2d 485, 487-88 (Fla. 4th DCA 2003)(internal citations and quotations omitted). Although Mr. O'Hare does not have a claim against Defendant for Fraudulent Inducement, the conduct that the Fourth District described in *Friedopfer* is nearly identical to the fraudulent tactics of Defendant prior to and during the meeting of September 3, 2014. As fraud is the antithesis of good faith, Defendant is not entitled to Qualified Privilege. In addition, Defendant appeared to have flirted with ethical issues by mentioning criminal proceedings (indictment and State Attorney) in order to gain and advantage in a civil litigation as well as inducing a client to drop his lawyers and cases where they represented Mr. O'Hare without their presence.

Also Mr. Defendant can claim no privilege with regard to RICO statements. He was not retained for the RICO action and thus was acting outside of his role in handling public records cases. The RICO action was expressly reserved for Mr. Richman and was not in any form, authorized by the Town Commission. Thus, neither Defendant nor the Mayor had authority to file the RICO action or settle any of O'Hare's claims without the authority of the Town Commission. Indeed, without prior commissioner authorization, §286.011, Fla. Stat. prohibits the Town from filing a RICO lawsuit. AGO 74-294 prevents delegation of authority to a single

14

member to negotiate on behalf of a public body. In addition, Defendant's conduct void under the Florida Sunshine Laws when he tried to ensure that a vote was prearranged on behalf of Mr. O'Hare. AGO 74-47 (City Manager cannot act as a liaison between councilmembers to crystalize a decision prior to public vote).

Since there was no public meeting until October 10, 2014 authorizing the exploration of a RICO lawsuit, Defendant's comments in July, August and September 2014 were nothing more than a scare tactic, a hallow scare tactic just as in *Pledger*. The fact that the RICO action was actually filed is of no consequence as it was of no consequence in *Pledger*.

Furthermore, there is a dispute regarding Defendant's express malice. Defendant was Mayor Morgan's personal lawyer and I was Mayor Morgan's political competitor. Defendant has a dual role as special counsel for the Town and Mayor Morgan's political operative. Mayor Morgan has made it clear that he will attack his "political detractors." As the evidence suggests, Mayor Morgan got Defendant hired for his public records experience yet it turned out Defendant actually had none.

Apart from Defendant's dual role, he also harbors animus in his heart. From day one, he has raised his voice at me (Dep. S. Morgan 2014, 51:4-8, 11-12) *See* Exhibit 5, he has insinuated that I have psychiatric problems (Dep. S. Morgan 2014, 52:8-14) *See* Exhibit 5, and has insinuated that he has cozy relationships with judges to the point that they are on "speed dial." (Dep. S. Morgan 2014, 51:13-21) *See* Exhibit 5. At that hearing Defendant told my son that children who graduated from the Gulf Stream School should have more class than my son. What is worse is that Defendant reiterated that comment after swearing under oath that he bore no hostility to me (on the record) and immediately thereafter approaching Jonathan (off the record) only to repeat the same "classless" statement after Jonathan indicated he could make amends if

15

Defendant cleared up that hurtful statement. (Sweetapple 2016 Dep. P. 271:L 14-16; 273:L 4-6) *See* Exhibit 9. This, taken with the fact that Defendant relishes in making multiple derogatory comments about me, comments so vicious that Defendant refused to mention them shows that he harbors ill-will and is not just doing his job. (Sweetapple 2016 Dep. P. 139:L 20-24; P. 154:L 5-9). *See* Exhibit 9.

Thus it is clear, Defendant's defense is imperfect at best and not appropriate for summary judgment.

## IV.     Truth is not a Viable Defense

Defendant cannot continue to argue that I was engaged in racketeering as a matter of law and truth because that is just not so. First, this Court is well aware that it dismissed the RICO case against me with prejudice and without leave to amend due to futility at 9:15-cv-80182-KAM [DE 47] (S.D. Fla. 6.30.15). Second, [DE 104] at 8 in this litigation, the Court has told Defendant once again that the Truth Defense is off the table, "Finally Defendant's argument that the statements were true, is ironically, false." Third, the 11th Circuit has now weighed in, "the allegations do not support a RICO claim under our precedent. We therefore affirm the dismissal of plaintiffs' complaint." Case No. 15-13433 (11th Cir. 06.11.16). Fourth, despite Defendant's arguments in State Court on behalf of the Town of Gulf Stream, Judge Oftedal stated, "Just as Defendants' legal use of these statutes does not constitute a predicate act under RICO, it cannot, under any scenario, give rise to a cause of action or affirmative defense under any of the legal theories advanced by the Town." *Town of Gulf Stream v. O'Boyle, et. al.*, 502014CA004474 Div. AA, (15th Jud. Cir. Fla. Nov. 4, 2015). *See* Exhibit 10.

Thus, Defendant cannot prove the truth as a matter of law, that defense is simply not available.

### V.      Defendant's Statements Were Not Pure Opinion

The Town of Gulf Stream is correct in stating that Defendant is not a media defendant and the Plaintiff does not have to prove that the statements are capable of being proven true or false.  But as this Court is aware, the statement (publishing that I was a racketeer for making public records requests) was capable of being proven false as a matter of law, because the statement was actually proven false in thrice over, as a matter of law. *Supra* Section II "Truth is Not a Viable Defense." No single fact militates against the Defendants claim of opinion more than this fact.  The First Amendment protects ideas because ideas can never be wrong, "there is no such thing as a false idea [or opinion]." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). not everything is a 'pure opinion' or idea under the First Amendment, "Judge Friendly appropriately observed that this [sentiment] 'has become the opening salvo in all arguments for protection from defamation action on the ground of opinion, even though the case did not remotely concern the question." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)(citing *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 61 (2nd Cir. 1980). The above passage was not "intended to create a wholesale defamation exemption for anything that might be labeled opinion … it would be destructive of the law of libel if a writer could escape liability for accusation of defamatory conduct simply by using, explicitly or implicitly, the words 'I think.'" *Id.* at 18-19 citing *Cianci.*

Thus Defendant's vehement contest that the publication was true (as a matter of fact) means that his statements could not be an idea or pure opinion under the First Amendment. From the record it appears that Defendant still staunchly believes that I am guilty of RICO as a matter of fact as he has put forth facts attempting to prove the same in this record.  When

Defendant said RICO, he meant conduct that constituted the state or federal felonies found at 18 U.S.C. §§ 1962(c), 1964(c) & Chapter 895 of the Florida Statutes.   Defendants Exhibit 20, Paragraph 22 does not reflect a statement of 'opinion', there Defendant was making a statement of fact.

In addition, nowhere did Defendant state that for every publication (or any publication), he gave a full and accurate account of all facts passed to him by Joel Chandler and a clear statement that it was his merely his opinion that I was engaged in RICO.  Had that been the case, Defendant would have conveyed that Joel Chandler, himself and the Town's key witness in the RICO case, told Defendant that a public records request could never constitute a RICO violation. (Chandler Dep. Pg. 172-73; L.22-18).  *See* Exhibit 11. That would have put things in context that I was not a true racketeer but that the Town was just going to sue me with a reputation-destroying allegation out of spite. The information conveyed by Mr. Chandler through Defendant was at best selective and at worse, made up completely, thus placing this 'opinion' in the realm of a 'mixed opinion' not protected by the First Amendment.  Defendant's 'summarization' of facts leaves gaps to the pure opinion analysis and summary judgment is not appropriate where there are gaps.[1]

Further, Defendant states that everyone knew about the complete context because of an FCIR story, however, that story did not break until November 9, 2014 – months after the July, August and September 2014 meetings.  The only thing that is certain is that Defendant readily

---

[1] Defendant cannot find solace in the claim of "legal opinion." Assuming legal opinion has some protection (it does not), a legal opinion must at-least demonstrate a clear and accurate statement of facts, law, and application of the facts to the law demonstrating the strengths and weaknesses of the analysis.  Otherwise a lawyer could never be held liable for stating businessman was negligent or that someone was engaged in criminal behavior.  Perhaps when police officer or a lawyer calls someone a criminal, it is revered more as gospel than gossip. Also, it would be just as silly for a doctor to hide behind a 'medical opinion' for falsely accusing person of being unchaste (perhaps having an abortion) or afflicted with leprosy without giving a full breakdown of the bases of facts, science and an assessment of strengths and weaknesses of potential diagnoses.

admits that he made comments which would lead one to believe that I was engaged in RICO. After all, that was the point of leverage against Chris O'Hare – making him and his associates believe that I was in fact a criminal.

## Conclusion

The Court should deny Defendant's motion. He has failed to meet his burden of putting forth material facts which show that the slander per se is free of any dispute of material facts. Thus the Court should deny the motion and proceed to trial.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of July 2016, I filed the foregoing document with the Clerk of Court. I further certify that sent foregoing document via U.S. Mail or Electronic Mail to the following parties:

Jeffrey L. Hochman, Esq. and Hudson C. Gill, Esq.
Attorney for Defendant Mayor Scott Morgan
JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER & HOCHMAN, P.A.
Hochman@jambg.com; HGill@jambg.com

Joshua Goldstein, Esq. and Barry Postman, Esq.
Attorney for Defendant Robert Sweetapple
COLE, SCOTT & KISSANE
Joshua.Goldstein@csklegal.com; Barry.Postman@csklegal.com; Patricial.neal@csklegal.com

Dated: July 20, 2016

MARTIN E. O'BOYLE
**Prepared With The Assistance of Counsel**

By: _____
Martin E. O'Boyle[2]

---

[2] Due to an error in **Exhibit 6** and the receipt of O'Hare's affidavit at **Exhibit 1** late in the afternoon of July 18, 2016. This opposition is intended to supersede the one filed 2 days ago. I consent to giving Defendant Sweetapple the full 7 days he needs to reply if need be in order to avoid any prejudice.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO: 9:14-cv-81250-KAM

MARTIN O'BOYLE

     Plaintiff,

v.

ROBERT A. SWEETAPPLE AND
MAYOR SCOTT MORGAN,

     Defendants.

_____/

### AFFIDAVIT OF CHRISTOPHER F. O'HARE

     BEFORE ME, the undersigned authority, personally appeared CHRISTOPHER F.
O'HARE., who, upon being first duly sworn, deposes and says:

     1.     My name is CHRISTOPHER F. O'HARE. I am over the age of eighteen (18) and
am competent to testify in this matter.

     2.     I have personal knowledge of the facts here, and, if called as a witness, could
testify competently thereto.

     3.     I have approximately two dozen public records suits filed against the Town of
Gulf Stream for denial of public records since June 18, 2013.  None of these cases have yet to be
resolved.

     4.     As of September 2014, Mark Hanna, Esq. represented me in at least ten (10) of
those public records cases, as well as other non-public records cases.  I am also represented in
other public records suits and non-public records lawsuits by attorneys with The O'Boyle Law



Firm.  Louis Roeder was, and is, my personal counsel.

5.      I, along with Mark Hanna and Lou Roeder, was invited by Attorney Robert Sweetapple to meet with the Town's Mayor, Scott Morgan, along with another of the Town's attorneys, Joanne M. O'Connor, at Sweetapple's office on September 3, 2014.

6.      The purpose of the September 3, 2014 meeting was to initiate settlement discussions directly between the Defendant and me limited to those "certain" pending public records cases handled by Mark Hanna.  As such, Sweetapple did not invite any attorneys from the O'Boyle Law Firm.  In reliance upon Sweetapple's limitation of the subject matter, I did not expect to discuss anything except these certain cases and I therefore did not think it necessary to have anyone from the O'Boyle Law Firm who represented me in those other cases be present to represent me at this meeting.

7.      Based upon my understanding of the limited scope of our planned discussion I signed an agreement to keep confidential any discussion made during the settlement conference about those certain pending cases.

8.      The September 3, 2014 settlement conference started with discussions regarding only those certain public records cases, and only those public records cases handled by Mark Hanna, but Sweetapple then changed topics and made a speech about Martin O'Boyle. Sweetapple described O'Boyle as anti-social and mentally unstable. Sweetapple ranted about O'Boyle's behavior and described O'Boyle's actions in a very unfavorable and derogatory manner. Sweetapple talked about his planned RICO action against O'Boyle. Sweetapple said O'Boyle was using me and Sweetapple knew I wasn't like this. He said life is too short and I should spend my time with my family and not doing O'Boyle's dirty work. Sweetapple called O'Boyle a narcissist and mentally unstable – he used the word "psychopath." Sweetapple

appeared angry when he said this and he jabbed the air with his finger for emphasis. Sweetapple's body language suggested to me that his emphatic statements were not his opinion but where facts he knew to be true.

9.    Sweetapple returned to discussing my cases but he expanded the discussion to include all my cases against the Town of Gulf Stream – not just the cases I had agree to discuss in confidence. Sweetapple insisted that my counsel in those other cases, attorneys at the O'Boyle Law Firm, were not real attorneys and they were engaged in the unlicensed practice of law which he described as a felony. He said the Town would never pay me their attorney fees because the O'Boyle law firm was not a legitimate law firm.

10.   Sweetapple said unless I cooperated with the Town against O'Boyle and dismissed my cases I would be named a co-defendant, accused of being a co-conspirator, in a RICO scheme with Martin O'Boyle to extort the Town of Gulf Stream. I understood that when Mr. Sweetapple said the word 'extort' or referred to 'RICO,' he meant a criminal act of substantial magnitude.

11.   When asked O'Connor was asked if she agreed with Sweetapple, O'Connor said she thought what I was doing with the public records cases was despicable; and that she thought I was haranguing Gulf Stream with my record requests. She described my requests for public records as frivolous. She said that would soon change, that Jones-Foster was well connected.

12.   Sweetapple went on to describe his lawsuits against the City of Boca Raton and how I was wasting my time trying to sue Gulf Stream. He talked about how common it was for small Towns to behave badly and nothing I did was going to change that.

13.   Sweetapple again said he intended to sue me as a co-conspirator in a scheme to "shake down" the Town of Gulf Stream and abuse the legal process; that I was involved in the

unlicensed practice of law, and engaged in extortion with O'Boyle. He again said I could avoid being included in the RICO lawsuit if I agreed to cooperate with him.

14.     Mayor Morgan added that the Town had witnesses to support their RICO complaint.

15.     Sweetapple then went through of list of things that a witness, Joel Chandler, told him about the O'Boyle Law Firm and Martin O'Boyle's operations.  He even said that Chandler wanted to detail my involvement; but that he, Sweetapple, had protected me by preventing him from saying anything about me - yet.

16.     I later discovered that Chandler did, indeed, want to talk to Sweetapple about me and my public records cases; but Chandler wanted to make it clear to Sweetapple that, in his experience and opinion, I had nothing to do with the Town's RICO claims. Chandler had told Sweetapple and O'Connor that I had nothing to do with O'Boyle's activities, and that they should not involve me in any RICO complaint.  Sweetapple failed to mention any of that and failed to accurately present facts conveyed by Chandler. Chandler later wrote that he told Sweetapple and O'Connor I had done nothing wrong, that I had nothing to do with the RICO allegations and that I was a victim of the Town's foolishness.

17.     Mayor Morgan then accused me of trying to shake down the Town, claiming that Martin O'Boyle and I were linked together; and that he became Mayor to spearhead an aggressive defense.

18.     Mayor Morgan then proposed a "non-negotiable dismissal" of ALL my lawsuits against the Town; if I refused, I would be brought into the RICO claim as a defendant.  He also said that all parties who used the O'Boyle Law Firm were legitimate defendants in the RICO complaint.

19.     Sweetapple said that the Town was consulting with Gerry Richman, an expert on RICO, who was building a case against Martin O'Boyle.  Sweetapple said that they already had a 40-page "indictment" ready to go; and that the State Attorney's office was investigating as well.  It was clear to me that Sweetapple and Morgan were threatening criminal action against me if I refused to do as they said.

20.     When asked if Richman was working for the Town, Sweetapple said Richman was "co-counsel" and was working for him, Sweetapple.

21.     Mayor Morgan then said that he had made his offer and was "absolutely inflexible."  He said he was going to make sure the RICO case included me if I didn't agree to his demands.

22.     When Hanna asked Sweetapple how he could go from public records requests to a RICO claim, Sweetapple said there was a conspiracy between Martin O'Boyle and me.

23.      When asked how Mayor Morgan had the power to ensure that I be excluded from the RICO case, Sweetapple said he was planning on talking to each of the Town Commissioners one-on-one to explain the offer and to get each one of them to sign off.  The way the statement was made I understood that Sweetapple was going to privately solicit and pre-arrange a public vote.

24.     Finally, Sweetapple said the RICO complaint was finalized and that "the train was about to leave the station;" so if I did not want to be included, I would need to get this resolved as soon as possible.

25.     I understood from Sweetapple's forceful presentation and the context and tenor of the way Sweetapple made his statements at that moment that Sweetapple made them with the

intention of purposefully harming Martin O'Boyle's reputation. It was apparent to me that Sweetapple thought any association of me with O'Boyle would be harmful to me. As a result of Sweetapple's presentation I felt wary of Martin O'Boyle, suspicious of the O'Boyle law firm and extremely apprehensive about the RICO threat.

26.     Rather than having a settlement discussion. I felt Sweetapple's aggressive posturing and vehement statements to be a threat against me. Sweetapple's references to indictment and the state attorney in the meeting, made me unsure whether Sweetapple's RICO claim would come before an indictment or after. I remember feeling emotionally disturbed after leaving that meeting about the possibility of a criminal indictment against me.

Executed this _18_ day of _JULY_, 2016.

_____
Signature

_____2520 Avenue Au Soleil_____
Street Address

_Gulf Stream_   _Florida_   _33483_
City         State       Zip

State of Florida            )

County of Palm Beach        )

Sworn to (or affirmed) and subscribed before me this _18_ day of _July_ 2016, by **Christopher F. O'Hare,**

☑      personally known to me or
☐      having presented _____ as identification.

Page **6** of 7

_(Signature of Notary Public, State of Florida)_

Commission No. _____

TINA L. MARTIN
MY COMMISSION # FF 129242
EXPIRES: July 10, 2018
Bonded Thru Budget Notary Services

_(Print, type or stamp name of Notary Public)_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:14-CV-81250-KAM

MARTIN E. O'BOYLE,

      Plaintiff,

v.

ROBERT A. SWEETAPPLE and
THE TOWN OF GULF STREAM,

      Defendants.

_____/

## AFFIDAVIT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR
## SUMMARY JUDGMENT

I, Martin E. O'Boyle, being duly sworn upon my oath do hereby state based on my personal knowledge the following to be true and accurate:

1.     I am over the age of eighteen (18) and am competent to testify in this matter.

2.     Affiant is the Plaintiff in the above-entitled action.

3.     Plaintiff owns a residence located at 23 Hidden Harbour Drive, Gulf Stream, Florida, 33483.

4.     Plaintiff is a supporter of Florida's Public Records Law and, in an exercise of his Constitutional and statutory rights, has over the years submitted various public records request to Town of Gulf Stream.

5.     Plaintiff makes public records request to obtain and acquire public information.

6.     Plaintiff likewise engages in various forms of Constitutionally-protected acts/speech with respect to the Town.

7.     For example, in 2013 Plaintiff painted the façade of his Gulf Stream house with



various political messages criticizing the Town, its then-mayor, and its commissioners as the result of the Town denying Plaintiff's request for a building permit.

8.     The Town ultimately settled the dispute, which included, inter alia, planning and zoning issues, by entering into with Plaintiff the attached July 26, 2013 Settlement Agreement (**Exhibit A**). The Settlement Agreement states, inter alia, an "Apology" to Plaintiff, as well as recognition that "the Town is indebted to O'Boyle for the many decencies in in connection with the Town code that he has identified since his submission of the Application. The Town Commission believes the O'Boyle's actions will ultimately result in Gulf Stream being a better and friendlier place to live." The Settlement Agreement also provided for the payment to Plaintiff the amount of $180,000.00 which represented, inter alia, damages, costs, attorney's fees and expert fees related to the planning and zoning issues.   The $180,000.00 was a negotiated amount and was about $40,000 less than what was sought.

9.     In February 2014, Plaintiff announced that he would run for a council seat in Gulf Stream and subsequently began campaigning throughout the Town and neighboring municipalities.

10.    Plaintiff placed numerous campaign signs throughout the Town, many of which were conclusively removed by Gulf Stream agents/officials.

11.    The signs were targeted for removal at the request of Town Manager Thrasher because the signs displayed political content.

12.    Robert Sweetapple falsely accused Plaintiff of various state and federal crimes,

disparage Plaintiff's character, and has made multiple dregoatory comments about Plaintiff.   Mr. Sweetapple's statements have harmed me in the community.

13.   In connection with paragraphs 3 and 4 of Defendant, Robert Sweetapple's Statement of Undisputed Facts which references certain disputes in the Borough of Longport, NJ, attached is the settlement Agreement entered into between Plaintiff and the Borough of Longport (**Exhibit B**) which provided for, inter alia, confirming and granting the permits and approvals requested by Plaintiff and stating the "the Borough acknowledges and appreciates O'Boyle's efforts in preserving one of the Borough's historic structures".

14.   The $1.2 Million Tennessee sanctions referenced in Paragraph 6 of Defendant, Robert Sweetapple's Statement of Undisputed Facts was "set aside, withdrawn, and held for naught".   See Attached Order on Plaintiffs Motion to Alter or Amend Sanctions Award dated January 29, 2007 (**Exhibit C**).

15.   Sometime in late 2014 Mr. Joel Chandler offered, in exchange for a payment of $2,750.000.00, to cease his disparaging comments about Plaintiff and cease cooperating with the Robert Sweetapple and the Town of Gulf Stream.   This offer was rejected.

16.   My son, Jonathan O'Boyle told me in 2014, that Mr. Sweetapple insulted my son by telling him that he had less "class" than other students that had graduated from the Gulf Stream School in Gulf Stream.

17.   My son told me that on May 27, 2016, at the deposition of Mr. Sweetapple, that Mr. Sweetaapple, during a break and off record, reiterated the lack of "class"

comment to my son.

Under penalties of perjury, I declare that I have read the foregoing affidavit and the facts stated in it are true.

BY: _____
Name: MARTIN E. O'BOYLE

**STATE OF FLORIDA**              )
                                  ) SS
**COUNTY OF** BROWARD             )

    Sworn to, affirmed, and subscribed before me this *18* day of *October* _____, 2016,
by  MARTIN E. O'BOYLE,

NOTARY PUBLIC STATE OF FLORIDA

Sign: _____

KATHLEEN SOKOLOWSKI-LACA
MY COMMISSION # FF 231936
EXPIRES: July 15, 2019
Bonded Thru Budget Notary Services

Print: _____

(SEAL)

Please indicate:  Personally Known: ✓___  OR  Produced Identification: _____

Type of Identification Produced: _____

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (Agreement) is entered into, by and between the parties listed on Exhibit A in the column titled "PARTIES" (hereinafter collectively referred to as "Plaintiffs") and the Town of Gulf Stream, a municipal corporation of the State of Florida, whose address is 100 Sea Road, Gulf Stream, Florida 33483 (the "Town") and is executed by the Town and the Plaintiffs this 26 day of July, 2013 (the "Effective Date"). The Town and the Plaintiffs shall be collectively known as the "parties"

WHEREAS, it is the desire of the parties to this Agreement to resolve all disputes, appeals and pending litigation relating to the cases referenced in the column titled "CASES" on Exhibit "A" attached hereto (the "Cases"); and

WHEREAS, on behalf of the Plaintiffs, Martin E. O'Boyle (O'Boyle) presented to the Town Commission a proposal to settle the "Cases" ; and

WHEREAS, the Town Commission has reviewed the proposal for settlement and wishes to settle the Cases and to resolve other matters as set forth herein on the terms set forth herein; and

WHEREAS, it is the intention of the Plaintiffs and the Town to be bound to the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein expressed, and for the other good and valuable consideration the receipt and sufficiency of which is acknowledged and confirmed, the parties, intending to be legally bound, hereby agree as follows:



EXHIBIT

A

1.      The Town recognizes that the Plaintiff O'Boyle believes that the Town did not apply a correct interpretation of its Code of Ordinances (the Code) as it pertains to 23 North Hidden Harbour Drive, Gulf Stream, Florida (hereinafter the "Property") and the improvements on the Property (hereinafter the "Improvements").   In particular, Plaintiff, O'Boyle argues that the Town did not correctly apply its Code with respect to his request for Development Approval for, inter alia, a Level 3 Architectural/Site Plan (the Application) and such other permissions, approvals, interpretations, clarifications and authorizations  relating to the Property (the "Approvals") to demolish and construct the Improvements upon the Property as contemplated. . The term "Improvement" *

2.      The Town recognizes that its interpretation of the Code, including, without limitation,  the  current  setback  regulations  established  therein  may  not  enable  the Plaintiff O'Boyle, or a subsequent purchaser to rebuild or renovate the Improvements, including, without limitation, the home; or enable O'Boyle or a subsequent purchaser to demolish the Improvements, including, without limitation, the home and construct Improvements, including, without limitation, a new home.  Accordingly, in order to resolve the Cases between the Plaintiffs and the Town, the Town agrees that the lot coverage, floor area ratio,  height, and setback of, inter alia, the home's entry feature shall be permitted in accordance with the plans submitted with the Application (the "Plans") (which Plans shall be substantially the same as the Plans), which Application and Plans shall be an exhibit to the Development Agreement (the "Development Agreement").  The purpose of the Town's adoption of  the Development Agreement is

  * As used in the Settlement Agreement shall also include future improvements to be constructed on the Property.

2

to permit, inter alia, the floor area ratio, height of the home's entry feature, and front setback in accordance with the interpretation advanced by O'Boyle counsel in the argument portion of O'Boyle's Petition for Writ of Certiorari.     The Development Agreement will also recognize that the Property's (including its Improvement's) setbacks will not be measured from the point of measurement currently established in the Code; but will be measured in accordance with the actual Property lines for building purposes among other purposes.   It is also the purpose of the Development Agreement to facilitate the Plaintiffs or subsequent owner's demolition, rebuilding or renovation of the Improvements, including, without limitation, the existing home, or the construction of Improvements, including, without limitation, a new home.  The Development Agreement shall be substantially in the form provided for in Section 163.3220, Fla. Stat. The Development Agreement shall include terms customarily used in the Town (but adapted to reflect the agreements of the parties as contained herein). The Development Agreement, among other things, shall allow the Plaintiff or a subsequent owner to demolish, rebuild or renovate the Improvements, including, without limitation, the home or to construct Improvements, including, without limitation, a new home such that the front setback is not measured as currently established in the Code.

       3.     Both the Town and O'Boyle agree to act in good faith to promptly enter into the Development Agreement, which Development Agreement shall contain terms consistent with the terms set forth herein as they relate to the Property, including those necessary or appropriate  so as to facilitate the construction of the Improvements upon

3

the Property as set forth in the Application; and such other terms which are customary for Development Agreements in the Town for similar type Properties and improvements contemplated under the Application. The Town agrees to execute the Development Agreement as soon as practicable within Florida Statutes, but in no event later that 60 days from the date of this Agreement.

4.  The Town agrees to waive any fees the Plaintiff might normally incur which are associated with the Development Agreement, the Application, the Approvals and any fines or assessments resulting from any violations existing at the Property, including, without limitation, the alleged violations set forth on the attached Exhibit B.

5.  Intentionally Deleted.

6.  Upon the execution of this Agreement by the Plaintiffs, the Town agrees to pay O'Boyle $180,000.00, in readily available funds by Federal Wire Transfer pursuant to Wire Transfer Instructions as designated by O'Boyle, which wire instructions are attached as Exhibit C.

7.  Upon execution of this Agreement, the Town agrees that O'Boyle can proceed to improve the Property in accordance with the Application and to promptly provide O'Boyle with such Approvals as necessary.

8.  Upon the execution of this Agreement, the Plaintiffs shall dismiss with prejudice the Cases.

9.  Upon execution of the Agreement, O'Boyle shall promptly (a) remove all signs from the Property other than approved address signs, and (b) within twenty days

remove all murals on the exterior of his home and return the color of the paint on the home to the color that existed previously.

10.    Plaintiffs agree that upon execution of this Agreement, all pending public record requests made to the Town shall be deemed withdrawn.

11.    In the event any of the Plaintiffs or the Town are required to enforce the terms of this Agreement, the prevailing party shall be entitled to recover its costs and reasonable attorney fees through the appellate level.

12. RELEASES     (A)     The Plaintiffs <u>Release of the Town</u>.  On the Effective Date , the Plaintiffs shall execute and deliver a general release in favor of the Town, which release is attached as Exhibit "D1" attached hereto (the "Town Release").

(B)     <u>The Town's Release of Plaintiffs</u>.  On the Effective Date, the Town shall execute and deliver a general release in favor of the Plaintiffs, which release is attached as Exhibit "D2" attached hereto (the "Plaintiffs Release").

13     <u>Representations and Warranties of the Plaintiffs</u>.  Each of the Plaintiffs represents and warrants to the Town as follows:

5

(a)     that the representing Plaintiff has not sold, assigned, transferred or otherwise disposed of any claims that  any of the Plaintiffs had against the Town before the Effective Date;

(b)     that the Plaintiffs each represent that they have the full right, power, legal capacity and authority to enter into this Agreement and to consummate the transactions described in this Agreement as they apply to such Plaintiff; and

(c)     this Agreement has been duly and validly executed and delivered by the Plaintiffs and constitutes a legal, valid and binding obligation, enforceable against the Plaintiffs in accordance with its terms.

14..    Representations and Warranties of Town.  The Town represents and warrants to each of the Plaintiffs as follows:

(a)     that the Town has not sold, assigned, transferred or otherwise disposed of any claims that the Town had, before the Effective Date against all or any of the Plaintiffs;

(b)      that the Town has the full right, power, legal capacity and authority to enter into this Agreement and to consummate the transactions described in this Agreement; and

(c)      this Agreement has been duly and validly executed and delivered by the Town and constitutes a legal, valid and binding obligation, enforceable against the Town in accordance with its terms.

15.      **Covenant Not to Sue.**

(a)      Each of the Plaintiffs covenant and agree not to institute any litigation or arbitration against the Town for any matter or thing which is within the scope of the Town Release, as attached as D1.

(b)      The Town covenants and agrees not to institute any litigation or arbitration against any or all of the Plaintiffs for any matter or thing which is within the scope of the Plaintiffs Release, as attached as D2.

16.      **Continuation and Survivability of Representations ,Warranties and Covenants.**   The representations, warranties and covenants contained in this

Agreement shall survive the consummation of the transactions provided for in this Agreement

17. **Indemnification.** The Plaintiffs, jointly and severally, agree to defend, indemnify and hold the Town harmless from and against and in respect of any and all claims, suits, losses, liabilities, taxes, damages, deficiencies and expenses (including reasonable attorneys' fees) of any kind or nature (collectively, "Town Claims") which the Town may suffer, sustain or become subject to by reason of, arising out of, or in connection with: (a) the inaccuracy or breach of any of the representations and warranties of the Plaintiffs set forth in this Agreement; and (b) the breach by any of the Plaintiffs of any provision, covenant or agreement contained in this Agreement or any document, instrument or agreement contemplated hereby.

18. Indemnification. The Town, jointly and severally, agree to defend, indemnify and hold the Plaintiffs harmless from and against and in respect of any and all claims, suits, losses, liabilities, taxes, damages, deficiencies and expenses (including reasonable attorneys' fees) of any kind or nature (collectively, the "Plaintiffs's Claims") which any of the Plaintiffs may suffer, sustain or become subject to by reason of, arising out of, or in connection with: (a) the inaccuracy or breach of any of the representations and warranties of the Town set forth in this Agreement; and (b) the breach by the Town of any provision, covenant or agreement contained in this Agreement or any document, instrument or agreement contemplated hereby.

19. Notice of Default. No default shall have occurred under this Agreement until the defaulting party shall have been given 10-days written notice to cure. If the cure is such that is will reasonably take longer than 10-days and the defaulting party is pursuing the cure with diligence, then time within which to cure any such default shall be extended for such period as may be necessary to complete the curing of the default, providing that diligence and continuity are being used.

20.     **No Third Party Beneficiaries.**  This Agreement shall not create rights in any third-party beneficiary nor confer any benefit upon or enforceable rights hereunder upon anyone other than the parties and the "Releasees" in the Plaintiffs Release and/or the Town Release.

21.     **Further Cooperation.**  The Plaintiffs and the Town agree, at any time and from time to time after the date hereof, upon reasonable request, to perform, execute, acknowledge and deliver all such further documents as may be reasonably necessary or appropriate to carry out the provisions and intent of this Agreement and any document, instrument, or agreement contemplated thereby.

22.     **Specific Performance.**  The parties each acknowledge and agree that any breach or threatened breach of the obligation to consummate the transactions contemplated by this Agreement will cause irreparable injury to the other parties hereto and the remedy at law for any breach of such obligations would be inadequate.  The

parties therefore, agree and consent that the remedy of specific performance should be granted in any proceeding which may be brought to enforce any party's obligations under this Agreement without the necessity of proof that such party's remedy at law is inadequate.  Such equitable relief shall not be the aggrieved party's sole remedy but shall be in addition to all other remedies available in law or equity.

23.    <u>Voluntary Execution of Agreement</u>.  Each of the parties affirms that they are represented by counsel in this matter, that they have read and fully understand all of the terms of this Agreement, and that they are entering into this Agreement voluntarily without having been threatened, coerced or intimidated into the signing of this Agreement.  It is further agreed that no provision of this Agreement shall be construed presumptively against any party hereto.

24.    <u>Headings</u>.  The headings and sub-headings contained in the titles of this Agreement are for convenience only and shall not be interpreted to limit or alter any of the provisions of this Agreement.

25.    <u>Governing Law</u>.  This Agreement shall be deemed to have been made, executed, and delivered in the State of Florida and shall be construed in accordance with the laws of the State of Florida.

26.   **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors and assigns. No party hereto may assign its rights or delegate its obligations under this Agreement without the express prior written consent of the other parties hereto. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon any person, other than the parties and their respective heirs, successors and assigns, any remedy or claim under or by reason of this Agreement or any terms, covenants or conditions hereof.  All the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties and their respective heirs, successors and assigns.

27.   **Notices.**  All notices, requests and demands to or upon the parties hereto shall be in writing and shall be deemed to have been duly given or made:  if delivered in person, immediately upon such in person delivery;  if by nationally recognized overnight courier service with instructions to deliver the next business day,  upon delivery to the receiving party; and if by registered or certified mail, return receipt requested, upon delivery to the receiving party.  All notices, requests and demands upon the parties are to be given to the following addresses (or to such other address as any party may designate by notice in accordance with this Section):

|                    |                                              |
|--------------------|----------------------------------------------|
| If to the Town:    | Town of Gulf Stream                          |
|                    | 100 Sea Road                                 |
|                    | Gulf Stream, FL 33483                        |
|                    | Attn:  Rita L. Taylor, Clerk                 |
|                    | Facsimile:  561-737-0188                     |
|                    |                                              |
| With a copy to:    | Jones Foster Johnston & Stubbs, P.A.         |
|                    | 505 South Flagler Drive, Suite 1100          |
|                    | West Palm Beach, FL  33401                   |
|                    | John C. Randolph, Esquire                    |
|                    | Facsimile:  561-650-0465                     |

If to any of the Plaintiffs:

Martin E. O'Boyle
Commerce Group, Inc.
1280 West Newport Center Drive
Deerfield Beach, FL  33442
Facsimile:  954-360-0807

With a copy to:

William F. Ring, Jr., Esquire
Commerce Group, Inc.
1280 West Newport Center Drive
Deerfield Beach, FL  33442
Facsimile:  954-360-0807

28.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall be an original and all of which taken together shall constitute a single agreement, with the same effect as if the signatures thereto and hereto were upon the same instrument.  Any facsimiles, photographs or photocopies of this Agreement with all signatures reproduced shall be considered, for all purposes, as if it were an executed original counterpart of this Agreement.

29.     <u>Entire Agreement</u>.  This Agreement contains the entire agreement of the parties with respect to the matters covered and the transactions contemplated hereby. No modification or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the party to be charged, and then such waiver or consent shall be effective only as stated in writing.

30.     <u>Severability</u>.  If any term, covenant or condition of this Agreement or the application thereof shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term, covenant or condition other than those which are held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Agreement shall be valid and enforced to the fullest extent permitted by law.

31.     Upon execution of the Settlement Agreement, the Town agrees to dismiss with prejudice the asserted violations as set forth on Exhibit B.

32.     <u>Time is of the Essence</u>.   The dates and times for performance of all of the obligations hereunder shall be deemed of the essence of this Agreement.

33.     <u>Legal Action</u>.          In the event of any action taken by any party, including, without limitation, an appeal of this Agreement or any related applications or

13

agreements, or any part thereof, O'Boyle and the Town agree that they shall each use their best efforts to vigorously defend any such actions.

34.    **Apology**.    The Town recognizes the stress and strife that the O'Boyle family has endured as a result of the Town's conduct. The Town recognizes that the O'Boyle home has a value well in excess of $1,000,000, but is uninsurable against wind because of the non-existence of proper protection, which would have been part of the Improvements installed by O'Boyle had the Town not initially denied the Application. The Town is indebted to O'Boyle for the many deficiencies in connection with the Town code that he has identified since his submission of the Application. The Town Commission believes that O'Boyle's actions will ultimately result in Gulf Stream being a better and friendlier place to live.

35.    Reservation of Rights.    Notwithstanding language in this Agreement (including the attached Release) O'Boyle reserves all rights and remedies related to any claims which he may have related to the scope and size of Improvements which may be constructed upon the Property, to the extent that the scope and\or size of Improvements are less than the scope and size of the improvements which could have been constructed on the Property on the date when the permits for the existing Improvements (including, without limitation, the home on the Property was originally issued, which date was approximately 1981. Notwithstanding the provisions of this Paragraph 35, O'Boyle shall not construct a home (or retrofit the existing home) on the Property so that it is more than two stories.

14

36.   Building Envelope.   The Development Agreement will: (a) include a survey provided by O'Boyle, which survey shall provide a building envelope for the Property (as designated by O'Boyle pursuant to the preceding paragraph); and (b) allow the construction of Improvements within the area between intercostal waterway, the private roads and the common property line to the west

        IN WITNESS WHEREOF, the undersigned have executed this Agreement as of July 26, 2013.

        TOWN OF GULF STREAM
        By: _____
              Mayor

        PLAINTIFFS
        By: _____
              Martin E. O'Boyle

        By: _____
              Commerce Group, Inc.
              Martin E. O'Boyle, President

        By: _____
              N984AC Caravan, LLC
              Martin E. O'Boyle, Member

        By: _____
              Airline Highway, LLC
              Martin E. O'Boyle
              Managing Member

p:\docs\13147\00013\doc\1gr6737.docx

15

## EXHIBIT "A"

| CASE NO. 15th Judicial Circuit Palm Beach County, Florida | PARTIES | SUBJECT |
|---|---|---|
| 502013CA006750XXXXMBAO | Martin E. O'Boyle vs Town of Gulf Stream | PR #332 |
| 502013CA008125XXXXMBAH | Commerce Group, Inc. vs Town of Gulf Stream | PR #000 |
| 502013CA008809XXXXMBAA | N984AC Caravan LLC vs Town of Gulf Stream | PR #343 |
| 502013CA008701XXXXMBAA | N984AC Caravan LLC vs Town of Gulf Stream | PR #340 |
| 502013CA008594XXXXMBAG | Airline Highway LLC vs Town of Gulf Stream | PR #341 |
| 502013CA008452XXXXMBAG | Martin E. O'Boyle vs Town of Gulf Stream | PR #336 |
| 502013CA008919XXXXMBAD | N984AC Caravan LLC vs Town of Gulf Stream | PR #351 |
| 502013CA011120XXXXMBAO | Martin E. O'Boyle vs Town of Gulf Stream | PR #363 |
| 502013CA011122XXXXMBAI | Martin E. O'Boyle vs Town of Gulf Stream | PR Signage |
| 502013CA011411XXXXMBAJ | Martin E. O'Boyle vs Town of Gulf Stream | PR # 398 |
| 502013CA011414XXXXMBAI | Martin E. O'Boyle vs Town of Gulf Stream | PR #407 |
| 502013CA011416XXXXMBAO | Martin E. O'Boyle vs Town of Gulf Stream | PR #408 |
| 502013CA011417XXXXMBAD | Martin E. O'Boyle vs Town of Gulf Stream | PR # 409 |
| 502013CA011421XXXXMBAG | Martin E. O'Boyle vs Town of Gulf Stream | PR #410 |
| 502013CA011423XXXXMBAD | Martin E. O'Boyle vs Town of Gulf Stream | PR # 411 |
| 502013CA011424XXXXMBAE | Martin E. O'Boyle vs Town of Gulf Stream | PR #412 |
| 502013CA006388XXXXMBAY | Martin E. O'Boyle vs Town of Gulf Stream | Certiorari |
| US District Court Southern District of Florida 13-CIV-80530 Middlebrooks/Brannon | Martin E. O'Boyle vs Town of Gulf Stream | Injunction Declaratory Judgment |

p:\docs\13147\00013\docl\1gq1763.docx

# Exhibit B

<div align="right">Article #173</div>

### Town of Gulf Stream
100 Sea Road
Gulf Stream, FL 33483

Building Planning and                                          Ph.   (561) 276-5116
Zoning Department                                             Fax  (561) 737-0188

### CODE ENFORCEMENT SPECIAL MAGISTRATE
### TOWN OF GULF STREAM, FLORIDA

CASE NO: CE __2-13__                                    __5-14-13__

### STATEMENT OF VIOLATION AND NOTICE OF HEARING

Pursuant to section 2-75 of the Town of Gulf Stream Code of Ordinance, the undersigned hereby gives notice of uncorrected violation(s) of the Town of Gulf Stream Code(s) more particular described herein, and requests a PUBLIC HEARING before the CODE ENFORCEMENT SPECIAL MAGISTRATE of the Town.

1.  Location/Address where violation(s) exist(s): __23  Hidden Harbour Drive__

2.  Legal Description: __Lot 5  Hidden Harbour Estates__

3.  Name and address of owner/person in charge where violation(s) exist(s): __Martin E.__

    __O'Boyle,  23 S Hidden Harbour Drive, Gulf Stream, Florida 33483__

4.  Violation of Town Code Section(s) and description: __Sign painted on S side of dwelling__ __& multi-colored stripes painted on N side__ __Sec. 66-446 prohibits any sign not listed as being permitted. This sign not listed.__ __Sec. 70-106(b)(3) lists approved colors for Spanish Mediterranean structures & colors__ __that are used are not on this approved list.  Sec. 66-141(1)a.ae. provides that changes__ __in exterior wall colors require a Level 1 Architectural/Site Plan Review, which is a__ __staff review and permit. No review was requested and no permit was issued for these__ __changes.__

    (SEE ATTACHED "EXHIBITS OF VIOLATION")

5.  Date of First Inspection: __April 30, 2013__
    __Faxed notice on 5-1-13.    Refused to accept hand delivered notice 5-1-13__
6.  Date owner first notified of violation(s): __Accepted notice at Town Hall on 5-8-13__
    __Was given 48 hours which was May 3, 2013__
7.  Date on/by, which violations are to be corrected: __in the notice he refused but was sent__ __via fax.__

*********************************IMPORTANT NOTICE*********************************

Unless the violator corrects the violation(s) described herein by the date set forth above AND CONTACTS THE UNDERSIGNED CODE INSPECTOR AT __561-276-5116__ to verify COMPLIANCE with the Town Code(s) cited herein, NOTICE IS HEREBY GIVEN THAT A PUBLIC HEARING WILL BE CONDUCTED for the above referenced property before the Town of Gulf Stream Code Enforcement Special Magistrate on __6-4-13__ at __2 P.M.__ or as soon thereafter as the case can be heard in the Town Hall Commission Chamber located at 100 Sea Road, Gulf Stream, Florida.

YOU ARE REQUIRED TO APPEAR BEFORE THE SPECIAL MAGISTRATE at that time to answer allegations that you have violated the above cited sections of the Code of Ordinances of the Town of Gulf Stream. IF YOU FAIL TO ATTEND, the Special Magistrate may base his/her findings solely upon presentation by the Town Code Inspector

William H. Thrasher, Town Manager
Town of Gulf Stream

5617370188          Fax

YOU MUST NOTIFY THE TOWN OF GULF STREAM AT (561) 276-5116 ON OR BEFORE ___May 30, 2013___ THAT THE PARCEL OF REAL PROPERTY OWNED BY YOU AND DESCRIBED IN THIS NOTICE IS NO LONGER IN VIOLATION OF TOWN CODES AND THAT YOU ARE REQUESTING A REINSPECTION.

IF THE VIOLATION(S) IS/ARE NOT CORRECTED IN THE TIME SPECIFIED FOR CORRECTION, OR IF THE VIOLATION(S) IS/ARE CORRECTED AND THEN RECUR(S), THE CASE MAY BE PRESENTED TO THE SPECIAL MAGISTRATE EVEN IF THE VIOLATION(S) HAVE BEEN CORRECTED PRIOR TO THE SPECIAL MAGISTRATE HEARING.

IF YOU FAIL TO NOTIFY THE TOWN OF GULF STREAM, IT WILL BE PRESUMED BY THE CODE ENFORCEMENT SPECIAL MAGISTRATE THAT THE PARCEL OF REAL PROPERTY DESCRIBED HEREIN AND OWNED BY YOU CONTINUES TO BE IN VIOLATION.

If the Special Magistrate finds that you have committed a violation, he/she may order IMMEDIATE COMPLIANCE with the Code and if you fail to comply with such order within the time period set forth therein, he/she can IMPOSE A FINE OF UP TO $250.00 PER DAY for each violation remaining in non-compliance.

If the Town is successful in prosecuting your case before the Special Magistrate, FINES WILL BE IMPOSED BY THE SPECIAL MAGISTRATE. SUCH FINES SHALL CONSTITUTE A LIEN ON ANY REAL OR PERSONAL PROPERTY OWNED BY YOU. FAILURE TO PAY SUCH FINES CAN RESULT IN FORECLOSURE AND COLLECTION ACTION BY THE TOWN.

If you disagree with a decision of the Special Magistrate, you may appeal to the CIRCUIT COURT OF PALM BEACH COUNTY within 30 DAYS after the Special Magistrate's Order is entered.

If you wish to have the Special Magistrate RECONSIDER your case for any reason or if your case was in fine and is now in compliance and you wish to request a REDUCTION IN FINE, an APPLICATION AND THE APPROPRIATE FEE MUST BE SUBMITTED TO THE TOWN OF GULF STREAM FOR ANY SUCH REQUESTS. ALL REQUIREMENTS FOR SUCH REQUEST MUST BE MET FOR THE SPECIAL MAGISTRATE TO RECONSIDER YOUR CASE.

If a person decides to appeal any decision made by the Special Magistrate with respect to any matters considered at subject meeting, they will need a record of the proceedings, and for such purpose, they may need to ensure that a verbatim record of the proceedings is made, upon which record includes testimony and evidence upon which appeal is to be based. (FS 286.0105).

PLEASE GOVERN YOURSELF ACCORDINGLY.

By:   Rita L. Taylor, Town Clerk
      Town of Gulf Stream
      100 Sea Road
      Gulf Stream, FL 33483
      (561) 276-5116

EXHIBIT C

Wiring Instructions:

Branch Banking and Trust Company
300 Summers Street
Charleston WV 25301
Routing # 051503394
Commerce Realty Group Inc
Account # 5177704344
Attn: Robert Boder  Phone: 304-341-1043

Exhibit "D1"

RELEASE

This Release, made as of July 26, 2013, is executed this 26th day of July, 2013, is given by the Plaintiffs (collectively the "Releasors") to the Town of Gulf Stream and its employees and elected and appointed officials (collectively referred to herein as the "Releasees").

In consideration of Ten Dollars ($10.00) and for and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Releasors hereby releases and discharges of the Releasees from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, or equity, which Releasors had , has or may have, arising from, related to or in connection with the Cases and the matters contained in this Agreement.  Notwithstanding anything herein to the contrary, this Release does not include and specifically excludes all obligations Releasees have to the Releasor under that Settlement Agreement dated July 26, 2013 between Releasors and Releasees (the "Settlement Agreement") and arising under all instruments and documents delivered or executed in connection with and in furtherance of the Settlement Agreement.

Releasors and their  respective agents, attorneys, shareholders, officers, directors, employees, heirs, executors, administrators, personal representatives, successors and assigns are bound by this Release.  This Release shall inure to the benefit of each of the Releasees and their respective heirs, executors, administrators, successors and assigns.

This Release is governed by and shall be construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, the undersigned have executed this Release as of the day and date first written above.

By: _____
    Martin E. O'Boyle

By: _____
    Commerce Group, Inc.
    Martin E. O'Boyle, President

By: _____
    N984AC Caravan, LLC
    Martin E. O'Boyle, Member

By: _____
    Airline Highway, LLC
    Martin E. O'Boyle
    Managing Member

Exhibit "D2"

RELEASE

This Release, made as of July 26, 2013, is executed this 26th day of July, 2013, is given by the Town of Gulf Stream on behalf of itself, its employees and its elected and appointed officials (collectively the "Releasors") to the Plaintiff's (collectively referred to herein as the "Releasees").

In consideration of Ten Dollars ($10.00) and for and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Releasors hereby releases and discharges of the Releasees from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, or equity, which Releasors had , has or may have, arising from, related to or in connection with the Cases and the matters contained in this Agreement. Notwithstanding anything herein to the contrary, this Release does not include and specifically excludes all obligations Releasees have to the Releasor under that Settlement Agreement dated July 26 , 2013 between Releasors and Releasees (the "Settlement Agreement") and arising under all instruments and documents delivered or executed in connection with and in furtherance of the Settlement Agreement.

Releasors and their respective agents, attorneys, shareholders, officers, directors, employees, heirs, executors, administrators, personal representatives, successors and assigns are bound by this Release. This Release shall inure to the benefit of each of the Releasees and their respective heirs, executors, administrators, successors and assigns.

This Release is governed by and shall be construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, the undersigned have executed this Release as of the day and date first written above.

By: _____
        Mayor

# EXHIBIT C



23 NORTH
HIDDEN
HARBOUR
DRIVE
GULF STREAM
FLORIDA
33483

Appurtenant structures such as decks, pilings, docks, and other structures (but not another living unit or interior living space) ("Water Structures") may be constructed and/or installed in the area designated hereon as "Water", provided that such Water Structures are approved by the Town of Gulf Stream (if applicable), as long as the area designated "Water" remains water. If any portion of the Property (which is presently submerged) becomes no longer submerged, then such area shall be included in the crosshatched area.

Building Envelope Shown "Cross-Hatched" 

## AGREEMENT

THIS AGREEMENT (this "Agreement") is made and executed on this 29th day of August, 2008, by and between SHEILA O'BOYLE ("O'Boyle"), owner of certain property located at 107 S. 13th Street in the Borough of Longport (the "Property"), MARTIN O'BOYLE Husband of Sheila O'Boyle and the BOROUGH OF LONGPORT (the "Borough"), a municipal corporation of the State of New Jersey having an address of 2305 Atlantic Avenue, in the Borough of Longport, State of New Jersey.

## RECITALS

WHEREAS, the Property is currently improved with a dwelling (the "Home"); and

WHEREAS, the Home is considered a "historic structure" by and in the Borough as a result of its age and architectural prominence; and

WHEREAS, many of the historic structures that once existed throughout the Borough have been demolished and the Borough desires to encourage the owners of these structures to retain their historic structures to preserve the history of the Borough; and

WHEREAS, certain work and improvements, including, without limitation, alterations and additions (the "Alterations") have been performed on the Property; and

WHEREAS, prior to the performance of the Alterations, the ground floor of the Home contained habitable space, which included living and sleeping areas, a kitchen, sanitary facilities, floor drains, and other improvements; and

WHEREAS, certain of the Alterations performed to the ground floor include, among other things, habitable space, including living and sleeping areas, a kitchen, sanitary facilities and other improvements (the "Ground Floor Alterations"); and

WHEREAS, the Borough is aware of the Alterations, including the Ground Floor Alterations; and,

WHEREAS, on December 13, 2006, the Borough Zoning Official asserted that the Ground Floor Alterations violated the Zoning Code and issued a Notice and Order of Penalty (the "Asserted Zoning Violation"). On December 13, 2006, the Borough Construction Official asserted that the Ground Floor Alterations violated the State Uniform Construction Code and the Regulations promulgated thereunder (the "UCC") for failure to obtain Plumbing and Electrical Permits (the "Asserted Building Violation"). On July 23, 2007, the Borough Zoning Official asserted that the Property violated Chapter 99 and 167 of the Borough Code (the "Asserted Code Violations"). On or about September 20, 2007, the Borough issued alleged municipal ordinance violations under complaint number 0574 against Martin O'Boyle and on March 31, 2008, issued alleged violations under complaint number 0577 against Sheila O'Boyle and on September 9, 2007 issued an alleged parking violation under complaint number 33404 against Martin O'Boyle and/or Catherine O'Boyle (the "Asserted Municipal Court Violations"). On or about May 8,



EXHIBIT
B
tabbies

2008 the Borough filed actions in the Superior Court of New Jersey alleging violations of OPRA and on or about August 13, 2008 a separate action alleged violations of the Borough Code (the "Asserted OPRA and Building Code Violations"). The Asserted Zoning Violation, the Asserted Building Violation, the Asserted Code Violations, the Asserted Municipal Court Violations and Asserted OPRA and Building Code Violations are collectively referred to as the "Asserted Violations" WHEREAS, O'Boyle submitted a professional report to the Borough by Jack A Boekhout Consulting, LLC (the "Professional Report"), which concludes that (i) the Alterations comply with the UCC and the Borough Code and (ii) that the Asserted Violations are improper; and

WHEREAS, the Borough acknowledges that the Alterations do not constitute a "Substantial Improvement" as defined under Chapter 99 of the Borough Code; and

WHEREAS, the Borough acknowledges and appreciates O'Boyle's efforts in preserving one of the Borough's historic structures; and

WHEREAS, as the parties wish to avoid any future dispute concerning the Property, the Home, the Alterations and the Asserted Violations, the parties desire to resolve this matter in accordance with the terms and conditions of this Agreement (the "Resolution"). The terms and conditions of the Resolution agreed to between the parties are set forth below.

NOW, THEREFORE, in order to effectuate the foregoing, and intending to be legally bound hereby, the parties hereto agree as follows:

1.     The Borough acknowledges that the Alterations do not constitute a "Substantial Improvement" as defined under Chapter 99 of the Borough Code and that Alterations are in compliance with the UCC and the Borough Code.

2.     The Borough acknowledges that (i) the plans for the Ground Floor Alterations have been provided to the Borough Code Official, James Agnesino, and (ii) that the Borough has inspected and approved the Alterations and acknowledges that (A) all permits for the Alterations have been obtained, including, without limitation, a valid Certificate of Occupancy and (B) that neither the Property, the Home nor any portion of the Alterations are in violation of any, permits, approvals, authorizations; governmental or quasi-governmental rules, regulations, ordinances, orders; requirements of federal, state and municipal governments and appropriate departments, commissions, boards, and officers thereof, or any other body now or hereafter constituted exercising similar functions which are applicable to the Property or the use and occupancy thereof laws.

3.     Based upon the law and facts in these matters and further submissions by O'Boyle, The Borough agrees that there is no sufficient basis to support and no basis to sustain the Asserted Violations and accordingly withdraws and dismisses, with prejudice, the Asserted Violations and agrees that the Asserted Violations are void and of no further force or effect.

4.     In the event of a breach by either party with respect to any provision of this Agreement, in addition to any other remedies provided for elsewhere in this Agreement, each

2

CG 08.27.08

party shall have the right to pursue enforcement of such provision for such default in the New Jersey Superior Court.

5.      In the event of an appeal of this Agreement or any part thereof by any person or entity, O'Boyle and the Borough agree that they shall each use their best efforts to vigorously defend the appeal.

6.      This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written. There are no representations, warranties or agreements other than those specifically set forth herein.

7.      The parties represent and warrant that they have had independent counsel with whom they have consulted regarding the advisability of this settlement and the terms and provisions of this Agreement.

8.      This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

9.      Each individual who executes this document on behalf of a party represents and warrants that he has full authority to bind such party to the terms and conditions of this Agreement.

10.     The dates and times for performance of all of the obligations hereunder shall be deemed of the essence of this Agreement.

11.     The rights and obligations of the parties set forth in this Agreement shall survive the execution of this Agreement by the parties.

12.     The parties agree to execute such further documents and agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement including, but not limited to, the immediate filing of stipulations of dismissal with prejudice in the actions pending in: a) Superior Court; and, b) Municipal Court for the Asserted Municipal Court Violations.

13.     This Agreement may not be modified or amended orally, but only by written agreement executed by each of the parties hereto. This Agreement may be signed in one or more counterparts, each of which shall constitute an original of this Agreement, but all of which together shall constitute one and the same instrument.

14.     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile copy. The parties agree to exchange original executed copies of this Agreement promptly following the execution and exchange of facsimile copies.

15.     This Agreement shall be for the benefit of and binding upon the parties hereto and their respective successors and assigns; and the provisions of this Agreement shall run with the Property.

3

CG 08.27.08

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement as of the day and year indicated above.

BOROUGH OF LONGPORT

By: _____
Name: _____
Title: _____

Attest:

Dated:

_Neva M. Feury_
WITNESS
Dated: 8-27-08

_Sheila O'Bayle_
SHEILA L. O'BOYLE

Dated: _08/24/08_
WITNESS

_____
MARTIN O'BOYLE

CO 08.25.08

4

# BOROUGH OF LONGPORT
## RESOLUTION No. 2008-83

### A RESOLUTION APPROVING AND RATIFYING A SETTLEMENT AGREEMENT REGARDING THE LONGPORT/O'BOYLE LITIGATION

WHEREAS, the Board of Commissioners believe that it is in the best interest of the Borough of Longport to settle its differences and end all pending litigation between the Borough and Martin E. and Sheila L. O'Boyle.

NOW, THEREFORE, BE IT RESOLVED that the Board of Commissioners of the Borough of Longport hereby approves and ratifies a settlement agreement between the Borough of Longport and Martin E. and Sheila L. O'Boyle; and be it further

RESOLVED, that the Mayor and the Borough Clerk are hereby authorized to execute and deliver a fully-executed settlement agreement whereupon all pending litigation shall be settled; and be it further

RESOLVED, that all resolutions or parts of Resolutions inconsistent herewith are hereby repealed and this Resolution shall take effect immediately according to law.

Adopted:

IN THE CIRCUIT COURT FOR BLOUNT COUNTY, TENNESSEE
EQUITY DIVISION

NEW MIDLAND PLAZA ASSOCIATES, et al.,    )
                                         )
              Plaintiffs,                )
                                         )
      v.                                 )    CIVIL ACTION NO. E-18053
                                         )    *Notice of Entry Requested*
WACHOVIA BANK, N.A., et. al.,            )
                                         )
              Defendants.                )

ORDER ON PLAINTIFFS' MOTION TO ALTER OR AMEND
SANCTIONS AWARD

This cause came on to be further heard on the 29th day of January, 2007, before

the Honorable W. Dale Young, Judge of the Circuit Court for Blount County, Tennessee,

upon the Motion of Martin O'Boyle to Alter or Amend the Order entered November 2,

2006, awarding to the Defendants sanctions in the collective amount of One Million Two

Hundred Fifty Thousand Dollars ($1,250,000.00) and awarding to the Clerk of the Court

sanctions in the amount of Five Thousand Dollars ($5,000.00).

For good cause shown, and there being no objection from the Defendants, it is,

therefore, accordingly ORDERED, ADJUDGED and DECREED that the award of

sanctions to the Defendants, Wachovia Bank, N.A. and Alcoa Calderwood, LLC, against

Martin O'Boyle is herewith set aside, withdrawn, and held for naught, provided that

Martin O'Boyle shall within ten (10) days of the date of this Order pay to the Clerk of the



EXHIBIT
C

Court the sum of Five Thousand Dollars ($5,000.00) plus interest from and after

November 2, 2006, until the date of payment plus such additional court costs to be paid as

assessed by the Clerk of the Court.

ENTER this 29ᵗʰ day of January, 2007.

_____
, W. DALE YOUNG, JUDGE

APPROVED AS TO FORM:

_____
DAVID T. BLACK, Tennessee Bar No. 000999
Kizer and Black Attorneys, PLLC
329 Cates Street
Maryville, Tennessee   37801

2

CERTIFICATE OF SERVICE

I hereby certify that I have this 29th day of January, 2007, caused a true and

correct copy of the Order on Plaintiffs' Motion to Alter or Amend Sanctions Award to be

served on the following by first-class mail, postage prepaid:

> John A. Lucas, Esquire
> Hunton & Williams
> 900 South Gay Street
> Suite 2000
> Knoxville, TN 37901-0951

> Charles W. VanBeke, Esquire
> Wagner, Myers & Sanger, P.C.
> 1801 First Tennessee Plaza
> P.O. Box 1308
> Knoxville, TN 37901-1308

> Thomas S. Scott, Jr., Esquire
> Ball & Scott
> 550 W. Main Avenue
> Suite 750
> Knoxville, TN 37902

DAVID BLACK, ESQUIRE

3

> RECEIVED <

JUL 28 2014

Town of Gulfstream, FL

**Sweetapple, Broeker, Varkas, P.L.**
20 South East 3rd. Street
Boca Raton, FL 33432
Telephone: (561)392-1230
Fax: (561)394-6102

July 25, 2014
Invoice No. 10169

Town of Gulf Stream
100 Sea Road
Gulf Stream, FL 33483

TOWN OF GULF STREAM
> PAYMENT APPROVED <
Amount ___17,902.50___
By WW     Date 7/28/14
Check # 12169   Date 7/29/14

Client Number: 00949 Town of Gulf Stream
Matter Number: 1679 O'Boyle vs. Town of Gulf Stream
**For Services Rendered Through 7/25/2014.**

## Fees

| Date | Tmkpr | Description | Hours | Amount |
|------|-------|-------------|-------|--------|
| 06/27/2014 | AV | Research: Sanctions agreement opposing party and attorney for litigation abuse (read and summarize case law, treatise and rules); Revise Motion for Sanctions Agreement O'Boyle, attorney and son's law firm (include memo of law). | 1.75 | $612.50 |
| 06/30/2014 | RS | Review client edits to Motion and revise; Review case law regarding abuse of process. | 0.75 | $262.50 |
| 06/30/2014 | AV | Westlaw search 1) Limitations on rights to public records (read and summarize case law). | 1.50 | $525.00 |
| 07/02/2014 | RS | Conference with Scott; Work on files. | 0.40 | $140.00 |
| 07/02/2014 | RS | Conference with Scott; Conference with Joanne. | 0.40 | $140.00 |
| 07/02/2014 | AV | Westlaw search: Unauthorized practicing of law (read and summarize cases); Conference with R. Sweetapple and Joanne O'Connor. | 0.75 | $262.50 |
| 07/02/2014 | RS | Conference with A. Varkas; Conference with Joanne; Review, revise notice; Revise Motion; Review additional case law. | 1.50 | $525.00 |
| 07/04/2014 | RS | Conference with Joanne; Conference with client; Conference with A. Varkas and Ball. | 0.80 | $280.00 |
| 07/06/2014 | RS | Work on strategy; Outline projects; Conference with Scott; Review email; New case exhibits; Conference with Joanne and Scott. | 1.75 | $612.50 |

Continued On Next Page

EXHIBIT
2-1

Client Number:   00949                                                                    07/25/2014
Matter Number:   1679                                                                      Page:   2

| Date | Atty | Description | Hours | Amount |
|------|------|-------------|-------|--------|
| 07/06/2014 | RS | Conference with witness; Conference with witness counsel. | 0.30 | $105.00 |
| 07/06/2014 | RS | Conference with Scott; Receive and review cases and documents; Work on claim. | 1.50 | $525.00 |
| 07/08/2014 | RS | Conference regarding witness interview, affidavit and deposition. | 0.40 | $140.00 |
| 07/08/2014 | RS | Conference with Ken; Conference with attorney. | 0.70 | $245.00 |
| 07/09/2014 | RS | Conferences with client and Joanne; Witness interview. | 0.70 | $245.00 |
| 07/10/2014 | RS | Conference with Joanne and witness. | 0.40 | $140.00 |
| 07/11/2014 | RS | Receive and review emails; Prepare response; Review Weiss materials regarding Sober House; Conference with client and Joanne regarding deposition. Deposition preparation. (Date 07/10). | 1.60 | $560.00 |
| 07/14/2014 | RS | Receive and review emails; Conference with witness regarding deposition; Conference with client. | 1.25 | $437.50 |
| 07/15/2014 | AV | Westlaw and statute search: Objection to O'Boyles witness subpoena in R. Sweetapple (read and summarize statute and rule). | 0.50 | $175.00 |
| 07/16/2014 | RS | Review evidence; Outline issues; Prepare for conference; Conference with client. (Date 07/15). | 2.75 | $962.50 |
| 07/16/2014 | AV | Westlaw search abuse of process - a cause of action against O'Boyle (read and summarize case law for R. Sweetapple). | 1.50 | $525.00 |
| 07/17/2014 | RS | Prepare Travel and attend hearings; Motion with two different co-counsels regarding new claim; Interview witness; Conference with third co-counsel; Conference with client; Prepare letter; Conference with opposing counsel. | 5.00 | $1,750.00 |
| 07/21/2014 | RS | Conference with client and co-counsel; Prepare for meeting. | 0.70 | $245.00 |
| 07/21/2014 | AV | Review Motion for Protective Order/Objection to R. Sweetapple deposition duces tecum (Mr. O'Boyle's subpoena). | 0.25 | $87.50 |
| 07/22/2014 | RS | Conference with client and opposing counsel; Prepare for meeting; Review cases provided; Receive and review subpoena; Conference regarding PO. | 2.00 | $700.00 |
| 07/22/2014 | RS | Prepare for meeting; Outline questions and chronology. (Evening). | 1.75 | $612.50 |
| 07/23/2014 | RS | Prepare and travel; Meeting and statement of witness; Conference with client and co-counsel; Research regarding RICO. | 13.50 | $4,725.00 |
| 07/24/2014 | RS | Work on RICO claims; Research. | 1.50 | $525.00 |
| 07/24/2014 | RS | Travel and attend meeting with opposing counsel and Joanne; Conferences with Scott. | 2.00 | $700.00 |
| 07/24/2014 | RS | Work on Motion for PO. | 0.30 | $105.00 |

Continued On Next Page

Client Number:    00949                                                   07/25/2014
Matter Number:    1679                                                    Page:   3

| | | | | |
|---|---|---|---|---|
| 07/24/2014 | RS | Conference with Bill Trusher; Conference with Scott Morgan; Conference with Dave regarding research; Conference with Jerry Richman regarding RICO; Conference with Weissing regarding class action. | 1.20 | $420.00 |
| 07/25/2014 | RS | Assemble evidence; Receive and review motion for Summary judgment filed by Martin; Receive and review emails; Conference with co-counsel. | 1.75 | $612.50 |

                                               Billable Hours / Fees:      51.15    $17,902.50


                        Prior Balance:        $15,125.57        Last Payment: 07/14/2014
                   Payments Received:        ($15,125.57)
                        Current Fees:         $17,902.50
                      Advanced Costs:              $0.00
           TOTAL AMOUNT DUE:                  $17,902.50    *001 53110 513 10*

### PLEASE REMIT TO:  SWEETAPPLE, BROEKER & VARKAS, P.L.

### 20 S.E. 3rd. STREET, BOCA RATON, FL 33432
### PLEASE INDICATE INVOICE NUMBER ON CHECK.  THANK YOU!

12169

TOWN OF GULF STREAM OPERATING ACCOUNT

7/29/2014

To: SWEETAPPLE, BROEKER & VARKAS, P.L.
20 S.E. 3rd STREET
BOCA RATON, FL 33432

| INVOICE NUMBER | DATE | DESCRIPTION | AMOUNT | DISCOUNT | NET AMOUN |
|---|---|---|---|---|---|
| 10169 | 7/25/2014 | Legal | $17,902.50 | $0.00 | $17,902 |
| | | Totals: | $17,902.50 | $0.00 | $17,902. |

001-53110-513-10 Legal Services - Admin

SECURITY FEATURES INCLUDE TRUE WATERMARK PAPER, HEAT SENSITIVE ICON AND FOIL HOLOGRAM

12169

**TOWN OF GULF STREAM**
OPERATING ACCOUNT
100 SEA ROAD
GULF STREAM, FL 33483-7427
(561) 276-5116

SUNTRUST BANK
63-215/631

FRAUD ARMOR

CHECK DATE     CHECK NO.

7/29/2014   CHECK AMOUNT   12169

PAY      00949

TO THE
ORDER
OF

**Seventeen thousand nine hundred two and 50/100 Dollars**

$** 17,902.50

SWEETAPPLE, BROEKER & VARKAS, P.L.
20 S.E. 3rd STREET
BOCA RATON, FL 33432

AUTHORIZED SIGNATURE

⑈012169⑈ ⑊063102152⑊ 1000160073150⑈

## Page 1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2013 CA 17717 AA

CHRISTOPHER F. O'HARE,

    Plaintiff,

vs

TOWN OF GULF STREAM,

    Defendant.

_____/

- - -

VIDEOTAPED DEPOSITION OF ROBERT SWEETAPPLE
TAKEN AT THE INSTANCE OF THE PLAINTIFF
- - -

Boca Raton, Florida
Monday, December 22, 2014
11:31 a.m. - 2:34 p.m.

Stenographically Reported by
Mary Ann Hengstler, RPR
Notary Public, State of Florida

## Page 2

1  APPEARANCES:
2  JONES FOSTER JOHNSTON & STUBBS, P.A.
   505 South Flagler Drive, Suite 110
3  West Palm Beach, Florida 33401
   Counsel for the witness
4  joconnor@jonesfoster.com
   BY:  JOANNE M. O'CONNOR, ESQUIRE
5
   GMM/MADISON P.A.
6  401 South County Road, #3272
   Palm Beach, Florida 33480
7  Counsel for the Plaintiff
   service@g3mlaw.com
8  BY:  MARK J. HANNA, ESQUIRE
9  ALSO PRESENT:  Bill Ring
          Lou Radar (by phone)
10         Christopher O'Hare

## Page 3

1         INDEX
2  WITNESS          PAGE
3  ROBERT SWEETAPPLE
4    Direct Examination by Mr. Hanna   3
5
6
7
8  EXHIBITS FOR IDENTIFICATION     PAGE
9  Plaintiff's Exhibit A      8
10 (Memorandum dated 4/10/98 to
   Mayor Kaleel from Paul Nicoletti)
11
   Plaintiff's Exhibit B     48
12 (4/7/98 letter from Edwin Jonas to
   Paul Nicoletti)
13
   Plaintiff's Exhibit C     58
14 (E-mail dated 9/8/14 to Mark Hanna
   from Robert Sweetapple)
15
   Plaintiff's Exhibit D     81
16 (Warranty Deed dated 7/14/96)
17 Plaintiff's Exhibit E     81
   (Quit claim deed dated 3/1/01)
18
19
20
21
22
23
24
25

## Page 4

1      The videotaped deposition of ROBERT SWEETAPPLE
2  was taken before me, MARY ANN HENGSTLER, Registered
3  Professional Reporter, RPR-CP, Notary Public, State of
4  Florida at Large, at 20 S.E. 3rd Street, in the City of
5  Boca Raton, County of Palm Beach, State of Florida,
6  beginning at the hour of 11:31 a.m., on Monday,
7  December 22, 2014, pursuant to Notice filed herein, at
8  the instance of the Plaintiff in the above-entitled cause
9  pending before the above-named Court.
10          - - -
11 THEREUPON,
12     ROBERT SWEETAPPLE,
13 being by me first duly sworn to testify the whole truth,
14 as hereinunder certified, testified as follows:
15     DIRECT EXAMINATION
16 BY MR. HANNA:
17   Q.  Can you tell us your name.
18   A.  Robert Sweetapple.
19   Q.  And what is your professional address?
20   A.  20 Southeast 3rd Street, Boca Raton, Florida.
21   Q.  Do you -- What firm are you practicing at,
22 under?
23   A.  Sweetapple, Broeker and Varkas, P.L.
24   Q.  What type of firm is that?
25   A.  That's a LLC law firm.  And my firm Sweetapple



EXHIBIT
3

Page 21

```
1       Q.  Okay.
2       A.  I've, I've handled continuing criminal
3    enterprise cases also, which is the, a criminal cousin
4    of RICO.  I handled those in the eastern and western
5    districts of the Federal courts of Louisiana, in
6    Lafayette and New Orleans.
7       Q.  What did those cases involve?
8       A.  Those cases involved a criminal enterprise
9    that was alleged to be actually ultimately convicted of
10   running marijuana and money laundering.  I represented
11   a lawyer at some point who ended up pleaing to a
12   criminal, continuing criminal enterprise.  He was from
13   Miami and he was charged in the Western District of
14   Louisiana.
15      Q.  Okay.  Do you ever handle any public records
16   litigation?
17      A.  I have made numerous public records requests.
18   I've never sued for fees.  Never, never actually gone
19   after fees or defended a claim for public records on
20   behalf of an entity prior to this litigation.
21      Q.  Well, when you say you've made numerous
22   public records requests, and you said that no
23   litigation --
24      A.  Yeah.
25      Q.  -- resulted from it.
```

Page 22

```
1       A.  Yeah, I've, I've made Sunshine requests and
2    public records requests obviously since the law has
3    been in effect.
4       Q.  Why wasn't there any litigation out of that?
5       A.  Because I, I've rarely, I've rarely -- I've
6    seen a lot more litigation in public records requests
7    of late that is not bona fide, and I have never had a
8    problem, in terms of getting records from government
9    ultimately, and I've always made discrete requests for
10   documents I really need for a, for a lawsuit, and
11   they've been provided.
12      Q.  So the governmental entities provided the
13   records requested?
14      A.  Yeah.  But I've never seen a situation where
15   a group of people have inundated a clerk with thousands
16   of public records requests in order to close the town
17   down under the guise of trying to get open government.
18   But I -- of course, I guess when you practice law
19   enough you get to see everything in this world.
20      Q.  Have you reviewed the cases that have been
21   filed in Christopher O'Hare versus Town of Gulf Stream?
22      A.  That's my work product.  I'm not going to
23   disclose that.
24      Q.  Well, have you reviewed them?  I'm not asking
25   for any --
```

Page 23

```
1       A.  I'm not going to tell you what I've done as a
2    lawyer.  I'm not going to tell you what I've
3    researched, I'm not going to tell you what I've
4    written, I'm not going to tell you what I've thought.
5    I'm not going to tell you who I've spoken to.  That's,
6    that's my client's private business information.  They
7    hired me to perform a service, and I intend to perform
8    it.
9       Q.  So what is the basis of your refusal to
10   testify about that?
11      A.  Work product privilege.
12      Q.  Okay.  Now getting back to the areas that you
13   practice.  Has it changed in the last, say, ten years
14   since '98?
15      A.  My practice has varied throughout depending
16   on any number of circumstances.  The clients I've
17   gotten, the nature of the economy.  I handled some
18   major lender liability cases in the first recession
19   that I was involved in, which was 1981, and sued some
20   banks, and they were fairly high profile cases.  And as
21   a result, I was hired to handle a mass of lender
22   liability case in 2002 that listed to 2007.
23          As a result of that, I ended up getting a lot
24   of lender liability claims during this last recession.
25   I ended up representing a major boat manufacturer,
```

Page 24

```
1    Donzi, Fountain, Proline and Baja.  So I ended up
2    getting a lot of commercial litigation in North
3    Carolina and other states for that company.
4           So my practice really is driven by, by my
5    clients.  I get, I get called in to handle complex
6    litigation matters by clients, not only in the State of
7    Florida but in over a dozen, over a dozen states in the
8    country.
9       Q.  Now in 1998 you represented some Ocean Ridge
10   residents against the Town of Ocean Ridge?
11      A.  I don't know if it was 1998.  I don't think
12   it was 1998.
13      Q.  1998, 1999?
14      A.  I'm not sure of the year.
15      Q.  Okay.
16      A.  I don't remember.  But I, I, I handled
17   litigation in, in the circuit court, and I think it was
18   before a judge who is in the criminal division now.
19   He's been in the criminal division forever.
20          MS. O'CONNOR:  Judge Rapp.
21          THE WITNESS:  Yeah, Judge Rapp I think had
22   the case.
23   BY MR. HANNA:
24      Q.  What did that case involve?
25      A.  It involved a dispute between adjoining
```

6 (Pages 21 to 24)

8/22/2014                                    Gulf Stream: Orthwein moves aside as Morgan becomes mayor - The Coastal Star

Search The Coastal Star   Search

- Sign Up
- Sign In

# The Coastal ★ Star

- Main
- My Page
- Chat
- Classifieds
- Discussion
- Events
- Groups
- Members
- News
- Photos
- Videos

- All Blog Posts
- My Blog
- Add



# Gulf Stream: Orthwein moves aside as Morgan becomes mayor

- Posted by Chris Felker on May 1, 2014 at 10:30am
- View Blog

**By Dan Moffett**



Orthwein

Joan Orthwein spent the last two years in the crosshairs of Gulf Stream's legal battles, serving as the town's mayor during the stormiest period in its history.

At the Town Commission's April 11 meeting, she told a chamber crowded with well-wishers that it was time for someone else to take the helm.

"I'm not going to lie. It's been challenging," Orthwein said. "But you know what, the citizens have been wonderful and very supportive and caring of me. It is a wonderful community."

EXHIBIT
4



**Morgan**

The commission unanimously approved newly elected Scott Morgan as the town's new mayor and Commissioner Robert Ganger as vice mayor, with Orthwein moving aside to a commissioner's seat.

The reorganization is significant. Morgan, a lawyer and former chairman of the Architectural Review and Planning Board, campaigned on a platform that called for an aggressive legal defense against the town's detractors.

Gulf Stream faces more than 20 lawsuits and numerous public records requests filed by Martin O'Boyle and Chris O'Hare, two residents who have charged the town with violating their constitutional rights. During the election campaign, O'Hare put signs disparaging Orthwein on a boat and anchored it behind her waterfront home.

Morgan didn't waste time beginning his aggressive defense against the town's critics. He called a special meeting of the commission for April 14 to consider an ordinance against overnight parking at Town Hall — regulation aimed at vehicles displaying political signs that criticize town officials. The commissioners unanimously approved a first reading of the ordinance, which restricts parking from 7 p.m. to 7 a.m., and then made it law at another meeting on April 29.

O'Boyle and O'Hare objected, saying the ordinance violated free speech and also illegally restricted beach parking.

During the special session, Morgan and commissioners also scheduled a budget workshop immediately following the regular May 9 Town Commission meeting. Morgan said he wants to find residents willing to serve on an ad hoc financial committee to help the town deal with dwindling reserves and rising expenses.

Four uniformed police officers were on duty during the April 11 meeting, a testament to the uneasy climate in the town these days. Commissioners have had to hire outside counsel to fight the suits and have set aside an additional $190,000 to cover legal fees.

Morgan says "an aggressive, proactive approach to the lawsuits is necessary to prevent further harm to our town." He praised Orthwein's work as mayor. "You stepped into a job at a time that was very difficult, probably the most challenging period for the town since its founding," Morgan said. "You worked both publicly and privately to resolve the many issues we face, whether it be underground electric wires or more importantly, the onslaught of public records requests and litigation that followed. And all the time you had the best interests of the town at heart. But more than that, you did it with grace."

Orthwein said Morgan is ideally suited to guide Gulf Stream through its legal obstacle course. "The way things are today, I don't know why all politicians aren't lawyers," she said smiling.

"Scott's a great leader who is a lawyer and a litigator. He will help streamline the legal problems we're having, and they're huge. I'm not an attorney. Scott brings a great deal of wisdom, leadership and respect to the party."

Ganger said the town still will need Orthwein's contributions as a commissioner because of her extensive experience and understanding of the town's history.

"She's held her head high," he said. "She's served us well. We're not saying goodbye to a mayor; we're saying thank you for all you've done."

Orthwein, who came to the commission in 1995, is the second-longest serving elected official in Palm Beach County behind Cloud Lake Mayor Patrick Slatery, who has held office for 36 years.

She says moving forward with the project to put the town's utility wiring underground is her biggest achievement.

"That was a dream of mine," she said. "I have to say I was so excited and proud of this community when they voted for it. The underground wiring is such a positive thing."

One of Orthwein's last acts as mayor was presiding over the commission's unanimous approval of a decorum policy for meetings that prohibits verbal attacks and abusive language. O'Boyle and O'Hare spoke against the measure, criticizing it as too vague and too much like an ordinance with enforcement consequences, rather than a declaration of policy with no punitive provisions.

"The town has shown great resilience," Orthwein said. "We'll get back to normal some day."

**In other business:**

• Engineering consultant Danny Brannon told commissioners they will need about $30,000 to pay for construction work on the Town Hall's rear entrance to make it compliant with Americans with Disabilities Act requirements. The entrance will need a new access ramp, handrails and reconfigured parking. Ú

• Town Manager William Thrasher said the town is creating more portals on its website to make public records available online.

Views: 42

Tags: Gulf Stream, Joan Orthwein, Scott Morgan, Town Commission, election, new mayor, news

Like

0 members like this

Share Twitter  8+1

Like  0

- ≤ Previous Post
- Next Post >

Comment

**You need to be a member of The Coastal Star to add comments!**

Join The Coastal Star

 Comment by Christopher O'Hare 23 hours ago

I had hoped Mr. Morgan would bring some sanity back to a commission that has, under Mayor Orthwein, refused to follow the law and put personal egos ahead of the Town's general welfare.

Unfortunately Mr. Morgan's first act as mayor was to spearhead an ordinance destined to be challenged in court as an effort by the Town to chill free speech AND an outright violation of the Town's Comprehensive Land Use Plan which mandates all town hall parking be used for public beach parking. The Town has also prevented anyone from the public from commenting on this proposed ordinance before it was approved - another violation of State law.

Millions of public dollars could be saved if the Town leader's would follow the example of surrounding communities and just obey the law.

Mr. Morgan's "pro-active" approach to solving the Town's legal problems is just throwing gasoline on the fire. Town leaders know what they should do but hey, it's not their money they're spending on lawyers so why should they change their behavior now?

RSS

Welcome to
The Coastal Star

**Sign Up**
or Sign In

© 2014   Created by Mary Kate Leming.   Powered by NING | MODE SOCIAL

Badges  |  Report an Issue  |  Terms of Service

Sign in to chat!

## Page 1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO. 502014CA001572XXXXMB

MARTIN E. O'BOYLE,

    Plaintiff,

-vs-

TOWN OF GULF STREAM,

    Defendant.

_____

DEPOSITION OF SCOTT MORGAN
TAKEN ON BEHALF OF THE PLAINTIFF

Wednesday, March 26, 2014
10:05 - 11:46 a.m.

100 Sea Road
Gulf Stream, Florida 33483

Reported By:
Kathleen Lusz, RPR
Notary Public, State of Florida

## Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3       MARRETT W. HANNA, Esquire
         THE O'BOYLE LAW FIRM, P.C.
 4       1286 W. Newport Center Drive
         Deerfield Beach, Florida 33442
 5       Telephone: (954)834-2201
 6   On behalf of the Defendant:
 7       JOANNE M. O'CONNOR, Esquire
         JONES, FOSTER, JOHNSTON & STUBBS
 8       505 South Flagler Drive
         Suite 1100
 9       West Palm Beach, Florida 33401
         Telephone: (561)650-0400
10
11   On behalf of the Deponent:
12       ROBERT A. SWEETAPPLE, Esquire
         SWEETAPPLE, BROEKER & VARKAS, P.L.
13       20 S.E. 3rd Street
         Boca Raton, Florida 33432
14       Telephone: (561)392-1230
15
16   ALSO PRESENT:
17       JONATHAN O'BOYLE, Law Clerk
         WILLIAM H. THRASHER, Town Manager
18       CHRISTOPHER O'HARE
         MARTIN O'BOYLE, (11:08 until 11:46 a.m.)
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                    I N D E X
                      - - -
 3
 4   SCOTT MORGAN                         PAGE
 5   Direct Examination by Ms. Hanna       4
 6
 7
 8           E X H I B I T S   M A R K E D
                    - - -
 9
10   Plaintiff's
11   No. 1        Records Request      12
     No. 2        Composite            24
12   No. 3        July 23, 2013 Letter 36
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          DEPOSITION OF SCOTT MORGAN
 2                MARCH 26, 2014
                    - - -
 3
 4        (Oath administered.)
 5        MR. MORGAN: I do.
 6   Thereupon,
 7              SCOTT MORGAN,
 8   having been first duly sworn, was examined and testified
 9   as follows:
10              DIRECT EXAMINATION
11   BY MS. HANNA:
12       Q.  All right.  Mr. Morgan, you're an attorney I
13   understand so I don't really need to go through the --
14       MR. SWEETAPPLE:  I'd prefer if you don't mind
15   putting on the record any instructions you want the
16   witness to follow.
17       MS. HANNA:  Okay.  Fine.  Sure.
18       Mr. Sweetapple, before I get started, are you
19   insurance counsel on this case, or what's your
20   position here?
21       MR. SWEETAPPLE:  I'm here representing the
22   witness.
23       MS. HANNA:  Oh, okay.  Can I have your card
24   when you get a chance?
25       MR. SWEETAPPLE:  Sure.
```

**EXHIBIT**

5

1 (Pages 1 to 4)

Page 5

```
1    BY MS. HANNA:
2        Q.  Okay.  I'm sure you've been through this a
3    million times, but I'm going to ask you questions.  From
4    time to time your attorneys may interpose objections.
5    And I might stop and think about my question, rephrase
6    my question, or I might not.  I might just continue on.
7        But you're aware if there is an objection, you
8    know, you still do answer the question unless your
9    attorney imposes a different type of objection, which
10   I'm sure you're well aware of, attorney-client privilege
11   information.
12       THE WITNESS:  I'm sorry.  Mr. O'Hare, you're
13   not a party to this case?
14       MR. SWEETAPPLE:  He can sit here.
15       THE WITNESS:  He can sit here?
16       MR. SWEETAPPLE:  Yeah.  It's an open
17   proceeding.
18       THE WITNESS:  Oh, okay.  Sorry.  Where I am
19   from, it is not.  Only parties are permitted and
20   counsel of record only.
21       MS. HANNA:  Okay.
22       THE WITNESS:  So my mistake.
23       MR. SWEETAPPLE:  Where is that?
24       THE WITNESS:  Pennsylvania.
25       MS. HANNA:  Pennsylvania.
```

Page 6

```
1        MR. SWEETAPPLE:  Okay.  No.
2        THE WITNESS:  As Mr. O'Boyle would know, in
3    Pennsylvania that's how it's done.
4        MR. SWEETAPPLE:  Okay.  Well, we're in a
5    public building, and unless there's a prior
6    protective order granted by the Court, anyone in
7    the world can sit in here just like you're in
8    trial.
9        THE WITNESS:  Okay.
10       MR. SWEETAPPLE:  Florida is a little more
11   liberal than Pennsylvania.
12       THE WITNESS:  Yeah, interesting.  Okay.  All
13   right.  Well, sorry.
14       MS. HANNA:  Okay.  Now I lost my place.
15       MR. SWEETAPPLE:  You were explaining to the
16   witness that he's to answer questions except when
17   instructed by counsel.  Typically based on
18   lawyer-client privilege, but that's not the only
19   reason under Florida law but --
20       MS. HANNA:  Typical.  I used the word typical,
21   maybe I didn't.
22   BY MS. HANNA:
23       Q.  Regardless, if you don't understand a question
24   that I've asked you, please feel free to ask me to
25   explain myself.  I'm disheveled, and I may be confused,
```

Page 7

```
1    and I'd appreciate it if you could ask me to clear up
2    any confusion.
3        You know that you should answer your questions
4    verbally so that the court reporter -- you're close to
5    her, so she understands.  You don't nod or any other
6    gestures that can't be taken down on the record.
7        And if you need to take a bathroom break,
8    please just tell me, and we'll stop.
9        A.  Got it.
10       Q.  Or if you need another break for any other
11   reason, I have no problem.  Just let me know.  Okay?
12       A.  That's fine.
13       Q.  All right.  Let's start from the beginning.
14   Can you tell me where were you born?
15       A.  I was a born in Harrisburg, Pennsylvania.
16       Q.  Okay.  And can you give me a little bit more
17   about your background?  Take me through your life up to
18   this point.
19       MR. SWEETAPPLE:  Object to the form.
20       MS. O'CONNOR:  Join.
21   BY MS. HANNA:
22       Q.  Or do you want me to ask you?
23       A.  What do you mean?
24       Q.  Where did you go to school?
25       A.  I went to Susquehanna Township High School.
```

Page 8

```
1    And then I went to Pennsylvania State University, and
2    then Dickinson School of Law.
3        Q.  And what did you do after you graduated from
4    law school?
5        A.  Then I practiced law in Philadelphia, then in
6    the Harrisburg, Pennsylvania.
7        Q.  What kind of law did you practice?
8        A.  General litigation.
9        Q.  When did you come to Florida?
10       A.  I came to Florida in the early '90s.
11       Q.  Do you mind if I ask why?
12       A.  How in the world would that be relevant to
13   this proceeding?
14       Q.  Are you making an objection?
15       A.  I'm asking.
16       Q.  I'm getting your background.  And credibility
17   is always an issue.  I'm just -- Background information
18   is always relevant.
19       A.  I like Florida.
20       Q.  That's all you had to say.
21       Do you have any professional licenses?
22       A.  I was a licensed lawyer.  I have an inactive
23   license at this time.
24       Q.  Oh, so was.  How long ago did that happen?
25       A.  It's been inactive, I can't recall exactly,
```

Page 9

1   but probably within five years.
2       Q. Okay. How long have you been in Florida?
3       A. We came in the early '90s to Florida.
4       Q. Did you move directly to Gulf Stream?
5       A. No. Moved to Boca Raton for a couple of
6   years, and then moved to Gulf Stream.
7       Q. And your residence now where you live, was
8   that the first place you moved to in Gulf Stream or
9   was --
10      A. No. We've moved a couple times.
11      Q. Okay. But you've stayed within the --
12      A. Yes.
13      Q. -- Gulf Stream boundaries?
14          Are you retired from the practice of law then
15  I take it?
16      A. I wouldn't use the word retired. I have
17  another business.
18      Q. What's that business?
19      A. It's called Humidifirst. We manufacture
20  commercial humidifier systems. And I am the president
21  of that company.
22      Q. And where is that located?
23      A. In Boynton Beach.
24      Q. Let's see. Do you have any building
25  experience?

Page 10

1       A. What do you mean?
2       Q. Construction. Are you experienced with
3   development construction that would enable you to
4   interpret a code, a building code, that kind of thing?
5       A. I guess that depends.
6       Q. Depends on what?
7       A. Your definition of ability to interpret.
8       Q. Have you ever built a house?
9       A. I haven't laid the brick, but I've had a house
10  built.
11      Q. So you had a general contractor?
12      A. Yes.
13      Q. Okay. Do you know why we're here today?
14      A. You're taking my deposition.
15      Q. For --
16      A. The lawsuit.
17      Q. -- the public records lawsuit?
18      A. Yes.
19      Q. Are you familiar with Florida's Public Records
20  Act?
21      A. Vaguely.
22      Q. Have you ever read the statute?
23      A. No.
24      Q. Okay. When did you first find out about the
25  request that was made which is the subject matter of

Page 11

1   this litigation?
2       A. I haven't seen the complaint in this matter.
3       Q. I would happily provide --
4       A. But it is a complaint relative to a public
5   records request.
6       Q. Correct.
7       A. So I'm aware of that. And I first became
8   aware of that lawsuit when the Jones, Foster law firm
9   contacted me about this deposition.
10      Q. Okay. But my question was more specifically
11  directed to the actual request itself prior to the
12  initiation of litigation.
13      A. Oh, I had -- Would you repeat the question?
14      Q. When did you become aware of the public
15  records request that was made regarding your
16  communications with respect to your position on the
17  Architectural Review and Planning Board?
18      A. That's the subject of this case?
19      Q. Yes.
20      A. When I received a call from Jones, Foster.
21      Q. So you never saw -- Or Mr. Thrasher never
22  called you and asked you about any public records you
23  might have on your computers or --
24      A. No.
25          MS. HANNA: Would you mark that?

Page 12

1           (Plaintiff's Exhibit Number 1 was marked for
2   identification.)
3           MS. HANNA: I apologize, I only have one copy.
4           MR. SWEETAPPLE: Okay.
5           MS. HANNA: It's attached as an exhibit to the
6   complaint.
7           MS. O'CONNOR: Okay.
8           MR. SWEETAPPLE: Just for the record, it's --
9   What number is the complaint, the exhibit number of
10  the complaint as well?
11          MS. HANNA: I believe it's Exhibit B.
12          MR. SWEETAPPLE: Exhibit B. Okay.
13  BY MS. HANNA:
14      Q. Could you just take a look at that document
15  for me. Read it over, and let me now when you are
16  finished.
17      A. Okay.
18      Q. Has that refreshed your recollection at all
19  with respect to the request?
20      A. Your question was whether Mr. Thrasher called
21  me to ask me about a records request that you've just
22  marked as Exhibit 1.
23      Q. Or anybody from the Town of Gulf Stream.
24          Did anyone call you and ask you to produce
25  these records?

Page 13

1      A.  I received a call from someone at the Town of
2  Gulf Stream. I don't recall who it was. I'm not sure
3  when it was, but it was this year, saying that there had
4  been more requests by -- and I don't recall if it was
5  Mr. O'Boyle or Mr. O'Hare, but there were requests and
6  also involving me, and did I know of any letters or
7  documents I may have submitted to the Town in the last
8  year or so.
9      I was not told specifically about a request
10  for records of Scott Morgan of the ARPB. That
11  conversation was pretty much as I just described.
12     Q.  While we're on the topic, you mentioned ARPB,
13  could you --
14     A.  It's the Architectural Review and Planning
15  Board.
16     Q.  And when did you become a member of that
17  board?
18     A.  I don't recall.
19     Q.  It's been --
20     A.  It's been five years or six years, something
21  like that.
22     Q.  Okay. And what does the Architectural Review
23  board -- Review and Planning Board do?
24     A.  We review applications to the board regarding
25  development permits, construction, whether it's whole

Page 14

1  house or just renovations. It could be plan
2  renovations, code modifications, anything assigned by
3  the commission for the ARPB to review, and then report
4  back to the commission as an advisory panel.
5      Q.  How many applications do you think that you
6  have in a year? Can you give me a figure, just a
7  general guess?
8      MR. SWEETAPPLE:  One of the instructions that
9  she should have given you was not to speculate or
10  guess.
11     So if you have a general idea, you can
12  certainly testify to that, but don't guess or
13  speculate.
14     THE WITNESS:  We meet monthly generally except
15  August. And it varies considerably as to how many
16  applications. It may be one. It could be four.
17     So depending on the amount of construction
18  activity and the economy, it does vary
19  considerably.
20  BY MS. HANNA:
21     Q.  And how does that -- What happens? You
22  receive the packet, and what happens after that?
23     A.  Well, we receive a packet which is a good way
24  of describing it, and it includes the applications that
25  are to be heard by the board. We generally get them a

Page 15

1  week or so before the meeting. And then witnesses are
2  brought in to present the application information on.
3  It may be some plans, could be architectural drawings.
4  It really depends on what the applicant is trying to
5  accomplish. And then we hear that evidence, if you want
6  to call it evidence, it's really not a judicial body.
7  And then we determine whether it should be approved or
8  not.
9      Q.  I just want to be clear. So the Architectural
10  Review and Planning Board has witnesses in front of it,
11  or is it -- I'm sorry. Note --
12     A.  People are sworn in. They generally stand up
13  at the podium and give I guess you would call it
14  testimony. It is transcribed I believe or at least is
15  taped. I'm not quite sure.
16     Q.  So just so I understand the function of this
17  board, if I wanted to build a home in Gulf Stream and
18  I'm going to exceed the lot lines, I would come to you
19  first?
20     MR. SWEETAPPLE:  Note my objection to the form
21  to the extent it calls for a legal conclusion.
22     I suggest you read the Snyder opinion
23  regarding quasi-judicial proceedings and land use
24  applications in the State of Florida. It governs
25  all of the proceedings.

Page 16

1      But you can give your lay opinion if you have
2  one.
3      THE WITNESS:  My understanding of it is that
4  if you had an application, and that application is
5  pretty general - I think that's what you're getting
6  at - you would bring it to the Town, generally meet
7  with the town manager who would go over it, let you
8  know if there is any changes that really should be
9  made or some things that definitely won't comply
10  with the code.
11     Then it is brought to the ARPB. We make a
12  decision, and refer it on to the commission with
13  our recommendation. Our decision is not binding.
14  I believe that's the process.
15  BY MS. HANNA:
16     Q.  Okay. Thank you. Is there -- Are there
17  qualifications or anything that Gulf Stream requests
18  that you have before you sit on the ARPB?
19     A.  I don't believe so.
20     Q.  Well, once you got there and are on the
21  board --
22     What's your position on the board?
23     A.  I'm not on the board anymore.
24     Q.  Prior to -- At the time this request was made.
25  It was January 1, 2012.

**Page 17**

1  A. Yeah. I was chairman of the ARPB at that
2  time.
3  Q. You were chairman.
4  All right. You receive a packet you explained
5  to me. How do you get the packet?
6  A. You can come pick it up, or it typically will
7  be dropped off at our house.
8  Q. Who drops it off?
9  A. Sometimes a police officer will bring it.
10  Other times I assume of member of staff. I don't know.
11  I just come home from work, and it's there.
12  Q. I'm sorry to skip around. I just want to --
13  So you work full-time?
14  A. Yes.
15  Q. Okay.
16  MR. SWEETAPPLE: Except today.
17  MS. HANNA: Lucky me.
18  MR. SWEETAPPLE: It looks like you're going to
19  go well beyond the normal background. Is this
20  case -- And I'm just a casual observer. But it
21  looks like it's more about your client lost an
22  election than about a public records request,
23  because this is totally unnecessary for purposes of
24  establishing anything you want to prove in a public
25  records request lawsuit.

**Page 18**

1  Normally questions are calculated to lead to
2  discovery of admissible evidence. I hope certainly
3  you're going to at some point leave background.
4  You might want to ask him what he had for
5  breakfast. Maybe when you're done asking what he
6  had for breakfast, we can get to the subject matter
7  of your lawsuit.
8  MS. HANNA: Thank you for the speech. That
9  was nice.
10  MR. SWEETAPPLE: Yeah. Unless you're just
11  doing this for harassment.
12  MS. HANNA: Have you ever read Lorei v. Smith,
13  the Second DCA case?
14  MR. SWEETAPPLE: Yeah, I'm familiar. I've
15  been board certified as a civil trial lawyer and a
16  business lawyer here for decades.
17  MS. HANNA: And you've read that case --
18  MR. SWEETAPPLE: Yeah, uh-huh.
19  MS. HANNA: -- as it pertains to public
20  records?
21  MR. SWEETAPPLE: Yes. And what I'm suggesting
22  to you is why he moved to Florida and these other
23  questions you're asking him, are really just not
24  calculated to lead to --
25  MS. HANNA: Are you making an objection?

**Page 19**

1  MR. SWEETAPPLE: I am. And I'm laying a
2  predicate for the fact that at some point I suspect
3  that I'm going to have to move to suspend this
4  deposition, because you are starting to just harass
5  the witness. And what you're doing is you have the
6  Plaintiff's son here, the Plaintiff just lost an
7  election.
8  MS. HANNA: I'm sorry. Can we stop for a
9  second?
10  MR. SWEETAPPLE: No, we can't.
11  MS. HANNA: I would like to go off the record.
12  MR. SWEETAPPLE: I don't want to go off the
13  record.
14  MS. HANNA: Okay. Fine.
15  MR. SWEETAPPLE: You have the Plaintiff's son
16  here as your law clerk. The Plaintiff just lost an
17  election.
18  You indicated in the beginning you're
19  disheveled and disorganized. You're required to be
20  prepared. And you're required as an officer of the
21  court to use this proceeding pursuant to your oath
22  not to harass people for any improper purpose.
23  We're here. This gentleman has taken off from
24  work. And you have some issues that you want to
25  prove or take discovery regarding concerning a very

**Page 20**

1  discrete, limited case.
2  And I would appreciate it if you would conduct
3  yourself as a professional and stick to questions
4  that are calculated to lead to discovery of
5  admissible evidence.
6  Are we done with your background examination,
7  or are you going to harass him with regard to
8  things that have nothing to do with your purpose
9  here today?
10  MS. HANNA: Are you done?
11  MR. SWEETAPPLE: I just posed a question to
12  you.
13  MS. HANNA: Can I continue?
14  MR. SWEETAPPLE: Can you please answer my
15  question?
16  MS. HANNA: I'm not in a deposition. I'm
17  taking a deposition.
18  MR. SWEETAPPLE: Okay. Well, I forewarned
19  you, so let's watch what you do here.
20  MS. HANNA: Thank you. That was a lovely
21  speech, and I appreciate it.
22  As you're aware the issue here is whether
23  records were produced, when they were produced and
24  the existence of other records. And I suggest that
25  you read Lorei v Smith. It's a Second DCA case

Page 21

1   that speaks directly to the point when records are
2   not produced and there's an allegation that the
3   government is playing fast and loose, discovery is
4   much broader and not limited to a strict public
5   records typical deposition.
6       MR. SWEETAPPLE:  I understand that, but you
7   haven't asked anything to do with any production of
8   any records here yet.
9       So please proceed to do that.  You've been
10  under the guise of background wasting our time.  So
11  please get to your point.
12      MS. HANNA:  I appreciate that, but I believe
13  that the ARPB information is relevant.
14      MR. SWEETAPPLE:  I believe you're here to
15  harass this witness.  So keep asking questions.
16  Let's go.  Let's see if I'm correct or your
17  correct.  Because I have a feeling we're going to
18  have other proceedings very soon.
19      MS. HANNA:  So are we going to call the judge
20  or --
21      MR. SWEETAPPLE:  No, no.  I think we're going
22  to end up with other proceedings very soon.  So you
23  continue, because I'm watching very carefully.
24      MS. HANNA:  I would ask that you keep your
25  objections to a minimum so we don't have this whole

Page 22

1   Emancipation Proclamation on the record.  It does
2   cost five dollars a page.
3       MR. SWEETAPPLE:  Your client has filed dozens
4   of requests and lawsuits.  Okay?  And I'm going to
5   make my statements and objections on the record.
6   I'm objecting that your questions are not
7   calculated to lead to discovery of admissible
8   evidence and that you are harassing the witness and
9   that this deposition is a pattern of harassment
10  that your client has been pursuing for his own
11  psychological purpose and issues.
12      So please, I'll say it one more time, let's
13  get to the questions that you as a responsible
14  member of the Bar and professional should be asking
15  in this type of a deposition.
16      Now please proceed.
17      MS. HANNA:  I'm sorry.  Could you read the
18  last question back to me?
19      (The requested portion of the record was read
20  by the reporter.)
21  BY MS. HANNA:
22      Q.  Are you aware that those packets are public
23  records?
24      MR. SWEETAPPLE:  Note my objection to the
25  extent it calls for a legal conclusion.

Page 23

1       Go ahead and answer.
2       THE WITNESS:  I guess they would be.
3   BY MS. HANNA:
4       Q.  Okay.  Mr. Morgan, do you have a computer?
5       A.  Sure.
6       Q.  Do you have more than one computer?
7       A.  Sure.
8       Q.  Do you use those computers for business?
9       A.  Yes.
10      MR. SWEETAPPLE:  Object to the form.
11  BY MS. HANNA:
12      Q.  Do you use the computers for Town business?
13      A.  No.  I wouldn't say I use my computers for
14  Town business.  I'm a member of the ARPB.
15      Q.  How do you communicate with the Town when an
16  issue arises from the --
17      A.  What kind of an issue?
18      Q.  A variance request with the ARPB.
19      A.  As I said, typically what happens we get a
20  packet of material from the Town.  We don't -- We don't
21  know what's in it.  We don't know the issues that are
22  before the Town until we receive the packet, read the
23  packet, see what the applications are.  They usually are
24  not variances.  They're usually much simpler than that.
25  And then we go to the hearing.

Page 24

1       Q.  Do you communicate --
2       A.  We don't -- No.  I don't call the Town and
3   say, you know, I see we have an application for Joe
4   Smith, I'd like to get some more information on that.
5   No.  At least I've not done that.
6       Q.  Okay.  Yesterday I received an e-mail from
7   Ms. O'Connor forwarding me a document that I believe was
8   an e-mail from you to Mr. Thrasher.
9       MS. HANNA:  Mark that.
10      (Plaintiff's Exhibit Number 2 was marked for
11  identification.)
12      MR. SWEETAPPLE:  Thank you.
13      MS. HANNA:  I did bring copies of that.
14      MR. SWEETAPPLE:  You marked this as Two?
15      MS. HANNA:  Yes.
16  BY MR. SWEETAPPLE:
17      Q.  Could you just take a second and read that
18  e-mail?
19      A.  Yes.
20      Q.  Is this e-mail an e-mail that you used for
21  official business with the Town, related to the Town?
22      A.  This particular e-mail was -- You use the word
23  used for official business.  I don't know that that's a
24  correct way of designating it.  It's just an e-mail
25  address.

Page 25

1     Q.  As in this e-mail, the Exhibit 2, do you --
2   Strike that.  I'm sorry.
3         Do you have a specific e-mail address that you
4   use to communicate with members of the Town with respect
5   to your duties with the ARPB?
6     A.  No.
7     Q.  Do you have more than one e-mail address that
8   you use to communicate with the Town?
9     A.  I don't regularly communicate with the Town
10  for official business.  So I'm not quite sure what
11  you're asking.
12    Q.  I guess I'm not being clear.
13    A.  I sent this e-mail with that e-mail address.
14    Q.  And what was the date this e-mail was sent?
15    A.  October 18th of 2013.
16    Q.  Okay.  The second paragraph of the e-mail
17  addresses a request that was made.  And you state that
18  the request is vague.  So you were unable in good faith
19  to respond to it?
20    A.  That's correct.
21    Q.  What did you use to make that determination?
22    MR. SWEETAPPLE:  Note my objection to the
23  form.  Do you have the underlying --
24    MS. O'CONNOR:  Join.
25    MR. SWEETAPPLE:  -- the underlying

Page 26

1   communication that he's referring to?
2     MS. HANNA:  Is there an underlying
3   communication that he's referring to?
4     MR. SWEETAPPLE:  Well, yeah.  He says the
5   highlight in request number five of the e-mail
6   makes no sense.
7         So do you have that?
8     MS. HANNA:  Unfortunately, I don't, which is
9   one of the issues in this lawsuit.
10    MR. SWEETAPPLE:  Okay.
11    MS. O'CONNOR:  This is referencing an e-mail
12  that your client sent making a public records
13  request.  So I would suspect that you have it.
14    MS. HANNA:  The time frame is October 18,
15  2013.  Mr. O'Boyle made a request for --
16    MS. O'CONNOR:  It's not the request we're
17  talking about here.
18    MR. SWEETAPPLE:  You don't have his e-mail?
19  You don't have Mr. O'Boyle's e-mail?
20    MS. HANNA:  No, I do not.  I have
21  Mr. O'Boyle's public records request, which
22  includes any communication sent or received by
23  Scott Morgan of the Architectural Review and
24  Planning Board at the Town of Gulf Stream for the
25  period beginning January 1, 2012 through the date

Page 27

1   of this request, which is 1/24/14.
2     MR. SWEETAPPLE:  That request itself as a
3   matter of law is vague.  It doesn't even indicate
4   who to or from.
5     MS. O'CONNOR:  And just for the record, this
6   e-mail --
7     MR. SWEETAPPLE:  Is that what you're referring
8   to?
9     MS. O'CONNOR:  -- was produced to you in an
10  abundance of caution to the extent it might fall
11  within the ambit of the public records request
12  that's at issue in this lawsuit.
13        Exhibit 2 references another public records
14  request made by your client back in October of 2013
15  so...
16    MS. HANNA:  We've received 1422 pages after
17  this litigation was initiated.  All of those
18  documents were responsive to Mr. O'Boyle's request,
19  including packets from the ARPB.
20    MR. SWEETAPPLE:  Are you saying you don't have
21  an e-mail from your client in or about October of
22  2013?
23    MS. HANNA:  This is not my client who made the
24  request.
25    MR. SWEETAPPLE:  Okay.  Mr. J. O'Boyle.  You

Page 28

1   don't have an e-mail from Mr. J. O'Boyle from on or
2   about October 18th as referred to --
3     MS. HANNA:  Yes, I do.  I do.
4     MR. SWEETAPPLE:  Okay.  So you stand corrected
5   because Mr. J. O'Boyle is showing it to you.
6         Do you have a copy of it here for the purposes
7   of the deposition so that this exhibit can be
8   complete?
9         I'm objecting to this exhibit because it's not
10  complete.  It make a reference to a document in a
11  string that I would like to see and have made part
12  of the record if we could.
13        Do you only have it on your computer screen,
14  or do you have a hard copy of it?
15    MS. HANNA:  Could we just go off the record
16  for a second, please.
17    MR. SWEETAPPLE:  No.  We're not going off the
18  record with you.  We're going to have an official
19  record about your public records request about your
20  client's home improvement.  So we're never going to
21  go off the record.
22    MS. HANNA:  Mr. Sweetapple, you're bringing
23  up -- I mean you're throwing around election.
24  We're not talking about election.  We're not
25  talking about my client's home improvement.

Page 29

1    I'm trying to get to some issues here. I have
2  some genuine questions. You dispute the
3  genuineness of my questions.
4        MR. SWEETAPPLE: No, I don't.
5        MS. HANNA: However, your job here is not to
6  dispute my questions. It's just to sit and listen
7  and object to form. No speaking objections.
8        MR. SWEETAPPLE: You have a --
9        MS. HANNA: But you have decided that you're
10  going to interpose voluminous statements on the
11  record.
12       MR. SWEETAPPLE: I can object for a number of
13  grounds besides just form. Your understanding of
14  the law is entirely unsophisticated.
15       I am now objecting because this exhibit is
16  incomplete. And I'll ask you for the third time
17  very respectfully, other than the fact that
18  Mr. Jonathan O'Boyle just showed you a computer
19  screen and corrected your earlier position and
20  there is a communication from Mr. Jonathan O'Boyle
21  in October of 2013 which your Exhibit 2 apparently
22  is part of and relates to, I will ask you one last
23  time do you have a copy of it so the witness can
24  see it so he can have a complete exhibit? Or do
25  you need --

Page 30

1        MS. HANNA: I'm sure that I do.
2        MR. SWEETAPPLE: May I please make it part of
3  the record? Because you're asking him about that
4  communication. And he would like to see it.
5        MS. HANNA: I am not asking him about that
6  communication.
7        MR. SWEETAPPLE: Yes. Because you asked him
8  what -- He referred to a document as being vague.
9  That's the document.
10       Do you have it here today?
11       MS. HANNA: Can you read my question back for
12  me?
13       MR. SWEETAPPLE: You'll see in your questions
14  you asked him about what was vague.
15       MS. HANNA: I believe I asked him what his
16  understanding of vagueness was.
17       MR. SWEETAPPLE: Well, that would be a silly
18  question to ask.
19       MS. HANNA: Would it?
20       MR. SWEETAPPLE: Because that would be a legal
21  conclusion as to what's vague. A judge will make
22  that decision.
23       And after you've had that read back, please
24  answer my question I've asked three times. Do you
25  have the rest of this exhibit or not?

Page 31

1        MS. HANNA: To make Mr. Sweetapple happy,
2  we'll take it out for the time being, and we'll
3  move on.
4        MR. SWEETAPPLE: I'm happy to have you give me
5  the complete exhibit. That's not Two. We'll leave
6  that marked as Two, but we'll move on.
7        MS. HANNA: Thank you.
8        MR. SWEETAPPLE: The next exhibit will be
9  Three.
10       MS. HANNA: Thank you. Thank you for that,
11  Mr. Sweetapple.
12  BY MS. HANNA:
13       Q.  Going back to January 1, 2012 when the public
14  records request was made that's at issue in this case --
15       MS. O'CONNOR: Objection. The public records
16  request was made in January of 2014. The request
17  was made in January 2014. It concerns documents --
18       MS. HANNA: Oh, I'm sorry. You're right. You
19  are right.
20       MS. O'CONNOR: I just want to clarify for the
21  record.
22       MS. HANNA: Okay. Thank you.
23       Where is the request?
24       MS. O'CONNOR: With Exhibit 1.
25

Page 32

1  BY MS. HANNA:
2        Q.  Mr. Morgan, I'm asking you to take a look at
3  that again.
4        A.  Yes.
5        Q.  At the time that request was made, did you
6  have any documents that would be responsive to the
7  request?
8        MR. SWEETAPPLE: Object to the form.
9        THE WITNESS: I'm sorry. At the time this
10  request was made, January 24th of 2014, but not
11  made to me.
12  BY MS. HANNA:
13       Q.  To the Town.
14       A.  Did I have any public records responsive to
15  this?
16       Q.  Did you have any documents or e-mails or
17  letters that you communicated with the Town regarding
18  Town business?
19       MR. SWEETAPPLE: Object to the form.
20       THE WITNESS: Not to my knowledge.
21       MS. HANNA: What's your basis?
22       MR. SWEETAPPLE: Pardon?
23       MS. HANNA: What's your basis?
24       MR. SWEETAPPLE: My basis is that anything
25  that he had in his possession that you're asking

1  about would not be a public record.  It would be
2  his personal record.  It would be a public record
3  only if it were held by the city or town or
4  municipality or government entity.
5      So your whole area of inquiry is based on a
6  predicate that has no legal basis.  Anything in his
7  computer is not a public record because he sent it
8  to a government agency.
9      That's the basis for my objection.  Please
10  proceed.
11      MS. HANNA:  I'm going to take a break.
12  Jon, can you come outside with me?
13      MR. JONATHAN O'BOYLE:  Sure.
14      (A recess was had from 10:41 until 10:54 a.m.)
15  BY MS. HANNA:
16      Q.  Mr. Morgan, have you ever -- I know you have.
17  I'm just going to give you Exhibit C to the complaint.
18  I'll give it to your lawyer first.
19      MR. SWEETAPPLE:  Thank you.
20      MS. HANNA:  I think it's got an extra page on
21  it.
22      MR. SWEETAPPLE:  Not part of the exhibit?
23      MS. HANNA:  No.
24      MR. SWEETAPPLE:  Okay.  Here you go.
25      Are you going to mark this as Three?

1      MS. HANNA:  No.  Let's mark this as Two.
2  We'll come back to --
3      MR. SWEETAPPLE:  Well, we already have a Two
4  marked even though you're not --
5      MS. HANNA:  It's just a sticker.  We can take
6  it off.
7      MR. SWEETAPPLE:  Okay.  Well, then the record
8  won't know what we were talking about.  I prefer to
9  leave Two.  We talked about Two being incomplete.
10      MS. HANNA:  All right.
11      MR. SWEETAPPLE:  So I want a complete record.
12  So if you don't mind, we'll mark this as Three.
13      MS. O'CONNOR:  And just for the record, it's
14  not an exact copy.  It's just a part of Exhibit C
15  to the complaint.
16      MR. SWEETAPPLE:  So Exhibit C to the complaint
17  is --
18      MS. O'CONNOR:  Yes.  You don't have the cover
19  letter, the February 3, 2014 cover letter.  Here it
20  attaches.
21      MR. SWEETAPPLE:  I've got an attachment here.
22      MS. O'CONNOR:  And there was more than just
23  this document.  There's five pages attached.
24      MS. HANNA:  For Exhibit C?
25      MS. O'CONNOR:  Yes.  I have your complaint

1  right here if you'd like to look at it.
2      MS. HANNA:  Yeah.  May I see that?
3      MS. O'CONNOR:  Uh-huh.
4      MR. SWEETAPPLE:  So this is incomplete also
5  you're saying?
6      MS. O'CONNOR:  Correct.
7      MR. SWEETAPPLE:  We could just say it's part
8  of Exhibit C of the complaint.  At least we'd have
9  the whole exhibit to look at.
10      MS. HANNA:  Okay.
11      MS. O'CONNOR:  Do you need to make a copy of
12  that?
13      MS. HANNA:  I have this right here.  It's just
14  a little confusing because there is an extra sheet
15  attached to this.  So I did not believe that it was
16  part of the exhibit.
17      Do you want to take a look at this?  Is that
18  more complete for you?
19      MR. SWEETAPPLE:  Okay.
20      MS. O'CONNOR:  It's missing pages three out of
21  eight and seven out of eight.
22      MS. HANNA:  One, two, three, four, five.
23  How many pages do you have in your hand?
24      MS. O'CONNOR:  Five.
25      MS. HANNA:  This exhibit right here has five

1  pages.  It starts with a letter from the Town of
2  Gulf Stream, February 3, 2014, and ends with a page
3  signed by Scott W. Morgan.
4      MR. SWEETAPPLE:  Is this letter the only part
5  of the exhibit that Mr. Morgan authored?
6      MS. HANNA:  Yes.
7      MS. O'CONNOR:  I suspect you may have attached
8  an incomplete exhibit to your complaint.  This is
9  an eight page fax, and you're missing -- And it's
10  both this and the exhibit to the complaint only has
11  five pages.  You're missing a page three out of
12  eight and page seven and eight out of eight.
13      And the letter indicates that there are five
14  eight-and-a-half by eleven one-sided documents that
15  are included with this fax cover page.  And it
16  appears that only three were attached.
17      MS. HANNA:  Actually, page three is Exhibit B
18  of the complaint.
19      MR. JONATHAN O'BOYLE:  Yeah.  It's all A, and
20  the exhibits.
21      MS. HANNA:  Page two is Exhibit A to the
22  complaint.
23      MR. SWEETAPPLE:  Do you want to ask him about
24  this letter, the July 23rd letter?
25      MS. HANNA:  Yes.

## Page 37

1    MR. SWEETAPPLE: Okay. I marked that as
2  Three. So why don't we just go ahead and go
3  forward with that.
4        (Plaintiff's Exhibit Number 3 was marked for
5  identification.)
6    MS. HANNA: Two is subject to completion per
7  Mr. Sweetapple's request.
8    MR. SWEETAPPLE: Okay. So you're holding it.
9  Fine.
10   THE WITNESS: Can we continue, please?
11 BY MS. HANNA:
12   Q. Have you had a chance to read the letter that
13 I've handed you? It's marked as Exhibit 3.
14   A. I did not read it, but I'm familiar with it.
15   Q. Who was the author of that letter?
16   A. I wrote this and signed it.
17   Q. What prompted you to write that letter?
18   A. At an ARPB meeting, the town manager asked the
19 members of the board to take a look at the code and
20 propose any comments, modifications, changes, anything
21 that they thought might be helpful to an ad hoc
22 committee that was being set up to review the design
23 manual of our code. And so in response to that request,
24 I wrote this letter.
25   Q. Is this a letter that --

## Page 38

1    A. Oh, I'm sorry. I should have read it. Strike
2  that. I'm looking at the wrong one.
3    MR. SWEETAPPLE: Right.
4    THE WITNESS: I wondered why you were
5  looking... I'm sorry.
6        This was a letter I wrote on July 23rd. It's
7  titled Hidden Harbour Estates Lot 5. This was a
8  letter that I -- or a fax that I sent in to the
9  Town noting my objection to an application that was
10 coming before the ARPB I guess for the July
11 meeting. Sorry about that.
12 BY MS. HANNA:
13   Q. That's all right.
14      Do you typically send letters to the town?
15   A. No.
16   Q. Only when you have specific objections?
17   A. I would rarely send a letter to the Town. But
18 I had voiced my objection to the Harbour View Estates
19 development early on. This was one of the proposed
20 buildings that I objected to. And I wanted my
21 objections to be known to the ARPB for their
22 consideration.
23   Q. So when you have objections, you write a
24 letter to the ARPB?
25   A. No. Sometimes I would be sitting on the ARPB.

## Page 39

1    Q. Okay.
2    A. This letter -- Frankly, I knew I was not going
3  to be on. And had I been there, I more likely than not
4  would have recused myself. Because as a neighbor in
5  proximity to this property, as I had done before
6  previous times, had recused and vocalized my objections
7  to it. Others I did not object to with this property.
8    Q. Okay. Thank you.
9        I just want to clarify one point. Your
10 position as the commissioner of the ARPB gave you the
11 authority to author documents?
12   MR. SWEETAPPLE: Form.
13   MS. O'CONNOR: Objection.
14 BY MS. HANNA:
15   Q. Did you author documents during your tenure
16 as -- What was it?
17   A. Anyone can write letters, faxes, come and give
18 public comment, come and testify relative to any
19 application. You needn't be a member of the board or
20 the commission.
21   Q. But as a member of the board or the
22 commission, did you create correspondence?
23   MS. O'CONNOR: Objection.
24   THE WITNESS: For what?
25

## Page 40

1  BY MS. HANNA:
2    Q. Related to the applications that were before
3  you?
4    A. All the applications, no.
5    Q. Was there ever a time when you did create
6  correspondence relative to an application pending before
7  you?
8    MS. O'CONNOR: Objection. Asked and answered.
9    MR. SWEETAPPLE: Form.
10   THE WITNESS: Not to my knowledge.
11 BY MS. HANNA:
12   Q. Okay. How many e-mail accounts do you have,
13 Mr. Morgan?
14   MR. SWEETAPPLE: You don't have to disclose
15 that. You can say number, but you don't have to
16 tell them your e-mail addresses if you don't want
17 to.
18   MS. HANNA: I didn't ask for the e-mail
19 addresses.
20   THE WITNESS: I believe three.
21 BY MS. HANNA:
22   Q. Okay. I know I asked you this before, but I'm
23 asking you this again and with an addition, but just so
24 there is some context here.
25      When the request was made on January 14th --

Page 41

1  January 24, 2014, you had indicated earlier that
2  Mr. Thrasher did not contact you, nor anyone from the
3  town, correct?
4      MR. SWEETAPPLE:  Form.
5      MS. O'CONNOR:  Objection.
6      THE WITNESS:  When?
7  BY MS. HANNA:
8      Q.  When this request was made.
9      MR. SWEETAPPLE:  Pointing to Exhibit 1.
10 BY MS. HANNA:
11     Q.  Did anyone --
12     A.  No one -- I was not called or notified or
13 written on January 24th about a records request.
14     Q.  At any time thereafter, were you contacted
15 about a records request?
16     MS. O'CONNOR:  Objection.
17     THE WITNESS:  Yes.  Thereafter, I believe it
18     was thereafter based on what I saw, but I can't
19     really tell.
20 BY MS. HANNA:
21     Q.  When?
22     A.  I said I don't know.  I think I testified
23 earlier it was in the New Year.  I'm assuming it was
24 after this, but I'm not positive.  But I received a
25 telephone call from someone from the Town of Gulf Stream

Page 42

1  indicating that more records requests had come in.  It
2  was either from O'Boyle or O'Hare, I don't recall, and
3  had I helped written anything; did I help guide them;
4  had I submitted anything in the last year or so.
5      And that's when I said there was a Spence
6  property objection.  And there was the ad hoc committee
7  recommendation on the design code changes.  Those were a
8  couple that I could think of.
9      Q.  What's the ad hoc committee?
10     A.  There is an ad hoc committee reviewing the
11 design manual for any proposed changes or additions.
12 And Mr. Thrasher had asked the members of the ARPB to
13 send in any comments that they had that might be helpful
14 to the ad hoc committee studying that manual.
15     Q.  How did Mr. Thrasher ask?  Did he send you
16 an e-mail?
17     A.  No.  It was at a board meeting.
18     Q.  Board meeting.
19     (Mr. Martin O'Boyle entered the room.)
20 BY MS. HANNA:
21     Q.  Do you presently speak with the town solicitor
22 on ARPB matters?
23     MR. SWEETAPPLE:  Object to the form.
24     MS. O'CONNOR:  Join.
25

Page 43

1  BY MS. HANNA:
2      Q.  Have you spoken with Mr. Randolph, who's the
3  town solicitor, to address matters that come before the
4  ARPB?
5      MR. SWEETAPPLE:  Form.
6      THE WITNESS:  At board meetings.
7  BY MS. HANNA:
8      Q.  When you say the Spence property came up, do
9  you -- What happened with regard to the Spence property
10 with the application and your objections?
11     MR. SWEETAPPLE:  Form.
12     THE WITNESS:  There had been a number of
13     applications on the Spence property.  And that's
14     just a general phrase to describe what was
15     originally a single home.  It was purchased by a
16     developer who prepared a plat to develop it into
17     six homes.
18     Mr. O'Boyle actually led the objection to that
19     property at least with respect to the plat.
20     Thereafter, there have been applications filed
21     after that was approved for the individual homes.
22 BY MS. HANNA:
23     Q.  Did you ever talk to any of the contractors
24 involved in that project, the Spence property project?
25     A.  Had I ever spoken to Mr. Laudani who's I

Page 44

1  guess, the head of Seaside Builders?  Yes.
2      Q.  After his application was made?
3      A.  Yes.
4      Q.  Was that during an ARPB commission meeting?
5      A.  Both.
6      Q.  Did you ever have any e-mail exchange with
7  Mr. Laudani?
8      MR. SWEETAPPLE:  Form.
9      THE WITNESS:  I don't recall.  I don't know.
10     I don't recall.
11 BY MS. HANNA:
12     Q.  When you were preparing for the ARPB meetings,
13 did you take notes?
14     A.  No.  I might occasionally jot something on the
15 paperwork that was provided to us.  I don't routinely
16 take notes.  I might for questions.  I might either
17 write on a paper or on a pad something to ask as a
18 question.  But other than that, no, I don't take notes.
19     Q.  What do you do with the papers once you're
20 done with the meeting?
21     A.  I discard them.
22     Q.  You've been quoted as saying that you want to
23 take a proactive approach to the litigation involving
24 the Town with Mr. O'Boyle and Mr. O'Hare's public
25 records request.

Page 45

```
 1          Could you explain what you mean by that?
 2          MR. SWEETAPPLE:  Form.
 3          MS. O'CONNOR:  Join.
 4          MR. SWEETAPPLE:  Not calculated to lead to
 5     discovery of admissible evidence.
 6          THE WITNESS:  Yes.  I believe the Town should
 7     take a very aggressive stance with respect to
 8     lawsuits such as this one in order to defend the
 9     Town's interests.
10     BY MS. HANNA:
11          Q.  Have you ever received any documents from the
12     Town in the mail?
13          MR. SWEETAPPLE:  Object to the form.
14          MS. HANNA:  What's your basis?
15          MR. SWEETAPPLE:  "Have you ever received any
16     documents from the Town in the mail?"
17          You don't think that's a little overly broad?
18     You don't have a time period?  You're talking he's
19     probably received hundreds of documents from the
20     Town in the mail.
21          MS. HANNA:  Thank you for that.
22          MR. SWEETAPPLE:  I think you would be a little
23     more specific than that.  Otherwise we'll be here
24     for like weeks.
25
```

Page 46

```
 1     BY MS. HANNA:
 2          Q.  Of the hundreds of documents that your
 3     attorney has so pointed out --
 4          MR. SWEETAPPLE:  Water bills --
 5     BY MS. HANNA:
 6          Q.  -- from the town --
 7          MR. SWEETAPPLE:  Notices of elections,
 8     properties --
 9     BY MS. HANNA:
10          Q.  -- with respect to your position as the ARPB
11     planning --
12          MS. O'CONNOR:  That's not what he said.
13     BY MS. HANNA:
14          Q.  -- ARPB -- Architectural Review Board and
15     Planning, did you ever receive mail with respect to your
16     duties as the head of that board from the Town?
17          A.  No.
18          Q.  I have one more thing.
19          MR. SWEETAPPLE:  Do you have a complete
20     exhibit now?  Do you have this?
21          You are going to read it?
22          THE WITNESS:  I will this time having made a
23     mistake on the last one.
24          MR. SWEETAPPLE:  Okay.
25
```

Page 47

```
 1     BY MS. HANNA:
 2          Q.  Who authored that e-mail?
 3          A.  The e-mail on the top is the one that I sent
 4     dated October 18, 2013.
 5          Q.  And that's Exhibit 2, composite?
 6          A.  Right.  I think Two comprises four pages.
 7          Q.  Could you read the e-mail prior to that?
 8     Could you slide that sheet over, Exhibit Two top.
 9          A.  This -- I don't think this is an e-mail.  It
10     looks like a letter from the town, or maybe it was
11     e-mailed because it's got Jonathan O'Boyle's e-mail
12     address on it.  I don't know.
13          Do you want me to read this, whatever it is?
14          Q.  Go ahead.
15          A.  It's dated October 18, 2013.  Dear
16     Mr. Jonathan O'Boyle, The Town of Gulf Stream has
17     received your public records request dated October 15,
18     2013.  If your request was received in writing, then the
19     first page of that request is attached to this cover
20     letter.  If your request was verbal, then the
21     description of your public records request is set forth
22     in the space below.  Our staff will review your request
23     within the next three business days, and we will
24     promptly send you the appropriate response or an
25     estimated cost to respond."
```

Page 48

```
 1          Q.  Now, would you do me a favor and take a look
 2     at Mr. O'Boyle's, Jonathan O'Boyle's request?
 3          A.  This is dated October 15, 2013.
 4          Q.  Okay.  How many pages is the request?
 5          A.  The e-mail request is two pages.
 6          Q.  Okay.  Do you mind if I have that for a
 7     second?
 8          How did you become aware of this request which
 9     would have prompted you to send that e-mail to
10     Mr. Thrasher dated October 18, 2013?
11          MR. SWEETAPPLE:  Object to the form.
12          THE WITNESS:  I don't recall, but I was
13     obviously given at least request number five, but I
14     don't recall how I received it.
15     BY MS. HANNA:
16          Q.  And why did you -- What was the basis for your
17     conclusion in your e-mail?
18          MR. SWEETAPPLE:  Object to the form.
19          THE WITNESS:  Why don't you read it?  Does it
20     make sense to you?
21          It doesn't make sense.
22     BY MS. HANNA:
23          Q.  Why?
24          A.  Read it.
25          MR. SWEETAPPLE:  Read it into the record.
```

Page 49

1       THE WITNESS: I'll read it into the record.
2   Give it to me.
3   BY MS. HANNA:
4       Q.  Okay.
5       A.  Number five. "E-mail's sent from
6   Scott Morgan's for the month of September 2013."
7       What does that mean?  What is that?  It's
8   vague. I'm not going to respond to that.
9   BY MS. HANNA:
10      Q.  Could you just read -- When you were confused,
11  did you seek assistance for your confusion?
12      A.  Mr. -- I think I got this from Mr. Thrasher,
13  and I would assume that anybody reading that would have
14  the same reaction I did.
15      Q.  So your reaction you felt, and if I'm
16  misstating this, you felt that based on this response
17  being vague no records would be provided?
18      MR. SWEETAPPLE: Object to the form.
19      THE WITNESS: I didn't understand it,
20  Counselor.
21  BY MS. HANNA:
22      Q.  Did you ask Mr. Thrasher to explain it to you
23  or seek --
24      A.  No.
25      Q.  -- clarification?

Page 50

1       A.  No.  I responded in my e-mail, which is marked
2   as Exhibit 2 and is self-explanatory.
3       MS. HANNA: I'm just going to ask you
4   gentlemen if we could have a five minute break. We
5   may be concluding.
6       MR. SWEETAPPLE: Sure.
7       (A recess was had from 11:22 until 11:33 a.m.)
8       MS. O'CONNOR: If we could also note for the
9   record that also in attendance is the Plaintiff,
10  Martin O'Boyle, as well as Chris O'Hare, and
11  Mr. Thrasher from the Town.
12      MR. MARTIN O'BOYLE: And if I may, my name is
13  Martin O'Boyle --
14      MR. SWEETAPPLE: You're not allowed to make
15  any comments at this time. We are in the middle of
16  a court proceeding.
17      MR. MARTIN O'BOYLE: Okay.
18      MR. SWEETAPPLE: You're entitled to observe
19  and that's all. Please sit down, sir, or else I'm
20  going to suspend the deposition and move the Court
21  for sanctions, including contempt citation against
22  you.
23      Please sit down. There's an attorney here
24  representing you. Do you want to speak to her
25  privately? You can do so.

Page 51

1       MR. MARTIN O'BOYLE: I want to speak with her
2   on the record. I'm terminating the services of my
3   attorney.
4       MR. SWEETAPPLE: Do not speak to her on the
5   record, sir. Please sit down, Mr. O'Boyle.
6   Mr. Boyle, sit down and observe the --
7       MS. HANNA: Mr. Sweetapple, please don't raise
8   your voice.
9       MR. MARTIN O'BOYLE: I'm terminating the
10  services of my attorney.
11      MS. HANNA: There is no need to raise your
12  voice.
13      MR. SWEETAPPLE: Okay. I'm going to be on the
14  phone with Judge McCarthy. Let's go. Let's take a
15  break. I'm going to call Judge McCarthy it
16  appears.
17      MR. MARTIN O'BOYLE: Well, we'll call him
18  together because --
19      MR. SWEETAPPLE: Oh, we're going to call him
20  together. I'm going to pull his number out of my
21  speed dial here from my --
22      MR. MARTIN O'BOYLE: Sure.
23      MR. SWEETAPPLE: -- court judges.
24      MR. MARTIN O'BOYLE: Sure.
25      MR. SWEETAPPLE: And then we are going to have

Page 52

1   to call him in a few minutes.
2       MS. HANNA: He is not going to be available.
3       MR. SWEETAPPLE: Okay. Can you talk to your
4   client and make him aware that he's not to make
5   speeches?
6       MS. HANNA: Did you hear what my client just
7   said?
8       MR. SWEETAPPLE: We're going to leave. You
9   talk to your client. You speak for your client.
10      We'll leave, and when you're done -- Let's go
11  ahead and excuse ourselves. Then you can put on
12  the record whatever you want to say on behalf of
13  your client. This is not his soapbox or his
14  psychiatric office.
15      (Mr. Sweetapple, Ms. O'Connor, Mr. Thrasher
16  and the witness exited the room at 11:34 a.m.)
17      MR. MARTIN O'BOYLE: As I said, my name is
18  Martin O'Boyle I'm the Plaintiff. I have
19  terminated the services of our counsel. I am now
20  pro se. I am prepared to continue with the
21  deposition where counsel has left off.
22      (A recess was had from 11:34 until 11:40 a.m.)
23      MR. SWEETAPPLE: Back on the record. I'm
24  ready for counsel to proceed.
25      Counsel, are you going to continue to finish

## Page 53

1     this deposition? I think you've told me you've
2     been fired; is that the case?
3        MR. MARTIN O'BOYLE: Counsel no longer
4     represents me. I'm pro se.
5        MR. SWEETAPPLE: You're pro se.
6        MR. MARTIN O'BOYLE: Yes.
7        MR. SWEETAPPLE: Okay. Well, we're going to
8     have to take that up with the judge. You weren't
9     here for the beginning part of the deposition.
10       MR. MARTIN O'BOYLE: That's correct.
11       MR. SWEETAPPLE: You don't even know what's
12     been asked. Is it -- Is it your intention to
13     complete a deposition after terminating your
14     counsel?
15       MR. MARTIN O'BOYLE: It is my intention to
16     take the deposition. And, of course, I would have
17     to complete the deposition. Otherwise --
18       MR. SWEETAPPLE: Okay. I'm going -- I'm going
19     to move to suspend the deposition, and file a
20     motion with the Court. You couldn't possibly
21     complete this deposition not having been here. You
22     don't even know what's been asked or answered. I'm
23     not going to take time for you to go through and
24     have the court reporter read all that to you.
25       You also still have a law firm that is of

## Page 54

1     record in this case. Until that law firm has
2     withdrawn, they are your counsel. I'm going to
3     call upon your counsel to finish this deposition.
4     She's still counsel of record. Your son is here;
5     he is still counsel of record.
6       MR. JONATHAN O'BOYLE: Not true.
7       MR. SWEETAPPLE: So at this point, if your
8     attorney wants to put on the record that she has
9     been terminated and her firm has been terminated,
10     do you want to put that on the record?
11       MS. HANNA: My representation of Mr. O'Boyle
12     has been terminated, as the services of this firm
13     have been terminated as well.
14       MR. SWEETAPPLE: Okay. Fine. Then you'll
15     need to move -- And you're not going to take any --
16     not going to continue with this deposition at this
17     time? Is that no?
18       MS. HANNA: Yes, that's a no.
19       MR. SWEETAPPLE: Okay. So at this point are
20     you suspending the deposition, or what are you
21     doing?
22       MR. MARTIN O'BOYLE: I'm taking the
23     deposition.
24       MR. SWEETAPPLE: Excuse me.
25       MS. HANNA: Mr. Sweetapple, I asked you --

## Page 55

1       MR. MARTIN O'BOYLE: She's no longer counsel,
2     Counselor.
3       MR. SWEETAPPLE: No, she's counsel of record,
4     sir.
5       MR. MARTIN O'BOYLE: I understand.
6       MS. HANNA: Mr. Sweetapple, I asked you if we
7     could suspend the deposition.
8       MR. SWEETAPPLE: Right. You cannot.
9       MS. HANNA: You refused to. And now you are
10     saying that you want to suspend the deposition.
11       MR. SWEETAPPLE: No, no. I want to know if
12     you're going to finish the deposition as counsel
13     for the Plaintiff. You're telling me you've been
14     terminated. Then I guess you can't make any more
15     representations on this record.
16       MS. HANNA: Correct.
17       MR. SWEETAPPLE: I will suspend this and take
18     it up with the Court. I think the termination in
19     the middle of the deposition is in bad faith. I
20     think it's a ploy in order to try to continue this
21     deposition. I'm going to ask the Court to
22     determine that this firm has been terminated from
23     all matters as a result of this, that it's no
24     longer Mr. O'Boyle's counsel on any matters.
25       And I will be moving to suspend at this time.

## Page 56

1     I'll be moving for an award of attorney's fees and
2     costs. I think this is game playing. We've had a
3     good indication of that based on your questioning
4     and based on this ploy by Mr. O'Boyle.
5       Have a good day. I'll be filing a motion with
6     the Court. And we'll be serving Mr. O'Boyle
7     personally with that motion.
8       MR. MARTIN O'BOYLE: Madam Court Reporter, I
9     would like to say --
10       MR. SWEETAPPLE: The deposition is -- This is
11     concluded now. You can go off the record.
12       MR. MARTIN O'BOYLE: You are not to turn off
13     the record unless both parties agree. I do not
14     agree.
15       MR. SWEETAPPLE: Okay. You're not --
16       MR. MARTIN O'BOYLE: I am a pro se party.
17       MR. SWEETAPPLE: You have not appeared.
18       MR. MARTIN O'BOYLE: I'm not going to debate
19     it with you, Mr. Sweetapple.
20       MR. SWEETAPPLE: You can do whatever you want
21     on the record, Mr. O'Boyle. Mr. O'Boyle, you talk
22     to the court reporter.
23       MR. MARTIN O'BOYLE: I am not going to debate
24     it with you.
25       MR. SWEETAPPLE: Mr. O'Boyle, talk to the

Page 57

```
 1   court reporter.
 2       MR. MARTIN O'BOYLE:  I'm not going to debate
 3   it with you.  Thank you.
 4       MR. SWEETAPPLE:  Let the record reflect that
 5   all counsel, the counsel for the city, the counsel
 6   for the witness, and the witness had left.  And
 7   we're going to let Mr. O'Boyle sit here and talk to
 8   himself, his son, and his former law firm.
 9       MR. MARTIN O'BOYLE:  No, I'm going speak to
10   the court reporter only, Mr. Sweetapple.
11       MR. SWEETAPPLE:  Good.
12       MR. MARTIN O'BOYLE:  And we will seek
13   sanctions against you.
14       (Mr. Sweetapple, Ms. O'Connor, the witness and
15   Mr. Thrasher exited the room.)
16       MS. HANNA:  Marty.
17       MR. MARTIN O'BOYLE:  Anyway, I am here.  I am
18   pro se.  I was ready as I'm sitting in the person
19   formally taking the deposition's seat.  I am
20   prepared to take the deposition.  I alerted
21   Mr. Sweetapple to that.
22       He has unilaterally decided based on what I
23   would consider to be inappropriate comments about
24   my psychiatric condition and so forth to walk out
25   of the deposition.
```

Page 58

```
 1       We -- At this point if he leaves the building,
 2   we will ask the Court to allow us to continue the
 3   deposition.
 4       We come in good faith.  We come with the
 5   thought of finishing the deposition.  The
 6   documentation that has been, I guess, shown to the
 7   witness and has been admitted as exhibits I'm
 8   familiar with.  And I feel that there could have
 9   been an easy transition for the completion of the
10   deposition.  And, indeed, there should have been.
11   And I will let Mr. Sweetapple's conduct speak for
12   itself.
13       And beyond that, I would like to say thank you
14   very much for your patience, your tolerance and
15   your kindness.
16       MR. MARTIN O'BOYLE:  We are off the record.
17       (Deposition was adjourned at 11:46 a.m.)
18
19
20
21
22
23
24
25
```

Page 59

```
 1               CERTIFICATE OF OATH
 2   THE STATE OF FLORIDA)
 3   COUNTY OF PALM BEACH)
 4
 5       I, the undersigned authority, certify that the
 6   witness, SCOTT MORGAN, personally appeared before me and
 7   was duly sworn on Wednesday, the 26th day of March,
 8   2014.
 9
10       Dated this 29th day of March, 2014.
11
12
13
14
15       _____
         KATHLEEN LUSZ, RPR
16       Notary Public - State of Florida
         My Commission Expires:  6/9/16
17       My Commission No.:  EE 201660
18
19
20
21
22
23
24
25
```

Page 60

```
 1           C E R T I F I C A T E
 2   THE STATE OF FLORIDA)
 3   COUNTY OF PALM BEACH)
 4
 5       I, KATHLEEN LUSZ, Registered Professional
     Reporter and Notary Public in and for the State of
 6   Florida at large, do hereby certify that I was
     authorized to and did report said deposition in
 7   stenotype; and that the foregoing pages are a true and
     correct transcription of my shorthand notes of said
 8   deposition.
 9       I further certify that said deposition was
     taken at the time and place hereinabove set forth and
10   that the taking of said deposition was commenced and
     completed as hereinabove set out.
11
12       I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative or
13   employee of any attorney or counsel of party connected
     with the action, nor am I financially interested in the
     action.
14
15       The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
16   means unless under the direct control and/or direction
     of the certifying reporter.
17       Dated this 29th day of March, 2014.
18
19
20
21       _____
22       KATHLEEN LUSZ, RPR
23
24
25
```

Page 61

```
 1        DEPOSITION ERRATA SHEET
 2
 3     Our Assignment No. 112005
 4     Case Caption:  MARTIN E. O'BOYLE
 5     vs.  TOWN OF GULF STREAM
 6
 7        DECLARATION UNDER PENALTY OF PERJURY
 8
 9         I, SCOTT MORGAN, declare under
10     penalty of perjury that I have read the entire
11     transcript of my Deposition taken in the captioned
12     matter or the same has been read to me, and
13     the same is true and accurate, save and
14     except for changes and/or corrections, if
15     any, as indicated by me on the DEPOSITION
16     ERRATA SHEET hereof, with the understanding
17     that I offer these changes as if still under
18     oath.
19         Signed on the _____ day of
20     _____, 20___.
21
22
       _____
       SCOTT MORGAN
23
24
25
```

Page 63

```
 1        DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____DATE:_____
25              SCOTT MORGAN
```

Page 62

```
 1        DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23
24     SIGNATURE:_____DATE:_____
             SCOTT MORGAN
25
```

EXHIBIT

6

# Public Records Advocate Joel Chandler Quits Job

By RICK ROUSOS
THE LEDGER

**Published: Tuesday, July 1, 2014 at 12:35 p.m.**

**Last Modified: Wednesday, July 2, 2014 at 12:55 a.m.**

LAKELAND | Public records watchdog Joel Chandler has resigned from his $120,000 per-year job as executive director of a South Florida organization dedicated to open government.



Joel Chandler.

Chandler, 50, who lives in Lakeland, had worked for seven years with little or no pay in fighting for open government records and meetings. In late January, while still based in Lakeland, he joined Citizens Awareness Foundation as its chief executive.

The job took him around the state.

"My decision to resign was the result of a series of irreconcilable philosophical and ethical differences," Chandler said Tuesday.

Chandler said his main concern in suing government agencies has always been to "get them to fix the problems" in providing public records, not to collect money in a settlement other than for reasonable lawyers fees and court costs.

He said that hasn't been the case at the Citizens Awareness Foundation.

Chandler said a law firm established by the founder of Citizens Awareness Foundation has been too concerned about collecting fees and cited a particular case where he said a charitable organization was charged lawyers fees padded by thousands of dollars.

Marty O'Boyle, the founder of Citizens Awareness Foundation, said he is not on the board of that organization and not involved in any of its day-to-day operations. His son works at the law firm O'Boyle established.

O'Boyle said the case involving the charitable organization could have been handled better.

But, he said, the foundation does have a goal of, and has been active with, trying to get governments to follow the law in providing public records.

Latest Local Videos: A case to remove Lakeland lawyer John Vreeland as trustee for Leland Bryan began today.



By RICK ROUSOS
THE LEDGER

**Published: Tuesday, July 1, 2014 at 12:35 p.m.**

**Last Modified: Wednesday, July 2, 2014 at 12:55 a.m.**

Page 2 of 2

Chandler said the decision about which government agencies were to be sued and the details of settlements were supposed to be his, but weren't. O'Boyle said when you're a partner, that doesn't mean you get to make all the decisions.

O'Boyle said people at the foundation were "totally shocked" by Chandler's resignation.

"Nobody saw it coming."

Barbara Petersen, president of the Tallahassee-based First Amendment Foundation, said Chandler will be hard to replace.

"It will be very difficult, if not impossible, to find someone with Joel's drive and enthusiasm for open government issues, and I'm relieved to know that he intends to continue his role as both activist and advocate," Petersen

said.

Chandler is widely known in Polk County, particularly as a nemesis of the Polk County School Board.

As a result of a records dispute with Chandler, School Board lawyer Wes Bridges pleaded no contest in May 2009 to a misdemeanor charge of violating public records law.

That came after a State Attorney's Office investigation concluded he failed to release records to Chandler in a timely manner.

Polk County Judge John Kirkland fined Bridges $275, and he was also ordered to pay $150 for investigative costs.

Among a slew of victories, Chandler won a lawsuit for records of a privately operated prison. His public records research led to a suit against the state Department of Transportation over a policy that pulled aside drivers who tried to pay Florida Turnpike tolls with a $20 bill or higher while officials wrote down the make, model and tag number of the car, records that he said showed racial profiling.

He also used public records to show that a charity that received more than $400,000 in public funds had spent less than $10,000 on the designated program.

# In Lawsuits Statewide, Questions of Profits and Public Records

fcir.org/2014-11/09/in-lawsuits-statewide-questions-of-profits-and-public-records/



South Florida millionaire Martin O'Boyle founded the Citizens Awareness Foundation. (Photo courtesy of the Coastal Star.)

**By Tristram Korten and Trevor Aaronson**
Florida Center for Investigative Reporting

The nonprofit Citizens Awareness Foundation was founded to "empower citizens to exercise their right to know," according to its mission statement. The South Florida millionaire backing the foundation hired one of the state's most prominent public records activists to run it, rented office space, and pledged to pay the legal fees to make sure people had access to government records.

**Media Partners**

Bradenton Herald

Creative Loafing

Florida Times-Union

Key West Citizen

The Ledger

Miami Herald

Naples Daily News

The Tampa Tribune

But a review of court records and internal communications obtained by the Florida Center for Investigative Reporting shows that the foundation is less interested in obtaining records and educating the public than in working with a partner law firm to collect cash settlements from every lawsuit filed.

Citizens Awareness Foundation and the O'Boyle Law Firm set up shop in the same building at about the same time. The two share more than an address. They also share personnel, money and a mandate to sue as many state and local government agencies and businesses as they can for violating Florida's Sunshine law.

Since January, the foundation and a sister group, Our Public Records LLC, have filed more than 140 lawsuits in 27 counties, court records show. A lawyer with the O'Boyle Law Firm filed all of the cases FCIR reviewed.

The close partnership between Citizens Awareness Foundation and the law firm prompted the foundation's first executive director, Joel Chandler, to quit over concerns that the coordination "may be criminal, fraudulent and unethical," according to an affidavit he filed.

1/4

Both organizations are housed at the offices of the Commerce Group, the Deerfield Beach real estate development firm owned by millionaire Martin O'Boyle. O'Boyle is best known for inundating the Palm Beach State Attorney's office with more than 1,300 public records requests, and for suing the wealthy town of Gulf Stream, where he lives, after filing 1,200 public records requests.

Citizens Awareness Foundation's board is comprised of employees of the O'Boyle Law Firm and the Commerce Group. According to an email from one board member, the foundation had a quota to refer a minimum of 25 lawsuits per week to the law firm.

The foundation has threatened so many engineers with legal action that the Florida Engineering Society sent a warning to members. "It is debatable whether they are truly seeking records or just attempting to obtain legal fees for a violation of this requirement," Craig Varn, the organization's general counsel, said in the May 23 memo.

The road-building industry in Florida also has been swamped with public records requests and lawsuits from Citizens Awareness Foundation. "It's a sad game of 'gotcha,' the only purpose of which is to generate an attorney fee claim rather than obtain any actual public records," said Bob Burleson, president of the Florida Transportation Builders' Association.

State Sen. Wilton Simpson, R-Trilby, has received similar complaints, and has begun drafting legislation to better define the public records law. In October, the town commission of Gulf Stream, in Palm Beach County, voted unanimously to hire an outside lawyer to pursue a federal racketeering case against O'Boyle.

Representatives of Citizens Awareness Foundation and the O'Boyle Law Firm referred questions to Fort Lauderdale lawyer Mitchell W. Berger.

"We are new to this process and undertaking an investigation of the facts and circumstances which have resulted in the current controversy," Berger said. "We will not litigate this matter in the press on a question-by-question basis and will leave our responses to be filed in the appropriate proceedings where we are sure justice will be done and our clients will be exonerated in the process."

## Lawsuit Quota

The foundation and the law firm are exploiting an April 2013 amendment to state law that requires private companies holding public records to make them available.

After the 2013 amendment passed, Martin O'Boyle contacted Joel Chandler, a well-known open government activist, about starting Citizens Awareness Foundation. Chandler, who lives in Lakeland, had worked as a volunteer his entire career. O'Boyle offered him a $120,000 annual salary, a company car and health insurance.

"I went from being completely broke to getting paid $10,000 a month," Chandler said. "It was a very cool gig."

The foundation was incorporated on Jan. 27. The O'Boyle Law Firm opened on Feb. 10. They both listed the same address in Deerfield Beach on incorporation records. Martin O'Boyle's son, Pennsylvania lawyer Jonathan O'Boyle, was listed as the law firm's director.

Jonathan O'Boyle is not licensed to practice law in Florida, and records show he may have been acting as the firm's full-time managing director and supervising other lawyers. Under Florida Bar rules, lawyers supervising cases must be licensed in the state.

"He was in the office just about every day," Chandler said. "I was in the room multiple times when Jonathan was directing other attorneys in their work and no one was supervising Jonathan." In emails FCIR reviewed, Jonathan O'Boyle wrote about assigning himself a case. Another lawyer described O'Boyle directing settlement negotiations in a separate case.

When setting up the foundation, Chandler said he talked with the O'Boyles about the need to avoid conflicts of interest. He was worried because all of the foundation's board members either worked for Martin O'Boyle's real estate company or the law firm.

"That was a sticking point, whether I could only refer cases to his son's law firm," Chandler said. "I didn't want to be involved in something where we file lawsuits just to file lawsuits. I was assured I would have sole discretion about who to litigate and which law firm to use."

That never happened, he said. By April, Citizens Awareness Foundation board member Denise DeMartini, who works for the Commerce Group, was demanding more lawsuits.

"I am in the law meeting now and have been told that you have only provided eight new cases for this week. We were expecting a minimum of 25 a week," she emailed Chandler on April 28. The law meeting she referred to was the O'Boyle firm's staff meeting. DeMartini is not a lawyer.



filed. (Photo courtesy of Joel Chandler.)

Citizens Awareness Foundation was filing so many lawsuits that Chandler was not able to vet them all, as he had negotiated from the start. In some cases, lawsuits were filed in his name without his knowledge or permission, he said.

On June 2, Chandler emailed his board about using another law firm. "[I]f we use the O'Boyle Firm exclusively it will appear to be 'self dealing' by the IRS," Chandler said.

William Ring, the foundation's president and a lawyer with the Commerce Group, replied: "I'm not inclined to authorize [Citizens Awareness Foundation] to engage another law firm." Ring is now the registered agent for the O'Boyle Law Firm, state records show.

## Settlements Demanded

The foundation targeted governments big and small, but it also filed complaints against obscure companies contracted by government agencies. Many weren't aware the records law applied to them. The records requests often came in over the weekend, from "An Onoma" with the email address vendor.contract.publishing@gmail.com.

Dave McIntosh, who runs an environmental mitigation bank that does work for the state, said his records request from An Onoma came at 9:48 a.m. on Sunday, May 18. "I was totally convinced it was bogus," he said.

McIntosh wrote back asking who they were. The reply: "None of your business."

The lawsuit arrived a month later, along with a settlement demand for $2,500. McIntosh offered to pay the $410 filing fee and $500 for costs. The lawyers rejected the offer and added a nondisclosure agreement, meaning the settlement couldn't be discussed afterwards.

"To me that was hilarious, another brick in the wall that makes the case that these guys are a scam," McIntosh said. He's fighting the lawsuit.

In June, Miami's River of Life, a small social services agency, contacted Chandler saying they didn't realize their records were public and that they were willing to comply — but the settlement demand for nearly $4,000 was too

3/4

much. Chandler called the O'Boyle lawyer handling the case, Nickalaus Taylor, on June 27.

After the call, Chandler emailed Taylor: "In our conversation this morning I understood, from you, that the O'Boyle Law Firm has about $1,200 in costs and fees in the case up to this point. I also understood that you have been instructed by Jonathan O'Boyle to demand $3,800 to settle the case. If such a demand is accepted by the Defendant that would create a windfall of about $2,600 beyond actual fees and expenses."

Taylor responded: "This email is to confirm our conversation today and to reiterate that all offers for settlement are made pursuant to the policies of the O'Boyle Law Firm."

On June 30, Chandler resigned. Worried about the damage he had inadvertently caused, he contacted defendants in the lawsuits and offered his help. Citizen Awareness Foundation sued him for breaches of contract and fiduciary duty.

Since Chandler's departure, Citizens Awareness Foundation and Our Public Records LLC have filed 70 more lawsuits around the state.

Among the latest defendants: a Catholic charity in Sarasota County, an accountant in Hillsborough County, and ChildNet, a nonprofit in Broward County whose mission is to "protect abused, abandoned and neglected children."



Citizens Awareness Foundation and its sister organization, Our Public Records LLC, have filed lawsuits in 27 of Florida's counties, shaded here in blue. (Graphic by Grant Smith/Florida Center for Investigative Reporting.)

4/4

## PARTIAL CONTINGENT FEE AGREEMENT

The Town of Gulf Stream (hereinafter "I," or "Client") retains and employs the firm of Richman Greer, P.A. (the "Firm") to represent it regarding issues with Citizens Awareness Foundation, Inc. and the O'Boyle Law Firm, P.C., Inc., Martin O'Boyle, Christopher O'Hare and others regarding federal and/or state class action RICO and other claims on the following basis:

As compensation for its services, I agree that the Firm shall be paid and may pay to itself from the gross proceeds of any recovery, whether by settlement, judgment or appeal, a fee as follows, or a fee awarded by the court, whichever is greater, including attorneys' fees expended, if necessary, to obtain attorneys' fees:

Partially contingent basis wherein the Firm will reduce its hourly billing to 50% of its normal hourly rate (see attached Exhibit A) and, in consideration of that reduction, the Firm will receive in addition to its 50% hourly billing, 35% of the gross recovery including any attorneys' fees awarded.

The Firm is dedicated to maintaining a professional relationship regarding payment for the services provided to Client during this engagement. All bills not paid before the first day of the second month following rendition will automatically bear interest on all outstanding amounts at 12% per annum from the first day of the month following rendition until paid. In no event will the rate be greater than permitted by applicable law. If invoices are not paid within the terms agreed between the Firm and the Client, the Firm will have the right to immediately withdraw from further representing the Client. The Client hereby agrees to release the Firm from any further obligation to proceed or from any liability that may result should the Firm elect to withdraw as set forth in this paragraph.

In the event that the proceeds of recovery are payable over a period of time, the contingent portion of the attorneys' fees are payable at the time of settlement and will be figured as a percentage of the total present value of the settlement. The reduced hourly fees are payable as billed.

I agree to pay the costs of investigation and other reasonable expenses to prepare and prosecute this claim and/or suit, and should it be necessary to file suit, I agree to pay all court costs, and reasonable expenses of litigation. Pre-suit costs and litigation costs include, by way of example and not limitation, filing fees, deposition costs, fees of experts, travel costs, long distance telephone calls, telefax charges, express delivery charges, photocopying costs, investigative costs, computer research costs and similar matters. All costs may be advanced by my attorneys and shall be deducted from the recovery or settlement unless they have been earlier paid by me.



I further understand that in the event that litigation is unsuccessful as to any party, I may be responsible to such party for taxable court costs and attorneys' fees.

I further understand that as the client I have an absolute right to settle on any basis I deem appropriate. I further understand, however, that in the event I decide to settle against the advice of my attorneys who in good faith believe that the matter should continue to be prosecuted, my attorneys then will be entitled to be paid the full amount for the hours they have incurred on the partially contingent basis. In other words, should the Client decide to settle against the advice of its attorneys, to the extent that the attorneys had been entitled to receive upon the partially contingent basis 50% of their normal hourly fees, I will be responsible to pay to the attorneys the other 50% that they would have received had the matter not been partially contingent.

I agree that my attorneys have made no promises or guarantees regarding the outcome of my claim. Further, in the event the law firm determines that my claim should not be prosecuted, they may notify me of this decision and withdraw as my attorneys for all claims and I shall owe them no fee for legal services beyond the reduced hourly fees and costs owed to the firm.

I agree that associate counsel may be employed at the discretion and expense of my attorneys.

It is agreed and understood with respect to attorneys' fees, that this employment is on a partially contingent fee basis, and if no recovery is made by suit, settlement or otherwise, I will not be indebted to the law firm for any attorneys' fees other than the reduced hourly fee amounts incurred on the 50% partially contingent basis except as set forth above wherein settlement occurs against the advice of my attorneys. If a recovery is made, all attorneys' fees are payable at the time of closing.

It is understood that a resolution of the aforesaid dispute with the above-named parties could result in a business solution that may result in a limited financial recovery or no financial recovery but rather long or short term financial benefits, or a combination of these alternatives. In such case the Client and the Firm will seek to arrive at a mutually agreeable value of the total recovery or resolution against which the above percentage will be applied. If the Client and the Firm are unable to agree on a specific amount, then the issue will be decided by the Florida Bar

MINUTES OF THE SPECIAL MEETING HELD BY THE TOWN COMMISSION OF THE TOWN OF GULF STREAM AT THE CALL OF THE MAYOR ON **FRIDAY, MARCH 28, 2014 AT 4:00 P.M.** IN THE COMMISSION CHAMBERS OF THE TOWN HALL, 100 SEA ROAD, GULF STREAM, FLORIDA.

I.     **Call to Order:**     Mayor Orthwein called the meeting to order at 4:00 P.M.

II.     **Pledge of Allegiance:**     The Pledge of Allegiance was led by Mayor Orthwein.

III.     **Roll Call:**

| | | |
|---|---|---|
| Present and Participating | Joan K. Orthwein | Mayor |
| | Thomas M. Stanley | Vice-Mayor |
| | Robert W. Ganger | Commissioner |
| | Donna S. White | Commissioner |
| | Scott W. Morgan | Commissioner |
| Also Present and Participating | William H. Thrasher | Town Manager |
| | Rita L. Taylor | Town Clerk |
| | John C. Randolph | Town Counsel |

IV.     **Hiring Additional Counsel:**

**Commissioner Morgan** stated he believed that the Town needs to engage Special Counsel to handle the numerous public records lawsuits that exist. He continued that with his own experience and special training in litigation, he feels that this addition will expedite resolutions to those cases, and at less expense. Commissioner Morgan further stated that he recommends Robert Sweetapple, as he has considerable experience in court room litigation and public records. He also reported that Mr. Sweetapple has recently presided over a deposition in the Chambers of the Town of Gulf Stream with regard to public record cases, and stated that Town Manager Thrasher can attest to Mr. Sweetapple's handling of that matter. He commented that Mr. Sweetapple's fees were $500 an hour, but that he will reduce that figure to $350 an hour, for the Town of Gulf Stream.

**Commissioner Morgan moved and Commissioner Ganger seconded** to engage Robert Sweetapple to handle the Town of Gulf Stream public record lawsuits.

**Mayor Orthwein** asked for any comments.

**Commissioner White** inquired if Mr. Sweetapple was a local attorney registered in Florida.

**Commissioner Morgan** stated he was a local attorney, registered in Florida, and that the Town would not have the expense of flying him in for court appearances.

**Vice-Mayor Stanley** stated he had no problem with hiring Mr. Sweetapple.

**Commissioner Ganger** applauded the selection of Mr. Sweetapple.

**Mayor Orthwein** stated that she is acquainted with him and that he is a good man.

Special Meeting
March 28, 2014

All voted **AYE.**

## V.    Appointment to the Ad Hoc Committee:

**Mayor Orthwein** reported that Keith Williams, of Nievera Williams Design, has agreed to serve on the Ad Hoc Committee.   She stated that he will make a terrific addition to that Committee, as he is very bright and has terrific ideas.  Mayor Orthwein commented that he is the Landscape Architect for the Cook development, and also serves on the West Palm Beach Planning Board.

**Commissioner Ganger** added that Mr. Williams serves on the Boys & Girls Club, and is the type of person that jumps into his projects.  He also stated that Mr. Williams would be a very valuable addition to the Ad Hoc Committee team.

**Mayor Orthwein** stated that she has notified him of the next two (2) Ad Hoc Committee meeting dates.

**Commissioner Ganger moved and Vice-Mayor Stanley seconded** the appointment of Keith Williams, Nievera Williams Design, to the Ad Hoc Committee.  All voted **AYE.**

## VI.    ADJOURNMENT:

**Mayor Orthwein** adjourned the meeting at 4:10 P.M.


*Sandra Fein*
Sandra Fein
Recording Secretary

2

1

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA

                    Case No. 9:14-CV-81250-KAM

MARTIN E. O'BOYLE,

        Plaintiff,

        Vs.

ROBERT A. SWEETAPPLE and
MAYOR SCOTT MORGAN,

        Defendants.
_____/


        DEPOSITION OF ROBERT SWEETAPPLE

        Taken on behalf of the Plaintiff

                    VOLUME 1

                 PAGES 1 - 175


DATE TAKEN:   Friday, May 27, 2016

TIME:         9:00 a.m. - 7:00 p.m.

PLACE:        THE OFFICE OF DAUGHTERS REPORTING
              1515 North Federal Highway
              Suite 300
              Boca Raton, Florida 33432


        Examination of the witness taken before:

              LISA GREENWELL, Merit Reporter
              DAUGHTERS REPORTING, INC.
              934 North University Drive
                    Suite 224
              Coral Springs, Florida 33071
```

2

```
 1          APPEARANCE FOR THE PLAINTIFF
 2
 3          MARTIN E. O'BOYLE,  pro se
 4          1280 West Newport Center Drive
            Deerfield Beach, Florida 33442
 5
 6
 7
 8          APPEARANCE FOR THE DEFENDANT
 9             ROBERT A. SWEETAPPLE
10
11          JOSHUA A. GOLDSTEIN, Esquire
12   THE LAW OFFICES OF COLE, SCOTT & KISSANE, P.A.
            1645 Palm Beach Lakes Boulevard
13                 Second Floor
            West Palm Beach, Florida 33401
14
15
16
17
18          APPEARANCE FOR THE DEFENDANT
               Town of Gulf Stream
19
            JEFFREY L. HOCHMAN, Esquire
20   THE LAW OFFICES OF JOHNSON, ANSELMO, MURDOCH,
            BURKE PIPER & HOCHMAN, P.A.
21          3455 East Sunrise Boulevard
                 Suite 1000
22          Fort Lauderdale, Florida 33304
23
24
25
```

3

```
 1                 I-N-D-E-X
 2
 3   DEPOSITION OF ROBERT A. SWEETAPPLE      Page No.
 4
 5   Direct Examination By Mr. O'Boyle           4
 6
 7
 8
 9
10                 E-X-H-I-B-I-T-S
11   Plaintiff                               Page
12   No. 1      Second Amended Complaint      174
13
14
15
16
17           CERTIFIED QUESTIONS
          Page                         Line
18
           11                           24
19
           19                           19
20
           28                           19
21
           44                            8
22
          122                           12
23
24
25
```

4

```
 1   WHEREUPON,
 2               ROBERT A. SWEETAPPLE
 3   having been first duly sworn, testified upon his oath as
 4   follows:
 5          THE WITNESS:  Yes, I do.
 6               DIRECT EXAMINATION
 7   BY MR. O'BOYLE:
 8      Q.  Mr. Sweetapple, my name is Martin O'Boyle and I
 9   am here today to take your deposition in a matter styled
10   Martin O'Boyle versus Robert Sweetapple and the Town of
11   Gulf Stream.
12          Are you familiar with that matter?
13      A.  Only to have read the pleadings.  I am not going
14   to discuss my work product with regard to that.
15      Q.  And what work product would that be?
16      A.  In terms of the lawsuit against me.
17      Q.  Hm-hum.
18      A.  Discussions with counsel and other matters that I
19   acquired into and investigative.
20      Q.  Well, discussions with counsel I can certainly
21   understand that, assuming they were in connection with
22   the litigation.
23          But what other matters?
24      A.  I'm sorry, what do you mean "what other matters"?
25      Q.  Well, you said you're not going to discuss your
```

EXHIBIT
9

5

```
 1   work product?
 2     A.  I'm not going to discuss anything I did with
 3   regard to my defense in that case.
 4     Q.  That's fine.  Then you raised the word "work
 5   product".
 6     A.  Um-hum.
 7     Q.  What do you mean by "work product" in the context
 8   of this litigation?
 9         MR. GOLDSTEIN:  Object to form.
10         THE WITNESS:  I am not going to give you my
11         legal opinions here.  I'm here to testify as to
12         facts.
13            If you have a fact question, but I am not
14         going to explain the law to you or give you my
15         legal opinion, I'm sorry.
16   BY MR. O'BOYLE:
17     Q.  What facts have led you to believe that whatever
18   it is that I've done, which -- in connection with what
19   you're calling work product are, indeed, work product?
20         MR. GOLDSTEIN:  Object to form.
21         THE WITNESS:  Having attended law school and
22         practiced law school for 37 years.
23   BY MR. O'BOYLE:
24     Q.  So, that makes you infallible?
25         MR. GOLDSTEIN:  Form.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

6

```
 1         THE WITNESS:  Are you asking me my opinion
 2         about infallibility?
 3   BY MR. O'BOYLE:
 4     Q.  No.  I'm asking you a question of fact.
 5     A.  Well, I don't think that's a matter of fact.  I
 6   don't think anyone's infallible.
 7         You're trying to ask my opinion about things and
 8   I'm here to answer fact questions, Mr. O'Boyle.
 9     Q.  Okay.  It would be helpful if you would not read
10   my mind and not tell me what I'm thinking.  I'd
11   appreciate that.
12     A.  I don't think that's what I'm doing.  I'm here to
13   answer your questions.
14     Q.  You just said I think, that many applies, but
15   we'll move on.  That's fine.
16         MR. GOLDSTEIN:  Move to strike.
17   BY MR. O'BOYLE:
18     Q.  Give me a little background, if you could, on
19   yourself?
20     A.  What would you like to know?
21     Q.  Your education.  Let's start with high school?
22     A.  He attended Nova High School in Fort Lauderdale,
23   Florida.
24     Q.  And?
25     A.  What else would you like to know?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

7

```
 1     Q.  I just said, let's start with your high school.
 2     A.  I graduated from high school.  Do you want to
 3   know where I went to college?
 4     Q.  That would be good.
 5     A.  You attended Colgate University in Hamilton, New
 6   York.
 7     Q.  I see.  Is that where you got your law degree?
 8     A.  No, it isn't.
 9     Q.  Okay.  Can you share with me where you got your
10   law degree?
11     A.  Yes, sir.  At the University of Florida.
12     Q.  I see.  And are you an LLM?
13     A.  No.
14     Q.  Do you have a boat?
15     A.  Do I have a boat?  That's a personal matter.  But
16   yes, I do have a boat.  I don't know why you want to
17   know that, but I do have a boat.
18     Q.  Okay.  Mr. Sweetapple, why I want to know things
19   is my work product.
20     A.  Well, I'm not going to --
21         MR. GOLDSTEIN:  Hold on.  Mr. O'Boyle, I
22         just remind you of the Judge's prior orders
23         regarding keeping things to the relative facts
24         and issues in this case.
25            I will certainly give you some leeway.  I
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

8

```
 1   understand you're just trying to inquire as to
 2   background information, etc.
 3         But, you know, I am not sure you're
 4   questioning my client on his boat has any
 5   relevance to this proceedings.
 6         MR. O'BOYLE:  I understand you're not quite
 7   sure and I appreciate that.  And thank you for
 8   the lesson.
 9   BY MR. O'BOYLE:
10     Q.  What's the name of the boat?
11     A.  The large boat is called Alpha Dog.
12     Q.  And I assume you have a smaller boat?
13     A.  Yeah, doesn't have a name on it.
14     Q.  I see.  And I never heard that phrase Alpha Dog.
15   Is there some meaning to it?
16     A.  I am not going to discuss my personal discussions
17   with friends, but that was the name I was given in
18   college, yes.
19     Q.  You, personally, were called Alpha Dog?
20     A.  Yes.
21     Q.  I see.  Okay.  And from there, you passed it onto
22   your boat, would that be correct?
23     A.  Passed it onto my boat?
24     Q.  Yeah.  It went from you and now it's the name of
25   your boat, correct?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

**Page 9**

```
 1      A.  Well, that is the name on my boat, yes.
 2      Q.  Okay.  And what I was asking is, it went from you
 3  to your boat, right?
 4          In other words, it didn't make a stops in
 5  between?
 6      A.  I don't understand your question.
 7      Q.  Okay.
 8          MR. GOLDSTEIN:  Asked and answered.
 9          MR. O'BOYLE:  We'll just move on.
10  BY MR. O'BOYLE:
11      Q.  Where do you live?
12      A.  In Boca Raton.
13      Q.  How long have you lived there?
14      A.  Since 1986, so 30 years.
15      Q.  Same house?
16      A.  No.
17      Q.  Okay.  Your present house, how long have you
18  lived there?
19      A.  I would say ten -- ten-and-a-half years, almost
20  11 years.
21      Q.  And I assume that you lived there with your
22  family?
23      A.  I'm not going to discuss my personal life with
24  you, Mr. O'Boyle.  That's my private information.
25          You already asked me about my assets, my boat.  I
```

**Page 10**

```
 1  am not asking to discuss my assets or my private life
 2  with you.
 3      Q.  What assets did I ask you about?
 4      A.  A boat.  You want to know if I own something and
 5  I indulged you, but I am not going to discuss with you
 6  what I own, who I live with, what I discussed with my
 7  family.
 8          I'm here to answer your questions concerning your
 9  allegations that I somehow slandered you.  That's why,
10  I'm here.  I'm happy to answer your questions.
11          MR. O'BOYLE:  Counselor, are you instructing
12  him not to answer?
13          MR. GOLDSTEIN:  I'm not instructing him at
14  all.
15          MR. O'BOYLE Okay.  Would you instruct him to
16  answer, please.
17          MR. GOLDSTEIN:  No, I will not instruct him
18  to answer.  I don't think you are --
19          MR. O'BOYLE:  I'm sorry.
20          MR. GOLDSTEIN:  You have no basis to engage
21  or inquire into his personal life.  This is a
22  suit regarding a claim for slander.
23          MR. O'BOYLE:  So, you are instructing him
24  not to answer?
25          MR. GOLDSTEIN:  I am not instructing him
```

**Page 11**

```
 1      regardless.  I think he answered the question.
 2          MR. O'BOYLE:  Okay.
 3  BY MR. O'BOYLE:
 4      Q.  Your daughter's a lawyer, correct?
 5      A.  One of my daughters is a lawyer.
 6      Q.  Right.  Which one would that be?
 7      A.  Berkley.
 8      Q.  And her husband is a lawyer, correct?
 9      A.  Yes, he is.
10      Q.  And his name is?
11      A.  David Vitale, Junior.
12      Q.  And what does Mr. Vitale do?
13      A.  What does he do?
14      Q.  Yes.
15      A.  I don't know what you mean by that.
16      Q.  Okay.  Has he ever worked for you?
17      A.  He has worked for my law firm.
18      Q.  Okay.  And how long did he work for your law
19  firm?
20      A.  I would have to look at records, but I would --
21  if I were estimating -- I mean, in the range of a year,
22  could have been eight months, it could be 14 months, I'd
23  have to look at the records.
24      Q.  That's good enough.  And what did he do at your
25  firm?
```

**Page 12**

```
 1          MR. GOLDSTEIN:  Object.
 2          THE WITNESS:  I am not going to discuss his
 3  work product at my firm.  I am not going to tell
 4  you, Mr. O'Boyle, what my personnel do for
 5  clients at my firm.  I mean, he -- he worked for
 6  the firm.
 7          MR. GOLDSTEIN:  Mr. O'Boyle, again, I said
 8  that I would give you some leeway with inquiring
 9  as to background information as to
10  Mr. Sweetapple, but starting to delve into
11  employees of the firm and family members of
12  Mr. Sweetapple is completely irrelevant to this
13  case.
14          And I would remind you of the Court's order
15  where it was admonishing all parties, and
16  including your then counsel, that he would not
17  allow for such an inquiry.
18          MR. O'BOYLE:  Madam court reporter, can you
19  certify this on the record; Mr. Goldstein, you
20  are completely out of order there.  I have no
21  speaking engagements as you are speaking
22  objections, as you know.
23          And you have no knowledge whatsoever about
24  Mr. Sweetapple's son-in-law.  As an example,
25  would it be appropriate if he worked on this
```

## Page 13

```
 1      file?  Would it then be appropriate for me to ask
 2      about it?
 3           MR. GOLDSTEIN:  I am not sure what you mean
 4      by "this file"?
 5           MR. O'BOYLE:  Well, I can show you billing
 6      records.
 7           MR. GOLDSTEIN:  If these -- there's billing
 8      records that I have that show that
 9      Mr. Sweetapple's son-in-law worked on the present
10      case upon which we are here, I find that hard to
11      believe that you would have such billing records.
12           MR. O'BOYLE:  Okay.  It wouldn't necessarily
13      have to be on this case, of course.  This case is
14      tied into other cases, is it not?
15           MR. GOLDSTEIN:  I don't believe this is a
16      separately litigation, so I'm not sure why --
17      what you mean by "tied into other litigation".
18           MR. O'BOYLE:  Well, there's a First
19      Amendment retaliation that Mr. Sweetapple was
20      involved in.
21           MR. GOLDSTEIN:  I would disagree with that.
22      And I believe the Court has already dismissed any
23      such claim.
24           So, why don't we move a long, Mr. O'Boyle.
25           MR. O'BOYLE:  Okay.  Would you be kind
```

## Page 14

```
 1      enough to show me where the Court has dismissed
 2      that claim?
 3           MR. GOLDSTEIN:  I would be happy to pull up
 4      the Court's order granting the Motion to Dismiss.
 5      It was entered in this matter with respect to my
 6      client.
 7           MR. O'BOYLE:  And your client being
 8      Mr. Sweetapple?
 9           MR. GOLDSTEIN:  That is correct.
10           MR. O'BOYLE:  Okay.  So, he's no longer a
11      Defendant, is that correct?
12           MR. GOLDSTEIN:  He's no longer a Defendant
13      to any form of retaliation.  There's one claim
14      currently pending versus my client and you're
15      fully aware of that what claim is.
16           MR. O'BOYLE:  And what you're saying is that
17      I'm restricted from asking him about the First
18      Amendment retaliation claim?
19           MR. GOLDSTEIN:  I am not --
20           MR. O'BOYLE:  Is that incorrect?
21           MR. GOLDSTEIN:  I am not saying that you're
22      restricted from anything.  I'm just advising you
23      of the Court's order regarding discovery in this
24      matter and advising you that, although I'm giving
25      you some leeway, I don't think inquiring as to
```

## Page 15

```
 1      what specifics his son-in-law did or where his
 2      son-in-law works is relevant to the claims
 3      pending in this matter.
 4           MR. O'BOYLE:  So, are you willing now to
 5      show me that order?
 6           MR. GOLDSTEIN:  If I had a computer here, I
 7      would be more than happy to show you that order.
 8      I don't have a copy of the order with me.
 9           MR. O'BOYLE:  Would you call your office and
10      have them fax it here?
11           MR. GOLDSTEIN:  I am not going to call my
12      office and have them fax it here.
13           MR. O'BOYLE:  So, I'm going to assume that
14      there's no such order.
15           MR. GOLDSTEIN:  Assume as you'd like.
16           MR. O'BOYLE:  I will.
17      BY MR. O'BOYLE:
18           Q.  Your son-in-law, has he worked on any of the Gulf
19      Stream files?
20           A.  I am not going to disclose my staff's work
21      product with regard to other cases that are pending in
22      my office.
23           Q.  Is he still with your office?
24           A.  He does not work with my office now.
25           Q.  So, it can't be in connection with work product
```

## Page 16

```
 1      in your office, mainly him, specifically, what he's
 2      done?
 3           A.  You mean today?
 4           Q.  Today, yesterday, last week?
 5           A.  Well, when he was in my office, the work he has
 6      done for my clients on pending cases is work product
 7      done for those clients.
 8           He has left my office.  He works for another
 9      firm.  I do, occasionally, still call upon him to obtain
10      his legal opinions and to actually perform some work for
11      me, but the majority of the work product that he
12      performed for me was while he was actually employed by
13      the firm.
14           Q.  On your billings, where you have billings and
15      explanations associated with David Vitale, are you
16      claiming work product to those?
17           MR. GOLDSTEIN:  Object to the form.
18           THE WITNESS:  Any work that was done by
19      people in my office on cases for clients, I am --
20      yes, I'm not going to go into the details of
21      their work product.
22      BY MR. O'BOYLE:
23           Q.  On your bills you would have, and I am not
24      reciting how your bills are redacted, I'm just using
25      this by way of example, it will have Vitale's initials
```

17

```
 1    and then it will say worked on brief and the O'Hare
 2    matter or whatever matter it is.
 3         Is that something that you believe is work
 4    product?
 5    A.   The bills?
 6    Q.   Yeah.
 7    A.   Our bills are delivered to the Town and I believe
 8    they become a public record.  The Town redacts what
 9    it -- or the Town's attorneys, I guess, redact as they
10    deem appropriate.
11         But you're asking me for a legal conclusion, if I
12    believe it's work product?  I am not here to debate or
13    to discuss what work product is with you.  I'm just
14    giving you my understanding with regard to my office.
15    And I do not disclose what my staff or myself do for our
16    clients in working up their cases.  And I do not discuss
17    their confidences with other people.
18    Q.   If it's on your bill and it recites the name and
19    what he did, are you willing to disclose it and talk
20    about it?
21         MR. GOLDSTEIN:  Object.  This is asked and
22    answered.
23         THE WITNESS:  If you want to show me a bill,
24    I can read the bill just as well as you can.  And
25    whatever's on the bill is on the bill.
```

18

```
 1         As far as discussing or testifying as to
 2    what lawyers talked about, what cases were
 3    researched, what witnesses said when we
 4    interviewed witnesses, I would not do that.
 5         I don't think suing me for slander is an
 6    invitation to take discovery with regard to how
 7    we're defending dozens and dozens of cases that
 8    are pending, not only against the Town of Gulf
 9    Stream but you sued my firm and me.
10         So, I would not -- I would not disclose our
11    work product with regard to those cases or any
12    other clients.
13    BY MR. O'BOYLE:
14    Q.   Okay.  We'll get back to that.
15         Have you ever seen an airplane banner?
16    A.   You mean flying in the sky?
17    Q.   Yes.
18    A.   Since I was a kid, I've seen airplane banner.
19    Q.   When was the last time you have seen one?
20    A.   I don't recall.
21    Q.   Okay.  Have you seen any that you can recall in
22    the last five years?
23    A.   Not that I can recall what was said on them.
24    Q.   Okay.  In general, can you recall what was said
25    and the exact words?
```

19

```
 1         MR. GOLDSTEIN:  Object to the form.
 2         THE WITNESS:  I generally recall being at
 3    the beach couple years ago and seeing -- I don't
 4    know if it was a banner or some type of
 5    advertisement in the sky for a Bar or a
 6    something, event.  I don't know what it was.
 7    BY MR. O'BOYLE:
 8    Q.   Have you ever filed any papers in connection
 9    with -- I'm going to put them together, although I'm
10    just doing it for convenience, with regard to any
11    filings in O'Hare or O'Boyle cases, where you wrote
12    about the messages on plane banners?
13    A.   Yes.
14    Q.   So, you do remember them?
15    A.   Remember -- you asked me if I had seen any
16    banners.
17         MR. GOLDSTEIN:  Object to form.
18         THE WITNESS:  I hadn't seen those banners.
19    BY MR. O'BOYLE:
20    Q.   Okay.  How did you know about them?
21    A.   I am not going to tell you my work product and
22    who described or who provided information, but I did not
23    see those banners.
24         MR. O'BOYLE:  And counsel, I'm going to ask
25    you to instruct the witness to answer.
```

20

```
 1         MR. GOLDSTEIN:  Disclose attorney/client
 2    communications?
 3         MR. O'BOYLE:  That's not an attorney/client
 4    communication.  He has no knowledge that it's
 5    attorney/client privilege.
 6         MR. GOLDSTEIN:  Nor do you.  I'm not going
 7    to instruct my client to answer.  Ask another
 8    question.
 9         MR. O'BOYLE:  Let's get the Magistrate on
10    the phone.
11         THE COURT REPORTER:  Are we taking a recess?
12         MR. O'BOYLE:  Yes.
13         (Thereupon, a recess was taken; after which
14    the following proceedings were had:)
15         MR. O'BOYLE:  If you would for now, if you
16    would certify that question and answer, I would
17    appreciate it.
18         MR. HOCHMAN:  I just want to ask for the
19    record, Mr. O'Boyle, you went off the record to
20    contact the Magistrate Judge.  What was the
21    result of that effort?
22    BY MR. O'BOYLE:
23    Q.   Mr. Sweetapple, you have been counsel for the
24    Town of Gulf Stream for how long?
25    A.   Two years, more than two years.
```

21

```
 1      Q.  And what were you hired to do?
 2      A.  I am not comfortable disclosing to you my
 3  discussions with the client as to my different roles
 4  that I've played as counsel.
 5      Q.  If I showed you an article in the Coastal Star,
 6  and Mr. Morgan confirmed it, would you then be
 7  comfortable?
 8      A.  Comfortable doing what?
 9      Q.  Explaining what you do at the City, at the Town
10  of Gulf Stream?
11      A.  I would never be comfortable discussing with a
12  non-client my communications with a client, and reading
13  a paper would not make me comfortable, I don't believe.
14      Q.  Okay.  Were you hired to prepare Wills and truss
15  for the commissioners?
16      A.  I am not going to disclose the scope and nature
17  of my communications with a client.  I am not
18  comfortable doing that.
19      Q.  Were you hired to obscure criminal behavior?
20      A.  I am not going to disclose the -- I am not
21  comfortable telling you what I talked about with my
22  client.
23      Q.  How much have you billed them so far?
24      A.  I actually have no idea.  I heard a number
25  Wednesday when I was in here that you used.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

22

```
 1      Q.  And?
 2      A.  I have no idea how much I billed.  I've never
 3  gone to look and total it.
 4      Q.  Have you billed a million dollars, do you think?
 5      A.  I have no idea.
 6      Q.  But you could have billed a million dollars?
 7      A.  I could have?
 8          MR. GOLDSTEIN:  Object to the form.
 9  BY MR. O'BOYLE:
10      Q.  Yes.  Would you have billed or is it out of the
11  question?
12      A.  I only billed for work I have done.  I have no
13  idea what the total is.
14      Q.  Okay.  For the work that you've done that you
15  have billed for, could those billings be $1 million or
16  more?
17          MR. GOLDSTEIN:  Object to the form.
18          THE WITNESS:  I am not comfortable
19      speculating.
20  BY MR. O'BOYLE:
21      Q.  Okay.  Do you have an accounting system at your
22  office?
23      A.  An accounting system.  I have an accountant.  I
24  don't know what a system is.  If he has a system, I'm
25  sure there's some system.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

23

```
 1      Q.  And do you ever sit down with your accountant or
 2  whoever provides you with financial statements, telling
 3  you income, expenses?
 4          Have you ever heard of income and expenses?
 5      A.  Yes.
 6      Q.  Okay.  And if you take the expenses and subtract
 7  them from the income, you get the net proceeds or the
 8  net income, do you agree with that?
 9      A.  As a mathematical or accounting principal?
10      Q.  As a mathematical or accounting principal, yes?
11      A.  And you're asking me if you take net -- would you
12  say that again?  I'm not -- if you take net income and
13  deduct net expenses or you take income and you deduct
14  expenses you get net income.
15      Q.  That's what I asked.  Do you agree with that?
16      A.  That's my general understanding of accounting.
17  If you're asking my opinion as to accounting, but I am
18  not an accountant.
19      Q.  Okay.  Do you ever review financial statements?
20      A.  I review financial statements all the time.  I do
21  quite a bit of commercial litigation.
22      Q.  And do those financial statements reflect the
23  total billings of the firm within a specified period?
24      A.  Are you talking now about my financial statements
25  or just financial statements in general?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

24

```
 1  firm's.
 2      A.  I am not comfortable disclosing to you my firm's
 3  financial information or discussions with accountants
 4  which, I believe, are privileged.
 5      Q.  Aren't the billings to the Town of Gulf Stream
 6  public records?
 7      A.  I think -- I think I already said that.
 8      Q.  Okay.  Then how are they privileged?
 9      A.  You weren't asking about billings.
10      Q.  You said -- But anyway, rather than debate it,
11  you agree that they're not privileged?
12      A.  What, sir.
13      Q.  The billings that you made to the Town of Gulf
14  Stream?
15      A.  The copies of the bills?
16      Q.  Doesn't have to be copies, could be originals?
17      A.  The originals of the bills you're asking me?
18      Q.  I'm asking you the bills.  You have copies, you
19  could have originals, you have whatever you want, but
20  you submit bills -- Well, let me back up.
21          Do you submit bills to the Town of Gulf Stream
22  for what you say is your firm's -- your firm's services?
23          MR. GOLDSTEIN:  Form.
24          THE WITNESS:  My firm sends bills to the
25      Town of Gulf Stream.  I'll answer it again, I did
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

25

```
 1        this already earlier.  I believe they are
 2        reviewed by the Town's council and are redacted
 3        as they deem appropriate and then they become a
 4        public record.
 5             I even believe they're placed somehow on the
 6        internet, although I've never seen that, but I --
 7        I understand that.  I say, that's my
 8        understanding.
 9   BY MR. O'BOYLE:
10        Q.  How do you know they're reviewed by the Town's
11        council?
12        A.  I'm not comfortable discussing with you my
13        communications with the Town's council about these
14        matters.
15        Q.  Are you comfortable in discussing with me the
16        legal bills which are public records that you have
17        submitted to the Town?
18             MR. GOLDSTEIN:  Asked and answered.
19             THE WITNESS:  If you have -- it's not a
20        matter -- if you have a bill that you want me to
21        look at, I'm happy to look at it.  I hope it will
22        relate, somehow, to your slander case and that
23        you aren't just intending to take discovery about
24        my work product in other cases.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

26

```
 1   BY MR. O'BOYLE:
 2        Q.  I have no desire at all to take your work product
 3        or to learn anything that is privileged between you and
 4        your counsel.
 5             I was just -- I would just like to understand, as
 6        Plaintiff here and as a member of Gulf Stream, how much
 7        money is going out and where is it going.
 8             MR. GOLDSTEIN:  There's no question pending.
 9             THE WITNESS:  Yeah.  I'm happy to answer
10        your questions.  I'm here to answer your
11        questions.
12   BY MR. O'BOYLE:
13        Q.  Would you please?
14        A.  What's the question.
15        Q.  Okay.  How much have you billed Gulf Stream
16        for -- would you have accounting records that tell you
17        what you billed Gulf Stream for?
18             MR. GOLDSTEIN:  Asked and answered.
19             THE WITNESS:  I presume.  They can total it,
20        the computer could total it I'm sure.
21   BY MR. O'BOYLE:
22        Q.  Have you ever seen it, what you billed?
23        A.  No.
24        Q.  Never?
25        A.  Never looked at it.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

27

```
 1        Q.  Okay.  How many suits has the Town filed against
 2   myself and/or Mr. O'Hare by you?
 3        A.  Suits that have been filed by the Town against
 4   you or Mr. O'Hare?
 5        Q.  Yes.
 6        A.  Where you are the Defendants?
 7        Q.  Yes.
 8        A.  I believe just the Federal RICO case.
 9        Q.  Okay.  You didn't recently -- I must be mistaken.
10   You didn't recently file a counterclaim?
11        A.  You didn't ask me about a counterclaim.
12        Q.  I think they're all one, but okay, that's fine.
13             Did you recently file a counterclaim?
14        A.  Did I, as an attorney, recently file a
15   counterclaim or did the Town?
16        Q.  Did you sign a counterclaim in connection with me
17   and Mr. O'Hare?
18        A.  When?
19        Q.  In the last six months?
20        A.  You'd have to show it to me.  I filed a number of
21   counterclaims on behalf of the Town.
22             I know that our firm recently filed a
23   counterclaim against Citizens Awareness Foundation,
24   Inc., and you on behalf of my firm.  Mr. O'Hare was not
25   named.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

28

```
 1        So, I'd have to look and see the last
 2   counterclaim that named you and Mr. O'Hare.  I don't
 3   know if it was in the last six months or not.
 4             THE COURT REPORTER:  I'm sorry, can we take
 5        a break so he can finish whatever he's doing.
 6             MR. O'BOYLE:  Sure.
 7             (Thereupon, a recess was taken; after which
 8        the following proceedings were had:)
 9   BY MR. O'BOYLE:
10        Q.  You mentioned Citizens Awareness just a minute
11   ago?
12        A.  I did.
13        Q.  What is Citizens Awareness?
14        A.  You're asking me my legal opinion?
15        Q.  No.  I'm asking you in -- to your understanding,
16   what is it?  Is it a garage, is it a burger joint?  What
17   is it?
18        A.  You're asking my legal opinion.
19        Q.  No, I'm asking you what it is.  If somebody asked
20   me what this piece of equipment in front of me is, I'd
21   say it's a computer.  That's not a legal opinion.
22        A.  Well, I believe you're asking me a legal opinion.
23   I'm not comfortable giving you my legal opinions.
24             I've been hired to do that for the Town of Gulf
25   Stream.  I'll give them my legal opinions as to what
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

29

```
 1   Citizens Awareness Foundation, Inc. is.
 2           MR. O'BOYLE:  Madam, would you kindly
 3       certify the record there.
 4   BY MR. O'BOYLE:
 5       Q.  Do you know a guy named Joel Chandler?
 6       A.  Do I know him?
 7       Q.  Yes.
 8       A.  I wouldn't say I know him.
 9       Q.  Okay.
10       A.  I could say that I've met him and interviewed
11   him.
12       Q.  But you don't know him?
13       A.  When I say "know him", I mean, that -- to me that
14   means know him, like, socially or personally.  I know
15   about him.
16       Q.  Tell me about him?
17       A.  What do you want to know about him?
18       Q.  Whatever you said, I know about him, that's what
19   I want to know?
20       A.  Well, I am not comfortable giving you what I know
21   about him from the standpoint that I have had interviews
22   with him that are work product.
23           I have done investigation and research which are
24   work product.  And Mr. Chandler is the -- is a witness
25   in numerous cases that are -- or potential witness in
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

30

```
 1   numerous cases that are currently pending.
 2       Q.  Against the Town of Gulf Stream?
 3       A.  Numerous cases that are pending.
 4       Q.  Against the Town of Gulf Stream?
 5       A.  Yes, he's a witness in cases that are pending
 6   against the Town of Gulf Stream.  He was just listed as
 7   a witness in a case that's pending against the Town of
 8   Gulf Stream.
 9       Q.  In your opinion, is he an upstanding, honorable
10   man?
11       A.  I am not here to give you my opinions,
12   Mr. O'Boyle.  That would be my work product.  I am not
13   comfortable doing that.
14       Q.  The statement that you took, that's a public
15   record, is it not?
16       A.  I'm sorry, which statement are you referring to?
17       Q.  How many statements have you taken from
18   Mr. Chandler?
19           MR. GOLDSTEIN:  Object to form.
20           THE WITNESS:  You didn't identify
21       Mr. Chandler in your question.  You just stood
22       up, got up, picked up a piece of paper and asked
23       me the statement that you took.
24           MR. GOLDSTEIN:  Bob --
25           THE WITNESS:  So, if you ask me about the
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

31

```
 1       statement of Mr. Chandler?
 2   BY MR. O'BOYLE:
 3       Q.  Yes?
 4       A.  You're asking me for a legal conclusion.  But my
 5   understanding is, at some point, that became a public
 6   record, yes.
 7       Q.  Okay.  So, you have not a problem in the world
 8   discussing this?  This is not work product?
 9       A.  I have no problem discussing the fact I took a
10   statement from Mr. Chandler at all.
11       Q.  What about the content of the statement, that's
12   public record?
13       A.  I'm happy to tell you what I remember him saying
14   and me saying, but I think the transcript is probably
15   the best indication.  It was videotaped and transcribed
16   by a court reporter.
17       Q.  Let's go through the transcript.
18       A.  Do you have a copy for me to look at?
19       Q.  I do not, but you won't need one.
20           Incidentally, how did you come about to meeting
21   Mr. Chandler?
22       A.  Mr. Chandler called me on the phone.  He
23   indicated he wanted to report what he believed was
24   criminal and fraudulent conduct that had been committed
25   by you, your son, a law firm, and an entity by the name
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

32

```
 1   of Cafi, C-A-F-I.
 2       Q.  And was Mr. Chandler a former member of the FBI,
 3   do you know?
 4       A.  I didn't ask him that question in that
 5   conversation.
 6       Q.  So, you don't know?
 7       A.  I never -- I have no knowledge of Mr. Chandler
 8   being involved with the FBI.
 9       Q.  Okay.  Is Mr. Chandler -- was he involved with
10   the CIA?
11       A.  I never asked him that question.
12       Q.  So, your knowledge is you don't know?
13       A.  I don't know.
14       Q.  Okay.  Was he ever involved in Interpol?
15       A.  I don't know.
16       Q.  And is he a lawyer?
17       A.  I don't believe so.
18       Q.  Okay.  And when he spoke to you and he said that
19   I was involved in criminal activities, what were they?
20       A.  Are you talking about in the statement that he
21   gave me?
22       Q.  Or in the statement or in the affidavit or in the
23   timeline or anything else that he gave us is public
24   knowledge?
25       A.  Well, I'll be happy to discuss the statement with
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

**Page 33**

1  you.  I've interviewed Mr. Chandler several times and
2  that's work product.
3      But in that taped interview, there's a discussion
4  of what he believed was potentially criminal and/or
5  fraudulent behavior.  I think -- do you want me to tell
6  you what I remember from the statement?
7  Q.  Sure.
8  A.  I haven't read the statement for some time.  But
9  I generally recall there was, in the interview, a
10  discussion that he -- I have to be careful as to what
11  discussions I've had with him that aren't part of the
12  record, so I have to be careful.
13      At some point, he described your funding a
14  purported not-for-profit corporation, but that he was
15  merely only working for you.  He was, a long with
16  another man, going around the state making public
17  records requests for purposes of generating, I think he
18  said, you wanted three thousand lawsuits or 25 a day for
19  your son's law firm to file.
20      I don't remember if he mentioned kill shots and
21  triple A kill shots in that transcript or in the
22  communication with me or in the writings he gave me, but
23  there was a --
24  Q.  Excuse me, let me interrupt you and I apologize.
25      MR. GOLDSTEIN:  You asked a question, let

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

**Page 34**

1  him --
2      MR. O'BOYLE:  I understand.
3      MR. GOLDSTEIN:  You have to let him finish
4  answering the question.
5      THE WITNESS:  Okay.  So, then I remember he
6  said that you were funding the entire operation.
7  That you were going to try to get deductions and
8  called it a not-for-profit.
9      That you were -- I am not sure if this is
10  actually in that statement or not, a funded
11  through Commerce Group and otherwise pay for all
12  of the activities to generate these cases
13  throughout the state.
14      That he had gone to numerous state and local
15  governments to make these kill shots to generate
16  lawsuits for your son's law firm that you were
17  funding the firm with an unlimited budget to
18  develop as much legal business as you could for
19  your son in this manner.
20      That you wanted to -- oh, that you had set
21  up your close advisors, I believe it was a
22  Mr. Ring, who was your long term business
23  partner, and Brenda Russell, a secretary, and
24  Denise DeMartini, one of your secretary's, to
25  hold them out as if they were the directors, but

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

**Page 35**

1      that you were paying him -- that you had actually
2  hired him.
3      That there was never any meetings of Cafi
4  essentially wasn't a real entity, it was just
5  you.  That these same people were running the
6  O'Boyle Law Firm with your son.  That your son
7  had said he was going to be a lawyer any day, but
8  he was working full-time in the law offices in
9  your same office of Commerce Group.  That he was
10  practicing law.  That he was running the firm.
11  That he was preparing pleadings.
12      That you had engaged in targeting.  You had
13  filed over a hundred public records requests in
14  the name of Cafi, but Cafi was really Commerce
15  Group.  Commerce Group was on the forms that you
16  had had your secretary do it and that he was mad
17  about you're saying that you weren't involved
18  with Cafi when you were actually running Cafi.
19      That he didn't want to be part of your
20  targeting.  That he -- that lawsuits were filed
21  directed by you on behalf of Cafi when he had
22  been told that he would be in charge of any
23  litigation.
24      That he was instructed to give all the
25  litigation to your son's firm.  And that he told

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

**Page 36**

1      you that he thought that that would clue people
2  into what you were doing, but you insisted.  That
3  he had an argument with Mr. Ring about that and
4  Mr. Ring said that, whatever Big Daddy does, he's
5  the money, you have to do what he says.
6      He told me about e-mails and communications
7  involving what he called a "windfall scheme".
8  That not only was the Plaintiff in the cases not
9  a real not-for-profit and a sham that was done to
10  get credibility whenever a suit was filed, but he
11  also told me that he learned through a
12  not-for-profit or some Defendant in a Cafi case
13  that there had been more money demanded by the
14  firm then had been incurred in fees, and that he
15  objected to that and that it had been on-going
16  and it was called the "windfall scheme".
17      And that he had confronted lawyers in the
18  firm, I believe including Jonathan O'Boyle, and
19  he was told that that's the way it's going to be
20  done.
21      And he told me there were e-mails regarding
22  all of that and that you had told him to retract
23  the e-mails or you were going to visit great
24  unpleasantness on him.
25      He told me that Denise DeMartini was running

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

37

```
 1        the law firm with Jonathan, discussing client
 2        matters that were not he or Cafi in front of him
 3        regularly.  That there was what man named
 4        Mr. Grey that was being used by the law firm as a
 5        runner to go do the same thing.
 6        I mean, there's a whole lot of things he
 7        told me.  It was quite -- quite an earful.
 8   BY MR. O'BOYLE:
 9        Q.  Well, let's go over these things.
10        A.  Also, he had provided me, of course, a drop box
11   for -- before I took his statement.
12        Q.  And by the way, in that connection, I understand
13   that he wanted to provide to Mr. Richmond the same
14   document that he showed to Mr. Richmond, he refused on
15   basis it was unethical?
16        A.  I have no knowledge of discussions between
17   Mr. Chandler and Mr. Richmond regarding the drop box.
18        I do know that I was asked by Cafi and refused to
19   give the drop box to Mr. Richmond or to any -- or to
20   Joann O'Connor because there was a claim made that, I
21   believe, I received a letter from your lawyers,
22   Mr. Ring I believe it was, that I could not -- demanding
23   that back.
24        And I advised Mr. Ring that it was my position,
25   based on what had been related to me, that these were
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

38

```
 1   allegations of crime or fraud and, therefore, there was
 2   no lawyer/client privilege, and that I was going to have
 3   the Court decide whether or not these documents had to
 4   be returned to this alleged entity called Cafi.
 5        And thereafter, I believe, is when you sued my
 6   law firm trying to get these documents back and that's
 7   been the subject of litigation.
 8        Q.  I think your first statement was that I was
 9   funding Cafi?
10        A.  That's not my statement.  I'm relating to you
11   what Mr. Chandler told me.  He told me you were funding
12   everything, the law firm, Cafi, all of the staff at the
13   companies.
14        That you were, basically -- he used the word Big
15   Daddy, I guess, which is what Mr. Ring called you to
16   Mr. Chandler.  And that everything -- whatever you
17   wanted to do is going to be done.  And the way you
18   wanted to do it was going to be done.
19        And that Mr. Chandler better just learn that's
20   the way things ran.  And Mr. Chandler -- that's what he
21   described to me.
22        I am just telling you, my best recollection of
23   what was in the statement or about that time what he
24   discussed with me.  Keeping in mind I had lunch with
25   him.  I, also, spoke to him after the statement.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

39

```
 1        So, there are things that may not be on that
 2   record.  I'm having trouble remembering which is on the
 3   record and which was after the record without having the
 4   statement in front of me.  But you don't want to give me
 5   the statement to refresh my recollection, so, I'm giving
 6   you my best recollection.
 7        Q.  Did you pay him off?
 8        A.  Did I pay him off?
 9        Q.  Yeah.
10        A.  I've never given Mr. Chandler any money for
11   consideration.  But I did -- I did buy him a slice of
12   pizza at lunch.  And he said, can -- actually, I bought
13   myself a pizza.  And he said he wasn't hungry.  And he
14   kept looking at my pizza.  And he said -- I said, would
15   you like a slice of my pizza?  And he said, you sure I
16   can take it?  I said, I'm sure you can have slice of my
17   pizza, Mr. Chandler.
18        Q.  You had pepperoni?
19        A.  I wish my memory were that good.
20        Q.  Okay.
21        A.  Normally I don't order pepperoni if I'm doing a
22   deposition because I love pepperoni, but it doesn't love
23   me.  So, then I stick to mushrooms.
24        If I'm adventurous, I might add onions, but it
25   all depends on what I'm doing that day.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

40

```
 1        Q.  Gotcha.  When you started your long statements a
 2   few minutes ago, the first thing you said is that in
 3   recalling Mr. Chandler's statement, that he said that I
 4   was funding Cafi?
 5        A.  Are you talking about in the sworn statement?
 6        Q.  Yes.
 7        A.  My recollection is that he told me that you were
 8   funding everything.
 9        Q.  Okay.  Well, wouldn't Cafi be part of everything?
10        A.  Yes, he told me you were funding Cafi; and
11   everything.
12        Q.  Okay.  So, he did say that I was funding Cafi?
13        MR. GOLDSTEIN:  Objection.
14        THE WITNESS:  That's my recollection.
15   BY MR. O'BOYLE:
16        Q.  Tell me what factual evidence that you have that
17   that's true?
18        A.  I am not comfortable discussing the contents of
19   the drop box that was provided to me because the same
20   lawyer you were using in this case, Mr. DeSusa, is,
21   apparently, also representing Cafi.  And he filed suit
22   against my law firm claiming that these are confidential
23   materials of Cafi.
24        So, until a court adjudicates case that or until
25   they are released in some other fashion, I am not
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

41

```
 1   comfortable answering that question.
 2        Q.   And I am not asking for one document.
 3        A.   And I don't want to talk to you about what's in
 4   the documents.
 5        Q.   And I'm not asking for you to talk to me about
 6   what's in the document.
 7        A.   Okay.
 8        Q.   What I'm asking you is, am I correct in that
 9   Mr. Chandler said that I was funding Cafi?
10             MR. GOLDSTEIN:   Asked and answered.
11   BY MR. O'BOYLE:
12        Q.   And you said yes, correct?
13        A.   The record speaks for itself, Mr. O'Boyle.  You
14   asked me that question three or four times.
15             MR. GOLDSTEIN:   Asked and answered.
16   BY MR. O'BOYLE:
17        Q.   Okay.  Your exaggeration aside --
18        A.   I'm sorry?
19        Q.   I said, your exaggeration aside --
20        A.   Is that a question?
21             MR. GOLDSTEIN:   There's no question pending.
22             MR. O'BOYLE:   I'm going to continue on and
23        get a question.
24             THE WITNESS:   And I'm going to need a
25        restroom break shortly.  It's been an
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

42

```
 1        hour-and--a-half I've been here.
 2   BY MR. O'BOYLE:
 3        Q.   In this sworn statement dated --
 4        A.   Do you mind if we take a restroom break if you're
 5   going to go through the entire statement?
 6        Q.   Not at all.
 7        A.   It's just a two-minute break.
 8             MR. HOCHMAN:   We're off the record.
 9             MR. O'BOYLE:   Takes two to go off the
10        record, but we'll go off the record.
11             MR. HOCHMAN:   Exactly gotcha.
12             (Thereupon, a recess was taken; after which
13        the following proceedings were had:)
14             MR. O'BOYLE:   Would you like to go back on
15        the record?
16             MR. HOCHMAN:   Yes, certainly.
17   BY MR. O'BOYLE:
18        Q.   On July 23, 2014 between 10:48 a.m. and
19   3:56 p.m., and the time is insignificant just trying to
20   do it to, maybe, help you out.  Did you take a sworn
21   statement from Joel Chandler?
22             MR. GOLDSTEIN:   Asked and answered.
23             THE WITNESS:   Yes.  Except for the lunch
24        recess.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

43

```
 1   BY MR. O'BOYLE:
 2        Q.   Okay.
 3        A.   And yes, that's --
 4        Q.   Just one quick question, did you tell me about
 5   the last -- about the lunch recess when we -- the last
 6   time when Mr. Goldstein said it was asked and answered?
 7        A.   Yes, I told you about the pizza.
 8        Q.   You did?
 9        A.   And that was related to the sworn statement when
10   I was having sworn statement.  The court reporter wasn't
11   there.  So, other than that time period, I was taking
12   the sworn statement.
13        Q.   Okay.  You did take this sworn statement?  In
14   other words, there's questions and answers in here from
15   Mr. Sweetapple and Mr. Chandler?
16        A.   I think you asked me that.  Yes.
17        Q.   Okay.  And in that sworn statement it talks about
18   Joel Chandler saying that I was funding Cafi.
19             Do you claim that a public statement in this
20   public document to be work product or privilege?
21             MR. GOLDSTEIN:   Object to the form.
22             THE WITNESS:   I'm not going to give you my
23        legal conclusion, but I have recited -- I mean, I
24        am admitting that I asked that question and he
25        gave that answer and it's part of a public
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

44

```
 1        record.
 2   BY MR. O'BOYLE:
 3        Q.   And do you have any reason to believe that that's
 4   true, that statement?
 5        A.   I'm not going to disclose my work product.  I am
 6   not comfortable discussing my work product to you or my
 7   opinions, my legal opinions.
 8        Q.   I don't want your legal opinions.
 9             Tell me how that's work product?  Help me out?
10        A.   I'm not going to help you out, sir.  You had an
11   attorney and you've chosen to proceed without an
12   attorney.
13             Your son's an attorney.  You can ask him during a
14   break.
15             MR. O'BOYLE:   Would you certify the
16        question, please.
17   BY MR. O'BOYLE:
18        Q.   We'll get to that when we go through the
19   document.
20             What's a kill shot?
21        A.   That is a term that Mr. Chandler used in his
22   discussions with me.
23        Q.   How did you -- he's not a hired killer or
24   anything like that to your knowledge, is he?
25        A.   No.  You want my understanding -- what, basically,
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

45

```
 1    he was describing to me was the making of public records
 2    requests with no intent to get the documents, but to
 3    have it so difficult or orchestrated in a way that it
 4    would not be answered in such a way that the lawsuit
 5    that would come from it would result in an obligation on
 6    behalf of the government entity to have to pay fees so
 7    there would be, as he explained it, no way they would
 8    know there was a record that existed, they forgot to
 9    include, so complex.
10         But basically, it was the way to go around and to
11    farm lawsuits.  And I believe there's an e-mail that's
12    not -- that's before Cafi was formed that's not part of
13    the claim Cafi confidential documents, that talks about
14    the kill shot.  And how many he -- I may -- I may have
15    that.
16         I brought a stack of documents with me.  If
17    during the break I could look.  But I think there's an
18    e-mail that actually talks about the kill shots that was
19    prior to Cafi being formed.
20         Q.  And if it was prior to Cafi being formed, who
21    would it involve?
22         A.  It involved Mr. Whitmore, your son's law firm,
23    a discussion of how many cases could possibly be formed
24    using these kill shots for the law firm.
25         Q.  And this is all from Mr. Chandler, am I correct?
```

46

```
 1         A.  No.  There's e-mails between Mr. Whitmore and
 2    Mr. Chandler before Cafi was formed when the law firm
 3    was being setup to handle this type of activity.
 4         Q.  And when you say "this type of activity", you're
 5    talking about Mr. Chandler preparing complaints for
 6    Mr. Whitmore, is that what you're saying?
 7         A.  No.  I'm talking about the business model that was
 8    being setup, whereby, Mr. Chandler, Mr. Grey would go
 9    around the state and with no desire to get public
10    records, saying they were representing -- just not
11    saying they represent Cafi, just going out there and
12    asking for records.
13         You were paying them or paying Mr. Chandler, that
14    he had your credit card, I believe he said.  You gave
15    him $1,000.  And then these were kill shots where the
16    really good ones that he thought were great lawsuit he
17    would bring to the law firm.  You would call it a Cafi
18    public records request.  Some of these were oral.  He
19    would just go in and make requests and then he would
20    come back, the law firm would file lawsuits saying it
21    was Cafi, which is a not-for-profit so that the
22    recipient would believe it's a legitimate entity that's
23    making these requests.
24         And the kill shot was part of the mechanism that
25    he described.  And I believe it's in an e-mail that I
```

47

```
 1    could get for you.
 2         Q.  The documents that Mr. Richmond didn't want or
 3    Joel didn't want to give them to him, I am not sure I
 4    grasp what you were saying in full.
 5         But Mr. Chandler gave to you confidential
 6    documents, did he not?
 7              MR. GOLDSTEIN:  Object the to form.
 8              THE WITNESS:  Mr. Chandler sent a drop box
 9         to me after we had a discussion on the telephone.
10    BY MR. O'BOYLE:
11         Q.  And Mr. Chandler was no longer with Cafi at that
12    point, am I correct?
13         A.  I don't -- I don't believe he was from the
14    conversation.
15         Q.  So, if he wasn't with Cafi and he had Cafi
16    documents where there communications with lawyers and so
17    forth, wouldn't they be privileged?
18         A.  You're asking me for -- first of all, there's
19    hypotheticals in the question.  And second of all,
20    you're asking me for a legal opinion.
21         Q.  Okay.  Do you believe -- I believe that those
22    documents were stolen, that's what I believe.
23         And if I'm correct, isn't that kind of activity a
24    felony?
25         A.  I am not here to give you my legal opinion with
```

48

```
 1    regard to your legal matters.
 2              MR. GOLDSTEIN:  Going to object to the form.
 3    BY MR. O'BOYLE:
 4         Q.  Okay.
 5         A.  And I don't understand --
 6              MR. GOLDSTEIN:  There's no question pending.
 7              THE WITNESS:  That's all.  I am not here to
 8         give you a legal opinion.
 9    BY MR. O'BOYLE:
10         Q.  And I wouldn't want a legal opinion from you.
11    Thank you.
12              MR. GOLDSTEIN:  Move to strike the
13         commentary.
14    BY MR. O'BOYLE:
15         Q.  Where did Joel get these documents, he didn't
16    work for Cafi, they were Cafi documents.  Where would he
17    have gotten them, do you have any idea?
18              MR. GOLDSTEIN:  Object to the form.
19              THE WITNESS:  Mr. Chandler told me they were
20         his documents.
21    BY MR. O'BOYLE:
22         Q.  You're a lawyer, you know better, don't you?
23              MR. GOLDSTEIN:  There's no question pending.
24         Object to the form.
25              THE WITNESS:  Are you saying that I should
```

49

```
1            have doubted Mr. Chandler?
2    BY MR. O'BOYLE:
3        Q.  No.  I think you should have looked at the
4    documents.  You knew that Mr. Chandler was no longer
5    with Cafi.  You knew that the documents were between
6    Cafi and their counsel, and you took them anyway.
7            MR. GOLDSTEIN:  Object to the form.
8            THE WITNESS:  There were a number of
9    different types of documents in the drop box
10   before I allowed -- at the very onset of my
11   discussion with Mr. Chandler, I instructed him
12   that I did not want to talk to him unless he had
13   an independent attorney.
14           He indicated to me that he had spoken to, in
15   excess of, ten attorneys about what was
16   happening.  He indicated to me that he had
17   already contacted numerous victims.  That I was
18   hardly the first person he was contacting.
19           And I indicated to him that I would be more
20   comfortable if he had an attorney.  And he said
21   he didn't need one.  And I said, fine.  I am
22   happy to proceed.
23           And he sent me a drop box.  And I told you
24   what my position was with regard to that drop box
25   when your -- when Mr. Ring made a demand for
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

50

```
1            those documents back and it's the subject of
2    on-going litigation.
3    BY MR. O'BOYLE:
4        Q.  When you got the drop box and the documents, did
5    you look at the documents?
6        A.  They were so voluminous that I did not look at
7    them.  I looked at some of them.  I am not very savvy
8    with the computer, it was on a computer.
9            I didn't know what a drop box was at the time.  I
10   looked at some of it.  And I, actually, said to
11   Mr. Chandler, because I'd arranged to go immediately to
12   see him, could you please write out a chronology for me
13   so that I know what you're talking about.
14           And then he sent me another computer document
15   which was a chronology with like e-mails.  So, I did
16   look at that.
17       Q.  But of the e-mails that you looked at, were any
18   of them between Cafi and counsel?
19           MR. GOLDSTEIN:  Object to the form.
20           THE WITNESS:  I'd have to go back and look.
21   BY MR. O'BOYLE:
22       Q.  You don't remember?
23       A.  I don't.  I don't.  I really don't feel
24   comfortable talking about those documents anyway as to
25   what they said.  I haven't looked at them in a long,
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

51

```
1    long time.
2            But I do -- I do believe there were e-mails
3    between Jonathan and Joel.  Whether or not that's Cafi
4    or not, of course, is a legal conclusion.
5        Q.  Hm-hum.  The documents in the drop box, in either
6    the to or from, did you see the name Cafi or Citizens
7    Awareness Foundations, Inc.?  I am not sure how it shows
8    up.
9        A.  I don't remember that.  I remember Joel Chandler
10   and different people.
11       Q.  Okay.  So, you don't remember of all those
12   documents in the drop box?  You don't remember one that
13   said Cafi?
14       A.  Well, I am not -- that's not what I said.  I said
15   I don't remember if, in the e-mails, where it said from
16   Joel to Whitmore, to -- or Ring to Joel, if it said Cafi
17   or Joel.
18           Mr. Chandler's position was that he -- that the
19   employment by Cafi was just a ruse.
20       Q.  And my position is, is that he's a pedophile.
21       A.  Is that a question?
22       Q.  No.  You were just telling me what his position
23   is.
24       A.  I'm just telling you what he told me.  I don't
25   know what your dealings with him are or how you would
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

52

```
1    believe he's a pedophile.
2            MR. HOCHMAN:  Can you read back the
3    statement on the record where Mr. O'Boyle made a
4    comment about Mr. Chandler?
5            MR. O'BOYLE:  Please, strike that, please.
6            MR. HOCHMAN:  I just want it read back so I
7    can hear exactly what the -- so I can write it
8    down in my notes.
9            MR. O'BOYLE:  Would you, please, strike
10   that.  He can write down all he wants.
11           (Thereupon, the last pending question was
12   read back; after which the following proceedings
13   were had:)
14           MR. HOCHMAN:  Do you know what page that's
15   on in terms of where you are, approximately?
16           THE COURT REPORTER:  About 47 to 50.
17           MR. HOCHMAN:  I would like an excerpt,
18   please, of the couple questions before that and
19   to the point that I'm saying this is now excerpt
20   number one.  Thank you.
21           So, I may not order the entire transcript,
22   but I'm going to ask for the excerpt.  Thank you.
23           MR. O'BOYLE:  Is your speech over?
24           MR. HOCHMAN:  I was making a request to the
25   court reporter so I can an order a portion of the
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

53

```
 1      transcript.
 2              MR. O'BOYLE:  You could have done that
 3      later.
 4              Are we back on the record?
 5              THE COURT REPORTER:  We were always on.
 6              MR. O'BOYLE:  And, again, I just want to say
 7      that to my knowledge, Mr. Chandler is not a
 8      pedophile and I would never accuse him of being a
 9      pedophile.
10              Moving a long.
11   BY MR. O'BOYLE:
12      Q.  Did Mr. Chandler, when he sent you the drop box,
13   you read certain documents you said?
14      A.  I did look at certain documents.
15      Q.  Okay.  How many documents were in the drop box,
16   approximately?
17      A.  I don't know.
18      Q.  Was there less than a million?
19      A.  I'm certain.
20      Q.  Excuse me?
21      A.  I'm certain.
22      Q.  Okay.  Was there less than a hundred thousand?
23      A.  I'm certain.
24      Q.  Okay.  Was there less than fifty thousand?
25      A.  I believe so.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

54

```
 1      Q.  Okay.  Was there less than twenty-five thousand?
 2      A.  I never counted them.  I would think there's less
 3   than twenty-five thousand.
 4      Q.  Is there less than ten thousand?
 5      A.  I'd have to see it printed out and look at them.
 6   I mean, if I were guessing, I would say --
 7              MR. GOLDSTEIN:  Don't guess.
 8              THE WITNESS:  I mean, I really would
 9      have to -- I'm guessing.
10              MR. GOLDSTEIN:  Let me move to strike any
11      questions characterized as a guess.
12              THE WITNESS:  Okay.  I would be guessing.
13   I never counted the number of documents.
14   BY MR. O'BOYLE:
15      Q.  So, it could be twenty thousand and it could be
16   nine, correct, somewhere between there?
17      A.  It was more -- I think when they printed it, it
18   was more a notebook, it wasn't a box.
19      Q.  And when you say "notebook", one of the big black
20   books?
21      A.  It's a black book.  I don't know, you know, how
22   big or how many pages there are.
23      Q.  Okay.
24      A.  I had it printed because I don't often read
25   documents on the computer.  I'm old fashioned, 36 years
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

55

```
 1   of doing this.  I'm learning, though.
 2      Q.  And I appreciate that.  Although, a few minutes
 3   ago you just said the very opposite and that is, that
 4   you were looking at them on the screen?
 5      A.  I tried that, but I'm not comfortable doing that
 6   because I like to underline and I like to -- so, I'll do
 7   that, I'll glance at things on the screen.
 8              But I always have them print it out.  I'm a tree
 9   killer from way back.
10      Q.  Okay.
11      A.  Although, I'm trying to get around that.
12      Q.  Okay.  Good enough with me.
13              So, I guess just as a follow up question, you
14   don't think that anything in connection with your
15   conduct, Joel Chandler's conduct in connection with the
16   drop box, the Cafi documents, you don't think there's
17   anything wrong with what you've done morally, ethically,
18   legally, nothing?
19              MR. GOLDSTEIN:  Object to the form.
20              THE WITNESS:  You're asking me for my legal
21      opinion.  I can tell you that all times as a
22      lawyer, I try to conduct myself in a way that's
23      ethical, legal and even moral.
24              So, no, I don't believe that anything that I
25      did in receiving this person's attempt to inform
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

56

```
 1   me on behalf of the Town of Gulf Stream of what
 2   he believed was criminal and fraudulent conduct
 3   directed, not only to Gulf Stream but to over a
 4   hundred governments in the state, was immoral,
 5   unethical or illegal.
 6              I believe I had a duty to receive that
 7   information on behalf of my client.
 8   BY MR. O'BOYLE:
 9      Q.  Do you believe you had a duty to submit that to
10   the Bar?
11      A.  Had my client not filed a Bar complaint, I think
12   the ethical rules required that when a lawyer becomes
13   aware of unethical conduct or alleged unethical conduct
14   with regard to another lawyer, we do have a duty to
15   report that to the Bar, yes.  That's my understanding of
16   the Bar rules.
17      Q.  So, if what you did in connection with the drop
18   box in reading the documents and so forth is immoral,
19   unethical or illegal, one of the lawyers here, probably
20   Mr. Goldstein, would report you to the Bar and that
21   would be appropriate, am I correct?
22      A.  You're asking me my legal opinion?
23      Q.  No.
24      A.  I'm telling you that my -- you're asking me my
25   general understanding.  I'll give it to you from my
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

57

```
 1    experience; is that if a lawyer becomes aware of a
 2    breach of the rules regulating the Florida Bar by
 3    another lawyer, he has a duty to report that.
 4       Q.  Okay.  The amended counterclaim that was filed in
 5    Case 4474, do you know anything about that?
 6            MR. GOLDSTEIN:  Object to the form.
 7            THE WITNESS:  I believe that is a public
 8        records case that you filed against the Town of
 9        Gulf Stream.
10    BY MR. O'BOYLE:
11       Q.  The amended counterclaim is what you think I
12    filed?
13       A.  No, no, that Case 44 --
14       Q.  That's not what I asked you.
15       A.  Do I know anything about the counterclaim?
16       Q.  Yeah, the amended counterclaim?
17       A.  I know that there was an amended counterclaim
18    filed in that case.
19       Q.  Do you have any idea who filed it?
20       A.  I believe my firm filed it with O'Connor,
21    Joann O'Connor's firm.
22       Q.  Okay.  So, it would have been signed by you and
23    Joann O'Connor, is that what you're saying?
24       A.  I would have to see the document.  I mean, it
25    doesn't have to be signed by both attorneys of record.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

58

```
 1       Q.  But it was signed by you?  When I say "you", I
 2    mean your firm.
 3            MR. GOLDSTEIN:  Asked and answered.
 4            THE WITNESS:  I would have to see the
 5        document, but I don't know.  If it was
 6        electronically filed, I don't know if I signed
 7        it.  If you show it to me, we'll know.
 8    BY MR. O'BOYLE:
 9       Q.  Ah-huh.  Okay.  Are you familiar with the Bar of
10    the Rules?
11       A.  Generally, yes.
12       Q.  Sorry?
13       A.  Yes, I am generally familiar with the Bar rules.
14       Q.  And what's the difference between being familiar
15    with the Bar rules and generally being familiar with the
16    Bar rules?
17            MR. GOLDSTEIN:  Object to the form.
18            THE WITNESS:  When I served as vice chair of
19        the Florida Bar Grievance Committee along with
20        Judge French, I was very familiar with the Bar
21        rules because I worked with them on a weekly
22        basis.
23            Now, if you ask me a specific question about
24        a specific number or content, I would have to
25        look at the rules to recite them to you.  But
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

59

```
 1    there was a time when that wasn't necessary.
 2    BY MR. O'BOYLE:
 3       Q.  The sworn statement that you took from
 4    Mr. Chandler, are you relying on it?
 5       A.  What do you mean, am I relying on it?
 6            MR. GOLDSTEIN:  Object to form.
 7    BY MR. O'BOYLE:
 8       Q.  Okay.  I have to type a letter and I'm relying on
 9    this computer to not break down and allow me to type the
10    letter.
11            Are you relying on the content of this document
12    which you took from Mr. Chandler?
13            MR. GOLDSTEIN:  Object to the form.
14            THE WITNESS:  For what purpose?
15    BY MR. O'BOYLE:
16       Q.  The truth?
17       A.  I had Mr. Chandler swear to anything he told me.
18       Q.  And what happens if you have conflicting
19    information?
20            If Mr. Hochman says white and Mr. Goldstein says
21    black or Mr. Chandler says red, Marty O'Boyle says
22    green, how do you handle that?
23       A.  How do I handle that?
24       Q.  I asked you first.
25       A.  I'm not a judge.  I am not a jury.  I don't
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

60

```
 1    adjudicate people's credibility.  I interview witnesses.
 2    I only tale things that I think are in good faith.
 3            If I thought someone was lying to me, I certainly
 4    would not use their statement, but I don't -- I don't
 5    know how to answer your question other than that.
 6       Q.  Well, about the veracity of the document, the
 7    statement's made.  Are you -- probably not using the
 8    right word, please excuse me, but are you relying on --
 9    for all of your -- not for all, but for many of your
10    future pleadings, filings from this, are you relying on
11    the content of this?
12            MR. GOLDSTEIN:  Object to the form.
13            THE WITNESS:  I am not capable of telling
14        you what my future pleadings are going to be.
15    BY MR. O'BOYLE:
16       Q.  No, no.
17       A.  Nor am I comfortable telling you my work product
18    and what statements of what witnesses I'll be relying on
19    for my representation of the Town and various matters
20    that are filed or un-filed for that matter.
21       Q.  Have you not filed pleadings since the date that
22    you took this?  When I say "pleadings", may not be the
23    right term.
24            You have filed documents -- you filed -- you made
25    filings in connection with court matters, legal matters,
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

61

```
 1   litigations, am I correct?
 2           MR. GOLDSTEIN:  Object to form.
 3           THE WITNESS:  On behalf of the Town of Gulf
 4       Stream?
 5   BY MR. O'BOYLE:
 6       Q.  On behalf of the Town of Gulf Stream?
 7       A.  I made many, many filings on behalf of the Town
 8   of Gulf Stream.
 9       Q.  Okay.  And I'm going to tell you that many of
10   your filings that I've seen include much of what is in
11   here.  Does that sound correct to you?
12           MR. GOLDSTEIN:  Object to form.
13           THE WITNESS:  That you said most of my
14       filings?
15   BY MR. O'BOYLE:
16       Q.  Yes, most.
17       A.  I would have to look at all the filings.  I'd
18   have to look at all the filings and weigh them and count
19   them to see if there's a reference to any of that
20   testimony.
21       Q.  Well, let's take baby steps.  Let's take one
22   filing.  Have you in any one filing used information
23   that's in this sworn statement you took from
24   Joel Chandler?
25       A.  Yes.
```

62

```
 1       Q.  Okay.  And what documents do you remember with
 2   specificity?
 3           MR. GOLDSTEIN:  Object to the form.
 4           THE WITNESS:  Where I actually filed that or
 5       where I actually made a reference to it?
 6   BY MR. O'BOYLE:
 7       Q.  Have you found --
 8       A.  There's a long statement and he also provided an
 9   affidavit.
10       Q.  Right.
11       A.  And I -- I --
12       Q.  I am not talking about either, by the way.
13       A.  Okay.  Please, restate your question.  I am not
14   sure exactly what you want because I want to get the
15   right answer.
16       Q.  Sure.  Thank you.  You have filed, after July 23,
17   2014, pleadings, filings, whatever they're called in
18   connection with certain cases which would be the Town of
19   Gulf Stream versus my son, myself, Mr. O'Hare, would
20   that be correct?
21           MR. GOLDSTEIN:  I'm going to object to the
22       form of the question.
23           THE WITNESS:  What was the question again?
24   BY MR. O'BOYLE:
25       Q.  I'm talking about cases, whether they be counter
```

63

```
 1   claims, whether they be motions, whether they be
 2   straightforward claims.
 3           I told you I'm not adjoined when it comes to the
 4   names of the -- of the documentation, but your filings?
 5       A.  What about my filings again?
 6           MR. GOLDSTEIN:  Mr. O'Boyle, do you have a
 7       specific filing that you're referring to that you
 8       can direct him.  I think it would be easier.
 9   BY MR. O'BOYLE:
10       Q.  Okay.  Well, thank you.  Lunch time, if you would
11   like -- you can buy me lunch and I would appreciate it.
12           You filed a counterclaim in 4474, do you remember
13   what was in that counterclaim?
14           MR. GOLDSTEIN:  Object to the form.
15           THE WITNESS:  I prefer to see the original
16       counterclaim to answer.  But I remember a
17       declaratory judgment count, I believe.
18           I believe I was -- I'd have to see the
19       original pleading.  I know, at some point, I was
20       trying on behalf of Gulf Stream to have the court
21       rule on the issue of the Carl documents,
22       something like that.  I'd have to see the
23       pleading to be safe.
24   BY MR. O'BOYLE:
25       Q.  Okay.  Besides 4474 -- let's move for a little
```

64

```
 1   bit.
 2           Do you remember preparing a document and at my
 3   deposition you threw it on the table and said, did you
 4   say this is the biggest piece of shit you'd ever seen,
 5   do you remember that?
 6       A.  Did I -- I'm sorry, did I see a document?
 7       Q.  No, that's not what I said.  Listen closely.
 8       A.  Okay.
 9       Q.  I said, do you remember at my deposition that you
10   took, do you remember pulling out a document and
11   saying -- putting it on the table and saying, did you
12   say that this was the biggest piece of shit you'd ever
13   seen?
14       A.  Ask you that question?
15       Q.  Yes.
16       A.  In --
17       Q.  Yes.
18       A.  I'd have to see that question in the transcript.
19       Q.  You don't deny it, though?
20       A.  I'd have to see it.
21       Q.  But you don't deny that you said it?
22       A.  I am not admitting or denying it.  I need to --
23   if there's a transcript it will say what I said.
24           I don't -- unless you used that word, I try not
25   to cuss in legal proceedings.
```

65

```
 1     Q.  You said, the biggest piece of shit that I'd ever
 2  seen.
 3     A.  I think --
 4     Q.  And what that was was about an UPL against my
 5  son.
 6     A.  That you had said that -- I've heard you say this
 7  is the biggest piece of shit I'd ever seen about a
 8  motion to disqualify the O'Boyle Law Firm.
 9     Q.  Okay.
10     A.  I remember something about that when you said
11  that.  I don't think it was the Joel Chandler statement.
12  I think that was a motion that I had files a long which
13  Joann O'Connor on behalf of the Town to disqualify the
14  O'Boyle Law Firm.  But that was before -- that was
15  before I took a statement from Mr. Chandler.
16     Q.  I don't think you're correct, but I can't say
17  that you're wrong?
18     Q.  I don't think you're correct.
19         MR. GOLDSTEIN:  Move to strike.
20         THE WITNESS:  In fact, I'm certain of it.
21         MR. GOLDSTEIN:  There's no question pending.
22  BY MR. O'BOYLE:
23     Q.  What was your a factual basis for saying that my
24  son was guilty of the unlicensed practice of law?
25         When I say "your factual basis", we're going to
```

66

```
 1  exclude from that any non-facts that you have.
 2         MR. GOLDSTEIN:  Okay.  Mr. O'Boyle, again, I
 3  I'm going to object.  If you can tell me how this
 4  is relevant to the claims of -- that my client
 5  allegedly slandered you, I would be happy to
 6  listen to -- or for you to advise me.
 7         MR. O'BOYLE:  If you want to instruct him
 8  not to answer, you're more than welcome to do
 9  that.
10         MR. GOLDSTEIN:  I am not instructing him
11  either way.  I just want asking for you to
12  advise how a --
13         MR. O'BOYLE:  Kindly --
14         MR. GOLDSTEIN:  -- motion that's filed --
15         MR. O'BOYLE:  -- ask him to kindly answer
16  the question, please.
17         MR. GOLDSTEIN:  I'm asking as to how a
18  motion that was filed completely separate from
19  the litigation has any relevance to the claim --
20         MR. O'BOYLE:  I am not going to answer you,
21         MR. GOLDSTEIN:  -- or to him.
22         THE WITNESS:  If you want to talk about the
23  facts --
24         MR. O'BOYLE:  Yes.
25         THE WITNESS:  -- that will support the
```

67

```
 1  Town's position that there was unlicensed
 2  practice of law by the O'Boyle Law Firm, that was
 3  set forth in a motion that was filed with the
 4  court.  And the facts, I believe, are set forth
 5  in that motion.
 6         If you handed me a copy of the motion, I
 7  could recite for you all of the facts.  If you
 8  want me to generally recall the facts, I can do
 9  that.  If you want me to give you the facts that
10  were provided by Mr. Chandler after the motion
11  was filed, I am happy to try to do that for you
12  as well.
13  BY MR. O'BOYLE:
14     Q.  I appreciate that and thank you.
15         What I would be interested in is, as they say in
16  Dragnet, just the facts please?
17     A.  Okay.  You want the facts that are in the Motion
18  to Disqualify.
19     Q.  No, sir, I want the facts.
20         MR. GOLDSTEIN:  Object to the form.
21         THE WITNESS:  Any fact that went to the
22  unlicensed practice of law that was put out?
23  BY MR. O'BOYLE:
24     Q.  Yes, any fact.  And let me see if I can clarify
25  what I'm thinking.  Fact, the court reporter is sitting
```

68

```
 1  about eight-foot from me.
 2         Not a fact, on the other side of the building
 3  there's another court reporter who's there.  I think she
 4  is, but I can't say for sure.  I have no factual basis
 5  to make such a statement.
 6         I have a factual basis to say that she's here.
 7  That's a --
 8     A.  The facts that I am aware of that have been set
 9  forth in pleadings, statements, filings --
10     Q.  Just facts.
11     A.  That I am aware of, the just facts --
12         MR. GOLDSTEIN:  Do you want to ask him a
13  question?
14         THE WITNESS:  The facts that I am aware
15  of --
16         MR. O'BOYLE:  I asked him a question.
17         MR. GOLDSTEIN:  Then stop interrupting him.
18         MR. O'BOYLE:  Sure.  Stop interrupting me.
19         THE WITNESS:  The facts that I'm aware of that
20  have been made public in filings or statements
21  that I remember now sitting here include a
22  confrontation between Judge Barkdull and Jonathan
23  O'Boyle where that issue was raised.
24  BY MR. O'BOYLE:
25     Q.  Okay, let's stop.
```

69

```
 1        A.  Well, let me finish my answer, please.
 2             MR. O'BOYLE:  Let's stop.
 3             MR. GOLDSTEIN:  You've asked him a question,
 4        let him answer.
 5             MR. O'BOYLE:  I'll withdrawing my question.
 6        We'll ask them one a the a time.
 7             THE WITNESS:  You've only given one.
 8             MR. O'BOYLE:  That's all I need for now.
 9   BY MR. O'BOYLE:
10        Q.  You said one of the facts is, that confrontation
11        between Judge Barkdull and Jonathan O'Boyle.  Tell me
12        how that constitutes the unlicensed practice of law,
13        please?
14             MR. GOLDSTEIN:  Object to the form of the
15        question.
16             THE WITNESS:  I was giving you a preface to
17        my answer to say that I retrieved a transcript of
18        a -- this colloquy between the Judge and Jonathan
19        where he said, we're about to discuss the
20        unlicensed practice of law and asked him to move
21        back from the bar, which was one of the first
22        times I think I realized that Jonathan was not a
23        member of the Florida Bar.
24             And there is record evidence, public record
25        evidence, that the O'Boyle Law Firm in Florida
```

70

```
 1        registered itself purporting to be a branch,
 2        let's say, let's simplify it, a branch of the
 3        O'Boyle Law Firm that was in Philadelphia.
 4             And the evidence that was presented in the
 5        filings was that Mr. Jonathan O'Boyle was living
 6        full-time in Florida.  That he told the
 7        Pennsylvania Bar that he was not active in
 8        Pennsylvania, and that he actually resided at a
 9        residence address in Gulf Stream.
10             So, that the parent corporation that was
11        supposed to be sponsoring the branch office of
12        the O'Boyle Law Firm had no lawyer in it.  It was
13        supposed to be Jonathan, but he resided in Gulf
14        Stream and was not an active member of the
15        Pennsylvania Bar.
16             In addition, facts were asserted by
17        Mr. Chandler that Jonathan was --
18   BY MR. O'BOYLE:
19        Q.  Excuse me.  Mr. Chandler is not -- you cannot use
20        Mr. Chandler for factual information.  There's no
21        factual information.  I want to know facts?
22        A.  Well, a statement of a witness --
23        Q.  Aside from --
24             MR. GOLDSTEIN:  Okay, don't --
25             MR. O'BOYLE:  That's fine.  And once again I
```

71

```
 1        apologize for not being clear.
 2             MR. GOLDSTEIN:  I think you also don't need
 3        to interrupt Mr. Sweetapple's answer.
 4             MR. O'BOYLE:  I don't want you to keep
 5        interrupting me.
 6             MR. GOLDSTEIN:  Well, I respect that you
 7        give him the same respect that you're demanding.
 8             MR. O'BOYLE:  I respect that you give me the
 9        same respect.
10             MR. GOLDSTEIN:  I will when you do so to my
11        client.
12             MR. O'BOYLE:  So, you're not going to give
13        me respect is that what you're saying, counsel?
14             MR. GOLDSTEIN:  No.  I'll give you the
15        respect and I expect it to be reciprocated.
16             MR. O'BOYLE:  It's only conditional is that
17        what you're saying, counsel?
18             MR. GOLDSTEIN:  I'm not saying it's
19        conditional.  I'm expecting you to reciprocate and
20        allow the witness to finish answering the
21        question.
22             THE WITNESS:  Could we take a break while
23        you're --
24             MR. HOCHMAN:  Can I ask you to read back the
25        record what Mr. O'Boyle said about what
```

72

```
 1        Mr. Chandler says is not a fact.  I just want to
 2        write that down for my notes, please.
 3             MR. O'BOYLE:  No, that's not a fact.
 4             THE COURT REPORTER:  We're off the record.
 5             (Thereupon, a recess was taken; after which
 6        the following proceedings were had:)
 7   BY MR. O'BOYLE:
 8        Q.  Mr. Sweetapple, we just completed a break.  And
 9        as in any hiatus, you sometimes lose your place and I
10        may have.  I don't know that I did, but I may have.
11             We were talking about facts for the UPL and you
12        mentioned Judge Barkdull and then I think you were, for
13        lack of a better way of saying it, moon walking.  What
14        does Judge Barkdull have to do with facts --
15             MR. GOLDSTEIN:  Object to form.
16   BY MR. O'BOYLE:
17        Q.  -- regarding Jonathan O'Boyle and your claim that
18        he was engaged in the unauthorized practice of law?
19             MR. GOLDSTEIN:  Asked and answered.
20             THE WITNESS:  I'm trying to answer your
21        question as best as I can.  Do you want to tell
22        me what your pending question is?  I heard moon
23        walking.
24   BY MR. O'BOYLE:
25        Q.  Yeah, I just did.  Would you like me to repeat it
```

73

```
1    again?
2       A.  If you could.
3       Q.  I would be delighted to.
4       I asked you for, in connection with the UPL that
5    you filed against Jonathan O'Boyle, the document that I
6    said, this is the biggest piece of shit that I'd ever
7    seen.
8       In connection with that document, what factual
9    information was in that document that would make
10   Jonathan guilty of the unauthorized practice of law?
11      MR. GOLDSTEIN:  Object to the form.
12      THE WITNESS:  That document has facts
13   alleged in it.  First of all, it was a motion to
14   disqualify a law firm.  I don't believe it sought
15   to find Jonathan guilty of the unlicensed
16   practice of law.  It was not any type of a
17   charging document.
18      And I told you that one of the things I
19   recall being in the motion were facts regarding
20   the presence of Jonathan practicing law in
21   Florida, allegedly, on behalf of a branch office
22   and there was no main office that had a lawyer
23   because the main office was supposed to be
24   Jonathan in Pennsylvania.
25      And the records that were attached to the
```

74

```
1    motion suggested that Jonathan had told the
2    Pennsylvania Bar that he was living in Gulf
3    Stream and that he was inactive.
4       And I think there was a case cited from the
5    Florida Supreme Court dealing with, whether or
6    not lawyers could operate in Florida, allegedly,
7    as a branch office of an out of state firm and on
8    what facts and conditions they could do so.
9       And the motion that was filed was a motion
10   to disqualify the O'Boyle Law Firm from handling
11   the case that was pending based on the argument
12   that it was not a bona fide interstate law firm.
13   That's my recollection of the motion.
14      But it would help if I could see it because
15   it was a couple years ago.
16   BY MR. O'BOYLE:
17      Q.  Okay.  But you did sign it, did you?
18      A.  It would help if I saw it.  I don't know if it
19   was electronically filed, if Joann signed it, I would
20   have to see it.
21      Q.  Okay.  So, are you denying you signed it?
22      A.  Pardon?
23      Q.  Are you denying you signed it?
24      A.  I thought we just had this question.
25      Q.  Perhaps we did.
```

75

```
1       Are you denying you signed it?
2       A.  I am not denying or admitting that I signed it
3    myself with my handwriting, I'm saying I would need to
4    see it.
5       Now, papers are filed electronically without me
6    signing them.  In the old days, I had to sign things.  I
7    had co-counsel.  I don't know if Joann signed it or I
8    signed it without seeing it, I haven't looked at it in
9    some time.
10      Q.  How many lawyers have you, for lack of a better
11   way of saying it, charged with the unlawful practice of
12   law?
13      A.  You mean, have I charged?
14      Q.  Filed any type of document, either directly with
15   the Bar or with the courts, how many?
16      A.  I don't -- I don't think any.
17      Q.  So, as far as Jonathan is concerned,
18   Jonathan O'Boyle -- let me say it differently.
19      Weren't you being vicious?
20      A.  No.  I think I was actually doing my job which
21   was to represent my client and take the position that
22   this law firm was not entitled to fees or to represent
23   the Plaintiff.
24      Q.  Okay.
25      A.  I don't think there's anything vicious in the
```

76

```
1    motion at all.  It purports to cite facts and law which,
2    I believe at the time I filed it, were in good faith and
3    still do.
4       Q.  And why did you mention Judge Barkdull in the
5    scheme of my question which is, I only want the facts?
6       A.  I answered that already.  And I told you that I
7    was giving you a preface for how I got into the issue of
8    the -- of investigating the whole concept of
9    unauthorized practice of law.
10      I didn't say that Judge Barkdull's statements
11   were about to talk about the unauthorized practice of
12   law, although, that could be a fact as well because as a
13   judge making a statement, I don't know if that's a fact
14   or not.
15      Q.  Now, I'm reading your document and you are
16   correct, it's titled Defendant's Motion to Disqualify
17   the O'Boyle Law Firm PC, Inc., in the alternative for an
18   evidentiary hearing.
19      Are you saying that the O'Boyle Law Firm, Inc.
20   was engaged in the unauthorized practice of law?
21      MR. GOLDSTEIN:  I'm going to object.  The
22   document speaks for itself.
23      THE WITNESS:  I was saying that the -- I
24   think the motion says, and I'd love to have a
25   copy of it, but I'll give you my best answer
```

77

```
 1        without it.  As I recall the motion, it alleged
 2        that the law firm was not a bona fide branch
 3        of -- it was not an authorized law firm to
 4        practice law because it was not a bona fide
 5        branch of an genuine parent law firm.  And I
 6        cited a case that, I believe, was directly on
 7        point.
 8   BY MR. O'BOYLE:
 9        Q.  And you said it was not a bona fide law firm.
10   And that information, what is your factual basis it
11   wasn't magic?
12             MR. GOLDSTEIN:  Ask and answered.
13             THE WITNESS:  I had -- I had -- there were
14        attached to the motion, I believe, were documents
15        that bore out some of the things I said in my
16        answer.
17   BY MR. O'BOYLE:
18        Q.  Well --
19        A.  There should be some attachments.
20        Q.  Well, one of the things you said in your answer,
21   for a factual basis for him being practicing or engaged
22   in the unauthorized practice of law is his cell phone
23   number began with 561.  Tell me how that correlates?
24             MR. GOLDSTEIN:  Object to the form.
25        Mischaracterizes testimony.
```

78

```
 1             THE WITNESS:  The motion set forth a
 2        position that in order for this law firm to
 3        actually be a recognized Florida law firm, it
 4        would have to be a branch of a bona fide
 5        Pennsylvania law firm.
 6             And the facts that were recited in the
 7        motion, I believe, included materials from the
 8        Bar that showed that Jonathan had indicated he
 9        was not active in Pennsylvania.  That showed that
10        he had reported to the Bar of Pennsylvania that
11        he lived in Gulf Stream.
12             The 561 number would be some evidence of the
13        fact that he was located in Florida.  Some
14        evidence only because people do move with their
15        cell phones.
16             And I think the motion had other factors
17        that were recited in it, but I would have to see
18        it.  There were exhibits attached to it.
19             But you said the motion said that Jonathan
20        was practicing law, unauthorized practice of law.
21        The motion didn't say that as I recall.  The
22        motion said that Jonathan is permitted to be a
23        lawyer in Pennsylvania and practice law in
24        Pennsylvania.  And he could have a parent law
25        firm in Pennsylvania and then have a branch
```

79

```
 1        office, a bona fide office, in Florida, but that
 2        wasn't what was happening here.
 3             And that's what the motion -- that's why the
 4        motion sought to disqualify the law firm.  It
 5        never sought any sanctions against
 6        Jonathan O'Boyle.  I'll look at it, but I don't
 7        believe it did.
 8   BY MR. O'BOYLE:
 9        Q.  When you said it didn't seek any sanctions, the
10   unauthorized practice of law is a felony, is it not?
11             MR. GOLDSTEIN:  Object to the form.
12             THE WITNESS:  The motion did not seek any
13        sanctions against Jonathan O'Boyle.  The motion
14        was directed to the activity of a law firm and
15        that went to the issue of A, could the law firm
16        represent the law firm.
17             And B, was the law firm entitled to fees.
18             Now, as I recall -- well, I'll just let you
19        ask the questions.
20   BY MR. O'BOYLE:
21        Q.  I'm looking at just one of your attachments.
22        A.  You don't have a copy for me to look at while
23   you're reviewing these documents?
24        Q.  Yeah, but I wouldn't give it to you anyway.
25        A.  Okay.
```

80

```
 1             MR. O'HARE:  Would you like us to go pose?
 2             MR. HOCHMAN:  Yes, I would like that.
 3             MR. O'BOYLE:  Okay.  Let's all get up and go
 4        pose.
 5             THE WITNESS:  Mr. O'Boyle, are you
 6        adjourning the deposition?
 7             MR. O'BOYLE:  No, no, not at all.  Counsel
 8        asked us to go --
 9             MR. HOCHMAN:  I didn't ask you, you
10        volunteered.
11             MR. O'BOYLE:  And you said yes, you want me
12        to do it.
13             MR. HOCHMAN:  Yes, if you want to.
14             THE WITNESS:  I'm ready for your next
15        question, Mr. O'Boyle.
16             MR. O'BOYLE:  Okay.
17   BY MR. O'BOYLE:
18        Q.  The O'Boyle Law Firm PC, Inc., was that not a
19   Pennsylvania -- registered in Pennsylvania as a law
20   firm?
21             MR. GOLDSTEIN:  Object to the form.
22             THE WITNESS:  My -- I'd have to see the
23        document to see if it was PC, Inc., the dates,
24        but my general recollection is that it was
25        registered as a company in Pennsylvania.
```

81

```
1    BY MR. O'BOYLE:
2        Q.  Well --
3        A.  And I believe it was registered at a relative of
4    your family, some type of residential address if I
5    recall correctly, condo or townhouse.
6        Q.  And what factual basis do you have that said you
7    can't be a Pennsylvania lawyer if your address for
8    notifications and mail is at a relatives?
9        A.  That's not what I'm saying.
10           MR. GOLDSTEIN:  Object to the form.
11           MR. O'BOYLE:  Okay.  Madam, would you be
12       kind enough to read back what Mr. Sweetapple
13       said.
14           THE COURT REPORTER:  "That's not what I'm
15       saying".
16           MR. O'BOYLE:  Go back.
17           THE WITNESS:  If you can read the question
18       and answer, please.
19           (Thereupon, the last pending question and
20       answer was; after which the following proceedings
21       were had:)
22           THE WITNESS:  Your question is, what
23       information do I have that you can't be a
24       Pennsylvania lawyer if your address for
25       notification is at a Pennsylvania relatives
```

82

```
1    address?
2            MR. O'BOYLE:  Madam reporter, would you
3        kindly read the question back for Mr. Sweetapple.
4            THE WITNESS:  Please.
5            (Thereupon, the last pending question and
6        answer was; after which the following proceedings
7        were had:)
8            THE WITNESS:  I don't have any a factual
9        basis one way or the other for that.
10   BY MR. O'BOYLE:
11       Q.  Okay.  Was that in your motion?
12       A.  I believe the motion made reference -- I believe
13   the motion made reference to -- to the fact that --
14   Which fact are you asking me was in the motion?
15       Q.  Madam --
16       A.  You said, was that in the motion.  What do you
17   mean by that?
18       Q.  What we were just talking about when you made her
19   read back multiple times.
20       A.  What portion of it?  The residency portion, the
21   townhouse portion, the portion that dealt with the --
22       Q.  They're all your answers.
23           MR. O'BOYLE:  Madam, may I ask that you read
24       it back.  I hope this will be the last one.
25           MR. GOLDSTEIN:  Object to form.  Strike the
```

83

```
1    commentary.
2            (Thereupon, the last pending question and
3        answer was; after which the following proceedings
4        were had:)
5            THE WITNESS:  My answer is, I have no a
6        factual basis for that.
7    BY MR. O'BOYLE:
8        Q.  Okay.  That's fine.  And thank you,
9    Mr. Sweetapple.
10       You say in your Defendant's Motion to Disqualify,
11   Jonathan O'Boyle has used the Pennsylvania professional
12   corporation to establish an office or other regular
13   presence in the State of Florida without being admitted
14   to practice here generally and thereby engaged in the
15   unlicensed practice of law.
16       What is your a factual basis for making that
17   statement?
18           MR. GOLDSTEIN:  Document speaks for itself.
19       Object to the form.
20           THE WITNESS:  In addition to what's in that
21       motion or just what's in that motion?
22   BY MR. O'BOYLE:
23       Q.  Well, we'll start with what's with -- what's in
24   the motion.  We'll start with that.
25       A.  I think the motion referred to the number of
```

84

```
1    cases he was appearing pro hac vice in.
2        I'd have to see the motion and it's been some
3    time since I looked at it, a year.
4        Q.  Well, you're understanding my word, are you not?
5        A.  I understand -- I understand your words, but
6    you're asking me to recall beyond my ability to recall
7    is what I'm saying.
8        Q.  Well, if you saw them or heard my words, what
9    would be the difference?
10       A.  Well, there's a number of things -- you read one
11   paragraph in the motioned.  I'd like to read the whole
12   motion to see what facts are in there.
13       Q.  That's just what we're going to do.
14       A.  Good.  You told me you wouldn't show it to me,
15   but I'm glad you're going to.
16       Q.  I'm not going to read the whole motion.
17       A.  All right.  That way if I had a copy, I could see
18   whether, in fact, you were reading the whole motion or
19   not.
20       Q.  You said that several times.
21       A.  That's the first time I think I've said that.
22       Q.  I don't think so.
23       You say that Jonathan was an out of state
24   attorney who resided at his father's home in Gulf
25   Stream, Florida.
```

85

```
 1        What is the factual basis for saying that that
 2   constitutes the unlawful practice of law?
 3        MR. GOLDSTEIN:  Object to form.  Document
 4   speaks for itself.
 5        THE WITNESS:  That's a fact that was cited
 6        in the motion.
 7   BY MR. O'BOYLE:
 8   Q.  I have the motion.  You say it's a fact?
 9   A.  Yeah, that your son represented to the
10   Pennsylvania Bar that he was living in Florida and that
11   he was not active in Pennsylvania.
12        Part of the rubric for the interstate law firm
13   would have required that Jonathan or some lawyer be
14   practicing in Pennsylvania.  And the case is cited, it
15   tells you.  Lawyers can't come here from out of state
16   and practice law and say, oh, I have an office in New
17   York and they have abandoned their office in New York.
18        If that happened, every lawyer in the country
19   could come from wherever they used to practice and say,
20   I'm practicing here as a Florida lawyer.  And when you
21   ask, where's your main office, just say, oh, it's a post
22   office box.  There's really no lawyer there.
23        If you read the case that's cited, there has to
24   be a lawyer running a bona fide office that's a parent
25   company in order to sponsor an interstate law firm.
```

86

```
 1        And what I alleged, I believe, in the motion is
 2   that before Jonathan was admitted in Florida, there was
 3   a decision made to open the O'Boyle Law Firm in Florida,
 4   that he was here full-time instead of waiting until he
 5   passed the Bar to do that or instead of having some
 6   other lawyer in Pennsylvania actually run a law firm in
 7   Pennsylvania, that was the problem that was cited.  And
 8   that's what the attachments were filed to show.
 9        Now, that's all I remember sitting here.  I mean,
10   that's what I do remember sitting here.  Unless you give
11   me more information.
12   Q.  Who owned your office building where you keep
13   your offices?
14   A.  That's my private financial information.  I'm not
15   going to disclose that to you.  I am not comfortable
16   talking about my assets, Mr. O'Boyle.
17   Q.  It's public information, is it not?  Isn't it on
18   the Palm Beach Tax Collector -- Tax Assessor's website?
19   A.  The name of the entity?
20   Q.  Yes.
21   A.  I presume it is.
22   Q.  Okay.  So, who is it?
23   A.  Sitting here, I couldn't even tell you the name
24   of the entity.  I think it's the address, but I -- I'd
25   have to look.
```

87

```
 1   Q.  Okay.
 2   A.  I think it's an LLC with the address.
 3   Q.  I see.  And who's the tenant?
 4   A.  Who's the tenant?
 5   Q.  Yes.
 6   A.  My law firm occupies space there.  Peter Sosa
 7   occupies space there.  Clients of mine occupy space
 8   there.
 9   Q.  Okay.  So you know a lawyer named Kevin Tynin?
10   A.  I don't believe I've ever met Mr. Tynin.  I've
11   heard of him.
12   Q.  Okay.  Have you ever spoken to Mr. Tynin?
13   A.  I believe -- I believe when I was -- yes, I
14   believe so or wrote to him.  Spoke or wrote to him.
15   Q.  Who?
16   A.  Spoke or wrote.  I believe I spoke, but I may
17   have only written to him.
18   Q.  Okay.  But you communicated with him?
19   A.  In some form I communicated with him.
20   Q.  And why would you contact Kevin Tynin?
21        MR. GOLDSTEIN:  Object to the form.
22        THE WITNESS:  Before filing the motion that
23        I filed, I saw -- I believe I saw some record
24        that referenced Mr. Tynin with regard to the
25        O'Boyle Law Firm.
```

88

```
 1        And I believe I either called or wrote him
 2        with a series of questions about my concerns.
 3        And I wanted to make sure I had his input with
 4        regard to my investigation before I filed any
 5        motion, if I can recall correctly.
 6   BY MR. O'BOYLE:
 7   Q.  Generally stated, did he say that I agree that
 8   Jonathan O'Boyle is engaged in the unlicensed practice
 9   of law?
10        MR. GOLDSTEIN:  Object to form.
11        THE WITNESS:  No.
12   BY MR. O'BOYLE:
13   Q.  What did he say?
14   A.  I believe there's a letter.
15   Q.  Okay.
16   A.  And I'd have to see the letter to remember his
17   exact position.
18   Q.  You don't remember one word?
19   A.  I don't.  I remember --
20   Q.  You've explained earlier that you had an
21   obligation, as an example, as a lawyer if you saw
22   somebody in violation of the rules, you'd have to report
23   it.
24        If Mr. Tynin said to you that Jonathan O'Boyle,
25   his activities are in violation of the rules, such as --
```

89

```
 1    I don't know if such as is right, the unlicensed
 2    practice of law, you would have reported that, wouldn't
 3    you?
 4         A.  I'm sorry?
 5         Q.  You would have reported that, would you not?
 6         A.  If Mr. Tynin would have said --
 7         Q.  That, when you spoke to him, yeah, Jonathan
 8    O'Boyle, I know him, he's engaged in the unlicensed
 9    practice of law?
10         MR. GOLDSTEIN:  Object to the form.
11         THE WITNESS:  If I believed there was
12    evidence of that sufficient that it triggered my
13    ethical obligations, I would exercise my ethical
14    obligations.
15    BY MR. O'BOYLE:
16         Q.  And when you say "evidence of that," Mr. Tynin
17    saying that to you, as a member of the Bar in the State
18    of Florida, you would discount what he said and look for
19    additional evidence, tell me?
20         A.  This is all hypothetical.  But if an attorney
21    told me another attorney was engaged in the unlicensed
22    practice of law, I would probably -- I know I would want
23    other facts and evidence before I would ever make an
24    ethical complaint.
25         I don't think I've made -- I can't remember any
```

90

```
 1    ethical complaint regarding unlicensed practice of law.
 2    I would not make that complaint without evidence.  I
 3    certainly wouldn't make it based on some lawyer saying
 4    that without investigating it further.
 5         Q.  Do you know what kind of lawyer he is?
 6         A.  Mr. Tynin?
 7         Q.  Yes.
 8         A.  I don't know what kind of lawyer he is.
 9         Q.  Okay.
10         A.  I think he's a Florida lawyer.
11         Q.  Well, he is a Florida lawyer.  And I think if you
12    did a little bit of due diligence, you would find that
13    he -- his practice is ethics.
14         A.  I'm aware that Mr. Tynin holds himself out as
15    someone who has experience with Bar matters.  There's no
16    such designation in the Bar that allows you to hold
17    yourself out as being an ethics council.  There's no
18    certification for that.
19         But I know that he purports or suggests that he
20    has some experience in that area.
21         Q.  Okay.
22         A.  But I know that from the communication --
23         Q.  Okay.
24         A.  -- I had with him.
25         Q.  And did he, after your communication where he, I
```

91

```
 1    guess, wanted to know what your inquiry was, didn't he
 2    call you to discuss Jonathan and didn't you not call him
 3    back?
 4         And if that's the case, would you consider your
 5    conduct as being reckless lawyering?
 6         MR. GOLDSTEIN:  Object to the form.
 7         THE WITNESS:  You're refreshing my
 8    recollection.  I think that I indicated in the
 9    correspondence that I proposed that all of our
10    communications be in writing so that I would have
11    a record of the communications because I was
12    making certain inquiries and I wanted a response
13    in writing.
14    BY MR. O'BOYLE:
15         Q.  And what you're saying is, Mr. Tynin just
16    disregarded your requests, is that what you're saying?
17         MR. GOLDSTEIN:  Object to the form.
18         Mischaracterizes his testimony.
19         THE WITNESS:  No, I'm not saying that.
20    BY MR. O'BOYLE:
21         Q.  What are you saying?
22         A.  Just what I said.
23         Q.  Can you say it again?
24         A.  It's in the record.  I am not going to repeat
25    myself.  I've given you my testimony to your question.
```

92

```
 1    If you have another question, please ask it.
 2         MR. O'BOYLE:  Madam court reporter, can you
 3    read back Mr. Sweetapple answer, please, and go
 4    into my question?
 5         (Thereupon, the last pending question and
 6    answer was; after which the following proceedings
 7    were had:)
 8         THE WITNESS:  I answered it.
 9         MR. O'BOYLE:  Okay.  Then, can you go back
10    one question and we'll find out for sure if
11    Mr. Sweetapple answered it.
12         (Thereupon, the last pending question and
13    answer was; after which the following proceedings
14    were had:)
15    BY MR. O'BOYLE:
16         Q.  Did you call Mr. Tynin back and say, I got your
17    phone message but I need to make sure everything is in
18    writing, so would you be kind enough to put whatever you
19    have to say in writing?
20         A.  I don't recall.
21         Q.  Do you have such a communication?
22         A.  An oral communication or written communication?
23         Q.  Well, written communication?
24         A.  I remember there was an exchange of
25    communications in writing.  I haven't seen them in over
```

93

```
 1   two years, but I do recall there was an exchange.
 2       Q.  Did Mr. Tynin ever write you?
 3           MR. GOLDSTEIN:  Asked and answered?
 4           THE WITNESS:  I recall he did.
 5   BY MR. O'BOYLE:
 6       Q.  Okay.  And you didn't write him back, did you?
 7       A.  I think I wrote him and he wrote me back.
 8       Q.  Okay.  When he -- that could be.
 9           And did he write you again?
10       A.  I'd have to -- I'd have to look at my file and
11   see all the correspondence that took place.  I don't
12   remember.
13       Q.  Did you investigate Jonathan O'Boyle?
14           MR. HOCHMAN:  Before we go on to the next
15           line of questioning, I'd ask this as the second
16           excerpt with Mr. Tynin through the next excerpt
17           as request number two.
18           THE WITNESS:  Pardon?  Did I investigate
19           Jonathan O'Boyle?
20   BY MR. O'BOYLE:
21       Q.  Yes.
22       A.  I am not going to disclose my work product other
23   than the work product that's public record.  And I think
24   you'll see printouts and other documents that I obtained
25   that are attached to the motion.
```

94

```
 1       Q.  In your May 2, 2014 letter to --
 2       A.  May I see a copy of it?
 3       Q.  No.  To Jonathan O'Boyle, did you say in that
 4   letter, during the course of my investigation?
 5       A.  I'd have to see the letter, but I don't think
 6   I've ever written to Jonathan O'Boyle.  You're talking
 7   about Mr. Tynin.
 8       Q.  Talking about Jonathan O'Boyle?
 9       A.  You asked me about a letter I wrote to
10   Mr. Jonathan O'Boyle which I don't think I've ever
11   written to your son.
12       Q.  Okay.  Well, you're wrong.
13       A.  Okay.
14           MR. GOLDSTEIN:  Move to strike commentary.
15           THE WITNESS:  If you can show me a letter,
16           maybe it will refresh my recollection.
17   BY MR. O'BOYLE:
18       Q.  I understand.  Generally stated, what we have in
19   this, what I'm going to call the corral, is a RICO suit,
20   some records suits, and a few others, such as this one,
21   slander suit, I think you said something about Cafi
22   suing you.  I think that's what you said, would that be
23   correct?
24       A.  What question are you asking me there?
25           MR. GOLDSTEIN:  Object to form.
```

95

```
 1   BY MR. O'BOYLE:
 2       Q.  Okay.  Is Cafi suing you?
 3           MR. GOLDSTEIN:  Asked and answered.
 4           THE WITNESS:  Cafi has sued my law firm.
 5   BY MR. O'BOYLE:
 6       Q.  Okay.  Is it suing you?
 7       A.  I don't think I'm a named Defendant in that case.
 8       Q.  Okay.  You're familiar with the RICO suit which
 9   rests in piece.  That's a suit that you were heavily
10   involved in the preparation of, correct?
11           MR. GOLDSTEIN:  Object to form.
12           THE WITNESS:  I was involved in it.  Heavily
13           is a term you used.  I mean, I worked on that
14           case.
15   BY MR. O'BOYLE:
16       Q.  Okay.  And who did you work on the case with?
17       A.  I worked -- Well, the lawyers that worked on the
18   case included Mr. Richmond, several lawyers in his firm,
19   Joann O'Connor, that's all I remember.
20       Q.  Okay.  So, that's all.  No more lawyers?
21       A.  There could have been more, I don't remember.
22       Q.  Okay.  So, it may have been more than five or
23   six?
24       A.  Yeah.
25           MR. GOLDSTEIN:  Object to form.
```

96

```
 1           THE WITNESS:  Mr. Richmond had a team of
 2           lawyers that worked quite a bit on the case.
 3   BY MR. O'BOYLE:
 4       Q.  Okay.  Why, in this letter to Jonathan O'Boyle,
 5   did you make this statement, "all Philadelphia residents
 6   owe and must pay the city income tax regardless of where
 7   they work".
 8       A.  That's a letter to Jonathan O'Boyle?
 9       Q.  Yes.
10       A.  What's the date of that?
11       Q.  Just asking about the statements?
12           MR. GOLDSTEIN:  Object to the form.
13           THE WITNESS:  That's -- why I make
14           statements is my work product.  I am not
15           comfortable giving my work product.
16           It would have been a result of legal
17           research, I presume.
18   BY MR. O'BOYLE:
19       Q.  Okay.  Well, give me -- you are making a
20   statement in that letter that is certainly not
21   privileged?
22       A.  I'm not claiming the letter's privilege, I'm
23   claiming -- First of all, I need to see the statement
24   because I don't know the context of it nor do I remember
25   it specifically.
```

97

```
 1        But what I'm saying to you is, why I would make a
 2   legal statement or make a legal -- an inquiry regarding
 3   a legal topic would be my thought process, my mental
 4   impressions, my work product, a result of my research
 5   and I'm not comfortable telling you why I make
 6   statements or take positions.  As a lawyer, I tell my
 7   client's that generally not my opposing opinions.
 8        Q.  Give me your lay opinion?
 9        A.  My lay opinion of what?
10        Q.  You say here, all Philadelphia residents owe and
11   must pay the city income tax regardless of where they
12   work.  It's either work product, which you say it is and
13   I'm asking you just for your lay opinion as to what that
14   is?
15             MR. GOLDSTEIN:  Object to the form.  Asked
16        and answered.
17             THE WITNESS:  I think it means what it says.
18        Sounds like it was a legal opinion I expressed,
19        not a lay opinion.  Sounds like it was a legal
20        opinion I expressed.
21             But I told you, I'm -- even if I could
22        remember, I would not tell you the subject of my
23        research, who I spoke to, how I came to that
24        conclusion.  That would be my mental impressions
25        and work product.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

98

```
 1   BY MR. O'BOYLE:
 2        Q.  You say in this document --
 3        A.  What document are you referring to?
 4        Q.  The one that I have in my hand.
 5        A.  Well, what is it?
 6        Q.  I'm only asking you about a statement you made.
 7   You're saying to Jonathan, you swore that you were
 8   domiciled and permanently resided in Long Port, New
 9   Jersey.
10        Now, I'm just curious, why in the world would you
11   make such a statement?
12             MR. GOLDSTEIN:  I'm going to object to the
13        form.  If you want to have him answer questions
14        as to specific statements in the document, I'm
15        going to request that you show him the document
16        because I can't confirm what you're reading --
17        that you're specifically reading is exactly set
18        forth in the document.
19             MR. O'BOYLE:  Mr. Sweetapple?
20             THE WITNESS:  I'd have to see the document
21        to know what was said, how it was said, to whom
22        it was said.  You're reading things to me saying
23        that I said them.  I don't even know that I said
24        them.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

99

```
 1   BY MR. O'BOYLE:
 2        Q.  Okay.
 3        A.  Or that I wrote them.
 4        Q.  I understand.
 5             MR. HOCHMAN:  Mr. Sweetapple, my
 6        understanding is that, he's asking you why and
 7        you're asking him if you want me to answer why,
 8        let me see the document for the context.
 9             THE WITNESS:  That's the only way I can
10        answer it.
11             MR. HOCHMAN:  I understand.  Mr. O'Boyle,
12        are you willing to give him the document?
13             MR. O'BOYLE:  I am not.
14             MR. HOCHMAN:  Okay.
15             MR. GOLDSTEIN:  I'm just going to state on
16        the record that I'm going -- as a standing
17        objection to any line of questioning regarding a
18        document that he's currently questions about
19        based upon his refusal to provide the witness
20        with a copy.
21             MR. O'BOYLE:  Madam court reporter and
22        Mr. Goldstein, Mr. Hochman, if it will make it
23        easier, I will accept a blanket objection on any
24        and every question.  And after you get the
25        transcript, you can have a ball.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

100

```
 1        You don't have to make -- waste time.  You
 2   will have already made it.
 3             MR. HOCHMAN:  I am not sure the federal
 4        civil procedure will allow me to do that with
 5        you, who's a non-lawyer.
 6             So, I would like that and I'll accept it,
 7        but I am not certain I don't waive it.  I'm
 8        concerned about that.
 9             MR. O'BOYLE:  Well, I don't want you to
10        waive anything.  Can you, maybe, during lunch,
11        can you make inquiry.  It would just save us a
12        bunch of time, that's all.
13             MR. HOCHMAN:  Well, I am not certain that if
14        I do that, that I'm not waiving something on
15        behalf of the Town.  I'm uncomfortable with it.
16             I would suggest to you that the question
17        would go easier if you -- if you're going to ask
18        why would you say something in a document, that
19        you produce the document to the witness and he
20        can look at it and give you an answer.
21             The way that you're doing it, I would
22        suggest to you, doesn't help you.  And I think
23        it's appropriate objection.  And I think it will
24        go faster if you didn't ask a why question.
25             MR. O'BOYLE:  Thank you.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

101

```
 1   BY MR. O'BOYLE:
 2       Q.  Mr. Sweetapple, do you have any evidence that
 3   Jonathan O'Boyle is currently domiciled in other than
 4   Long Port, New Jersey?
 5       A.  I don't know where Jonathan O'Boyle is currently
 6   domiciled.
 7       Q.  And so, that's a no, you have no evidence?
 8       A.  I have no evidence where he's currently
 9   domiciled.
10       Q.  Okay.  And on May 2, 2014, which is the date of
11   this document that I know you did highly want to see,
12   do you have any knowledge as it where Jonathan O'Boyle
13   was domiciled?
14                MR. GOLDSTEIN:  Renew my objection.
15                THE WITNESS:  As I sit here, I do not
16       recall.  I would have to look at my files.
17   BY MR. O'BOYLE:
18       Q.  Okay.
19       A.  And my work product.
20       Q.  Okay.  Do you have any knowledge that Jonathan
21   O'Boyle does not currently reside in Long Port, New
22   Jersey?
23                MR. GOLDSTEIN:  Asked and answered.
24                THE WITNESS:  No.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

102

```
 1   BY MR. O'BOYLE:
 2       Q.  When you communicated with Mr. Tynin, did you
 3   speak about the UPL?
 4       A.  I don't remember speaking to Mr. Tynin.
 5       Q.  You don't remember ever speaking with him?
 6       A.  Not specifically.  I told you, I don't know if it
 7   was oral or in writing.
 8       Q.  Right.  But forget the word specifically, do you
 9   remember ever speaking to him?
10       A.  No, I can't say that I remember having an oral
11   conversation with him.
12       Q.  Okay.  Have you ever heard of 2146 East
13   Huntington Street, Philadelphia?
14                MR. GOLDSTEIN:  Form.
15                THE WITNESS:  Is that an address that was
16       used in a writing?
17   BY MR. O'BOYLE:
18       Q.  It is.
19       A.  I can't specify a certain address without seeing
20   it.  I don't relate that address to any specific thing
21   without seeing the writing.
22       Q.  Okay.  The writing -- and by the way, the letter
23   that I'm looking at has numbered paragraphs, essentially
24   bullets.
25       A.  Who's the letter addressed to?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

103

```
 1       Q.  Pardon?
 2       A.  Who is the letter addressed to?
 3       Q.  I already answered that, but I'll read it again,
 4   Jonathan O'Boyle, Jonathan O'Boyle, Jonathan O'Boyle.
 5       A.  It's addressed to him?
 6       Q.  Three times.
 7       A.  Okay.
 8       Q.  And the paragraphs or the content that I'm
 9   talking about is in numbered paragraphs.  And before
10   those numbered paragraphs it says, during the course of
11   my investigation, I noted the following matters.  And
12   then after that you put in 11 paragraphs.
13       And paragraph number three, which has about ten
14   words, says 2146 East Huntington Street, address in
15   Philadelphia, seems to be a residential property owned
16   by a family member.
17       I know we talked about that address not in the
18   context of what I'm looking at now, but there's nothing
19   wrong with an address that you have on your, I guess,
20   registration or whatever, that's owned by a family
21   member, is there?
22       A.  You already asked me that and you refreshed my
23   recollection because before I communicated in writing
24   with Mr. Tynin, I made inquiry of a Jonathan O'Boyle
25   regarding the facts that I have been made aware of and I
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

104

```
 1   asked him to respond to a series of questions.  You
 2   refreshed my recollection, I remember that.
 3       Q.  When you said "asked him", Jonathan?
 4       A.  Jonathan.  I wrote Jonathan and before I --
 5   before I communicated with Mr. Tynin.
 6       Q.  Okay.
 7       A.  So, before I took any position in the motion, I
 8   asked Jonathan his position with regard to topics and
 9   then I remember some correspondence with Mr. Tynin.
10       So, if you would have shown that to me, you could
11   have refreshed my recollection a lot sooner.  Thank you.
12       Q.  Did you ever hear Johnstown, Pennsylvania?
13       A.  I remember making some reference to it in some
14   writing.
15       Q.  And do you have an idea what the content was?
16       A.  Some allegation that -- or some evidence or some
17   fact that Jonathan had claimed that he was practicing
18   there, something like that.
19       Q.  Was he practicing there?
20       A.  I don't have any personal knowledge myself.
21       Q.  Do you know anybody else who has personal
22   knowledge?
23       A.  I am not going to divulge my work product to you
24   in terms of how I obtained evidence or what evidence I
25   obtained.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

105

```
 1        Q.  Do you think that's evidence where his office --
 2   where he has his office, do you think that's evidence?
 3        A.  Yes, I think that's something that's in that
 4   motion, that was in that motion or ultimately was a
 5   factor in the motion.
 6        Q.  It was certainly in the motion.
 7        But wouldn't it be the case if this motion went
 8   before a judge that your opponent, whether it be
 9   Mitchell Burger, Elaine, John himself, wouldn't they ask
10   the question and wouldn't you have to answer -- in other
11   words, you wouldn't be able to say, work product, I'm
12   not answering.
13        Accusing a guy of UPL, but I am not telling you
14   why because it's work product.  Do you think you would
15   get away with that?
16        MR. GOLDSTEIN:  Object to the form.
17        THE WITNESS:  I can't speculate.
18   BY MR. O'BOYLE:
19        Q.  You can't speculate?
20        A.  As to what would happen in a proceeding?  No.
21        Q.  Okay.  When you were in college or law school,
22   mail or other important documents, did you receive them
23   in college and law school?
24        And let me just give you an example.  You made an
25   application to law school while you were in college, I'm
```

106

```
 1   assuming.  Sometimes in college, things get misplaced or
 2   slowed down and so on and so forth.
 3        Did you give your address in college or did you
 4   give your parents, your brother, your wife, if you were
 5   married, as an address that you know that someone would
 6   receive it and call you up and say, Bob, we just got
 7   your admission to A, B, C school, did you get those
 8   important documents in college or did you get them at
 9   someone's house that you know was going to be vigilant?
10        MR. GOLDSTEIN:  Object to the form.
11        THE WITNESS:  Would you mind having that
12   read back?  I counted seven questions.  Don't
13   know which one you want answered.
14   BY MR. O'BOYLE:
15        Q.  Okay.  Let's start with number one and then we
16   can go right down to number seven.
17        A.  Okay.  Want to have her go number one, I think,
18   was whether or not I used -- why don't we read them,
19   read that back and I'll write them out with a piece of
20   paper and then I can try to answer them.
21        You want to have her read it back slowly for me.
22        MR. O'BOYLE:  Yes.  Young lady, would you
23   read back slowly for him.
24
25
```

107

```
 1        (Thereupon, the last pending question was
 2   read back; after which the following proceedings
 3   were had:)
 4        THE WITNESS:  You want to know if I received
 5   mail in college.  Yes, I received mail in
 6   college and I received them in law school.
 7        Keep going.
 8        (Thereupon, the last pending question was
 9   read back; after which the following proceedings
10   were had:)
11        THE WITNESS:  Yes, let me answer that.  Yes,
12   I made application to law school.  I was in
13   college.
14        Okay.  What's the next question.
15        (Thereupon, the last pending question was
16   read back; after which the following proceedings
17   were had:)
18        THE WITNESS:  In college, I had a residence
19   in Florida that was my domicile address.  In law
20   school I had the same address, it was on my
21   driver's license.
22        My brother, I don't think I gave.  I
23   didn't have a wife at the time.  I didn't give my
24   parents.  I did give my parents, I mean.  In
25   college and law school, my address was 6800
```

108

```
 1   Northwest 6th Street, Plantation, Florida,
 2   33432.
 3        (Thereupon, the last pending question was
 4   read back; after which the following proceedings
 5   were had:)
 6        THE WITNESS:  Any important documents came
 7   to the address in college and law school that I
 8   maintained which was my parent's address in
 9   Plantation, Florida.
10        Did I answer your questions?
11   BY MR. O'BOYLE:
12        Q.  I think so.
13        A.  Good.
14        Q.  Now, in connection with --
15        A.  And by the way, it's 12:25.  Can we break for
16   lunch when you are done with this topic?
17        MR. O'BOYLE:  We can do it right now.
18        THE WITNESS:  Well, go ahead and finish the
19   topic, I'm not starving to death.
20   BY MR. O'BOYLE:
21        Q.  Okay.  Now, in your -- one or more of your
22   filings regarding Jonathan O'Boyle and the unpublished
23   practice of law, Jonathan -- if he were in college and
24   were -- or law school -- and by the way, I'm going to
25   use those interchangeably.
```

109

```
 1          If he were in college or in law school, it would
 2   not be unusual for him to utilize his parent's address,
 3   forgetting his mail, particularly his important mail
 4   that he may be waiting for, would it?
 5          MR. GOLDSTEIN:  Object to the form.
 6          THE WITNESS:  Would it be -- would it be
 7   unusual, is that the question.
 8   BY MR. O'BOYLE:
 9      Q.  Yes.
10      A.  I don't think so.
11      Q.  Okay.  Then, why did you raise it in your papers
12   that he was -- he was showing the Pennsylvania Bar that
13   his -- that his residence was in Florida?  Why did you
14   raise that?
15          MR. GOLDSTEIN:  Object to the form.
16          THE WITNESS:  Asset forth in the motion.
17   BY MR. O'BOYLE:
18      Q.  Okay.
19      A.  And the case that was cited.
20      Q.  Okay.  So --
21      A.  It was evidence that there was no bona fide law
22   firm in Pennsylvania.  There was only one lawyer in the
23   supposed Pennsylvania law firm; it was Jonathan O'Boyle.
24          He decided to tell the Pennsylvania Bar that he
25   was not actively practicing in Pennsylvania and that he
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

110

```
 1   was living in Florida.  That's not a law school get mail
 2   situation, it's a statement he's made to the Bar where
 3   he's actively practicing.
 4          Then, in order to open up the O'Boyle Law Firm in
 5   Florida, representations were made that it was a branch
 6   of an active Pennsylvania law firm and it was being run
 7   by Jonathan O'Boyle.  Yet, Jonathan O'Boyle made
 8   contrary representations, did not appear based on the
 9   evidence that's put in the record, to have been
10   practicing and residing in Pennsylvania because he was
11   inactive there.
12          So, there's a case that's right on point that I
13   cited to the court.  So, that's why I made that
14   reference.  So, I'm giving you the benefits of my
15   analysis, it's in the motion.
16   BY MR. O'BOYLE:
17      Q.  I'm looking attached to your motion --
18      A.  Excuse me, why are we talking about my motion in
19   a different case that's pending?
20      Q.  Because that's what I want to do.
21      A.  Okay.  You haven't asked me one question about
22   slander or defamation since I've been here.
23      Q.  Well, sounds like the deposition you took of me,
24   but I think you will find that I'm gaining great
25   knowledge here.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

111

```
 1      A.  That's not --
 2      Q.  And I appreciate it.
 3          I'm looking at a document that it's Exhibit C to
 4   your Motion to Disqualify and it says, Jonathan was
 5   admitted to the Bar on 11/13/2012 with a public access
 6   address of 23 Hidden Harbor Drive, Gulf Stream, Florida.
 7   Is there anything wrong with that?
 8      A.  I don't know.
 9      Q.  Give me your lay opinion?
10          MR. GOLDSTEIN:  Object to the form.
11          THE WITNESS:  I have no -- I have no
12   knowledge of anything wrong with what you just
13   said.
14   BY MR. O'BOYLE:
15      Q.  Okay.  1001 Broad Street, Johnstown,
16   Pennsylvania, do you know anything about that address?
17          MR. GOLDSTEIN:  Object to the form.  Asked
18   and answered.
19          THE WITNESS:  As I sit here now, no, I
20   don't.
21   BY MR. O'BOYLE:
22      Q.  Okay.  Do you think you ever knew anything about
23   that address?
24      A.  I think it was something that was the subject of
25   a motion, letter, inquiry regarding the un -- the
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

112

```
 1   allegation that the O'Boyle Law Firm was engaged in the
 2   unauthorized practice of law.
 3      Q.  And how would an address -- and of course it's an
 4   exhibit to your motion, how would an address fit into
 5   the unlicensed practice of law?  It's not like you're
 6   going to run around with a lottery ticket and say I won.
 7   How would it will fit?
 8          MR. GOLDSTEIN:  Object to the form.
 9          THE WITNESS:  You want my legal opinion, you
10   want my work product or do you want me to recite
11   what's in the motion?
12   BY MR. O'BOYLE:
13      Q.  I want your lay opinion.
14          MR. GOLDSTEIN:  Object to the form.
15          THE WITNESS:  I don't have a lay opinion.  I
16   have a legal opinion.
17   BY MR. O'BOYLE:
18      Q.  Then, give me your legal opinion?
19      A.  I am not going to give you my legal opinion.
20      Q.  Then give me your lay upon?
21      A.  I don't have a lay opinion.  My opinion is based
22   on my study of the law.
23      Q.  Okay.  And by the way, we can break for lunch
24   anytime at all?
25      A.  I want you to, you know, finish the topic you're
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

113

```
1    on and then we can -- tell me when you are done and
2    we'll take a break and then we'll come back and start
3    something new.
4              MR. O'BOYLE:  Well, I think I got, at least,
5    an hour.
6              THE WITNESS:  On the unauthorized practice
7    of law?
8              MR. O'BOYLE:  Yeah.
9              THE WITNESS:  Well then, maybe you should
10   break for lunch.
11             MR. O'BOYLE:  Okay.
12             THE WITNESS:  Let's do that.
13             MR. GOLDSTEIN:  I need to use the restroom.
14   So, let's just do that for a minute and then
15   we'll figure it out.
16             THE WITNESS:  Let's take a two-minute break
17   and we'll talk and see how we're doing as far as
18   eating goes.
19             MR. GOLDSTEIN:  Okay.
20             MR. HOCHMAN:  Madam court reporter, do you
21   have a preference as to what we do?
22             THE COURT REPORTER:  No.
23             (Thereupon, a recess was taken; after which
24   the following proceedings were had:)
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

114

```
1    BY MR. O'BOYLE:
2         Q.  Bear with me for --
3              MR. HOCHMAN:  Are you ready to proceed?
4              MR. O'BOYLE:  Give me just a moment.
5              (Thereupon, a recess was taken; after which
6         the following proceedings were had:)
7              MR. O'BOYLE:  Did you say we were back on
8         the record?
9              MR. HOCHMAN:  We tried, but then you said
10        you needed a minute.
11             MR. O'BOYLE:  Ask for a minute and then you
12        got an hour.
13             Madam court reporter, are we now on the
14        record?
15             THE COURT REPORTER:  Yes.
16             MR. O'BOYLE:  Thank you.
17   BY MR. O'BOYLE:
18        Q.  Mr. Sweetapple, have you ever heard of a young
19   lady, I say young lady, Ms. Michelle Gavagni,
20   G-A-V-A-G-N-I, does that name ring a bell with you?
21        A.  No.
22        Q.  Okay.  Now, about Ms. Michelle Gavagni, Florida
23   Director of Board of Bar Examiners at 1891 Higher
24   Court --
25        A.  That's familiar.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

115

```
1         Q.  That is familiar?
2         A.  Yeah.
3         Q.  Okay.  And you wrote to her, didn't you?
4         A.  I believe so.
5         Q.  Okay.  And what would you have written to her
6    about?
7         A.  I believe that's confidential.
8         Q.  A letter to the Bar on the unlicensed practice of
9    law?
10        A.  I think any letters to the Board of Bar Examiners
11   are confidential, that's my understanding.
12        Q.  Okay.  I think you're incorrect.
13             And I'm going to ask you to answer it or if it
14   would make you feel better, when we do break, you could
15   check and confirm that I'm wrong or confirm that I'm
16   right and then we can go on, okay?
17        A.  As you see fit.  Ask me questions.  I mean,
18   I'll --
19        Q.  Okay.  Do you have a duty to report, I guess,
20   improper character to the Character and Fitness
21   Committee?
22        A.  What Character and Fitness Committee?
23        Q.  The one with the Bar Association, I'm sorry.
24             MR. GOLDSTEIN:  Object to the form.
25             THE WITNESS:  I'm unaware of a Character and
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

116

```
1    Fitness Association with the Bar Association.
2    BY MR. O'BOYLE:
3         Q.  Okay.  September 3, 2014, does that date ring a
4    bell with you?
5         A.  I think that's the date of the settlement
6    conference and that was to be treated as mediation and
7    it was at my office, if I'm not mistaken.
8         Q.  When you say "treated as mediation", as a matter
9    of law?
10        A.  Are you asking me for my legal opinion?
11        Q.  No.  You just said an affirmative statement.
12        A.  The statements -- I'm sorry, the agreements to be
13   maintained confidential, I think, as mediation or as a
14   mediation.
15        Q.  But what's written on the piece of paper doesn't
16   necessarily carry the day, does it?
17        A.  Are you asking me for my legal opinion?
18        Q.  I'm asking you, you are the author and I'm asking
19   you?
20             MR. GOLDSTEIN:  Object to the form.
21             THE WITNESS:  What's on a written piece of
22        paper, does it always carry the day?
23        My legal opinion -- I'll give you my legal
24        opinion.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

117

BY MR. O'BOYLE:

Q. Okay.

A. Lawyers argue over documents all the time and are interpreted differently all the time based on law, facts.

Q. Okay. That September 3rd document or that September 3rd meeting, or I guess you spoke, there is just a document that emanated from that meeting?

A. There's a document that was signed before the meeting.

Q. Okay. And who has that document?

A. I think everyone that was there got a copy of it, I believe.

Q. Okay. And what went on during that meeting?

A. That was a private confidential settlement discussion to be treated as mediation and I would not be comfortable talking about that.

Q. Okay. And have you gotten a third party opinion from a lawyer who has affirmed what you just said?

MR. GOLDSTEIN: Object to the form.

THE WITNESS: I wouldn't -- I wouldn't disclose to you any opinions that I've gotten from my client, from another lawyer.

BY MR. O'BOYLE:

Q. So --

118

A. It's privileged.

Q. So, there's really, then, no way that we could know whether it's -- I am not sure I'm going to use the right term, whether it's confidential except what you said?

A. No.

Q. Okay. How else would we know?

A. Have the Judge determine it.

Q. Okay. But as of today, is it confidential or not?

MR. GOLDSTEIN: Asked and answered.

THE WITNESS: My understanding is that it's confidential.

BY MR. O'BOYLE:

Q. Okay. And your understanding is based on?

A. My understanding is based on my understanding of the law.

Q. Okay. What was the meeting about?

A. I am not --

MR. GOLDSTEIN: He's answered.

THE WITNESS: I am not going to disclose the contents of the meeting.

BY MR. O'BOYLE:

Q. Was Mr. O'Hare there?

A. Mr. O'Hare was there.

119

Q. Okay. Jonathan O'Boyle, his attorney, was he invited there?

MR. GOLDSTEIN: Object to the form.

THE WITNESS: I don't know anything about the communications between Mr. O'Hare and Jonathan O'Boyle.

BY MR. O'BOYLE:

Q. Did you know that Jonathan O'Boyle was one of Mr. O'Hare's counsel and was handling many of the lawsuits against Gulf Stream on his behalf?

A. On August -- on September 3, 2014?

Q. September 3, 2014, yes.

A. Are you saying that Jonathan O'Boyle was Mr. O'Hare's lawyer and represented him on numerous matters that were pending?

Q. That's my recollection, yes.

A. I don't believe that Jonathan O'Boyle was a member of the Florida Bar at that time, sir.

Q. Well then, I could be very wrong. The O'Boyle Law Firm, they represented Mr. O'Hare in multiple litigations at that time.

A. I believe they did present Mr. O'Hare in a number of cases.

Q. Didn't you have an obligation to notify Mr. O'Hare's counsel rather than put him in a meeting

120

and let him fend for himself?

MR. GOLDSTEIN: Object to the form.

THE WITNESS: You're asking me for a legal conclusion?

BY MR. O'BOYLE:

Q. No.

A. I'm not going to give you my legal conclusion.

Q. Then, give me your lay opinion.

MR. GOLDSTEIN: Object to the form.

THE WITNESS: It's not a matter of a lay opinion. I have a firm legal conclusion that I'm not going to give you.

BY MR. O'BOYLE:

Q. Well, I'm entitled to your lay opinion.

A. I don't have a lay opinion. A lay person wouldn't have a legal opinion on this.

Q. Okay. So, you think it's strictly a legal opinion whether or not you invite a client's lawyer to a meeting with the client, is that what you're saying?

MR. GOLDSTEIN: Object to the form.

THE WITNESS: No.

BY MR. O'BOYLE:

Q. What are you saying?

A. I'm trying to answer your question.

Q. Well, try again.

A. Ask me the question again, I'll try again.

MR. O'BOYLE: Madam court reporter, I call upon you.

(Thereupon, the last pending question was read back; after which the following proceedings were had:)

THE WITNESS: And my answer is the same, I believe that ultimately is a legal opinion.

BY MR. O'BOYLE:

Q. Okay. Have you ever told anyone about that meeting?

A. I am not going to discuss anything that I've discussed with clients or staff. And I'm sure I've discussed it with my client and staff.

Q. Well, let's go beyond that. Let's go to the bowling alley. Let's go to --

A. I'll answer one question at a time. I haven't been to a bowling alley in some time, but I can safely say no.

Q. Okay. How about at one of the clubs in Delray or Gulf Stream?

A. No, I don't believe I've disclosed the content of the confidential settlement discussion to anyone outside in a club or anything of that nature.

Q. When you say, "anyone outside the club" --

A. Anyone outside of the legal protected group, like in the public is what I mean.

Q. Who is the legal protected group?

A. My staff, my associates, my co-counsel.

Q. I'm listening.

A. That's it. My client.

Q. Am I remembering right, that earlier you said that a lawyer is obligated to report behavior that violates the Bar rules to the Bar?

MR. GOLDSTEIN: Object to the form.

THE WITNESS: My answer's in the record.

BY MR. O'BOYLE:

Q. Would you answer again, please.

A. No, because I answered it two or three times already.

MR. O'BOYLE: Counsel, would you ask Mr. Sweetapple to answer?

MR. GOLDSTEIN: I believe he's answered the question.

MR. O'BOYLE: I don't believe that he has answered that question.

MR. GOLDSTEIN: I believe --

MR. O'BOYLE: If you're instructing him not to answer --

MR. GOLDSTEIN: I'm not -- Mr. O'Boyle, I am

not instructing him. I'm telling you that he answered that question several times now.

MR. O'BOYLE: Would you kindly certify that, madam court reporter.

BY MR. O'BOYLE:

Q. Mr. Sweetapple, I'm going to ask you for your lay opinion as to whether a lawyer is obligated to report behavior that violates Bar rules to the Bar?

A. I don't have a lay opinion.

Q. You don't have a lay opinion, correct?

Okay. The September 3rd meeting in 2014 that we just spoke about a few moments ago, Ms. O'Connor was there, was she?

A. Yes.

Q. Okay. Did you have a duty to report her to the Bar for her attendance in that September 3rd meeting?

A. You're asking me for my legal conclusion.

MR. GOLDSTEIN: Object to the form.

THE WITNESS: I will not give you my legal conclusions. You're asking me for my legal conclusions.

BY MR. O'BOYLE:

Q. Can I have your lay opinion?

A. I don't have a lay opinion.

Q. So, you strictly have a legal conclusion or legal

opinion which you won't answer and you do not have a lay opinion just so I have it right, would that be right?

MR. GOLDSTEIN: Asked and answered.

THE WITNESS: Yes, that's exactly what I just said. You just repeated what I just said.

BY MR. O'BOYLE:

Q. I just want to make sure that I got it right.

A. I can move closer to you if you need to hear it or --

Q. No, no, it's not a question of hearing, it's a question of sometimes absorbing. And what I would hate to do is to move forward, and it happens, what I would hate to do is to move forward and assume an answer that was not correct. I would rather confirm it which I think is a reasonable, prudent thing to do.

A. All right. I would appreciate it if you would have it read back rather than just repeatedly ask me questions --

MR. GOLDSTEIN: There's no question pending.

BY MR. O'BOYLE:

Q. Okay. Do you think your interactions with Joel Chandler constitutes a conspiracy?

MR. GOLDSTEIN: Object to the form.

THE WITNESS: Does my interactions with Joel Chandler constitute a conspiracy?

125

```
 1   BY MR. O'BOYLE:
 2       Q.  That was the question.
 3       A.  That would be a legal opinion and I'm not going
 4   to give you my legal opinion.
 5       Q.  Okay.  So, I take it that the answer is yes or
 6   you don't know?
 7       A.  You can take --
 8           MR. GOLDSTEIN:  Mischaracterizes testimony.
 9           THE WITNESS:  You want me to answer that or
10       is that a question?
11   BY MR. O'BOYLE:
12       Q.  Your counsel interrupted us, but please answer.
13       A.  So, your question is, you take that as a yes or
14   what?
15       Q.  I don't know?
16       A.  That's your prerogative.  That's not my answer.
17       Q.  Your letter to the Bar, to Ms. Gavagni, like the
18   other letter you have numbered paragraphs, here there's
19   only four and I'm going to pick the shortest one.
20           A videotaped deposition and transcript of
21   Martin O'Boyle.  Did I violate any of the Bar rules?
22           MR. GOLDSTEIN:  Object to the form.
23           THE WITNESS:  A videotaped transcript of
24       Martin O'Boyle?
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

126

```
 1   BY MR. O'BOYLE:
 2       Q.  A videotaped deposition and transcript of
 3   Martin O'Boyle.
 4       A.  In other words, did you violate any Florida
 5   rules?
 6       Q.  Yeah.
 7       A.  That's a legal opinion and you're asking me for a
 8   legal opinion.  I'm not going to give you a legal
 9   opinion.
10       Q.  Okay.  In your lay opinion, did I violate any of
11   the rules?
12           MR. GOLDSTEIN:  Object to the form.
13           THE WITNESS:  The Bar rules?
14   BY MR. O'BOYLE:
15       Q.  Yeah.
16       A.  I don't have a lay opinion concerning Bar rules.
17       Q.  Okay.  Why did you send Ms. Gavagni?
18           MR. HOCHMAN:  Can you do me a favor, can you
19       spell that for me because you pronounced it a
20       couple different ways.
21           MR. O'BOYLE:  G-A-V-A-G-N-I.
22   BY MR. O'BOYLE:
23       Q.  Why would you send a transcript and video
24   deposition on me, another lawyer, to the Bar?
25           MR. GOLDSTEIN:  Object to the form.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

127

```
 1           THE WITNESS:  I would presume -- I need to
 2       see the letter, but I would presume there was
 3       testimony in that document that concerned the
 4       subject of the letter.
 5   BY MR. O'BOYLE:
 6       Q.  Letter says, in furtherance of complaints,
 7   plural, filed against Jonathan O'Boyle and the O'Boyle
 8   Law Firm, I have enclosed the following; and there are
 9   four items.
10           And then it says, we're forwarding these
11   materials to you in furtherance of the Town of Gulf
12   Stream complaint pursuant to our obligation under the
13   rules regulating the Florida Bar, 4-5.5 and 4-8.3?
14           MR. GOLDSTEIN:  Object to the form.
15       Document speaks for itself.
16           THE WITNESS:  What are you asking me about
17       the letter?
18   BY MR. O'BOYLE:
19       Q.  Okay.
20       A.  I'd like to see it to refresh my recollection.  I
21   don't have a -- I haven't seen that in, I don't know how
22   long, years.
23       Q.  Why did you forward the materials to Ms. Gavagni
24   at the Bar, why did you forward those materials?
25           MR. GOLDSTEIN:  Object.  Calls for a mental
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

128

```
 1       impression, work product.
 2           THE WITNESS:  I'm not going to answer based
 3       on legal communications with my client, my legal
 4       opinion, my mental impressions.
 5   BY MR. O'BOYLE:
 6       Q.  Can you give me your lay opinion?
 7       A.  I don't behave as a lawyer based on lay opinion.
 8   I behave as a lawyer based on my legal opinions and
 9   based on my instructions or communications with clients.
10       Q.  But certainly you have lay opinions.  I mean,
11   when you see a bowl of spaghetti, you don't look up case
12   law, you pick up a fork and you eat the bowl of
13   spaghetti, am I right?
14       A.  Sometimes I use a spoon.
15       Q.  Or a spoon, that's -- that's fine.  Sometimes I
16   use a fork and a spoon.
17       A.  Me as well.
18       Q.  So, you do have lay opinions?
19       A.  I think we all have lay opinions.
20       Q.  Okay.
21       A.  I don't have lay opinions about legal matters.
22       Q.  Okay.  In here you talk about an article
23   published by the Florida Center For Investigative
24   Reporting concerning the O'Boyle Law Firm and Citizens
25   Awareness Foundation, Inc.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

129

```
 1          What was your objective in sending that to
 2   Ms. Gavagni?
 3          MR. GOLDSTEIN:  And I'm going to object to
 4   the form and again, renew my previous objection.
 5          If you'd like to ask him questions about
 6   statements made in the letter, I prefer you show
 7   him the letter so that we can assure that,
 8   in fact, you are reading is accurate and he can
 9   see the document that you're referring to.
10          MR. HOCHMAN:  And let me just make another
11   statement.  On behalf of the Town, if we want to
12   ask this witness questions about this letter at
13   trial, we're going to do that.
14          And if you choose not to inquiry based upon
15   having him look at the letter and doing it
16   appropriately, you do so at your peril.
17          But I'm letting you know, if you object to
18   us questioning at trial, if there's a trial in
19   this case, going through the letter and step by
20   step, what his thinking was, you can either have
21   that opportunity now or we will take our position
22   at trial, okay.
23          MR. O'BOYLE:  Thank you.
24          MR. HOCHMAN:  Okay.
25
```

130

```
 1   BY MR. O'BOYLE:
 2      Q.  If I told you I had a copy of your September 3rd
 3   document, would that be all right with you?
 4          MR. GOLDSTEIN:  Object to the form.
 5          THE WITNESS:  My September 3rd, what
 6      document.
 7   BY MR. O'BOYLE:
 8      Q.  The only document I know of September 3rd, the
 9   one we spoke about a little earlier, the one that was
10   signed by -- something about mediation and so forth.  We
11   talked about it earlier?
12      A.  I --
13          MR. GOLDSTEIN:  Form.
14          THE WITNESS:  I believe that's public
15      record.  I don't think there's anything
16      confidential about the document.
17   BY MR. O'BOYLE:
18      Q.  Okay.  What would be confidential?
19      A.  What the document says, what the parties were
20   meeting for, settlement conference to be treated as
21   mediation.  Everything they discussed was to be
22   confidential and treated as mediation.
23      Q.  So, that would be in the document then, would it
24   not?
25      A.  No.  If there was a settlement agreement at the
```

131

```
 1   end, that would be put in a document.  That would, also,
 2   be a public record.
 3          But the oral communications that occur, the law
 4   encourages settlement and confidential settlement
 5   conferences so people can resolve their differences
 6   without those matters being discussed outside that
 7   setting and that's what we were attempting to do.
 8      Q.  Would you object if Mr. O'Hare, who was at the
 9   meeting from recalling what you said, came forward and,
10   in fairness to all the parties, alerting the Bar
11   Association whatever and shared what was the content of
12   that September 3rd, what I'm going to call, the
13   mediation document?
14      A.  That's a legal conclusion.  It's a legal opinion.
15          MR. GOLDSTEIN:  Object to the form.
16   BY MR. O'BOYLE:
17      Q.  Okay.  Would you personally object to it?
18      A.  That's my legal -- it would depend on my legal
19   opinion.
20      Q.  Okay.  What is your lay opinion?
21      A.  I don't have a lay opinion about legal matters.
22      Q.  Okay.  Mr. Chandler, there's a --
23      A.  By the way, it's about 1:15.  So if, maybe, at
24   1:30 we can take a break at lunch, I'm starting to get
25   hungry now.  So, 15 more minutes if you don't mind.
```

132

```
 1          MR. O'BOYLE:  We can do it right now.
 2          THE WITNESS:  No, go ahead.  I don't want to
 3      interrupt you.
 4          MR. O'BOYLE:  You're not interrupting
 5      because I'm going into something else that would
 6      take a while.
 7          THE WITNESS:  Okay.  It's a great time to
 8      take a lunch.
 9          MR. HOCHMAN:  Right now, according to my
10      watch, it's now 1:11.
11          THE WITNESS:  One hour.
12          MR. O'BOYLE:  An hour-ish.  Downstairs, you
13      just don't know what you're going to be
14      confronted it with.
15          By the way, are you buying?
16          THE WITNESS:  No.  If we ever settle, I'll
17      buy.
18          MR. O'BOYLE:  The cameras are on and I just
19      don't want anybody to forget.
20          MR. GOLDSTEIN:  He might hold you to it.
21          (Thereupon, a recess was taken for lunch;
22      after which the following proceedings were had.
23          MR. O'BOYLE:  Are we on the record?
24          THE COURT REPORTER:  Yes.
25
```

133

```
1   BY MR. O'BOYLE:
2       Q.  Mr. Sweetapple, how was it that you became
3   special counsel, as Mr. Morgan calls it, to Gulf Stream?
4       A.  That requires lawyer/client communication.  It's
5   privileged.
6       Q.  Okay.  Can you answer it other than a legal
7   fashion, as a layman?
8       A.  No, because what I was told was from the client
9   in anticipation or after being retained.
10      Q.  I'm sorry?
11      A.  No, I can't.
12      Q.  And can you tell me why you can't?
13      A.  Because it's privileged communication.
14      Q.  As to why you were hired, that's privileged?
15      A.  Everything the client told me was -- is
16  privileged.
17      Q.  Okay.  Now, if the client said what I just asked
18  in a newspaper, wouldn't he have waived the
19  communication, the privilege?
20      A.  You're asking me for a legal conclusion, I can't
21  give you my legal opinion.  I'm not here to give you my
22  legal opinions.  I give those to Gulf Stream.
23      Q.  Okay.  Can you give me your layman's opinion?
24      A.  No.
25      Q.  And why not?
```

134

```
1       A.  I don't think I have a layman's opinion on the
2   law.
3       Q.  Besides the law, you have no other layman's
4   opinions?
5       A.  I do, but not on the issue of waiver of
6   confidentiality.  That's not a lay opinion, that's a
7   legal opinion.
8       Q.  The RICO suit, were you part of the, I'm going to
9   say group of lawyers, who worked on and filed the appeal
10  of the 11th Circuit?
11          MR. GOLDSTEIN:  Object to the form.
12          THE WITNESS:  I -- I did not file the appeal
13      to the 11th Circuit.
14          And as to the work I did on the appeal,
15      that's lawyer/client privilege.
16  BY MR. O'BOYLE:
17      Q.  If it's in your billings that are public records,
18  would that be attorney/client privilege?
19      A.  Anything that's in my billing is a public record,
20  but I'm not going to discuss any work I did on -- the
21  nature of the work I did.
22      Q.  But you did work on the appeal, would that be
23  correct?
24      A.  If you take out the bills, it will show any
25  reference to the work -- time I spent on the appeal.
```

135

```
1       Q.  Is that a yes?
2       A.  That's a yes.  If you take a look at the bills,
3   you'll see any work that I did on the appeal.
4       Q.  Okay.  But you --
5       A.  Not the nature, but you'll see the time.
6       Q.  But you did work on the appeal?
7       A.  I did work on the appeal by virtue of reviewing
8   it.
9       Q.  By virtue --
10      A.  Of reviewing it.  I didn't write any of the
11  appeal.
12      Q.  Okay.  In your billings, the initials DPV, who is
13  that?
14      A.  That's David Paul Vitale.
15      Q.  And who's ADV?
16      A.  Alexander DeVargus.
17      Q.  I see.  Do you know when Mr. Vitale became
18  licensed in Florida?
19      A.  I don't.  Not by memory.
20      Q.  Generally stated --
21          MR. GOLDSTEIN:  Asked and answered.
22          THE WITNESS:  Trying to think when my
23      daughter -- it was after my daughter, but I don't
24      remember the -- I can't pick the month.
25
```

136

```
1   BY MR. O'BOYLE:
2       Q.  Okay.
3       A.  I think it was the summer, sometime in the
4   summer.
5       Q.  Of 1961?
6       A.  19 -- or 2000 -- maybe '14.  I'm guessing.
7          MR. GOLDSTEIN:  I don't want you to guess.
8          MR. ROCHMAN:  I'm going to move to strike if
9      that's a guess.
10  BY MR. O'BOYLE:
11      Q.  Do you know a fellow named Peter Isen?
12      A.  Peter Isen?  No.
13      Q.  Okay.  Well, he knows you.  Are you sure you
14  don't know him?
15      A.  I don't know him.  I know who he is, but I don't
16  think I ever met him.
17      Q.  Who is he?
18      A.  I read that he was a resident -- if I'm not
19  mistaken, a resident of Long Port, New Jersey that you
20  sued after he said that you were the enemy of the people
21  of Long Port or something of that nature.  And I read an
22  opinion concerning that as I recall.
23      Q.  Of the 350 million people in America, where did
24  you find Peter Isen?
25          MR. GOLDSTEIN:  Form.
```

137

```
 1          THE WITNESS:  I'm not going to give my work
 2     product, but in order to determine your past
 3     conduct, you don't have to look up Peter Isen,
 4     you just have to look up Martin O'Boyle.
 5 BY MR. O'BOYLE:
 6     Q.  And you would find -- if you look up
 7 Martin O'Boyle and you were looking to determine my past
 8 conduct, you would find what by way of facts?
 9          MR. GOLDSTEIN:  Form.
10          THE WITNESS:  You're asking me what's in the
11     public record about you?
12 BY MR. O'BOYLE:
13     Q.  No.  You said all we have to do if you want to
14 find out about Martin O'Boyle, you have to look him up.
15     A.  No.  I said, you don't have to know who Mr. Isen
16 is to find out about him.  If you look at your past
17 record of activities, litigation, fights with towns,
18 mayors, banks, that you see names of people who you have
19 sued and conduct that you have engaged in.
20     Q.  And the conduct that I have engaged in, do you
21 have any firsthand knowledge of that?
22     A.  In other words, did I see it, was I there?
23     Q.  No.  Do you have any firsthand knowledge?
24     A.  What do you mean by firsthand knowledge?
25     Q.  Well, I'll ask it a different way.  The conduct
```

138

```
 1 that you speak of, are you relying on others to -- with
 2 regard to determining that conduct with regard to your
 3 sitting here now saying your conduct, you made that
 4 statement and it came from somewhere?
 5     A.  Yes.  I'm relying on others to -- witnesses,
 6 reporters, judges who write opinions, I'm relying on any
 7 number of people when I investigate a party's past
 8 conduct.
 9     Q.  Did you find anything in any of the information
10 that you looked at that said that there's a glass
11 mountain of evidence, that phrase?
12          MR. GOLDSTEIN:  Form.
13          THE WITNESS:  Glass mountain of evidence.
14     That I found?
15 BY MR. O'BOYLE:
16     Q.  Yeah.
17     A.  Yes.  When I investigated statements that you
18 made to the Town of Gulf Stream, you made reference to a
19 writing of a judge who I subsequently -- subsequently
20 recuse himself in a case that is on appeal currently,
21 and you made reference to a quote from a judge in an
22 order, I did see -- I did see that you put that in the
23 record.
24     That was, I think, at the time you went in there
25 and made comments about me which you subsequently
```

139

```
 1 retracted on the record.
 2     Q.  So, the glass mountain evidence, that was about
 3 you?
 4     A.  That was a statement by a judge that you
 5 attributed to a judge when you were making derogatory
 6 comments about me to the Town which you subsequently
 7 retracted.
 8     Q.  Have you ever made any derogatory comments about
 9 me?
10          MR. GOLDSTEIN:  Object to the form.
11          THE WITNESS:  I am not going to discuss my
12     communications with my client or my staff or my
13     counsel.
14 BY MR. O'BOYLE:
15     Q.  Okay.  Do you remember the question?
16     A.  Yes.  Have I made any derogatory statements about
17 you?
18     And to -- I'm sure I've made a derogatory comment
19 about you.
20     Q.  Singular?  Haven't you made multiple derogatory
21 comments about me?
22          MR. GOLDSTEIN:  Object to form.
23          THE WITNESS:  I would say that I have made
24     multiple derogatory comments about you.
25
```

140

```
 1 BY MR. O'BOYLE:
 2     Q.  Did you know that I had a white truck?
 3     A.  That you had a white truck?
 4     Q.  Yes.
 5     A.  No, I don't know if you have a white truck.
 6     Q.  Okay.  Did you know that the Town towed my truck
 7 in the first half of 2014?
 8     A.  I'm not going to disclose anything that my client
 9 told me, but I recall -- I thought reading somewhere
10 that it was your wife's truck.  I think I read a police
11 report or something that was a public record that said
12 it was your wife's truck.
13     Q.  Ah-huh.
14     A.  That was towed from somewhere.
15     Q.  Whether my -- it was my wife's truck or my truck,
16 were you aware that the Town towed that in the first
17 half of 2014?
18          MR. GOLDSTEIN:  Asked and answered.
19          THE WITNESS:  At some point I became aware
20     that it was towed.  How I became aware, I don't
21     remember if it was reading a police report, but I
22     did have communications thereafter that I am not
23     going to discuss with my client about the issue.
24 BY MR. O'BOYLE:
25     Q.  Have you ever heard of a newspaper called the
```

141

```
1    Gulf Stream Patriot?
2        A.  I've seen a copy of the Gulf Stream Patriot maybe
3    one or more.  I know I've seen at least one.
4        Q.  And how did you get your hands on that?
5        A.  How did I get my hands on it?
6        Q.  Yes.
7        A.  I don't remember.
8        Q.  We talked about, I think we did anyway, banners
9    flying in the sky.  Do you -- Now, I guess you've had
10   time to think about it, do you remember any of those
11   banners which may have applied to you?
12           MR. GOLDSTEIN:  Form.
13           THE WITNESS:  There's a pending motion with
14           regard to banners that you admitted you were
15           flying and there were a few that had my name or
16           referenced me, I believe.  I do remember them.
17   BY MR. O'BOYLE:
18       Q.  Okay.  The pending motion, isn't flying a banner
19   a First Amendment right?
20       A.  That's a legal opinion.
21           MR. GOLDSTEIN:  Form.
22   BY MR. O'BOYLE:
23       Q.  Okay.  And you don't want to answer that,
24   correct?
25           MR. GOLDSTEIN:  Object to the form.
```

142

```
1            THE WITNESS:  I can't give you my legal
2            opinion.  It's a subject motion in court that's
3            going to be adjudicated at the end of the case.
4    BY MR. O'BOYLE:
5        Q.  What does the -- if I were to find the motion,
6    what would it say about the banners?
7            MR. GOLDSTEIN:  Form.
8            THE WITNESS:  I think it related to conduct
9            that you had engaged in after the motion was
10           filed to disqualify the O'Boyle Law Firm.  And
11           whether or not it was designed to intimidate
12           counsel from prosecuting that motion and fully
13           representing the Town.
14           And as you may know in litigation, there are
15           all types of restrictions courts can put on First
16           Amendment rights.
17           So, I believe there's an issue before the
18           court as to whether or not you and/or others in
19           the law firm were attempting to bully and
20           intimidate counsel by making a personal attacks
21           and flying a banners and that's the subject of a
22           motion.
23           I think that's been your conduct in
24           Long Port as well as the State Attorney to use
25           banners to attempt to intimidate or bully people.
```

143

```
1    BY MR. O'BOYLE:
2        Q.  Well, I'm glad you said think because that
3    clearly tells me that you don't know.
4        A.  It's just my -- my lay observation.  That's not a
5    legal observation, that's my lay observation that you do
6    that from having read what I've read.
7        Q.  And what you read you could affirm is one
8    hundred percent true, correct?
9        A.  I never believe what I read is a hundred percent
10   true.  I always -- I have some scepticism.
11           I don't think the New York times is one
12   hundred percent true.  I don't think the Congressional
13   Record is a hundred percent true.
14           So, I read as much as I can.  I speak to as many
15   witnesses as I can.  I try to corroborate.  I try to be
16   as thorough as I can in my work, Mr. O'Boyle.
17       Q.  I don't doubt that at all.  But as far as these
18   banners, you have no factual knowledge that I am
19   responsible for those banners, do you?
20           MR. GOLDSTEIN:  Form.
21           THE WITNESS:  That's not true.
22   BY MR. O'BOYLE:
23       Q.  Okay.  Well, tell me what it is?  Tell me what
24   your factual knowledge is?
25       A.  Your attorney in open court admitted that you
```

144

```
1    were flying the banners.
2        Q.  What attorney would that be?
3        A.  Mr. Taylor is it?  In front of Judge Barkdull --
4    I mean, in front of Judge Peter Blanc.  It's in the
5    record.
6            And I believe there was some other admission of
7    that.  I don't know why you would be denying it.
8        Q.  Did I deny it?
9        A.  Well, you said you don't have any proof as if you
10   were challenging that it happened.
11       Q.  Well, please don't tell me what I'm doing.
12       A.  I'm not telling you what you're doing.
13       Q.  You sure are.
14       A.  I don't want to argue with me, Mr. O'Boyle.
15       Q.  Sweetapple Silver Houses, LLC, have you ever
16   heard of that?
17       A.  I heard -- yes, I have.
18       Q.  And are you upset by that -- by the name of that
19   company?
20       A.  Not upset.  No, I'm not upset.
21       Q.  Okay.  What are you?
22       A.  As a lay person, I see it as, yet, another
23   attempt that's consistent with dozens of incidents I've
24   seen where you've attempted to bully or intimidate
25   people into doing what you wanted and that's what I see
```

145

```
 1    it as.  It's pretty typical from what I've been doing
 2    and predictable.
 3         Q.  And that's according to you, right?
 4         A.  I'm the one testifying.
 5         Q.  I understand that.  But that's according to you?
 6         A.  I just said those things.
 7         Q.  But that's according to you, correct?
 8              MR. GOLDSTEIN:  Asked and answered.
 9              THE WITNESS:  If I said it, it would be
10    according to me, I didn't quote anybody.
11    BY MR. O'BOYLE:
12         Q.  Okay.  All right.  If I would have opened some
13    sober houses and called them Sweetapple, LLC -- I'm
14    sorry, Sweetapple Silver Houses, LLC, would that have
15    troubled you?
16              MR. GOLDSTEIN:  Asked and answered.
17              THE WITNESS:  You're asking me to speculate.
18    BY MR. O'BOYLE:
19         Q.  Just give me your laymen's opinion?
20              MR. GOLDSTEIN:  Asked and answered.
21              THE WITNESS:  I would be speculating.
22    BY MR. O'BOYLE:
23         Q.  Pardon?
24         A.  I would be speculating.
25         Q.  How many sober houses have you built?
```

146

```
 1         A.  I haven't built any sober houses.
 2         Q.  How many sober houses have you operated?
 3         A.  I haven't operated any sober houses.
 4         Q.  Do you know David Saffron?
 5         A.  David Saffron?  I do not know David Saffron.  I
 6    know the name and I have spoken to him.
 7         Q.  So, then you do know him?
 8         A.  No.
 9              MR. GOLDSTEIN:  Object to the form.
10              THE WITNESS:  I don't know him.
11    BY MR. O'BOYLE:
12         Q.  Explain to me what's the difference between
13    speaking to someone and knowing someone in your mind, I
14    think that will save us some time?
15         A.  I had a woman from China call me to ask me if I
16    was going to pay my American Express card.  And I said,
17    I already have.  I have no idea -- she told me her name,
18    but I have no idea what she looks like, I know -- I have
19    no idea about her family.
20              David Saffron I spoke to on the telephone on more
21    than one occasion.
22         Q.  Did you send Mr. Saffron any documentation,
23    information, anything?
24         A.  I believe I did.
25         Q.  And what is it that you sent him?
```

147

```
 1         A.  I would have to go back and look.
 2         Q.  Did Mr. Saffron send you anything by way of
 3    documentation?
 4         A.  Yes, he did.
 5         Q.  He did.  What did he send you?
 6         A.  I believe that's confidential and related to my
 7    litigation.  I'd have to go back and look, but that's my
 8    recollection.
 9         Q.  And how would it be confidential?
10         A.  It would be my work product and lawyer/client
11    work with regard to my matters.
12         Q.  I see.  But he did send you information?
13         A.  Yes, he did.
14         Q.  How many pieces of information did he send you?
15         A.  I'd have to go back and look.
16         Q.  Generally?
17         A.  It wasn't very many.
18         Q.  Very many, is there --
19         A.  Less than -- I mean, two, three, four.  I mean,
20    I'd have to go look.
21         Q.  Small amount?
22         A.  Small amount.  It was a brief period exchange, I
23    believe.
24         Q.  How did you find Mr. Saffron in this $350
25    million -- million people country?
```

148

```
 1         A.  I don't remember.
 2              MR. GOLDSTEIN:  Form.
 3    BY MR. O'BOYLE:
 4         Q.  How did Mr. Saffron find you?
 5         A.  I don't know if he found me or if I found him.
 6         Q.  I see.  And if you did find him, you have no idea
 7    how that happened?
 8              MR. GOLDSTEIN:  Asked and answered.
 9              THE WITNESS:  I have no idea as I sit here.
10    I could look through my files and see if it was
11    through a search that was done or I mean, a case
12    that his name appeared in.
13              As I sit here now, I don't know how learned
14    of him or he learned of me.
15    BY MR. O'BOYLE:
16         Q.  Okay.  Tom O'Donnie, do you know him?
17         A.  I don't recognize that name.
18         Q.  Patsy Randolph?
19         A.  I recognize the name from depositions.  I may
20    have met her.  I have no idea sitting here today what
21    she looks like.  I believe she's a resident of Gulf
22    Stream.
23         Q.  Have you spoken to her?
24         A.  It's possible because if she is one of the people
25    that's been at council meetings, I've had people come up
```

149

```
1    to me.  I don't remember if it was her or not, but I
2    recognize that name.
3         Q.  Is everything that you said at the council
4    meeting, to the public, true?
5         A.  When?  Are you talking about at council meetings?
6         Q.  Yes.
7         A.  I hope so.
8         Q.  That's a yes or no?
9              MR. GOLDSTEIN:  Object to the form.
10             THE WITNESS:  To the best of my knowledge.
11   BY MR. O'BOYLE:
12        Q.  To the best of your knowledge, everything you
13   said is true, correct?
14        A.  When I report to the counsel, when I speak to
15   counsel members.
16        Q.  When you speak in the -- Well, I'm going to call
17   the commission chambers to the people, to the commission
18   members, to the town manager, to the town clerk, to the
19   town attorney?
20        A.  I assuming that the information I have is
21   accurate.  I attempt to only tell the truth.
22        Q.  Okay.  Earlier on you said that you made some or
23   several derogatory comments about me.  May I ask what
24   they were?
25        A.  I can't remember the exact nature of them.  Some
```

150

```
1    were with my wife, for instance, in private.  Those are
2    privileged.  I think I made one last night.  So, I
3    wouldn't share them with you.
4         Q.  Besides your wife, the one you made last night --
5    excuse me, the one you made last night, I assume, was
6    not to your wife or was it?
7         A.  To my wife.
8         Q.  Okay.  I see.
9         A.  About what I thought you were doing in this
10   proceeding, for instance.
11        Q.  I see, okay.  The derogatory statements that you
12   made, you don't remember a one of them?
13        A.  Actually, I do remember.  I had a personal
14   conversation with my tennis partner last night.  I am
15   not going to share it with you, but he's also a lawyer
16   and one of my lawyers.
17             But I did speak to him as to what I thought you
18   were about with regard to your conduct in this case
19   and --
20        Q.  And is that -- do you believe that to be
21   privileged?
22        A.  Yes.
23        Q.  Okay.  And what is your basis for that belief?
24        A.  Because he happens to be a lawyer and he
25   represents me.
```

151

```
1         Q.  In this matter?
2         A.  He represents me in general.  He's my general
3    counsel.
4         Q.  Okay.
5         A.  Has been for twenty something years.
6         Q.  But he doesn't represent you in this matter, is
7    that correct?
8         A.  He's not counsel of record in this matter, but I
9    have discussed with him this matter.
10        Q.  Okay.  Do you have any documents that are
11   unsealed by a court?
12        A.  Do I have any?
13        Q.  Yes.
14        A.  In my possession?
15        Q.  Yes.
16        A.  Not that I am aware of.
17        Q.  Okay.
18        A.  I mean, other than the fact I -- that we -- are
19   you talking about your case?  Not yesterday we filed a
20   thousand pages in a case, I believe, unsealed in a -- in
21   the 15th Judicial Circuit.  It was a different case.
22   Those we filed, I have these.
23        Q.  As applies to myself and -- and/or to Mr. O'Hare?
24        A.  Not that I am aware.  I believe with regard to
25   Mr. O'Hare, there was a motion to file something
```

152

```
1    unsealed, but I don't think it's ever been filed and I
2    don't think I have a copy of whatever it was that was
3    being filed.
4         Q.  Okay.  Let's then limit it to just me.  Do you
5    have any documents that are unsealed?
6         A.  That's been filed unsealed?  No.
7         Q.  I don't know what filed unsealed means, but let
8    me try to use the best words that I can.  Do you have
9    any documents that a court says you're not supposed to
10   have?
11             MR. GOLDSTEIN:  Object to the form.
12             THE WITNESS:  Not that I'm aware of.
13   BY MR. O'BOYLE:
14        Q.  Did Peter Isen send you any documents?
15        A.  I already answered that.  Yes, he did.
16        Q.  You didn't answer that, but that's fine.
17             And may I ask what he sent you?
18        A.  It's confidential and privileged and work
19   product.
20        Q.  Back to the derogatory statements that you said
21   about me; you said you told your wife and that's
22   privileged.
23             And you told your tennis buddy and you've
24   represented here that he is your counsel, has been
25   counsel for 25 years.  And whatever you told him is
```

153

```
 1    privileged, am I right so far?
 2        A.  And I spoke with, you know, staff, lawyers in the
 3    office, my client.
 4        Q.  External to your client and their employees and
 5    external to your 25-year tennis partner who's your
 6    lawyer, but not in this case, I mean, he hasn't entered
 7    an appearance in this case, who else did you make
 8    derogatory comments about me to?
 9        A.  I can't remember anybody offhand.
10        Q.  Can't remember a sole?
11        A.  No.
12        Q.  Okay.  Now, you said you made -- and I may not
13    have the right word, multiple -- you said you made
14    derogatory comments multiple times.  And you may have
15    even said something with a higher element then that,
16    meaning a lot of times or whatever, but somewhere in
17    that arena.
18            Why didn't you just say two?
19            MR. GOLDSTEIN:  Object to the form.
20        Mischaracterizes testimony.
21            THE WITNESS:  For instance, my tennis
22        partner who I play tennis with two or three times
23        a week -- I've been involved with you for two
24        years.
25            So, I confidentially will say things to him
```

154

```
 1    about what I think you're doing that are
 2        derogatory, I think, can be taken as derogatory
 3        right before I hit the tennis balls.
 4    BY MR. O'BOYLE:
 5        Q.  What words or phrases would you characterize as
 6    derogatory?
 7            MR. GOLDSTEIN:  Object to the form.
 8            THE WITNESS:  I'm not going to disclose the
 9        terms that I've used.
10    BY MR. O'BOYLE:
11        Q.  What words or phrases would you describe as
12    derogatory, except for those that you made to the Town
13    of Gulf Stream and any of its employees, except for
14    those that you made to your wife and except those who
15    you made to your tennis partner for 25 years who's been
16    your lawyer and still is your lawyer, and that's why
17    you're claiming a privilege?
18            MR. GOLDSTEIN:  Object to the form.
19            THE WITNESS:  You want to know what I
20        consider to be a derogatory comment?
21    BY MR. O'BOYLE:
22        Q.  What you consider to be derogatory comments?
23        A.  About another person?
24        Q.  Well, you wouldn't -- unless it's about you,
25    which is not what --
```

155

```
 1        A.  About any person, what would I consider to be
 2    derogatory?
 3        Q.  Just in general, a derogatory comment?
 4            MR. GOLDSTEIN:  Form.
 5            THE WITNESS:  He's an ass.  He's a fool.
 6        He's a jackass.  I mean, there are different
 7        derogatory terms people use all the time about
 8        other people.
 9    BY MR. O'BOYLE:
10        Q.  He's fucked up, is that a derogatory comment?
11        A.  I've -- I would think so.
12        Q.  Okay.  He's a douche bag, is that a derogatory
13    comment?
14        A.  I would think so.
15        Q.  His head is in his ass, is that a derogatory
16    comment?
17        A.  Yes.  Although, the last three you quoted I hear
18    kids saying all the time.  So, maybe now it isn't a
19    derogatory comment.  Our society seems to be changing.
20    Now, Mr. Trump says things like that, so I guess
21    our world is really changing.
22        Q.  Mr. Vitale, would he have any billings with your
23    firm or would you bill him out before 3/20/2015?
24        A.  When he was a law clerk.
25        Q.  And by the --
```

156

```
 1        A.  He worked for me as a law clerk for some time
 2    before he became a lawyer.
 3        Q.  And were you billing him out as a law clerk?
 4        A.  Yes.  As a law clerk, yes.
 5        Q.  And what was the rate that you were billing him
 6    out at?
 7        A.  I don't remember.
 8        Q.  What does, generally, a law clerk --
 9        A.  I'd have to look and see.  Mr. Vitale graduated
10    number two in his class from BC Law.  He's a three-year
11    CPA.  He's now working at a large New York firm making
12    twice -- You know, a lot more than I paid him and I was
13    paying him top dollar.
14            So, I mean, I don't know -- I don't remember what
15    his rate was.  But, you know, he's be a top tier lawyer.
16        Q.  At this point, though, he was not a lawyer?
17        A.  At this point he was a CPA and was awaiting his
18    Bar -- getting sworn into Bar.  He was -- he graduated
19    from law school.  He was not yet sworn in.
20        Q.  Did you ever slander me, Mr. Sweetapple?
21        A.  That's a legal conclusion, but don't believe I
22    did, no.
23        Q.  And what makes you not believe that you did?
24        A.  Because I don't believe I did.  I am aware of
25    what slander is and I don't believe I ever slandered
```

157

```
 1    you.
 2         Q.   Isn't that a legal conclusion of what slander is?
 3         A.   I told you, I don't believe I have.  I think
 4    it's -- it's a legal conclusion.
 5         Q.   Okay.  What would you expect a paralegal to bill
 6    at?
 7              In other words, if you looked at another lawyer's
 8    bills, which I'm sure you do --
 9         A.   I would say 150, 250.  For a paralegal, you're
10    not talking about a graduate law clerk.  I mean,
11    Mr. Vitale worked with the Federal Judge in Boston who
12    did the Boston Bomber Trial, for instance.
13              I mean, you're talking about a first year law
14    clerk, second year law clerk, paralegal, that's a
15    different concept than someone who's graduated from law
16    school who's worked in Federal Court, who's, you know,
17    highly talented and -- depends on who the person is.
18              You can be a paralegal without even going to --
19    you can call yourself a paralegal without even having
20    gone to paralegal school.
21         Q.   Now, I know what these two fellas, Mr. Hochman,
22    Mr. Goldstein bill at.  And I'm looking and I believe,
23    and unless I'm mistaken, that Mr. Vitale billed at more
24    than them.  How could that be?
25         A.   Billings are a function of the type of work you
```

158

```
 1    do.  For instance, I bill at 350 an hour for Gulf
 2    Stream, I believe.  My billing rate is 650 an hour.  It
 3    depends on who the lawyer is, what the firm is.
 4              Insurance defense lawyers bill at very, very low
 5    rates in the industry.  So, you'll see insurance defense
 6    lawyers billing at 150, 125.  I billed at 125 in 1980.
 7              So, it's typical in the industry that insurance
 8    defense lawyers, because they do volumes of work, it's
 9    negotiated with carriers, small firms, big commercial
10    firms, private firms that do the type of work that we do
11    bill more at the rates we do.  It's the function of the
12    type of firm, the type of lawyers that are involved.
13         Q.   But if a top lawyer can bill at 650 --
14         A.   That's not the top rate.  I mean, Mr. Grossman
15    bills much bigger than I do.
16         Q.   No, a top lawyer, a seasoned lawyer can bill at
17    650, why would a good lawyer bill 125, 150?  Is it
18    because they can't get work otherwise?
19              MR. GOLDSTEIN:  Asked and answered.
20              THE WITNESS:  No.  You're asking my opinion
21         from the -- my experience with the law.  It's not
22         really a legal opinion, it's an informed business
23         opinion.
24              But I have seen the big insurance firms bill
25         at very low rates with very high volume, very
```

159

```
 1         large use of paralegals, young lawyers.
 2              You can get a job at the State Attorney's
 3         Office and make $45,000 a year and you're really
 4         billing out at $50 an hour when you add it up.
 5         Really depends on the setting you're in.
 6    BY MR. O'BOYLE:
 7         Q.   Gotcha.  Before Mr. Vitale was a lawyer, he was
 8    billing at 200 an hour, does that sound right?
 9         A.   I would have to look.
10         Q.   Okay.  After Mr. Vitale was a lawyer, he was
11    billing at 200 an hour, does that sound right?
12         A.   It could be.  Could be.
13         Q.   Who determines what the billing rate is?
14         A.   His billing rate, after he became a lawyer, was
15    300 or 275 or 325.  But because Joann O'Connor was
16    billing at a discounted rate as a courtesy to the
17    client, I did not bill him at the firm's rate.
18              So, you mentioned yesterday that I made $600,000
19    representing Gulf Stream, which I never added up, and
20    you thought it was outrageous.  I looked at it as how
21    much I've lost in revenue because both Mr. Vitale and
22    myself were not billing at our full rates and I have
23    more than enough work to handle at 650 an hour, but
24    because I committed to take the case at 350 because it
25    was a government, I've continue to bill at that way.
```

160

```
 1    However, it's consumed much more time than I ever
 2    expected and gone much longer than I ever expected.
 3              So, I probably have, in terms of my business, if
 4    I ever did look at my income and statements, which I
 5    don't focus on, I would probably see that I've lost
 6    money representing the Town of Gulf Stream frankly.
 7         Q.   When you say it took much longer than you
 8    expected, could I read into that that you thought you
 9    were going to crush myself and Mr. O'Hare long before
10    this?
11         A.   No.
12              MR. GOLDSTEIN:  Object to the form.
13              THE WITNESS:  You can read into that that I
14         never knew who Mr. Chandler was and I never
15         expected anything like this would develop in the
16         case when I got into it.
17              Absolutely could not have predicted a
18         witness like Joel Chandler contacting me and
19         hearing what I have heard; that was totally
20         beyond anything I ever expected when I got
21         involved in this litigation.
22    BY MR. O'BOYLE:
23         Q.   If Mr. Chandler said that the Town's conduct was
24    criminal, would you agree with him?
25         A.   If -- you're asking me a hypothetical.
```

161

```
 1      Q.  No --
 2      A.  You're also asking me for a legal opinion and I
 3   am not going to give you my legal opinion.
 4      Q.  Well, then give me a non-legal opinion?
 5           MR. GOLDSTEIN:  Form.
 6           THE WITNESS:  I don't think -- I don't think
 7      I offer non-legal opinions on those subjects.
 8   BY MR. O'BOYLE:
 9      Q.  How many people have you said that -- have you
10   told that I was a criminal?
11      A.  I have not said Martin O'Boyle is a criminal.
12      Q.  Have you said Marty O'Boyle is a criminal?
13      A.  No, I haven't.
14      Q.  Have you made Martin -- or I'm sorry,
15   Mr. O'Boyle is a criminal?
16      A.  No, I haven't.
17      Q.  I see.  And have you ever said that I was an
18   extortionist?
19      A.  I don't believe so.  I've never said that.
20      Q.  Well, certainly in the papers, the RICO suit, you
21   said that?
22      A.  I didn't file the RICO suit.
23      Q.  I didn't say you did.
24      A.  So, why are you saying that I said what's in the
25   papers that were filed by the Richman Greer Firm?
```

162

```
 1      Q.  Because you participated in the preparation --
 2      A.  You're saying --
 3      Q.  And you said that you reviewed them or you
 4   reviewed it?
 5      A.  I said I reviewed the appeal, but I did work on
 6   the RICO case.
 7      Q.  Okay.
 8      A.  To say that I wrote Martin O'Boyle is an
 9   extortionist, I don't believe I've ever even written
10   that in a legal paper.
11      Q.  And why haven't you?
12           MR. GOLDSTEIN:  Form.
13           THE WITNESS:  Why haven't I written it in a
14      legal paper?
15   BY MR. O'BOYLE:
16      Q.  Yes.
17      A.  Because, I don't know.
18      Q.  Is it because you don't believe it?
19           MR. GOLDSTEIN:  Form.
20           THE WITNESS:  I am not going to discuss my
21      beliefs and my legal opinions with you.
22   BY MR. O'BOYLE:
23      Q.  Have you ever used, in the same sentence, my name
24   with criminal?
25           MR. GOLDSTEIN:  Asked and answered.
```

163

```
 1           THE WITNESS:  I believe that I have in
 2      discussions with Mr. Hannah stated to him that
 3      Mr. Chandler contacted me saying that he was
 4      alleging that you and others were engaged in
 5      criminal and fraudulent behavior.
 6           I have said to him, such as, if what
 7      Mr. Chandler is saying is true, he appears to be
 8      alleging a scheme to defraud under Florida
 9      Chapter 817 which is a criminal statute.
10           I have discussed in terms of discussing this
11      alleged scheme told me about
12      with Mr. Hannah what the legal ramifications of
13      the allegations would be, we've debated that.
14   BY MR. O'BOYLE:
15      Q.  Did Mr. Hannah talk about what occurred at the
16   September 3rd meeting?
17      A.  Where?
18      Q.  Well, the same one we've been talking about, the
19   September 3rd meeting, the mediation?
20      A.  But where?  Did he talk after it or before it?
21      Q.  Well, he would have had to talk -- Well, after
22   it?
23      A.  Did he talk to me after it?
24      Q.  No, I didn't say that.  Did he talk -- do you
25   have any knowledge that Mr. Hannah, after the
```

164

```
 1   September 3rd meeting, disclosed what occurred during
 2   the September 3rd meeting?
 3      A.  To his client?
 4      Q.  Please don't change the question.
 5      A.  Disclosed -- I don't have any -- I don't have any
 6   personal knowledge.
 7      Q.  Did you take his deposition?
 8      A.  I took his deposition.
 9      Q.  And in his deposition didn't he say that?
10      A.  I don't remember.  I don't remember.
11      Q.  If he did say it, it's now fair game, you agree
12   with that, do you not?
13           MR. GOLDSTEIN:  Object to the form.
14           THE WITNESS:  What's fair game?
15   BY MR. O'BOYLE:
16      Q.  What happened in that meeting?
17      A.  That's a legal conclusion.
18      Q.  Okay.  It would no longer be privileged, would
19   it?
20      A.  That's a legal conclusion.
21      Q.  So, it might still be privileged, even though
22   there's a transcript out there, it's on the internet, it
23   still may be privileged?
24      A.  Yeah.  In terms of privilege, yes, yes, it's --
25      Q.  Okay.
```

165

```
 1      A.  Things can be discussed in deposition and still
 2   not admissible.  It could be a violation of an
 3   agreement.  You're asking me legal conclusions, but
 4   that's my -- that's what you're getting at.
 5      Q.  Well, once it's on the internet, isn't it hard to
 6   un-ring the bell?
 7          MR. GOLDSTEIN:  Object to the form.
 8          THE WITNESS:  I don't know what you mean.
 9   BY MR. O'BOYLE:
10      Q.  Okay.  Once something is -- say his video
11   deposition was put on the internet.  What he said at
12   that deposition would be disclosed to the world, am I
13   correct?
14      A.  I would presume anyone could see it, yeah.
15      Q.  Okay.  So, whatever privilege is or whatever did
16   attach or secrecy, or whatever the mediation word meant,
17   it's gone, isn't it?  If I'm correct, that it's on the
18   internet?
19          MR. GOLDSTEIN:  Asked and answered.
20          THE WITNESS:  That's a legal conclusion.
21   BY MR. O'BOYLE:
22      Q.  That is a legal question?
23      A.  Yes.
24      Q.  Okay, that's fine.  You were hired by Gulf Stream
25   in March or April of 2014, does that sound right?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

166

```
 1      A.  It does.
 2      Q.  Okay.  And what was the scope of your duties as
 3   they announced it solely in public?
 4      A.  I wouldn't know.  I wasn't in public when they
 5   announced it.
 6      Q.  How did you find out what your duties were?
 7      A.  My duties have been discussed with my client.
 8      Q.  Have your duties at all changed?
 9      A.  I wouldn't feel comfortable discussing my
10   communications with my client in that regard.
11      Q.  I am not asking you to.  I just asked if you're
12   duties have changed?
13      A.  That would be lawyer/client privilege.
14      Q.  Well, your duties could change unilaterally?
15      A.  Well, my --
16          MR. GOLDSTEIN:  Form.
17          THE WITNESS:  My duties are a function of my
18      discussions with my client.  I am not going to
19      reveal my discussions with my client.
20   BY MR. O'BOYLE:
21      Q.  Now, we're dealing with a government and I'm
22   looking for the scope of your duties.
23          And the reason I am is, your duties as they were
24   initially discussed by the commission and where they are
25   now is far field, you're in a different planet.  And I
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

167

```
 1   just want to know how they changed?  When did they
 2   change?  If it's a -- if it's privileged, I understand.
 3      A.  Well, first of all --
 4          MR. GOLDSTEIN:  Form.
 5          THE WITNESS:  -- I don't agree with your
 6      characterization.
 7          Second of all, my communications with the
 8      client are privileged.
 9   BY MR. O'BOYLE:
10      Q.  Why don't you agree with my characterization?
11      A.  Because you said something about a different
12   planet.  I don't think we're on a different planet at
13   all.  I think we're dealing with my scope of
14   representation as it applied to the facts that developed
15   during litigation.
16          During litigation, facts come out and you apply
17   your lawyering and the scope of your representation to
18   those facts.
19      Q.  If you're fees are 650 an hour and if Mr. Vitale
20   was normally billing over 300, I think you said?
21      A.  Somewhere in that range, I don't remember.
22      Q.  Yeah.  You said that you were losing money?
23      A.  Yes, because I -- you're asking me a question.
24   Yes, because what I'm doing every month is working much
25   more on Gulf Stream matters then I expected and not
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

168

```
 1   billing clients that routinely pay me a lot more money.
 2          But I've made a commitment to take the case and
 3   I'm going to see the cases through.  I didn't expect to
 4   have you -- have someone sue me personally twice, the
 5   law firm twice.
 6          Although, based on what I know about your past
 7   conduct, I shouldn't be surprised.
 8      Q.  And I am not sure what that means whether you're
 9   talking about a glass mountain, whether you're talking
10   about filing a bullshit claim against my son for the
11   unlicensed practice of law, I don't know.
12          MR. GOLDSTEIN:  There's no question pending.
13      Is there a question?  Otherwise, I'm moving to
14      strike your comments.
15   BY MR. O'BOYLE:
16      Q.  In connection with this litigation, are you
17   claiming immunity?
18      A.  That calls for a legal conclusion and work
19   product, but I'd have to look at the pleadings that were
20   filed by my counsel to give you the best answer on that
21   regard.
22      Q.  If you'd like to take sixty seconds and ask your
23   counsel --
24      A.  If you show it to me -- I'm not going to speak to
25   my counsel right now.  If you show me the pleadings, I
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

169

```
 1    can read it.
 2        Q.  Okay.  We'll ask a different question.
 3        Are you not claiming immunity?
 4            MR. GOLDSTEIN:  Object to form.
 5            THE WITNESS:  Same answer.
 6    BY MR. O'BOYLE:
 7        Q.  Okay.  So, you don't know?
 8        A.  Well, I saw the pleading some time ago.  There
 9    were a number of defenses plead.  I don't remember -- I
10    remember absolute immunity, I think, and qualified
11    immunity as I recall.
12        Q.  I'm just referring to, are you claiming immunity?
13        A.  Well, I think the pleading refers to -- I think
14    it uses the term absolute immunity and qualified
15    immunity if I'm not mistaken, but I'd need to see it.
16        Q.  But qualified, the next word is immunity?
17        A.  Yes.
18        Q.  Absolute, the next word is immunity?
19        A.  Right.
20        Q.  My question is, are you claiming immunity?
21            MR. GOLDSTEIN:  Asked and answered.
22            THE WITNESS:  I think the pleading has those
23        two affirmative defenses in it if I'm not
24        mistaken.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

170

```
 1    BY MR. O'BOYLE:
 2        Q.  Okay.  So, you're claiming immunity?
 3        A.  My lawyer has asserted those defenses in a
 4    pleading on my behalf is my best recollection.
 5        Q.  Gotcha.
 6        A.  I'm going to want to take a break in five or
 7    ten minutes, so just --
 8        Q.  Did you ever say to Ms. O'Connor about me and my
 9    son that you're going to get me by going after my son?
10            MR. GOLDSTEIN:  Object to form.
11            THE WITNESS:  Well, I am not going to
12        disclose any communication with Ms. O'Connor.  I
13        mean, anything I discuss with Ms. O'Connor is
14        confidential.
15    BY MR. O'BOYLE:
16        Q.  Unless it was heard by a third party, isn't that
17    correct?
18        A.  That's a legal conclusion.  It depends on how it
19    was heard, who heard it.  That's a legal conclusion.
20        Q.  Okay, I see.  So, if someone else heard it, it
21    may not be privileged and you're not going to answer?
22            MR. GOLDSTEIN:  Object to the form.
23            THE WITNESS:  I'm not going to speculate.
24        But as to any communications I've had with
25        Ms. O'Connor, even if they're entirely invented
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

171

```
 1        in your question, I'm not going to answer.
 2    BY MR. O'BOYLE:
 3        Q.  Well, they're not invented and there's no glass
 4    mountain of evidence.
 5        A.  Do you have a question?
 6            MR. GOLDSTEIN:  Move to strike.
 7            MR. O'BOYLE:  You said made a statement and
 8        I was just responding.
 9            MR. GOLDSTEIN:  He was responding to your
10        statement.  Move on, please.
11            THE COURT REPORTER:  Can we take a break?
12            MR. O'BOYLE:  Sure.
13            (Thereupon, a recess was taken; after which
14        the following proceedings were had:)
15            MR. O'BOYLE:  We're back on the record, are
16        we?
17            THE COURT REPORTER:  Yes.
18            MR. O'BOYLE:  Mr. Hochman, I am told that
19        Ms. Randolph is supposed to be here for
20        deposition at 4:30 this afternoon and that it was
21        arranged through you, is that correct?
22            And do you, to your knowledge, will she be
23        here?
24            MR. HOCHMAN:  I don't know.
25            MR. O'BOYLE:  You don't know if it's
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

172

```
 1        correct?
 2            MR. HOCHMAN:  I don't know if it's correct
 3        and I don't know if she'll be here.
 4            MR. O'BOYLE:  Okay.  You don't know whether
 5        it was made through you?
 6            MR. HOCHMAN:  I know it wasn't made through
 7        me.
 8            MR. O'BOYLE:  It was not?
 9            MR. HOCHMAN:  That's correct, it was not
10        made through me.
11            MR. O'BOYLE:  If you'd give me one moment.
12        I was -- Mr. Goldstein, was it made through you?
13            MR. GOLDSTEIN:  Most certainly not.
14            MR. O'BOYLE:  Okay, okay.
15            MR. GOLDSTEIN:  I have never had a single
16        discussion with Ms. Randolph in my life.
17            MR. O'BOYLE:  I will alert the media.
18            MR. HOCHMAN:  Do you have service on her?  I
19        tried to ask this question at the very beginning
20        of this deposition.
21            MR. O'BOYLE:  You certainly did.
22            MR. HOCHMAN:  Do you have a return of
23        service indicating that Ms. Randolph was served
24        with process?
25            MR. O'BOYLE:  My understanding is, and we'll
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

173

```
 1     get it resolved this very second.
 2          MR. HOCHMAN:  Okay --
 3          MR. O'BOYLE:  -- is that the one of you two, it
 4     was made through one of you two.
 5          MR. HOCHMAN:  That is not possible.
 6          MR. GOLDSTEIN:  I would agree.
 7          MR. O'BOYLE:  Okay.
 8          MR. HOCHMAN:  We have no authority to accept
 9     a subpoena for a resident of the Town of Gulf
10     Stream.
11          MR. GOLDSTEIN:  Nor am I.
12          MR. O'BOYLE:  Is the other fellow there?
13          (Thereupon, Mr. O'Boyle is on the
14     telephone.)
15          MR. HOCHMAN:  Do you want to put it on
16     speaker so we can all hear?
17          MR. O'BOYLE:  No, privileged, work product.
18          MR. HOCHMAN:  Since you got your law
19     license, Mr. O'Boyle?
20          MR. O'BOYLE:  Are you not allowed to have
21     privilege unless you have a law license?
22          MR. HOCHMAN:  Well, not the attorney/client
23     privilege.  Do you have something else maybe?
24          MR. O'BOYLE:  Maybe I'm talking to my
25     attorney.
```

174

```
 1          MR. HOCHMAN:  I know that's not your
 2     attorney.
 3          MR. O'BOYLE:  Really?
 4          MR. HOCHMAN:  Yes.
 5          MR. O'BOYLE:  William --
 6          THE WITNESS:  That is his attorney.
 7          MR. O'BOYLE:  William, is he there.
 8          THE COURT REPORTER:  I'm going to go off the
 9     record.
10          (Thereupon, an off the record discussion was
11     held; after which the following proceedings were
12     had:)
13          MR. O'BOYLE:  Does anybody have a hard copy
14     of the second amended compliant?
15          MR. HOCHMAN:  You have it.
16          MR. O'BOYLE:  A clean copy, does anyone have
17     it?
18          MR. GOLDSTEIN:  I don't believe I do.
19          THE WITNESS:  I don't.
20          MR. O'BOYLE:  No.  Can you mark this.
21          (Thereupon, Plaintiff's Exhibit 1 was marked
22     for Identification.)
23          MR. HOCHMAN:  Has this been marked for
24     today's deposition?
25          THE COURT REPORTER:  Yes.
```

175

```
 1          MR. O'BOYLE:  Don't need it.  It's for the
 2     witness.
 3          MR. HOCHMAN:  It's for the witness?
 4          MR. GOLDSTEIN:  Let me take a look at it.
 5          MR. O'BOYLE:  Are we ready, madam?
 6          THE COURT REPORTER:  We're ready.
 7          (Thereupon, the conclusion of the deposition
 8     was resumed in Volume II.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

176

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
 3              Case No. 9:14-CV-81250-KAM
 4
     MARTIN E. O'BOYLE,
 5
          Plaintiff,
 6
          vs.
 7
     ROBERT A. SWEETAPPLE and
 8   MAYOR SCOTT MORGAN,
 9        Defendants.
     _____/
10
11
12          DEPOSITION OF ROBERT SWEETAPPLE
13          Taken on behalf of the Plaintiff
14                  VOLUME II
15              PAGES 176 - 283
16
     DATE TAKEN:    Friday, May 27, 2016
17
     TIME:          9:00 a.m. - 7:00 p.m.
18
     PLACE:         THE OFFICE OF DAUGHTERS REPORTING
19                  1515 North Federal Highway
                    Suite 300
20                  Boca Raton, Florida 33432
21
22   Examination of the witness taken before:
23          LISA GREENWELL, Merit Reporter
            DAUGHTERS REPORTING, INC.
24          934 North University Drive
                    Suite 224
25          Coral Springs, Florida 33071
```

177

```
 1              APPEARANCE FOR THE PLAINTIFF
 2
 3         MARTIN E. O'BOYLE, pro se
 4         1280 West Newport Center Drive
           Deerfield Beach, Florida 33442
 5
 6
 7
 8
 9              APPEARANCE FOR THE DEFENDANT
                   ROBERT A. SWEETAPPLE
10
11         JOSHUA A. GOLDSTEIN, Esquire
12    THE LAW OFFICES OF COLE, SCOTT & KISSANE, P.A.
              1645 Palm Beach Lakes Boulevard
                        Second Floor
13            West Palm Beach, Florida 33401
14
15
16
17
18              APPEARANCE FOR THE DEFENDANT
                     Town of Gulf Stream
19         JEFFREY L. HOCHMAN, Esquire
20    THE LAW OFFICES OF JOHNSON, ANSELMO, MURDOCH,
              BURKE PIPER & HOCHMAN, P.A.
21            2455 East Sunrise Boulevard
                        Suite 1000
22            Fort Lauderdale, Florida 33304
23
24
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

178

```
 1                   I-N-D-E-X
 2
 3    DEPOSITION OF ROBERT A. SWEETAPPLE         Page No.
 4
 5              Continuing
 6    Direct Examination by Mr. O'Boyle            179
 7
 8
 9
10
11
12
13              E-X-H-I-B-I-T-S
14    Plaintiff                                   Page
15    No. 2              bill                       260
16
17
18
19              CERTIFIED QUESTIONS
20
21    Page                                      Line
      200                                          25
22
      209                                           9
23
24
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

179

```
 1      (Thereupon, the following proceedings were had:)
 2  BY MR. O'BOYLE:
 3      Q.  Mr. Sweetapple, what the court reporter give you
 4  a moment ago is the second amended complaint in the
 5  matter of Martin O'Boyle vs. Robert Sweetapple and Town
 6  of Gulf Stream.
 7      May I ask how that's marked, please?
 8      THE COURT REPORTER:  Plaintiff's 1.
 9  BY MR. O'BOYLE:
10      Q.  Mr. Sweetapple, for the sake of privity, I hope,
11  I'd like for you to go through, there are 70 paragraphs
12  in here, and tell me which ones are true, which ones are
13  false, which ones are partially true, which ones are
14  partially false and which ones you don't know?
15      A.  Okay.
16      MR. GOLDSTEIN:  I'm going to object to the
17  form of this question.  It's an improper question
18  to ask.
19      THE WITNESS:  Let me read this.
20      MR. O'BOYLE:  Sure.  Take your time.
21      MR. GOLDSTEIN:  Moreover, I set forth that
22  any position with respect to the allegations that
23  the Plaintiff would have been set forth in our
24  answer.  I suspect you have a copy of our answer?
25      THE WITNESS:  There's notes on this,
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

180

```
 1  Mr. O'Boyle.  Do you want -- it says discuss
 2  settlement.  Do you want me to read that or do
 3  you want to give me a copy that has no notes on
 4  it?
 5  BY MR. O'BOYLE:
 6      Q.  How about if we do this, just --
 7      MR. HOCHMAN:  Do you waive the privilege?
 8      MR. O'BOYLE:  Have I waived the privilege?
 9  I'm a laymen.
10      MR. HOCHMAN:  Exactly my point, Mr. O'Boyle.
11  Thank you.  Finally you got caught up in it.  I
12  love it.
13      MR. O'BOYLE:  I got caught up in it.
14      MR. HOCHMAN:  Yes, you agree that you're not
15  a lawyer.
16      MR. O'BOYLE:  I don't think I ever
17  represented that I --
18      MR. HOCHMAN:  You asserted privilege before.
19      MR. O'BOYLE:  I'm allowed to assert a
20  privilege, lawyer or no lawyer.
21      MR. HOCHMAN:  Okay.
22      THE WITNESS:  Do you want to substitute this
23  for a clean copy?
24      MR. O'BOYLE:  I do.  And if I could -- give
25  me a moment.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

1    THE WITNESS:  I'll see if I can get this

2  decal off of here.

3    MR. HOCHMAN:  May I see the document,

4  please, Mr. Sweetapple.

5    THE WITNESS:  Sure.

6    MR. HOCHMAN:  Before you rip the decal off,

7  it is marked as an exhibit.  Just want to see

8  what we're doing here.

9    MR. O'BOYLE:  Do you have the other Second

10  Amendment.

11    MS. BAEZ:  You gave it to John.

12    MR. HOCHMAN:  Actually, it's only this page,

13  Page 3.  It's just discussed settlement which he

14  did.  I don't believe there's an issue.  It's all

15  up to you now.

16    MR. O'BOYLE:  This is Mr. Sweetapple?

17    MR. HOCHMAN:  Yeah, this is the one that's

18  marked.

19    MR. O'BOYLE:  Yeah.

20    MR. HOCHMAN:  Okay.  We'll use that one.

21    THE WITNESS:  Use the one with the

22  handwriting on it?

23    MR. HOCHMAN:  Yes.

24    THE WITNESS:  Okay.

25    MR. HOCHMAN:  Mr. O'Boyle, do you want me to

1  see if I can get in contact with the witness,

2  if I can have her show up even without a subpoena

3  or do you want to finish up with this deposition?

4    MR. O'BOYLE:  Well, we're going to be far

5  beyond 4:30 at this point.

6    MR. HOCHMAN:  So, tell me what you'd like me

7  to do?

8    MR. O'BOYLE:  If she'll come, that would be

9  great.  If you'll call her, sure.

10    MR. HOCHMAN:  I will try to call her.  My

11  question is, it seems odd, though, I am not going

12  to tell her to come if Mr. Sweetapple's

13  deposition is not going to be concluded.

14    MR. O'BOYLE:  Well, I think once we find

15  that out, we're going to have to make that

16  decision.

17    MR. HOCHMAN:  Well, I don't want to bother

18  her with a phone call to say I'll let you know.

19  I want to -- if you're saying --

20    MR. O'BOYLE:  Let's just get done because

21  we're --

22    MR. HOCHMAN:  Well -- but here's the point,

23  you wanted to stay on schedule at 4:30 was my

24  understanding.

25    MR. O'BOYLE:  Yeah, but let's not worry

1  about it right now.

2    MR. HOCHMAN:  But I'm saying, if you want

3  her to be here at 4:30 I have to call her now,

4  it's 4:00 o'clock.

5    MR. O'BOYLE:  I understand.

6    MR. HOCHMAN:  So, just give me an

7  instruction, the instruction is either A, please

8  try to call her, have her get here at 4:30 and if

9  she shows up, Mr. Sweetapple is done or don't

10  worry about it.

11    MR. O'BOYLE:  Let me use my words, I think

12  they're going to be the same.  If she shows up,

13  she shows up.  She knows she's supposed to as I

14  understand it.

15    MR. HOCHMAN:  I don't believe she does

16  because she's not under subpoena.

17    MR. O'BOYLE:  I understand.  If she's

18  supposed to show up.  If she doesn't show up, she

19  doesn't show up.  If she does show up, we can't

20  have two depositions at once unless I try new

21  things which I have no intent on doing.

22  So, let's go on with the deposition of

23  Mr. Sweetapple.

24    MR. HOCHMAN:  Okay.  Just because of that, I

25  am not then going to contact the witness in an

1  effort to get her here, even though she doesn't

2  have a subpoena, do we agree?

3    MR. O'BOYLE:  No, because I don't know

4  whether she doesn't -- I don't know any of that.

5  But let's go on with Mr. Sweetapple.

6    THE WITNESS:  Okay.  Can I start reading

7  this again because --

8    MR. O'BOYLE:  Please.

9    THE WITNESS:  -- little disruptive putting

10  it mildly.

11    MR. O'BOYLE:  Please, please, I apologize.

12    MR. HOCHMAN:  I can't see it any way.  And

13  whatever you have written down won't have any

14  impact on what I do in this case because I may

15  have things that help you.  You're not going to

16  help me.

17    MR. O'BOYLE:  Boy, is that an insult or

18  what.

19    MR. HOCHMAN:  No, it's just how I would

20  litigate.  It's not about you personally.

21    THE WITNESS:  It really is hard to read, I'm

22  sorry.  He wants to ask me about each sentence, I

23  want to give him my best answer.  You guys --

24    MR. HOCHMAN:  Did the man bun comment ran

25  you off?

185

```
 1          THE WITNESS:  Yeah, man bun, everybody
 2     laughing.  I read in quiet usually.  This is a
 3     legal pleading, it's not like reading, you know,
 4     the comics.
 5  BY MR. O'BOYLE:
 6     Q.  Mr. Sweetapple, please don't let your counsel --
 7     A.  Okay.
 8     Q.  Thank you.
 9     A.  You want me to stop at Count I, which is me, or
10  you want me to go on to Count II?
11     Q.  I'd like you to go through all 70, but if you
12  want to do it a piece at a time, that's fine with me.
13     A.  So, I'll go through the whole thing.  I thought
14  you were just going to ask me about this one.
15          Okay.  Do you want me to start with the
16  sentencing one-by-one.
17     Q.  Yeah, the paragraphs one-by-one.
18     A.  And you want to know, let me write it down, true,
19  false, just like I'm doing an answer; true, false?
20     Q.  True, false, partially true, partially false.
21     A.  Just respond to it as I think is appropriate?
22     Q.  Yeah, or you don't know.
23          MR. GOLDSTEIN:  I'm going to object --
24          THE WITNESS:  If there's an objection, if
25     there's a legal conclusion or something, it goes
```

186

```
 1     into lawyer/client.
 2  BY MR. O'BOYLE:
 3     Q.  You're here --
 4     A.  So, Plaintiff, Martin E. O'Boyle -- Second
 5  Amended Complaint.  Plaintiff, Martin E. O'Boyle,
 6  Plaintiff, sues Defendants, Robert A. Sweetapple
 7  ("Sweetapple") and the Town of Gulf Stream ("Town") and
 8  alleges as follows:  Parties, jurisdiction, and venue.
 9     Q.  Let me stop you there, Mr. Sweetapple.  It would
10  probably be easier if we started at Paragraph 7 rather
11  than the introductory.
12     A.  Okay, that's fine.  The Defendant, Town of Gulf
13  Stream, "Town", is a municipal corporation of the State
14  of Florida seated in the Southern District of Florida.
15          I don't have any personal knowledge of that, but
16  I presume that's true.
17     Q.  One second.  Okay.
18     A.  Background, Plaintiff's history of First
19  Amendment activities with Town.
20     Q.  Where are you, Paragraph 8 is next?
21     A.  Well, there's two sevens, there's two sevens --
22  you've got seven and background and then you have
23  another background.
24     Q.  I'm sorry, under background is where I was asking
25  you to start.  I didn't see the first seven.
```

187

```
 1     A.  Okay.  Well, I responded to the first seven, I'm
 2  on the second seven.
 3     Q.  Okay.  That's fine.
 4     A.  So, we're at the same place.
 5     Q.  Okay.
 6     A.  So, Plaintiff's history of First Amendment
 7  activities with the Town.  Paragraph -- second seven,
 8  the Town is a relatively small municipality with
 9  approximately a thousand residents located within its an
10  approximately five hundred acres of land.
11          My opinion is, it is a small municipality.  I
12  have no idea how many residents live there.  And I have
13  no idea what the geographic area of the Town is.
14     Q.  Wait one second.  You have to have some idea of
15  the number of residents?  Example, you know it's not
16  hundred thousand?
17          MR. GOLDSTEIN:  Object to the form.
18          THE WITNESS:  Yeah.  I mean, I've seen
19     somewhere a statement of the number of residents.
20     I didn't focus if it's five thousand, one
21     thousand, five hundred, seven-fifty.
22          I don't know residents you mean people that
23     are domiciled there, people come down for the
24     season.  I have no idea if there's a thousand
25     residents, but, you know --
```

188

```
 1  BY MR. O'BOYLE:
 2     Q.  Okay.
 3     A.  I'm just trying to be as candid with you as I can
 4  be.
 5     Q.  Okay.  I appreciate it.
 6     A.  And I'll do that with all the sentences I can.
 7     Q.  Okay.
 8     A.  Okay.  So, eight is, Plaintiff is a resident of
 9  the Town owning and occupying the home located at
10  23 North Hidden Harbor Drive, Gulf Stream, Florida,
11  33483.
12          I believe you live in the Town.  I don't know, as
13  far as, resident, if you're a voter there.  I have no
14  knowledge in that regard.  I know you have another --
15  another home or homes or I've seen that somewhere.
16          I recognize that address from the documents I've
17  seen.  I presume that you own it.  I've never looked at
18  the title to see if it's in your name or not.
19          And it says you are occupying it and I presume
20  you're occupying it, but I have no personal knowledge of
21  any of those things.
22     Q.  Not even the address?
23     A.  Well, I've seen the address as being related to
24  you, but I don't know if you own it, occupy it, if
25  you're a resident.
```

189

```
1        Q.  Gotcha.
2        A.  As I understood from what I read, it was -- it
3   was under construction or it had been demolished or had
4   some damage from a hurricane and you were -- I remember
5   there was some issues with a Jiffy John in the front or
6   some kind of problems, I forget what it was.  I don't
7   know if you're living there now, but --
8        Q.  Well --
9        A.  What I read it was with regards to issues
10  concerning damage and code issues and something I read.
11       Q.  I understand.  I just --
12       A.  Okay.  So --
13       Q.  I don't like to use bathrooms, I try to go out
14  and use the Jiffy Johns.
15       A.  No, I was referring to it was under construction
16  and you were remodeling it or something.  That's -- I
17  don't know if you're living there now or not, or how
18  long ago that was.
19       Q.  Thank you.
20       A.  Okay.  Nine, Plaintiff is an avid supporter of
21  Florida Public Record Law and, in an exercise of his
22  constitutional and statutory rights, has over the years
23  submitted numerous public records requests in the Town
24  and various other municipal agencies.
25            I don't know if you're an avid supporter of
```

190

```
1   public -- Florida's Public Records Law.  I've never had
2   any conversations with you, so I don't know who you
3   support or what you support.
4        I don't know if you're exercising your
5   constitutional and statutory rights.
6        And from what I have read, you have, over the
7   years, submitted, from what I can see, several thousand
8   public records requests to -- of what I'm aware of, is
9   the Town, the State Attorney, the Town of Long Port.
10       I don't know that I'm aware of any other
11  municipalities or agencies as I sit here.
12       Q.  Where is that, I'm missing --
13       A.  Number nine.
14       Q.  When you say "thousands"?
15       A.  I said you asked me -- you have submitted
16  numerous, I said I know that you've submitted -- I call
17  thousands numerous.
18       Q.  I see.
19       A.  I don't know what you call numerous.
20       Q.  What would you call --
21       A.  I don't call a hundred numerous.
22       Q.  What do you call fifty thousand?
23       A.  Numerous.
24       Q.  One thousand numerous, fifty thousand numerous?
25       A.  Well, I'm just trying to just tell you how I read
```

191

```
1   numerous.  So, I'm saying, I think what you said here
2   about numerous is true because of the numbers I'm
3   familiar with --
4        Q.  Okay.  So, let's go back over it.
5        A.  -- from what I read.
6        Q.  The Florida Public Records Law, does that have
7   anything to do with New Jersey?
8        A.  But it says in an exercise of his constitutional
9   and statutory rights has over the years submitted
10  numerous public records requests to the Town and various
11  other municipalities and agencies.
12       So, I took that to mean -- I'm telling you what I
13  know about.  So, I know about New Jersey, the State
14  Attorney and Gulf Stream.
15       Q.  Tell me --
16       A.  I take that back.  I think I know -- I am not
17  sure it was you personally, but I -- something about
18  Delray.
19       Q.  Tell me --
20       A.  Talking about you personally, right?  Just in
21  your name?
22       Q.  Tell me what you know about Long Port,
23  New Jersey?
24       A.  That's my work product.  I know a lot about
25  Long Port because I've done a lot of investigation about
```

192

```
1   Long Port as part of my representation of the Town.
2        Q.  I see.  You agree with me, do you not, that New
3   Jersey, a Florida Public Records Law, is not a law that
4   is enforceable or even existing in the State of New
5   Jersey, do you agree with that?
6            MR. GOLDSTEIN:  Object to the form.
7            THE WITNESS:  That's a legal opinion.
8   BY MR. O'BOYLE:
9        Q.  But give me your laymen's opinion?
10           MR. GOLDSTEIN:  Form.
11           THE WITNESS:  I'll try if I understand.
12       You're saying that if somebody in New Jersey --
13       if there was a violation of the Florida Records
14       Law in Florida, can somebody sued in New Jersey
15       for that?
16  BY MR. O'BOYLE:
17       Q.  No, that's not what I asked at all.  What you
18  said was that the numerous public records requests were
19  submitted to, I think you said the State Attorney, the
20  Town of Gulf Stream and the State of Law Enforcement --
21  Long Port which is, of course, the State of New Jersey.
22       What I asked you was, how does the Florida Public
23  Records Law fit into records requests in the State of
24  New Jersey?
25           MR. GOLDSTEIN:  Asked and answered.
```

193

```
 1          THE WITNESS:  When I read this, I see the
 2     reference the Florida Public Records Law.  But
 3     then it goes on and it seems to expand and it
 4     says, in the exercise of his constitution and
 5     statutory rights.
 6          I look at constitution as being federal, as
 7     well as, any state rights.  And I look at
 8     statutory rights as not just being a Florida
 9     statutory rights, I'm looking at all your rights
10     when read it because seems to me that you're
11     being expansive and that's the way I read -- when
12     there's an indication of rights, it would be
13     evert conceivable right related.
14          And then it says, has over the years, so in
15     my mind, I went back to Long Port in the past.
16     And then when he see submitted numerous public
17     records requests to the town and various other
18     municipalities and agencies, I say that part is
19     true because I know you have submitted numerous
20     public records requests to Gulf Stream, the State
21     Attorney of the 15th Judicial Circuit and Long
22     Port, New Jersey.  That's the way I read it.
23 BY MR. O'BOYLE:
24     Q.  What would make you say that I submitted, I don't
25     know how many you said, to the 15th Judicial Circuit,
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

194

```
 1     that's what you said?
 2     A.  The reports I read -- Well, I am not going to
 3     give you my work product.
 4     Q.  I don't want your work product.
 5     A.  The only way I could answer that, Mr. O'Boyle,
 6     would be to give you my work product.
 7     Q.  Well, it's a matter of public record, isn't it,
 8     whether someone submits a public records request?
 9     Isn't that open to him and her and her and him?
10     A.  You can go find out that way, yes.
11     Q.  And did you find out another way?
12     A.  I am not going to disclose my work product.
13     Q.  I don't want you to disclose your work product.
14     Did you find out another way?
15     A.  I can't answer that question without disclosing
16     my work product.
17     Q.  I am not asking you to disclose your work
18     product.
19     A.  Okay, then, I can't answer your question.
20     Q.  Okay, that's fine.  Let's go back over it.
21     A.  Okay.  So, let's go to --
22     Q.  Florida Public Records Law, to your knowledge, is
23     that the law that enforces the Records Act which happens
24     to be called OPRAH, in New Jersey?
25     A.  Does the Florida Public Records Act enforce the
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

195

```
 1     New Jersey Open Public Records Act?
 2     A.  No.  The Florida Public Records of Law, is
 3     that -- could someone -- Let me ask you this way, could
 4     someone go to New Jersey and file a request for a public
 5     record under -- it's called OPRAH up there, and if they
 6     don't get it, sue them under the Florida Public Records
 7     Law?
 8     A.  Well, first of all I don't practice law in New
 9     Jersey, I'm not licensed in New Jersey, so I am not
10     going to give you any opinions about OPRAH.
11          But my -- and you're asking me for a legal
12     opinion, but I'll give you a lay opinion which is, I
13     don't think you could sue for the violation of a Florida
14     public records request for something that happened in
15     New Jersey.
16     Q.  Just so I'm clear, what you said -- and I am not
17     trying to put words in your mouth --
18          MR. GOLDSTEIN:  Object.
19 BY MR. O'BOYLE:
20     Q.  -- you can't utilize the Florida Public Records
21     Law to sue the State of New Jersey or any of its body
22     politics if they don't produce the records under OPRAH?
23          MR. GOLDSTEIN:  Object to the form.
24          THE WITNESS:  Well, I don't -- I don't -- I
25     don't profess to have any knowledge of OPRAH or
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

196

```
 1     New Jersey law.
 2          And I'm not going to give you a legal
 3     opinion about the Florida Act.  From a lay
 4     person, I told you, I don't know how -- from a
 5     lay view, it wouldn't seem to me that the OPRAH
 6     Law would have any provision that applied a
 7     Florida violation to it.  Nothing would preclude
 8     that.
 9          The State Legislature could, on principals
10     of comedy, for instance, permit that.  But I
11     haven't cited OPRAH and I am not licensed in New
12     Jersey to opine on that.  I'm just trying to give
13     you my reaction to your allegation which is what
14     you asked me to do.
15 BY MR. O'BOYLE:
16     Q.  Right.  And I'm trying to understand --
17     A.  Okay.  Well, try again because I'm sorry, I may
18     be misunderstanding something.
19     Q.  You said, Plaintiff is an avid supporter of
20     Florida's Public Records Law, what factual evidence do
21     you have?
22     A.  No, I said you said Plaintiff is an avid
23     supporter of Florida's Public Records Law.  I don't know
24     if you're a supporter or a detractor.
25     Q.  Okay.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

197

```
 1      A.  I don't know what your personal goals are.  I
 2   don't know what your personal ambitions are.
 3          From a personal standpoint, I have work product
 4   and I have legal conclusions that would cause me to have
 5   my own opinion.
 6          So, I've never spoken to you about whether you're
 7   an avid supporter of Florida's Public Records Law.
 8          Anybody who's an avid supporter of Florida Public
 9   Records Law, in my mind, would not have the reaction
10   about his conduct at the Florida Legislature has
11   publicly made about your conduct.
12      Q.  And what is that?
13      A.  From what I read from reports of committees,
14   there was numerous statements of outrage and concern
15   over your activities in the public record.
16      Q.  And they mentioned specifically Martin O'Boyle?
17      A.  They mentioned specifically the activities that
18   you're engaged in in Gulf Stream, Florida and I can't
19   remember if they actually say your name.
20      Q.  Okay.
21      A.  So, I don't know if you're an avid supporter or
22   avid detractor.  I don't know what your motivation is
23   for filing dozens and dozens of requests on the same
24   day.
25          And then when Mr. O'Hare comes in and does sixty
```

198

```
 1   the next day, I don't know if you're doing it because
 2   you're an avid supporter.
 3      Q.  Okay.  Do you have a trailer, a big busted up
 4   silver trailer in Deerfield Beach?
 5      A.  No.
 6      Q.  On the beach?
 7      A.  No.
 8          MR. GOLDSTEIN:  Object to form.
 9   BY MR. O'BOYLE:
10      Q.  Did you take one away?
11      A.  No.
12      Q.  Okay.  Does an entity in which you're involved in
13   have a big busted up trailer, one of those silver
14   Airstreams on the beach in Deerfield Beach or in the
15   Deerfield Beach area just north of Hillsboro?
16      A.  There's no -- the entity you're referring to,
17   Deerfield Beach, Inc., does not have a trailer on the
18   beach.
19      Q.  Do you have one?
20      A.  No.
21      Q.  Okay.  Was there one there?
22      A.  Was there one there?
23      Q.  Yes.
24      A.  Yes.
25      Q.  Okay.  What happened to it?
```

199

```
 1      A.  It has been removed.
 2      Q.  Okay.  Were there signs surrounding it saying,
 3   you can't cross the beach -- I'm sorry, the sand?
 4          In other words, if I was coming from the south,
 5   I'd have to stop and turn around.  And if I was coming
 6   from the north, I'd have to stop and turn around.  Were
 7   there signs like that sort of surrounding your trailer?
 8          MR. GOLDSTEIN:  Object to the form.
 9          THE WITNESS:  Two property had signs, I
10       think, that said private property, no
11       trespassing, but the public had a right to cross
12       to get to the high water mark and crossed
13       regularly.
14   BY MR. O'BOYLE:
15      Q.  Is that what the sign said or did the sign say --
16      A.  The sign said what they said.
17      Q.  I know.  Did the signs have the sheriff's emblem
18   and say, you will be arrested if you cross the --
19      A.  I'd have to look at the sign.  I don't think it
20   said you will be arrested if you crossed the sand.
21      Q.  Is it possible it said that?
22      A.  Anything's possible.  I'd have to see the sign.
23   I haven't seen the sign for some time.
24      Q.  How many records requests did you make in
25   connection with that?
```

200

```
 1      A.  You mean, requests with the litigation of
 2   Deerfield?
 3      Q.  Okay.
 4      A.  Town of Deerfield?
 5      Q.  Okay.
 6      A.  Two or three on behalf of Deerfield Beach, Inc.,
 7   I believe.
 8      Q.  And how about in total with Deerfield?
 9      A.  That's the only matter, I think, there were any
10   requests made.
11      Q.  And how many in total with Deerfield?
12      A.  I'm speculating, but I'd say two or three, best I
13   recall.
14      Q.  Okay.  Who's Laura Watson?
15      A.  Laura Watson is a former Circuit Court Judge in
16   the 17th Judicial Circuit.
17      Q.  And when you said "former", she retired?
18      A.  No, she was removed by the Florida Supreme Court.
19      Q.  And who represented her?
20      A.  I was one of her attorneys.
21      Q.  Okay.  Who was her lead attorney?
22      A.  I believe I would be considered lead with
23   Jay Spechler.  I'd say I would be considered a lead
24   attorney, at least.
25      Q.  And Jay Spechler, is he the one who owned the
```

201

```
 1    trailer along with you?
 2       A.  I am not going to go into the ownership of a
 3    company that I represent and that I am affiliated with.
 4    That's private, confidential business information of
 5    Mr. Spechler's, so I can't do that.
 6          MR. O'BOYLE:  Would you certify that, young
 7    lady.
 8          MR. HOCHMAN:  I also --
 9          THE WITNESS:  You want me to keep going with
10    the document?  You diverted to Deerfield.
11          MR. O'BOYLE:  Yeah, I want to keep going,
12    but I'm allowed --
13          THE WITNESS:  You can do what you want, I
14    just wanted to know if I should get back to what
15    I was doing or not.
16          MR. O'BOYLE:  We'll figure it out.
17          THE WITNESS:  I'll follow your lead,
18    Mr. O'Boyle.
19          MR. HOCHMAN:  I'm going to ask the court
20    reporter for another excerpt starting with this
21    discussion about the trailer and the beach and
22    ending with my request for another excerpt,
23    please.
24    BY MR. O'BOYLE:
25       Q.  How many records requests did you make with
```

202

```
 1    Ms. Watson or any issues surrounding Ms. Watson?
 2          MR. GOLDSTEIN:  Object to the form.
 3          THE WITNESS:  My best recollection would be
 4    one.
 5    BY MR. O'BOYLE:
 6       Q.  And would that include the other lawyers in
 7    addition to you who represented her?
 8       A.  I couldn't speak for the other lawyers.  I don't
 9    have any recollection of theirs.  I know that I filed
10    one, I believe.  I believe I filed it with the Judicial
11    Qualifications Commission.
12       Q.  Did Mr. Spechler -- Spechler was a former judge?
13       A.  He was a judge for twenty some years, right.
14       Q.  And he was ousted, correct?
15       A.  No.
16       Q.  Judge Tobin did not denounce him?
17       A.  No.
18       Q.  What happened between him and Judge Tobin?
19       A.  Well, that's confidential.  I represented
20    Judge Spechler as well.
21       Q.  I see.  Okay, that's fine.
22          Okay.  In New Jersey, do you have any reason to
23    believe that making public records is a constitutional
24    right?
25       A.  I can give you a lay opinion and I -- I don't
```

203

```
 1    know as a lay person because I've never read the New
 2    Jersey Constitution.  I've never read OPRAH.  I don't
 3    know if it's a constitutional right.  I don't know if
 4    it's a statutory right.  I don't know if it's a Rule of
 5    Civil Procedure.  I haven't compared it to Florida law.
 6          So, I'm only giving you a lay opinion because I'm
 7    not a lawyer in New Jersey.
 8       Q.  So, your answer is you don't know?
 9       A.  I don't know.
10       Q.  Okay.  Thank you.
11          Then we go on and said, has over the years
12    submitted numerous public records requests to the Town
13    and various other municipalities and agencies.
14          What does numerous mean?
15          MR. GOLDSTEIN:  Asked and answered.
16          THE WITNESS:  Numerous, to me, in this
17    context meant like, I guess in my mind, more than
18    a hundred.  Just like when I read various, I
19    thought it meant three or more which is why I
20    said I thought it was true because I had three in
21    my mind.
22          So, numerous meant to me over a hundred and
23    various meant there were three and I counted
24    three.
25
```

204

```
 1    BY MR. O'BOYLE:
 2       Q.  Okay.
 3       A.  So, I said, I think I understand what you're
 4    saying.
 5       Q.  Okay.  So, numerous as it's written here, you
 6    think it means over a hundred?
 7       A.  First thing that came to my mind is I said that's
 8    true because numerous, yeah, that to me is numerous.
 9       Q.  Okay.  That would be over a hundred?
10       A.  I knew there were thousands, so I said, sure,
11    it's over a hundred, that's numerous.
12       Q.  Well, now you do said I knew.  You didn't say I
13    heard or I thought, you said you knew there were
14    thousands.
15       A.  Okay.  I should say I read, I had information and
16    I concluded, but I did not count.
17       Q.  Okay.  Now, when you said "you read", were you
18    reading the National Enquirer?
19          MR. GOLDSTEIN:  Object to the form.
20          THE WITNESS:  I'm not going to disclose my
21    work product.
22    BY MR. O'BOYLE:
23       Q.  Telling a -- what newspaper you're reading is
24    work product?
25       A.  I didn't say I read a newspaper, you said that,
```

205

```
1    Mr. O'Boyle.
2              MR. O'BOYLE:  Can you read Mr. Sweetapple's
3         answer?  I think it was one or two questions back
4         and I think you used the term newspapers.
5              THE COURT REPORTER:  You used the word
6         newspapers.  I'm all the way back to Judge Tobin
7         and Spechler and there's no word newspaper.
8    BY MR. O'BOYLE:
9         Q.  Okay.  How many, to your knowledge, records
10   requests did I submit to the Town?
11        A.  What time period?  I shouldn't even ask you
12   because I wouldn't answer that without having the tally
13   in front of me because I couldn't, in my mind, isolate
14   it per month or take you from March to March.
15        Q.  Okay.  So, where it says, over the years
16   submitted numerous public records requests of the Town
17   and various other municipalities, you don't know what
18   that means?
19             MR. GOLDSTEIN:  Object to the form.
20             THE WITNESS:  I know what it means to me.  I
21        think I've told you.  To me, it meant that you
22        had submitted, at least, a hundred and that
23        seemed true, was true from everything I had seen.
24             And it meant that there were, at least,
25        three municipalities or agencies.  And that, I
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

206

```
1         believe, is true from what you've read and seen.
2    BY MR. O'BOYLE:
3         Q.  So, there were three agencies and a hundred
4    records requests, did I get that right?
5              MR. GOLDSTEIN:  Object to the form.
6              THE WITNESS:  No.
7    BY MR. O'BOYLE:
8         Q.  Could you help me out?
9         A.  I said when I -- when I read this and -- when you
10   said numerous, you don't put a number.  So, in my mind I
11   said -- without even thinking about it, I said more than
12   a hundred.  To me, that's what numerous meant.
13        I said, I know that there's more than that.  That
14   seems numerous to me.  So, since there are thousands,
15   numerous would be certainly met.
16        And then when I saw various other municipalities
17   and agencies, various has to be three or more.  And I
18   could think of three, so I said that's true.
19        So, you're asking me what I believe just sitting
20   here reading this is true, false, somewhat true, I'm
21   going through each phrase and trying to do that.
22        Want to move to the next one?
23        Q.  Hold on.  Is hundred, in your opinion, acceptable
24   to a Town like Gulf Stream?
25        A.  I don't have an opinion as to acceptable or
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

207

```
1    unacceptable.
2         Q.  Okay.  Is a hundred, in your opinion, is that
3    excessive?
4         A.  I'm not going to give you my legal opinion.
5         Q.  I don't want it.
6         A.  And you asked me if I thought this statement in
7    Paragraph 9 was true with regard to submitting numerous
8    public records requests and I've answered that.
9         I'm not going to give you my opinion as to
10   quantitative issues or legal issues.
11        Q.  Give me your lay opinion, if you will?
12        A.  As to what?
13        Q.  As to whether a hundred is excessive?
14             MR. GOLDSTEIN:  Form.
15   BY MR. O'BOYLE:
16        Q.  I'm not a lawyer and I have my opinion as to
17   what --
18        A.  Well, I'm not going to give you -- I don't have
19   an opinion on that, so I don't have enough facts.  I
20   don't know is it being done to target a Town so that --
21   by requests by an entity that isn't real to intimidate
22   them to do what you want as Mr. Chandler was describing
23   with the hundred requests from Cafi with the Commerce
24   Group.  You want me to tell you whether you think that's
25   inappropriate?  That's a legal conclusion, so I am not
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

208

```
1    going to give you that.
2         Q.  And that's fine.  But again, you could give me a
3    layman's opinion as opposed to a legal opinion?
4              MR. GOLDSTEIN:  Asked and answered.
5              THE WITNESS:  What's that?
6    BY MR. O'BOYLE:
7         Q.  I said, you can give me a layman's opinion?
8         A.  I can't.
9         Q.  You can't?
10        A.  No.
11             MR. GOLDSTEIN:  Asked and answered.
12   BY MR. O'BOYLE:
13        Q.  Okay.
14        A.  I haven't thought of records requests as a layman
15   ever.
16        Q.  Okay.  Are you familiar with the most recent
17   Supreme Court decision in records?
18        A.  Justice Pariente's decision regarding attorney's
19   fees?
20        Q.  I think it went beyond attorney's fees.
21        A.  Yes, I've read that opinion.
22        Q.  Okay.  So, doesn't that opinion make a difference
23   whether you were well intended, bad intended, harassing,
24   doesn't make any difference at all in the scheme of
25   making public records?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

209

```
 1         MR. GOLDSTEIN:  Object to form.
 2         THE WITNESS:  Opinion speaks for itself.  I
 3     am not going to give you my legal analysis of the
 4     opinion.  You have your own lawyers.
 5  BY MR. O'BOYLE:
 6     Q.  Okay.
 7     A.  You will argue what you believe the opinion says
 8  and we'll argue what we believe the opinion says.
 9     Q.  From a layman's point of view, if someone told
10  you that someone submitted ten thousands requests at
11  Gulf Stream, to Gulf Stream, how would you react to
12  that?
13     A.  I don't know.  I would be speculating.  If I --
14  it's impossible for me to give you an opinion as if I
15  were a laymen looking at this because my mind is totally
16  implicated with what I know as a lawyer and what I know
17  from all my work product.
18         So, I can't tell you -- if I didn't know all the
19  information I have, how I would think about this as just
20  a lay person.  But I imagine, I can speculate, but
21  that's all I can do.
22         MR. O'BOYLE:  Madam reporter, would you
23     kindly certify that, please.
24  BY MR. O'BOYLE:
25     Q.  We can now go on to the next one.
```

210

```
 1     A.  Paragraph 10?
 2     Q.  Yes.
 3     A.  Ten, occasionally Plaintiff's public records
 4  requests are not complied with and Plaintiff has his --
 5  has exercised his right under Florida Statute 119 to
 6  bring a lawsuit to enforce his rights under the public
 7  records laws.
 8         Whether or not your public records requests are
 9  complied with is a legal conclusion and legal opinion
10  which I will not provide and cannot provide to you.
11         I don't have any -- I've never seen any ruling
12  where that legal conclusion has been established.
13         And then it says, and Plaintiff has exercised his
14  rights under Florida Statute to bring a lawsuit to
15  enforce his rights under the public records law.
16         I am aware that you have brought numerous
17  lawsuits to enforce your rights under the public records
18  law.
19     Q.  Now, unless I heard wrong, Paragraph 10, the
20  words are "are not".  I thought you said "are"?
21     A.  No, are not complied with.  You said are not
22  complied with.  Maybe I spoke too quickly.
23     Q.  Okay.  So, occasionally Plaintiff's public
24  records requests are not complied with, okay.
25         Eleven.
```

211

```
 1     A.  Eleven, Plaintiff has filed approximately
 2  twenty-nine lawsuits against the Town for alleged
 3  violations of the public records law.
 4         I don't know if that's the amount.  As of the
 5  date of this lawsuit -- is the date of this lawsuit the
 6  date on the top, 6/19/2015?
 7         It says the date of the lawsuit, is that the date
 8  the lawsuit was filed or the date the second amended
 9  complaint was filed.
10     Q.  It looks like the date of the Second Amended
11  Complaint.
12     A.  So, in July or June of last year, as of the date
13  of this lawsuit, Plaintiff is currently engaged in
14  twelve lawsuits against the Town related to alleged
15  violations of the -- I believe that's close.  As of June
16  of last year, I think that you had approximately,
17  twelve cases pending.
18         Plaintiff has also filed one lawsuit for
19  violation of 2680114 Florida Stat because he was not
20  allowed to speak before the Town for a parking ordinance
21  in response to the Plaintiff's parking his truck at Town
22  Hall, a truck which contained politically charged
23  banners critical to the mayor.
24         I have never reviewed that lawsuit.  I have heard
25  that deposition testimony of you and someone else about
```

212

```
 1  it.  I don't have any firsthand knowledge of the Town
 2  passing a parking ordinance.  All I know is
 3  lawyer/client communication on that subject.
 4         I don't know if the truck contained politically
 5  charged banners critical to the mayor.  I remember
 6  seeing a picture of a truck at some point somewhere and
 7  I don't remember even what it said.
 8     Q.  Are you familiar, by the way, with the Sunshine
 9  Suit?
10     A.  The Sunshine Suit.  What do you mean by the
11  Sunshine Suit?
12     Q.  There's a lawsuit, it's -- I call it the Sunshine
13  Suit, it's a violation, I guess, of the Sunshine Law of
14  which the defendants are you, Mr. Randolph,
15  Mr. O'Connor -- Ms. O'Connor, I'm sorry, and the Town
16  and you are their counsel.  Does that sound right?
17     A.  There were a number of questions there.
18         MR. GOLDSTEIN:  I'm going to object to any
19     line of questioning or discovery related to other
20     pending legal actions as the Magistrate has
21     already ruled on upon that he will not allow
22     discovery in other pending legal actions.
23         THE WITNESS:  There were a number of
24     questions.  I think I understand what you're
25     getting at if you will indulge me.
```

213

```
1         MR. O'BOYLE:  Sure.
2         THE WITNESS:  I believe you're asking me if
3    I'm aware of a lawsuit that you brought along
4    with another entity against Ms. O'Conner,
5    Mr. Randolph, Mr. Morgan and me in the 15th
6    Judicial Circuit related to allegations of
7    violation of the Sunshine Law and the answer is
8    yes, if that's your question.
9 BY MR. O'BOYLE:
10    Q.  That is.
11    A.  Okay.
12    Q.  And you are counsel under that -- or in
13 connection with that suit, would that be correct?
14         MR. GOLDSTEIN:  Object to the form.
15         THE WITNESS:  I am.
16         MR. GOLDSTEIN:  Counsel for whom?
17 BY MR. O'BOYLE:
18    Q.  Counsel for the Defendants.
19         MR. GOLDSTEIN:  Are you asking if he's
20    counsel for all the named Defendants?
21         MR. O'BOYLE:  Yes.
22         THE WITNESS:  I don't believe so.  I need to
23    see my appearance to be sure, but I think
24    I'm -- I think my firm and Mr. -- I believe Josh,
25    your firm is counsel for my -- for me, I'm
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

214

```
1    personally a Defendant.
2         So, I believe my firm and Mr. Goldstein's
3    firm are counsel for me in that case.  It's hard
4    to keep track of you, Mr. O'Boyle.
5 BY MR. O'BOYLE:
6    Q.  Okay.
7    A.  Are we on the next paragraph?
8    Q.  We certainly are.  Rolling right along.
9    A.  If I'm not mistaken, that's twelve, okay.
10 Plaintiff, likewise, engages in various forms of
11 constitutionally protected acts, speech, with respect to
12 the Town.  For example, in 2013, Plaintiff painted the
13 facade of his Gulf Stream house with various political
14 messages criticizing the Town, its then mayor and its
15 commissioners as a result of the Town denying
16 Plaintiff's request for a building permit.  The Town
17 ultimately settled the dispute which made its way to
18 Federal Court issuing an apology to Plaintiff and
19 agreeing to pay him $180,000.
20         All right.  So, I know you engage -- you engage
21 in various forms of constitutionally protected acts,
22 speech, with respect to the Town, that's a legal
23 conclusion.
24         In 2013, Plaintiff painted the facade of his Gulf
25 Stream house with various political messages criticizing
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

215

```
1 the Town, its then mayor and its commissioners.  That
2 was before my involvement and I've never seen the facade
3 of your house painted with political messages.
4         I don't know if it was done as a result of the
5 Town denying Plaintiff's request for a building permit.
6 I don't know why you painted this political message on
7 the facade of your house.
8         I did hear you in your deposition say you did it
9 to file or -- I think, to file your First Amendment
10 Rights you said, or to enforce your First Amendment
11 Rights I heard your testimony, but I don't have any
12 personal knowledge as to why you did this.
13         I do know that the Town ultimately settled the
14 dispute and issued an apology and agreed to pay you a
15 sum of money because I did read a settlement agreement.
16    Q.  So, the part that says, which made it's way to
17 Federal Court, that's true, am I correct?
18    A.  I don't -- I don't know.  I don't remember if --
19 I remember reading.
20    Q.  It's in the settlement agreement?
21    A.  I remember reading the settlement agreement.  I
22 don't remember the caption if it had one.
23    Q.  Okay.  So, you don't know whether the settlement
24 agreement dealt with the Federal Court action?
25    A.  I don't recall that.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

216

```
1    Q.  Okay.  But you do remember that the settlement
2 agreement, there was issuing -- there was an apology
3 issued?
4    A.  My recollection is that was in the agreement.
5    Q.  And the 180,000?
6    A.  I didn't -- the number doesn't stick out with me.
7 I didn't -- didn't remember a number.
8    Q.  There was a number, though?
9    A.  There was a number, yeah.  I mean, somewhere in
10 my mind when I thought -- I think 170,000, so that's
11 close to what I think I'm remembering having read.
12    Q.  Trying to shorten me 10,000?
13    A.  No, I don't want to do that to you.
14    Q.  Okay.  Number 13.
15    A.  In February 2014, Plaintiff announced that he
16 would run for a council seat in Gulf Stream and
17 subsequently began campaigning throughout the Town and
18 neighboring municipalities.
19         I had no knowledge in February of 2014 that you
20 announced you would run for a council seat in Gulf
21 Stream.
22         And subsequently began campaigning throughout the
23 Town and neighboring municipalities.
24         Plaintiff placed numerous campaign signs
25 throughout the Town, many of which were conclusively
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

217

1　removed by Gulf Stream agents, officials.  The signs
2　were targeted for removal at the request of the Town
3　Manager Thrasher because the signs displayed political
4　content.
5　　　　I don't believe I saw any of your campaign signs
6　in the Town of Gulf Stream.  I don't know if your signs
7　were removed by Gulf Stream agents or officials.  I
8　don't know if the signs were targeted for removal at the
9　request of Town Manager Thrasher because the signs
10　displayed political content.  I have no knowledge of
11　that.
12　　Q.　That's fine.
13　　A.　Fourteen, Mr. O'Boyle, 14?
14　　Q.　Yes, yes.
15　　A.　During the same time period, Plaintiff engaged in
16　constitutionally protected speech by flying banners and
17　displaying signs that were critical of his opponents or
18　otherwise carried political message.
19　　　　I take that you're referring to February 2014.
20　And I never saw any banners or signs that were critical
21　to your opponents.  And I never saw any of your signs in
22　that time that carried political messages.
23　　　　In response, the Town threatened Plaintiff with
24　adverse action, including code enforcement hearings
25　carrying daily fines not to exceed $500 per day or per

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

218

1　sign per day if he did not remove his signs or otherwise
2　cease such political speech.
3　　　　I have no knowledge of any such -- no personal
4　knowledge of any of that.
5　　Q.　Okay.  Give me ten seconds, please?
6　　A.　Sure.
7　　　　　THE COURT REPORTER:  Can we take a break.
8　　　　　MR. HOCHMAN:  Let the record reflect it is
9　now 5:00 o'clock.
10　　　　　THE WITNESS:  This is when I'm supposed to
11　leave, but I'm going to do my whole seven hours
12　so I satisfy his needs.
13　　　　　(Thereupon, a recess was taken; after which
14　the following proceedings were had:)
15　　　　　THE WITNESS:  How much more time do I have
16　because I want to get to a baccalaureate for my
17　youngest daughter, but I want to give you all the
18　time.
19　　　　　MR. O'BOYLE:  I don't know.
20　　　　　MS. BAEZ:  I'll let you know.  You guys can
21　go back on the record.
22　　　　　THE WITNESS:  I'm happy to stay here.
23　　　　　MR. GOLDSTEIN:  I have an hour left based on
24　my calculation.
25　　　　　MS. BAEZ:  It's possible just let me check

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

219

1　on it.
2　　　　　MR. O'BOYLE:  What are you calculating?
3　　　　　MS. BAEZ:  You guys can go back on.
4　　　　　MR. O'BOYLE:  I think that's a good idea.
5　Spotlight is on you.
6　　　　　I think we're 13.
7　　　　　MR. GOLDSTEIN:  No, we just finished 13.
8　　　　　THE WITNESS:  Where were we?
9　　　　　MR. GOLDSTEIN:  We were in 13 -- 14, I think
10　we were on 14.
11　　　　　THE WITNESS:  Do you have any questions on
12　13, Mr. O'Boyle.
13　　　　　MR. O'BOYLE:  No, I do not.  I think he's
14　right.
15　　　　　MS. BAEZ:  I have an hour-and-a-half.
16　　　　　MR. HOCHMAN:  That's not going to be
17　acceptable to me.
18　　　　　MS. BAEZ:  I didn't ask.  I'm saying, that's
19　what I have.
20　　　　　MR. O'BOYLE:  That's what the seven hours
21　comes to, right?
22　　　　　MS. BAEZ:  Yeah.
23　　　　　MR. HOCHMAN:  I understand the notion of
24　seven hours is an approximate, but I don't think
25　starting at 9:00 and ending after 7:00 o'clock

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

220

1　is appropriate.
2　　　　　MR. O'BOYLE:  Anyway, we're not going to go
3　into that, we're going to go through it and if
4　you want to walk out, you'll walk out.
5　　　　　THE WITNESS:  Okay.  Ready?
6　　　　　MR. O'BOYLE:  I am.
7　　　　　THE WITNESS:  During this same time period,
8　Plaintiff engaged in constitutionally protected
9　speech.  I thought we did this by -- yeah, 14.
10　　　　　MR. GOLDSTEIN:  Yeah, I think we're on 14.
11　　　　　THE WITNESS:  I said -- I'll do it again if
12　you want.
13　BY MR. O'BOYLE:
14　　Q.　Just one second.  Let me look at it because you
15　may be right.  I don't think we did 14.
16　　A.　Okay.  So, during the same time period, Plaintiff
17　engaged in constitutionally protected speech by flying
18　banners and displaying signs that were critical of his
19　opponents or otherwise carried political messages.
20　　　　So, I don't have any personal knowledge
21　concerning whether or not you were engaging in
22　constitutionally protected speech.  I don't know if you
23　were flying banners or displaying signs in February of
24　2014.  So, I don't know if they were critical of your
25　opponents or otherwise carried political messages.

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

221

```
 1          And then, I have no personal knowledge with
 2   regard to the statement that the Town threatened
 3   Plaintiff with adverse action, including code
 4   enforcement hearings, carrying daily fines not to exceed
 5   $500 per sign per day if he did not remove his signs and
 6   otherwise cease such political speech.
 7     Q.  Before we go to 15, let me ask you this, were you
 8   aware that I was arrested in the Town?
 9     A.  When?
10     Q.  I'm going to say three to four months ago.  It
11   was after a 5:00 o'clock meeting, one of the late
12   meetings, and they had two boards in the lobby and a lot
13   of propaganda.  You may have even been there that night,
14   although I don't really remember you.
15     A.  No, I wasn't there.
16     Q.  Okay.
17     A.  I didn't see you get arrested.
18     Q.  Okay.
19     A.  No.
20     Q.  And I was told later on that the only reason that
21   I was arrested is because they knew I was going to sue
22   the Town for their conduct and they wanted to get on an
23   even playing ground, playing field?
24     A.  I have no knowledge.
25     Q.  You have no knowledge of that?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

222

```
 1     A.  No.
 2     Q.  Okay.  Fair enough.
 3     A.  Where was I again?
 4         MR. GOLDSTEIN:  Fifteen.
 5   BY MR. O'BOYLE:
 6     Q.  Fifteen.
 7     A.  Fifteen, right.  As a result of the removal of
 8   his campaign signs, the threats of official adverse
 9   action of his political signs were not removed and other
10   conduct that -- by the Town.  Plaintiff filed another
11   federal action against the Town in March 2014.
12         I had no personal knowledge of that.
13     Q.  Okay.
14     A.  After the March 2014 election, the Plaintiff
15   continued to criticize Town officials with banners on
16   the side of his truck which he would park from time to
17   time at Town Hall to ensure maximum visibility and
18   political effectiveness because Town Hall is the seat of
19   the Town's legislative judicial and executive branches.
20         As I told you at some point, I became aware of a
21   fact that a sign -- regarding the towing of a truck, but
22   that's my work product.  I have no knowledge of the
23   March elections, your criticizing Town officials with
24   banners on the truck during the election or any of that.
25     Q.  Okay.  Let me, before we go on to the next one,
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

223

```
 1   are you a member of the Gulf Stream Racquet and Tennis
 2   Club?
 3     A.  No.
 4     Q.  Are you a member of any clubs?
 5         MR. GOLDSTEIN:  Object to the form.
 6   BY MR. O'BOYLE:
 7     Q.  In that area, the Delray?
 8     A.  No.  I was a summer member of the Ocean Club many
 9   years ago when my children were at Gulf Stream, but they
10   only liked that when they were little.
11     Q.  Does your wife know my wife, Sheila?
12     A.  I believe they did.
13         MR. GOLDSTEIN:  Object to form.
14   BY MR. O'BOYLE:
15     Q.  They're both still alive, right?
16     A.  I mean, they knew each other -- they know each
17   other.  They were at Gulf Stream School as mothers
18   together.
19     Q.  And do they still spend time together to your
20   knowledge?
21     A.  Not that I'm aware of, but I don't ask my wife
22   her -- about her friends and who she talks to or --
23   unless she tells me something.  I know she held your
24   wife in very high regard.
25     Q.  Has she said anything derogative, if that's the
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

224

```
 1   right word, about my wife to your knowledge?
 2     A.  Who is that?
 3     Q.  Your wife?
 4     A.  Well, I wouldn't divulge my husband/wife
 5   communications, but I can tell you that I'm remembering
 6   back from many years ago and she had very high regard
 7   for Sheila.
 8     Q.  And you didn't want to answer that because of the
 9   spousal privilege?
10     A.  Well, I don't want to go into -- I don't want to
11   open the door to talking about everything I talk to my
12   wife, but that was said not in confidence.
13         And I remember, if I'm not mistaken, that your
14   wife and my wife were room mothers, maybe, for fifth
15   grade for your daughter -- one -- your daughter and one
16   of my daughters, and they worked together.
17     Q.  Did you ever invite or did anyone in your family
18   ever invite anyone over to your home for a -- for
19   something social?
20     A.  Anyone over or anyone in your family over?
21     Q.  Anyone over for something social who you had
22   charged with the unauthorized practice of law?
23         MR. GOLDSTEIN:  Object to the form.
24         THE WITNESS:  Are you referring to Jonathan,
25   obviously, is that the person you're talking
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

## Page 225

```
 1        about?
 2             Has he ever been to my house for social
 3        events?  Not that I'm aware of.
 4   BY MR. O'BOYLE:
 5        Q.  Okay.
 6        A.  I don't remember -- I don't remember -- I don't
 7   think Jonathan was in any of my children's classes and I
 8   don't remember Jonathan as a young man at all.
 9        Q.  How about Sarah O'Boyle?
10        A.  Sarah had been to our house and Berkeley had been
11   to your house, I believe, when they were in fifth grade
12   or something.  How many years ago is that, fifteen?  I
13   don't know.  I'm getting -- at 62, I'm not wanting to go
14   count anymore.
15        Q.  Only two more than me, so --
16             Well, we stopped at 16, did we?
17        A.  No, we made it to 62 and 64.
18        Q.  You're a funny guy.
19        A.  So, let's see, 16.
20             MR. GOLDSTEIN:  I think we're seventeen.
21             THE WITNESS:  Seventeen, okay.  That was a
22        good year, too.
23             These are just a few of many examples of
24        Plaintiff's exercise of constitutionally
25        protected speech as it relates to the Town for
```

## Page 226

```
 1   the last -- for, at least, the past two years
 2   Plaintiff has displayed numerous signs and flown
 3   numerous banners critical of the Town, its
 4   mayors, its commissioners and other agents of the
 5   Town.
 6        Plaintiff has, likewise, attended numerous
 7   town meetings and events during which he has
 8   personally voiced his criticism of the same
 9   group.
10        I think the first sentence is a legal
11   conclusion.  I know you displayed banners for a
12   very brief period, during which it was anywhere
13   near two years.  I think, it was like a month or
14   two.  And I'm, again, going from like June 13th
15   to June 15th for two years.
16        I wasn't aware of any -- personally aware
17   of any signs that you were flying in Gulf Stream
18   or displaying in Gulf Stream.
19        The only thing that I can say is the work
20   product I have regarding learning about the
21   banners critical of the Town.  I have never -- I
22   don't believe -- I'm trying to remember if I ever
23   attended any town meeting where I've seen you.
24   I've watched videos.  I don't believe I've ever
25   seen you at a town meeting.  I don't think you've
```

## Page 227

```
 1        ever seen you at an event where you've criticized
 2        the group.  That's my best recollection.
 3   BY MR. O'BOYLE:
 4        Q.  We can move on.
 5        A.  Okay.  Plaintiff's above described constitutional
 6   speech and lawsuits were not undertaken and filed to
 7   harass the Town for any improper purpose.  Rather, each
 8   of the lawsuits filed by the Plaintiff against the Town
 9   was filed to enforce a specific constitutional or
10   statutory right which Plaintiff contends was violated by
11   the Town or its officials.  And the above described
12   speech was undertaken to voice legitimate concerns of
13   the Town's administration.
14        I have no personal knowledge of the lawsuits.  I
15   don't think I've read one of them.
16        I don't know what your purpose was for filing
17   these lawsuits.  I don't know if you contend that your
18   rights were violated by the Town in these lawsuits.  And
19   I don't know if you were expressing legitimate concerns
20   because I've never looked at those lawsuits.
21        Q.  Let me ask you this, are you familiar with the
22   public records law in Florida, Chapter 119, would that
23   be a true statement?
24        A.  I believe so.
25        Q.  Okay.  And you consider yourself and/or your firm
```

## Page 228

```
 1   a contractor of the Town of Gulf Stream?
 2        A.  That's a legal conclusion which I'm not going to
 3   provide you a legal opinion I am not going to provide
 4   you.
 5             MR. GOLDSTEIN:  Object.
 6   BY MR. O'BOYLE:
 7        Q.  Okay.  Do you have any public records, either
 8   personally or in your firm that would be available to a
 9   requestor in connection with the Town of Gulf Stream?
10        A.  That's a legal conclusion.  I'm not going to give
11   you my legal opinion.
12        Q.  So, if I made a request for a legal document as I
13   made to your counsel and you had it -- I say "you", I'm
14   using you or your firm interchangeably, would I receive
15   it?
16             MR. GOLDSTEIN:  Object to form.
17             THE WITNESS:  That's a legal conclusion that
18        would depend on a number of factors.  I'm not
19        going to give you my legal opinion even in a
20        vacuum which is what you're asking for.
21   BY MR. O'BOYLE:
22        Q.  What would be the number of factors?
23        A.  Did it relate to my representation of the Town or
24   did it relate to the personal matter, a firm matter,
25   some other client matter.  Am I a contractor.  Is it --
```

229

```
1    there are a number of factors such as those.
2       Q.  It would relay to your representation of the
3    Town?
4       A.  That would be one of the things, yeah.
5       Q.  Well, would there be any others?
6       A.  Yeah.  Am I contractor or not as a legal matter,
7    a thresh hold matter.
8       Q.  At the conclusion of a litigation -- and when say
9    "litigation", example, with myself and the Town of Gulf
10   Stream, and I ask you for your file, so you sit here
11   without looking at the law, do you believe that you
12   would have the obligation to produce it?
13          MR. GOLDSTEIN:  Object to the form.
14          THE WITNESS:  You're asking me yet, again,
15      for an opinion.  And I have a legal opinion, but
16      I'm paid to give my legal opinion to Gulf Stream
17      and I'm going to give my legal opinion to Gulf
18      Stream.
19          You have to either pay your lawyer or ask
20      your son to come up with your own legal theories
21      in this case.
22          I represent opposing parties.  I would think
23      by now you would understand that because we've
24      gone through this.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

230

```
1    BY MR. O'BOYLE:
2       Q.  I do understand it.  And I guess the best way to
3    answer it is for me to make a public request this
4    evening to you and your firm, whereupon, we'll expect a
5    response.  And if we don't expect a response, you could
6    expect a response.
7       A.  Mr. O'Boyle --
8          MR. GOLDSTEIN:  No, there's no question
9       pending.
10          THE WITNESS:  Yes.  What's the question?
11          MR. GOLDSTEIN:  Move to strike.
12   BY MR. O'BOYLE:
13      Q.  The question is, it would be a post that I
14   wouldn't want to take.  All I want to know is to have a
15   sense of how you would address such a request.  And it
16   sounds like to me that you don't want to tell me.
17          MR. GOLDSTEIN:  Asked and answered.
18          THE WITNESS:  Is that a question?
19   BY MR. O'BOYLE:
20      Q.  Yes.
21      A.  So, you want to know how I would address
22   something in the future without seeing it or doing any
23   research on knowing anything about it?
24          And all I can say is, that's speculation and I
25   can't answer that, Mr. O'Boyle, with all due respect.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

231

```
1       Q.  And with all due respect to you, Mr. Sweetapple,
2    anytime a records request is made, it's in the future.
3    It's not in the past, it's in the future.
4          If I make a records request to Mr. Goldstein,
5    it's in the future.
6       A.  Is that a question?
7          MR. GOLDSTEIN:  No, it's not a question.
8          MR. O'BOYLE:  Yes, it is a question.
9          MR. GOLDSTEIN:  No, it's not.  If you'd like
10      to form it in the phrase of a question, move to
11      strike your commentary.
12   BY MR. O'BOYLE:
13      Q.  Let me do it again and waste some time as
14   Mr. Goldstein says.
15          MR. GOLDSTEIN:  Object to commentary.  Move
16      to strike again.
17          MR. HOCHMAN:  Mr. O'Boyle, let me just let
18      you know it's after 5:00.  You know we'd like to
19      get out of here before 6:00.  And I don't think
20      you asking this witness about how he would handle
21      a future public records request is, in any way,
22      relevant to any allegation in the Second Amended
23      Complaint or any amended complaint.
24          Please, I'm asking if you can just go over
25      the issues that are in the lawsuit rather than
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

232

```
1    create new issues, it would be greatly be
2    appreciated.
3          MR. O'BOYLE:  And I would love to
4    accommodate you, but I have a job to do and I
5    intend to do it.
6          And I apologize.  If you went ahead and made
7    a schedule, remember with Ms. Randolph was
8    supposed to be here, she isn't, that was supposed
9    to be until 8:00 o'clock at night.
10          So.  If you made other plans, shame on you.
11          MR. HOCHMAN:  You say 8:00 o'clock at night,
12      why do you say that?
13          MR. O'BOYLE:  Because she was supposed to
14      start at 4:30 and end at 8:00 p.m.
15          MR. HOCHMAN:  I was not aware of that.
16          MR. GOLDSTEIN:  Neither party agreed to
17      having a deposition and stay until 8:00 o'clock.
18      You set that on your own.
19          MR. HOCHMAN:  And the notion was that if you
20      had a few questions to ask her, there would be
21      sufficient time to ask her, but not for an
22      extended deposition on a Friday right before a
23      holiday weekend.  I'm just asking you as a matter
24      of an accommodation --
25          MR. O'BOYLE:  I heard you and I'm -- I told
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

233

```
 1    you yesterday when you walked out or the day
 2    before whatever it was, that I was going to do
 3    the best I can and I got as close to the end as I
 4    could and you decided to walk out.  And that was
 5    your prerogative and you can walk out now.
 6    That's your prerogative or walk out anytime.
 7        I'm going to keep on doing this.  The more
 8    we have these discussions, the more time we're
 9    going to need.  So, I would ask you to take a
10    chill pill.
11        MR. HOCHMAN:  I'm going to make one last
12    comment, with respect to the issue of future
13    public records requests, that's what I'm talking
14    about.  If you want to go back to what you marked
15    as Exhibit Number 1 and talk about the
16    allegations, then that I believe it is relevant
17    and you can continue on that path.
18        MR. O'BOYLE:  Okay.  Have you been taking
19    all this down?
20        THE COURT REPORTER:  Yes.
21        MR. O'BOYLE:  Okay.  I am not going to
22    bother you to go all the way back then.
23        Where were we, Mr. Sweetapple?
24        THE WITNESS:  I'm following your lead at
25    this point.
```

234

```
 1    BY MR. O'BOYLE:
 2        Q.  Where did we leave off?  I know how disruptive
 3    Mr. Hochman can be, but let's try to --
 4        A.  Well, you were asking about future public
 5    records requests on which -- and what obligations there
 6    are legally to provide files once litigation is
 7    concluded, which has nothing to do with the pleading
 8    that's in front of me.
 9        Would you like me to go back and try to figure
10    out where we were before you diverted into that subject?
11        MR. GOLDSTEIN:  Nineteen.
12        THE WITNESS:  Nineteen.
13    BY MR. O'BOYLE:
14        Q.  Yeah, if you would like to do that.
15        A.  Okay.  So, I think -- I think Mr. Goldstein is
16    correct and I think 19 is the next paragraph.
17        Q.  Okay.
18        A.  Plaintiff used the above described lawsuits as
19    meritorious and necessary to enforce State and Federal
20    laws and with respect to, at least, some of the public
21    records lawsuits filed by Plaintiff, the Town's current
22    Mayor, Scott Morgan, has stated on the record that he
23    agrees the cases have merit.
24        I don't know what your view is of the above
25    described lawsuits.
```

235

```
 1    I don't know if they're necessary to enforce
 2    State and Federal laws.
 3        And I don't know what Mr. Morgan has stated on
 4    the record, and I don't know what record you're
 5    referring to.
 6        Q.  The Beatles White album.
 7        A.  If it's in a court proceeding or city meeting,
 8    what you're referring to.
 9        Q.  I'm joking.  Let's go to twenty.
10        A.  Okay.  In response to the Plaintiff's lawsuit,
11    the Town, through the actions of its mayor, its town
12    manager, the town police force and Sweetapple have
13    endeavored to forego Defendant/Plaintiff's various cases
14    on the merits and have opted instead to engage in
15    threats, intimidation and harassment designed to cause
16    Plaintiff to dismiss his lawsuits against the Town.
17        Okay.  So, I don't believe I have endeavored to
18    forego defending the lawsuits I'm handling on the
19    merits.  I think I have vigorously attempted to defend
20    those cases on the merits.
21        I don't think I have ever spoken to you, written
22    to you, threatened you, intimidated you, harassed you, I
23    don't think I've ever done anything to cause you to
24    dismiss your lawsuits against the Town.
25        And let me go on, next page.
```

236

```
 1        Q.  Wait, wait, wait.  In Paragraph 20, if I'm
 2    correct, that you told Ms. O'Connor that you were going
 3    to get to me through my son, would you consider that a
 4    threat?
 5        A.  First of all --
 6        MR. GOLDSTEIN:  Object to the form.
 7        THE WITNESS:  -- a threat is when you say
 8    something to someone and I haven't spoken to you
 9    ever about any of this litigation, I don't
10    believe, at any time, nor have I made any threats
11    to your counsel, nor have I intimidated you or
12    harassed you.
13        I did not say to Ms. O'Connor in front of
14    anyone or at any other time that I was going to
15    get to you through your son.
16        I have a pending -- I had a pending motion
17    to disqualify the O'Boyle Law Firm and you had a
18    reaction to it, apparently.  And if you deemed
19    that as intimidation or threat or harassment, I'm
20    sorry, that's called a legal proceeding.
21
22    BY MR. O'BOYLE:
23        Q.  If it were stated out in the hallway of a public
24    building, a courthouse, that's called a legal
25    proceeding?
```

237

```
 1              MR. GOLDSTEIN:  Object to form.
 2              THE WITNESS:  No, I'm saying the Motion to
 3         Disqualify the O'Boyle Law Firm is part of a
 4         legal proceeding.
 5    BY MR. O'BOYLE:
 6         Q.  I don't -- I don't know whether --
 7         A.  That's not harassment or threatening or
 8    intimidation, so I don't know what you're referring to.
 9    And I did not say that I was going to get to you through
10    your son.
11         Q.  Would you like to --
12         A.  No, no.  In fact, I --
13              MR. GOLDSTEIN:  Object to the form.
14              THE WITNESS:  I spent time with your son and
15         had a nice chat with him at one of the
16         depositions.  I have no desire to hurt your son
17         or to hurt you.
18              I have a desire to do my job and I have to
19         do my job as the facts come to me.  And when I
20         got involved in this case, I had no idea that
21         defending public records cases was going to
22         result in someone calling me in July and telling
23         me they wanted to report criminal or fraudulent
24         behavior.
25              But, Mr. O'Boyle, I don't make my cases.  I
```

238

```
 1         don't choose my facts.  I don't choose my
 2         witnesses.  What I do do, is I try to ethically
 3         and competently discharge my duty to my client.
 4         And unfortunately, I have to do it regardless of
 5         who the other side is.
 6    BY MR. O'BOYLE:
 7         Q.  And I'm not -- I'm not disputing that.
 8         A.  Well, thank you.  I'm glad you're not disputing
 9    that.
10              MR. GOLDSTEIN:  There's no question pending.
11    BY MR. O'BOYLE:
12         Q.  You said in July something about criminal and
13    then another type of behavior.
14              MR. GOLDSTEIN:  Objection, mischaracterizes
15         his testimony.
16              THE WITNESS:  What are you referring to?
17              MR. O'BOYLE:  Young lady, would you read
18         that back to make Mr. Goldstein happy?
19              MR. GOLDSTEIN:  I know what his testimony
20         is, you don't need to make me happy and read back
21         my client's testimony.
22              MR. O'BOYLE:  Would you kindly.
23              MR. GOLDSTEIN:  You need to ask the next
24         question.
25              MR. O'BOYLE:  Would you kindly read that
```

239

```
 1         back, please.  We want to see him have a smiley
 2         face.
 3              MR. GOLDSTEIN:  Move to strike commentary.
 4              THE WITNESS:  I believe I said that Mr. -- I
 5         didn't choose to have Mr. Chandler call me and
 6         tell me that he wanted to report criminal or
 7         fraudulent conduct to me.
 8              When I got involved in this litigation, I
 9         thought it was going to be public records
10         litigation.  I didn't know public records were
11         going to be in this dimension.  I didn't --
12              MR. GOLDSTEIN:  There's no question.
13    BY MR. O'BOYLE:
14         Q.  So, Mr. Chandler said that I was engaged in
15    criminal activity.
16              MR. GOLDSTEIN:  Asked and answered.
17              THE WITNESS:  When Mr. Chandler called me,
18         he called me, he said, to report criminal or
19         fraudulent activities involving Cafi.  And then
20         that's when I went into discussions immediately
21         about whether or not he had an attorney.
22              And then I believe his affidavit and his
23         statements discuss the fact that -- I think his
24         affidavit discussed the fact that he called me
25         and said that.
```

240

```
 1    BY MR. O'BOYLE:
 2         Q.  Did you advise him to go to the State Attorney's
 3    Office?
 4         A.  No.
 5         Q.  Why not?
 6         A.  Because I'm not his attorney.
 7         Q.  You're not his baby-sitter either.  The time that
 8    you spent on that huge interview and on the affidavit
 9    and so forth, if someone does something wrong and you're
10    a lawyer, aren't you supposed to report it?
11              MR. GOLDSTEIN:  Object to the form.
12              THE WITNESS:  In terms of -- in terms of
13         Mr. Chandler's statement, I went and took his
14         sworn statement and I did not give him any legal
15         advise.  I took it and, of course, then
16         appropriately investigated it.
17    BY MR. O'BOYLE:
18         Q.  Why did you not go to the State Attorney's Office
19    with that information?
20         A.  I'm not going to disclose the Town's work product
21    or communications with law enforcement with regard to
22    this matter.
23         Q.  It wouldn't be the Town, would it?  It would be
24    you, personally, as a member of the Bar.
25              Don't you have an obligation as a member of the
```

241

```
 1   Bar?
 2       A.  I'm not going to give you a legal opinion on
 3   that.
 4       Q.  All right.
 5       A.  Read the rules regulating the Bar.  Speak to your
 6   son.  It discusses what type of criminal conduct.  If
 7   it's your client you have to report, not some other --
 8   there's no special duty --
 9           MR. GOLDSTEIN:  Enough.
10           MR. HOCHMAN:  Ms. Court Reporter, I'm going
11       to ask for another excerpt which is the beginning
12       of this discussion about Paragraph 20 all the
13       testimony through this request, thank you.
14           Is this the third or fourth?
15           THE COURT REPORTER:  Fifth.
16   BY MR. O'BOYLE:
17       Q.  Which number?
18           MR. GOLDSTEIN:  Twenty-one.
19           THE WITNESS:  Ready for 21.
20   BY MR. O'BOYLE:
21       Q.  Yeah.  Is your voice all right?
22       A.  Pardon?
23       Q.  Is your voice all right?
24       A.  I'm starting to get a little horse.
25       Q.  Because Mr. Goldstein is answering all your
```

242

```
 1   questions.
 2           MR. GOLDSTEIN:  I was trying to help a long.
 3           THE WITNESS:  I appreciate your asking
 4       because my voice is getting a little horse, but I
 5       don't want to drink a lot of water because then I
 6       need another two-minute break.
 7   BY MR. O'BOYLE:
 8       Q.  Good enough for me.
 9       A.  A vicious circle.
10       Q.  So, 21?
11       A.  I think we're at the top of -- I was turning to
12   Page 5, so we were at constitutionally protected speech,
13   critical of the Town and its agents and ultimately move
14   from the Town due to pressure against Plaintiff and his
15   family.
16           I have done nothing -- as to the allegation as to
17   me I've done nothing.  I never asked you to cease your
18   constitutionally protected speech in any regard nor have
19   I asked you any of your attorneys to do that.
20           I have never, in any way, asked you to move from
21   the Town due to the pressure against Plaintiff and his
22   family.
23           So, I don't know what you're referring to there.
24       Q.  Okay.  Let me ask you this, did you ever threaten
25   Mr. O'Hare or any of his lawyers by saying something
```

243

```
 1   skin to, if you drop your lawsuits, we'll keep you out
 2   of the RICO?
 3           And when I say "you", I'm talking about
 4   Mayor Morgan, the Town, Ms. O'Connor, if you drop your
 5   lawsuits, we won't file a RICO suit against you.  Do you
 6   remember anything like that?
 7           MR. GOLDSTEIN:  Object to the form.
 8           THE WITNESS:  I'm not going to disclose any
 9       communications from the September 3rd mediation.
10           So, in terms if you want to know about
11       communications with Mr. Hannah, because I had no
12       communications with Mr. O'Hare directly other
13       than, I believe, in the September 3rd -- my
14       meetings with Mr. Hannah wore without Mr. O'Hare.
15           And in meetings with Mr. Hannah, I indicated
16       to him that the Town was considering and intended
17       to go forward with a case against Mr. O'Hare for
18       being part of an alleged scheme to defraud that
19       had been described by Mr. Chandler.
20   BY MR. O'BOYLE:
21       Q.  Why was Mr. Chandler not named in the RICO suit
22   considering his history, such as, fraud on the court,
23   such as, false indigent statements, such as, the most
24   prolific request of records in the state to my
25   knowledge, such as, being the one who made the request
```

244

```
 1   to Wanton Group, as well as, hundreds of other third
 2   party vendors, contractors, that are liable under 119?
 3           MR. GOLDSTEIN:  Object to the form.
 4           THE WITNESS:  First of all, you're calling
 5       for a legal conclusion.
 6   BY MR. O'BOYLE:
 7       Q.  No, I'm not.
 8       A.  A legal opinion as to why something wasn't done.
 9           Second of all, that wasn't my ultimate decision,
10   so I can't answer that.
11       Q.  Whose ultimate decision was it?
12       A.  The Town and consultation with the Richmond Greer
13   Law Firm.  And I believe -- I can't remember without
14   looking if the Jones Foster Law Firm was also a filer of
15   record, but I -- I just can't remember.
16       Q.  By the way, whose the town attorney for the Town
17   of Gulf Stream, it's not you, is it?
18       A.  I don't believe so.
19       Q.  Who is it?
20       A.  I think that would call for a legal conclusion.
21       Q.  As well?
22       A.  Yeah.  I mean, I don't know if there's a town
23   attorney.  I heard you ask those questions before.
24   Don't know if there's a town attorney.
25       Q.  Was it Morgan's decision to not go after
```

245

```
 1    Joel Chandler?
 2              MR. GOLDSTEIN:  Object to the form.
 3              THE WITNESS:  I am not going to disclose any
 4         communications that I had with my client with
 5         regard to any matter.
 6    BY MR. O'BOYLE:
 7         Q.  Chris O'Hare, what did he do, in your opinion,
 8    for him to get, for lack of a better way of saying,
 9    sucked into this RICO suit?  What did he do?
10              MR. GOLDSTEIN:  Object to the form.
11              THE WITNESS:  I'm not going to apprise you
12         with my legal opinion.
13              MR. GOLDSTEIN:  Go ahead.
14              THE WITNESS:  And I am not going to provide
15         you with my work product.
16    BY MR. O'BOYLE:
17         Q.  Okay.  Go to the next number now.
18         A.  Yes, sir.  If Mr. Goldstein will tell me what
19    that is?  I think I know, it's probably 21.
20              MR. O'BOYLE:  He'll probably answer for you.
21              MR. GOLDSTEIN:  Object.  Move to strike
22         commentary.
23              THE WITNESS:  So, we have Morgan's June 2,
24         2014 letter is the next heading.  Twenty-one, in
25         a June 2, 2014 letter from Morgan to all Town
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

246

```
 1         residents, Morgan noted that the Town's general
 2         fund reserves had fallen below an acceptable
 3         number and blamed this occurrence on the lawsuits
 4         filed by Plaintiff and another Town resident.
 5              I don't remember if I had ever seen that
 6         letter, so -- I don't live in the Town, I don't
 7         go to the Town very often.
 8              Twenty-two?
 9    BY MR. O'BOYLE:
10         Q.  Are you aware that Joel Chandler sent a letter, I
11    think an e-mail actually, to Chris O'Hare absolving him
12    from any obligations, liability and the like in
13    connection with the RICO suit and urged the City, or the
14    Town, to let him out of the suit?
15              MR. GOLDSTEIN:  Object to the form.
16              THE WITNESS:  I am aware that Mr. O'Hare
17         wrote a message that was read to the commission.
18    BY MR. O'BOYLE:
19         Q.  Mr. O'Hare or Mr. Chandler?
20         A.  Mr. Chandler regarding Mr. O'Hare.
21         Q.  Right.  And would I be correct in saying that
22    that met deaf ears?
23              MR. GOLDSTEIN:  Object to the form.
24              THE WITNESS:  No.
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

247

```
 1    BY MR. O'BOYLE:
 2         Q.  Okay.  What was the result that e-mail or letter
 3    being read to the commission?
 4              MR. GOLDSTEIN:  Object to the form.
 5              THE WITNESS:  In terms of the decision made
 6         to go forward?
 7    BY MR. O'BOYLE:
 8         Q.  Or to not erase him from the turmoil.
 9              MR. GOLDSTEIN:  Form.
10              THE WITNESS:  Mr. O'Hare was named in the
11         suit, but I'm not going to disclose to you my
12         communications with Mr. Chandler, my work
13         product with Mr. Chandler about Mr. O'Hare and
14         about Mr. Raider because that's work product or
15         their financial arrangements, I'm not going to
16         disclose any of that.
17    BY MR. O'BOYLE:
18         Q.  But Mr. Chandler sent Mr. O'Hare a communication,
19    you are not suggesting that's privileged, are you?
20         A.  No, not at all.  I'm saying that I am not going
21    to disclose my work product and my interviews with
22    Mr. Chandler before he sent that and that's all I'm
23    saying.
24         Q.  Okay.  Now, you're aware that we took
25    Mr. Chandler's deposition on Tuesday of this week?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

248

```
 1         A.  I am aware that it was finished on Tuesday of
 2    this week, but I know nothing about it.
 3         Q.  If I told you he called the Town of Gulf Stream a
 4    bunch of criminals, what would you say about that?
 5              MR. GOLDSTEIN:  Object to the form.
 6              THE WITNESS:  That would be speculating.  I
 7         haven't had a chance to think about that.
 8              My first reaction would be that people
 9         should not speak that way even in depositions.
10         That's reckless, irresponsible to any group of
11         people.  To say someone's a criminal, you know,
12         like that, I personally, you know, find that kind
13         of conduct irresponsible, but that's my own
14         personal reaction.
15              I'd have to hear the context and who the
16         people he was referring to and what the conduct
17         was, but the minute you hear a group of people
18         and they're all something, my dinger goes up.
19    BY MR. O'BOYLE:
20         Q.  Is that your laymen's opinion then?
21         A.  That's my laymen's opinion.
22         Q.  Thank you.
23         A.  That's all I can give you.
24         Q.  No, I understand.  Thank you.
25              And that statement that you just made, would that
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

249

```
 1   apply to me.  If someone were to call me a criminal?
 2            MR. GOLDSTEIN:  Object to the form.
 3            THE WITNESS:  Without getting into a
 4       layman's opinion, we're getting into my legal
 5       opinion.  And my legal opinion as an informed
 6       opinion that's a result of quite a bit of work
 7       product that I'm not going to share with you.
 8   BY MR. O'BOYLE:
 9       Q.  Joel Chandler, you, in my opinion, have much more
10   knowledge about him than you do about me.  He used the
11   term criminal with the Town, as I recall, were a bunch
12   of criminals or something like that, I forget the exact
13   words.
14       And what you said is, my word now, inappropriate,
15   you don't like that kind of stuff, shouldn't be said at
16   a deposition and so forth.
17       A.  My first reaction is that's offensive to -- to
18   latent group of people, public officials, unless you
19   have some evidence, you are making it for a public
20   purpose.
21       I know of no basis for calling the people I have
22   dealt with at Gulf Stream criminals.  I find it
23   offensive.
24       Q.  If Joel had called me a criminal, would you feel
25   the same way?
```

250

```
 1       A.  Would I be offended?
 2       Q.  Would you feel the same way?  I think you were
 3   beyond offended, but yes, would you feel offended?
 4       A.  In light of the facts that Mr. Chandler reviewed
 5   to me and in light of my work product, I'm not going to
 6   give you my legal opinion as to how I would react.
 7       Q.  Can you give me your laymen's opinion just as you
 8   did with -- as applied to the Town of Gulf Stream?
 9            MR. GOLDSTEIN:  Object to the form.
10            THE WITNESS:  No, because with regard to
11       Mr. Chandler's statement, I don't know what it
12       related to, I have no idea of any facts.
13       You just give me, in a vacuum, something
14       that he said with regard to you, I have quite a
15       bit of work product and knowledge.  And I'm -- I
16       don't have -- it's impossible for me to have an
17       lay opinion now.
18   BY MR. O'BOYLE:
19       Q.  And that lay opinion would be emanated from a
20   glass mountain of evidence?
21            MR. GOLDSTEIN:  Object to the form.
22            THE WITNESS:  I don't know what you're
23       referring to about a glass mountain of evidence.
24       I mean, if you're saying that the evidence I have
25       is not reliable, that's -- that's a determination
```

251

```
 1       to be made in different types of proceedings that
 2       are --
 3   BY MR. O'BOYLE:
 4       Q.  In connection with this litigation.  And again,
 5   I'm looking at it in the sense of a corral where the
 6   RICO, this litigation, the records litigation, so forth,
 7   all fit in there.  Do you feel it's appropriate for any
 8   of the lawyers to call anyone a terrorist?
 9            MR. GOLDSTEIN:  Object to form.
10            THE WITNESS:  I think in court I made a
11       reference to the fact that this was a form of
12       terrorism, that was with regard to the -- what I
13       explained to the court, I believed, was the
14       abusive filing.  And I did not say terrorism in a
15       middle east sense, I said that the conduct was a
16       form of terrorizing this Town.
17       And for instance, one day I heard testimony
18       you served over 350 public records requests on
19       the scanner fax machine and shut it down so that
20       the Town could not use its machinery.  And that,
21       to me, is terrorizing a Town.
22       Coming in and just inundating the Town with
23       public records requests for ulterior purposes, if
24       there are ulterior purposes, could be viewed, in
25       my lay opinion, as a form of terrorism, yes.
```

252

```
 1   BY MR. O'BOYLE:
 2       Q.  What does the Supreme Court say about that?
 3       A.  That's a legal -- a legal opinion and I'm not
 4   going to give you my legal opinion.
 5       And I believe that the growth of schemes to
 6   defraud that are increasing, including legal activities
 7   is an issue of law that, you know, I have an opinion on
 8   and I'm not going to share it with you.
 9       Q.  That's fine.  You said 450 requests.  And again,
10   this is not, maybe, the exact words, but with the goal
11   being to shut the Town down, fax machine didn't work or
12   copy machine didn't work?
13       A.  They couldn't use their equipment because you
14   just non-stopped kept sending public records requests
15   in.
16       And from a lay person, I would view that as an
17   attempt to abuse the law.  And unfortunately, what
18   happens when people try to use the law in abusive
19   fashions, is that society sometimes has to change the
20   laws and then everyone suffers from the conduct of a
21   few.
22       Q.  So, I think I understand.  So, what you're saying
23   is, just as an example, the sixty thousand records
24   requests that Mr. Chandler made in the last 12 weeks is
25   not abusive?
```

253

```
 1      A.  I am not going to give you my opinion on
 2  Mr. Chandler's conduct because it's a legal opinion.
 3      Q.  But you just gave me an opinion on the 35?
 4          MR. GOLDSTEIN:  Object to the form.
 5          THE WITNESS:  Yes, I did.  And I'm not going
 6      to give you a conduct -- I don't -- I don't have
 7      the details.  I can give you a lay person's
 8      opinion.
 9  BY MR. O'BOYLE:
10      Q.  Go ahead.
11      A.  Which is something smells pretty rotten when
12  people make 60,000 public records requests from one
13  entity.  Was it done in one week?  Was it done in one
14  day?
15      Q.  About twelve weeks.
16      A.  Okay.  Well, I can't -- I need -- I would need
17  more data.  It's very concerning to me because, as I've
18  said in court, anyone with ten lawyers and ten word
19  processors could robocall public records requests a
20  thousand a minute to any government agency in the state
21  and based on the current status of the law, bring an
22  agency to its knees.
23          And unfortunately, when people file public
24  records requests to be kill shots to generate lawsuits,
25  in my lay opinion, that's abusive.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

254

```
 1          When people then decide to target governments and
 2  then file thousands of requests, from my lay opinion, it
 3  appears abusive.
 4      So, I have learned, in my 36 years of practicing
 5  law, that there are people that have figured out how
 6  they can abuse laws.  And unfortunately, when they do
 7  and it becomes detrimental, oftentimes the law changes.
 8      So, I think that -- I think that that's my lay
 9  opinion.
10          THE COURT REPORTER:  I have to take a break.
11          THE WITNESS:  Let's take a break.
12          MR. O'BOYLE:  Certainly.
13          (Thereupon, a recess was taken; after which
14      the following proceedings were had:)
15          MR. O'BOYLE:  I'm ready.
16          THE WITNESS:  Okay.  So, let's go.  Which
17      number?
18  BY MR. O'BOYLE:
19      Q.  Before we got into the numbers, you had mentioned
20  a bit ago that it was the Town's decision to proceed
21  with the RICO suit?
22      A.  That's my understanding, yeah.
23      Q.  Okay.  And where did you get that understanding?
24      A.  I saw there was a vote.  I wasn't there, but I
25  read that somewhere.  That's the main basis for it.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

255

```
 1      Q.  So, you saw there was a vote.
 2          MR. GOLDSTEIN:  Is there a question pending?
 3          MR. O'BOYLE:  Pardon?
 4          MR. GOLDSTEIN:  Wondering if there was a
 5      question pending?
 6  BY MR. O'BOYLE:
 7      Q.  Do we need to go through it again?  If we
 8  will -- if you do, I will?
 9          MR. GOLDSTEIN:  No, that's --
10  BY MR. O'BOYLE:
11      Q.  Okay.  Did the Town pay you the $25,000
12  deductible on your insurance policy?
13      A.  They didn't pay it to me.
14      Q.  Did they pay it on your behalf, if not to you?
15      A.  I believe so.
16      Q.  Okay.  And that was -- they paid the money and
17  this was in connection with their insurance company or
18  yours?
19      A.  Mine.
20      Q.  I see.  And the $25,000 was applicable to what
21  litigation?
22      A.  This litigation, I believe.
23      Q.  The one that we're here for today?
24      A.  Yes, Mm-hum.
25      Q.  It wasn't in connection with the Sunshine Suit?
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

256

```
 1      A.  No, no, I'm counsel in that case and
 2  Mr. Goldstein just came in long after the deductible so
 3  expired or exhausted.
 4      Q.  I'm sorry, can you please speak up?
 5      A.  Yeah, I'm sorry.  The deductible and the
 6  representation was in this case.  Mr. Goldstein's firm
 7  just came in to -- they never came into the Sunshine
 8  case.
 9          MR. GOLDSTEIN:  We just entered an
10      appearance.
11          THE WITNESS:  They entered -- oh, did you in
12      the Sunshine case?
13          MR. GOLDSTEIN:  I think so.
14          MR. O'BOYLE:  Please don't coach the
15      witness, Mr. Goldstein.
16          THE WITNESS:  They entered an appearance in
17      the Cafi long after the deductible was
18      extinguished.
19  BY MR. O'BOYLE:
20      Q.  I'm sorry, Mr. Sweetapple, Mr. Goldstein was
21  speaking while you were and I only have one good ear.
22  So, if you can give that another go, I'd appreciate it.
23      A.  No.  As I understand it, the $25,000 deductible
24  did not apply to anything other than the case that we're
25  deposing me in.
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

257

```
 1      Q.   Okay.  And that was your insurance company and
 2   the twenty-five came from the Town, correct?
 3      A.   Yes.
 4      Q.   Okay.  In the Sunshine case, you're a Defendant,
 5   is that correct?
 6      A.   We've discussed that, yes.  You asked me that, I
 7   answered.
 8      Q.   And who's counsel for Robert Sweetapple?
 9      A.   My firm.
10      Q.   Okay.  And who is paying the bills for the
11   representation of Robert Sweetapple?
12      A.   I don't think there have been any bills issued.
13   I think that time is being accumulated.
14      Q.   Are you expecting the Town to pay the bills?
15      A.   That's speculative.
16      Q.   Well, it's not speculative.  I'm asking, are
17   they?  I'm asking you, are you expecting them?
18           MR. GOLDSTEIN:  Object to the form.
19           Argumentative.
20           THE WITNESS:  I'm keeping my records of my
21           time and I have no expectation.  I would be
22           speculating.
23   BY MR. O'BOYLE:
24      Q.   As a tax payer, I'm concerned about the amount of
25   money this is costing the Town.
```

258

```
 1   Are you intending to bill the Town or as you sit
 2   here today, are you intending to bill the Town?
 3      A.   I'm intending --
 4           MR. GOLDSTEIN:  Object to form.
 5           THE WITNESS:  I'm intending to actually bill
 6           you.  I filed a 57105 Safe Harbor Letter and I
 7           don't believe that your claim that I'm a
 8           government official and that my meeting with
 9           Mr. O'Boyle -- I mean, Mr. Morgan with no other
10           government official there in anyway, violates the
11           Sunshine Law.
12           So, I'm actually intending to seek fees
13           against you.
14   BY MR. O'BOYLE:
15      Q.   Just so I'm clear, there's a difference between
16   seek fees and collect fees.  Which one are you intending
17   to do?
18      A.   Both.
19           MR. GOLDSTEIN:  Asked and answered.
20   BY MR. O'BOYLE:
21      Q.   Both?
22      A.   I believe that -- I believe that I have a bona
23   fide claim for fees in light of the complete lack of any
24   justiciable issue.  And I'm -- based on what
25   Mr. Chandler told me, I expect you to be able to pay a
```

259

```
 1   small fee award without even hesitating.
 2      Q.   Well, you can't believe Mr. Chandler in
 3   everything he says, you know.
 4      A.   He was your employee, not mine.
 5           MR. GOLDSTEIN:  There's no question pending.
 6   BY MR. O'BOYLE:
 7      Q.   Do you believe what Mr. Chandler -- do you
 8   believe everything Mr. Chandler says?
 9      A.   Not everything he says, but --
10      Q.   What don't you believe?
11      A.   When I say I don't believe everything he says, I
12   mean, I take everything with a grain of salt.
13           There's -- I can't think of anything that
14   Mr. Chandler has told me that wasn't bourne out by my
15   investigation or that was contradicted by anything that
16   I read off the top of my head I can't.
17           Well, I can say that in light of -- in light of
18   what I know about the interview I had with him
19   concerning Mr. O'Hare, I took what he put in his letter
20   to Mr. O'Hare and didn't believe it.  That I can tell
21   you when saw that letter, I didn't believe it at all in
22   light of what I knew.
23      Q.   And what letter would that be?
24      A.   The letter that was read to the council or the
25   commission regarding why Mr. O'Hare shouldn't be
```

260

```
 1   involved in the lawsuit.
 2      Q.   And now you successfully confused me.
 3      A.   You asked me if it there's anything that
 4   Mr. Chandler told me that I didn't believe.  And I'm
 5   elaborating that the only thing I can think of is his
 6   letter to the commission based on the things that he
 7   told me about Mr. O'Hare, I took that with a complete
 8   grain of salt and didn't believe it.
 9           It contradicted what I had been told and I saw it
10   as just a coverup.
11      Q.   Okay.  Mr. O'Hare is a pretty big fellow.  He
12   would be kind of hard to coverup, wouldn't he?
13           MR. GOLDSTEIN:  Object to the form.
14           THE COURT REPORTER:  Number 2.
15           (Thereupon, Plaintiff's Exhibit Number 2 was
16           marked for Identification.)
17   BY MR. O'BOYLE:
18      Q.   Now, Mr. Sweetapple I don't have another copy of
19   that.
20      A.   Okay.
21      Q.   But I'm going to ask you what it is.
22           MR. GOLDSTEIN:  Document speaks for itself.
23           THE WITNESS:  This is a bill.  It's
24           O'Boyle vs. O'Connor.  And this looks like it was
25           sent out to Gulf Stream which I don't think has
```

261

```
 1        happened since then because my office didn't
 2        realize this is not a O'Boyle vs. Gulf Stream or
 3        they saw -- probably saw O'Boyle vs. O'Connor,
 4        Morgan, whatever, thought it was a Gulf Stream
 5        case.
 6             So, this is a bill or a matter that I'm
 7        accruing time on.
 8   BY MR. O'BOYLE:
 9        Q.  And is there a bill amount there?
10        A.  $8,260.
11        Q.  And if we were to short form the name of that,
12   would we call that the Sunshine Suit?
13        A.  I believe this is a Sunshine Suit.
14        Q.  Okay.  And that's the same suit where you said
15   you were not billing, you were just collecting your
16   time?
17        A.  Collecting, right.
18        Q.  Is that correct?
19        A.  Yes.  It looks like they printed out a bill in
20   that matter and sent it.
21        Q.  That is what it looks like, doesn't it?
22        A.  Yeah.  I hope it only happened once, but they
23   would certainly -- this is certainly -- this is not a
24   Gulf Stream Defendant case.
25        Q.  But you sent the bill to Gulf Stream, didn't you?
```

262

```
 1        A.  I didn't, but apparently my office did.
 2        Q.  And if Gulf Stream paid it, are you going to
 3   refund it?
 4        A.  I'm going to give them a credit for this.
 5        Q.  Okay.  And if there was another bill and Gulf
 6   Stream paid it, are you going to fund it or give them a
 7   credit?
 8        A.  Yeah.  Anything -- this was -- this is a case
 9   where I am personally a Defendant and Gulf Stream is not
10   a Defendant.
11             So, if Gulf Stream was improperly billed any of
12   those, I'll give them the credit.  And if I don't
13   collect the fees from me, then I'll decide if I want to
14   bill Gulf Stream for my fees in defending myself from
15   going to their settlement conference.
16        Q.  And who is defending or who's defending Gulf
17   Stream in this suit?
18        A.  I think Mr. Hochman's firm.
19        Q.  Didn't you just tell me that Gulf Stream wasn't
20   in this suit?
21        A.  Mr. Morgan is in the suit.  No, now you're
22   confusing me.  This suit -- I think there's an insurance
23   council, either through the League Of Cities or through
24   the Jones Foster Law Firm, but I don't really know the
25   specifics of how they got their counsel.  I can't
```

263

```
 1   remember who it is.
 2        Q.  Okay.  But we are squared away.
 3             MR. O'BOYLE:  Is that P2?
 4             THE WITNESS:  Yes, P2.
 5   BY MR. O'BOYLE:
 6        Q.  P2 is an invoice from the Sweetapple firm for
 7   $8,209 in connection with the Sweetapple firm
 8   representing Mr. Sweetapple in the -- what we're calling
 9   the Sunshine Suit?
10        A.  Right.
11        Q.  Right?
12        A.  Yes.  O'Boyle vs. O'Connor is a matter, but it's
13   not -- it's not a Gulf Stream Defendant case.
14        Q.  Okay.  You don't consider yourself a terrorist,
15   do you?
16        A.  No.
17             MR. GOLDSTEIN:  Object to form.
18             MR. HOCHMAN:  Can I see the exhibit, please?
19   BY MR. O'BOYLE:
20        Q.  Would you consider Mr. O'Hare a terrorist?
21             MR. GOLDSTEIN:  Object to the form.
22             THE WITNESS:  Do you want me to answer that
23        by disclosing what Mr. Chandler told me you and
24        he were doing?
25
```

264

```
 1   BY MR. O'BOYLE:
 2        Q.  Sure.
 3        A.  Mr. Chandler told me that it was -- that, A,
 4   Mr. O'Hare and you were both paying him for his training
 5   and services, not just you and Mr. Raider as well.
 6             And that it wasn't enough for you two to just go
 7   make requests that were A1 kill shots and to develop
 8   your lawsuits by filing one or two requests, but he
 9   withdrew from this involvement because your intent on
10   barraging Gulf Stream and making Gulf Stream an example
11   for all the other municipalities so that Caﬁ, when it
12   filed a request anywhere in the state, you could just
13   look to Gulf Stream and it would be a wasteland of
14   public records requests and he withdrew himself from
15   that.
16             But Mr. O'Hare was financially involved with him.
17   Mr. Raider, they were trained.  He never said, oh, I
18   think it's great that Mr. O'Hare files sixty requests on
19   a Monday.  He thought that this conduct was going to
20   result in the demise of public records law.  He said he
21   liked Chris.
22             And when he was training Chris and Raider, that
23   Chris' wife came in and she heard what was going on and
24   said this is disgusting, what you all are doing is
25   disgusting.  That's what Mr. Chandler told me, part of
```

265

1   what he told me, the evening after I took the statement
2   and asked him about Mr. O'Hare's involvement.
3       So, Mr. Chandler professed, at least, to have
4   absolute disgust for the idea of targeting the Town of
5   Gulf Stream and making it into a wasteland of public
6   records requests where it was clear that the records
7   couldn't even have been read in time, 350 requests,
8   sixty requests.  I have somewhere there were over a
9   hundred requests immediately before the time I was
10  hired.  And all that would do, Mr. Chandler said, would
11  be to destroy public records access in the state and he
12  was incensed by it.
13      So, I wasn't surprised, based on the financial
14  arrangements between Mr. O'Hare and you, that
15  Mr. Chandler tried to cover for Mr. O'Hare, but my -- my
16  opinion, my legal opinion in this case -- my legal
17  opinion in this case, which he kept asking me for and
18  asking me for became rather conclusively based on
19  everything I saw that there was a scheme to defraud, not
20  only the Town of Gulf Stream with the Cafi barrage and
21  the Cafi lawsuits, they're really just you, not Cafi,
22  there's no real Cafi from what I can see.  Everything I
23  see shows there's no real Cafi, it's classic.
24      And then not only were you intent on bringing
25  Gulf Stream to its knees with public records requests

266

1   barrages as trained by Mr. Chandler despite his
2   statement that that should not happen or be done, but
3   then you went around the state with Mr. Grey and
4   Mr. Chandler and made requests to over a hundred,
5   almost two hundred, I believe, government, state and
6   local.
7       Mr. Grey testified that the O'Boyle Law Firm was
8   paying him as a runner, a portion of the attorney's fees
9   collected in the lawsuits.  That's his statement under
10  oath.  I have the deposition transcript.
11      The whole goal was this "windfall scheme" because
12  when you -- when you made a public records request to a
13  Town and they saw what you were doing to Gulf Stream and
14  they saw the O'Boyle Law Firm and they saw Cafi, they
15  would just tower and write whatever check you wanted and
16  that you that you were asking for checks that were well
17  in excess of any time.  You were filing a templet
18  complaint and demanding five thousand, ten thousand.
19      I saw evidence of claims for fees that were
20  denied by a court in Dade County where, I believe, you
21  demanded ten thousand and given 1700 recently.
22      So, you keep asking me for my legal opinion,
23  unfortunately, Mr. O'Boyle, I was hard pressed not to
24  decide, when I heard Mr. Chandler's statements, when I
25  read the exhibits, when I looked at what was happening

267

1   in these other government bodies, I was hard pressed not
2   to come to the legal conclusion that you were paying and
3   running and involved in, a long with those others, in a
4   scheme to defraud to obtain money and property from
5   state, government agencies.
6       And to set your son up in a law firm when he
7   wasn't even a lawyer, wasn't even a lawyer, and you had
8   to open the law firm here for him because you couldn't
9   wait to be the only client of this firm.  He couldn't go
10  out -- this young man couldn't go out and go work for a
11  firm.  He couldn't go out on his own with you supporting
12  him and get real clients.  You're the client.  You're
13  calling yourself a not-for-profit and you are providing
14  all of the litigation using this type of conduct.
15      How could I not conclude that this is a scheme to
16  defraud.  How could I not conclude that, Mr. O'Boyle?
17      Q.  Once you smoke a fatty, you can conclude
18  anything.
19      A.  Well, I don't think I was smoking anything.
20      MR. GOLDSTEIN:  There's no question pending.
21      MR. HOCHMAN:  Let me have an excerpt and
22  this is going to be the last one that I ask for
23  which starts with Exhibit 2 being marked to
24  Mr. O'Boyle inviting the witness to -- I'm sorry,
25  to be requesting this next exhibit.  Excerpt

268

1   number six, thank you.
2   BY MR. O'BOYLE:
3       Q.  Mr. Sweetapple, that was a wonderful speech that
4   you made.  However, it is absent facts.  Where you're
5   getting your information is absolutely beyond me.
6       It's clear to me now where the slander kicks in.
7   Absolutely you made it clear to me.  And it's also clear
8   to me now where the First Amendment retaliation kicks
9   in.
10      That speech that you made was so nonsensical, so
11  absent facts, where you got it, I'm just at such a loss.
12  It was such nonsense.
13      A.  Do you have a question, Mr. O'Boyle?
14      Q.  Yes.  How are you feeling, Mr. Sweetapple?
15      A.  I'm feeling sad.  I'm feeling sad when I look at
16  this whole thing that you would put your son in this
17  position.  I know how much you love your son and I know
18  how much I love my son.
19      And I know your son went to Gulf Stream School
20  and I know my wife cared greatly for your wife.  And I
21  feel very badly that those documents were handed to me
22  and that that witness called me.
23      But when I look at this whole thing, the person I
24  feel the most sorry for is that young man sitting right
25  there because there was no need to turn your supposed

269

```
 1   public record constitutional interest that you describe
 2   that I just read about here into a business to make
 3   money.
 4        I didn't make up the kill shots.  I didn't make
 5   up the shake down.  I didn't make up the "windfall
 6   scheme".  These are -- these are things that you know
 7   full well are in -- that there's evidence of it that's
 8   not just Mr. Chandler talking.
 9        So, don't sit here and pretend that I'm making
10   things up, Mr. O'Boyle.  I wish I were.  I wish this
11   wasn't true.  I wish you hadn't done this to this young
12   man.  That's all I can tell you.
13        Q.  I appreciate -- I appreciate very much if you
14   wouldn't sit here and make things up.
15        A.  What have I made up?
16            MR. GOLDSTEIN:  There's no question pending.
17   BY MR. O'BOYLE:
18        Q.  I guess the mistake -- the big mistake that I
19   made is, I should have filed a complaint against my son
20   for the unauthorized practice of law.
21        A.  You should have told him to wait.
22            MR. GOLDSTEIN:  There's no question pending.
23   BY MR. O'BOYLE:
24        Q.  Would you say that that is the thing to do or
25   would you -- what would you say?
```

270

```
 1        A.  I would say --
 2            MR. GOLDSTEIN:  Object to form.
 3            THE WITNESS:  I would say --
 4            MR. GOLDSTEIN:  Argumentative.
 5            THE WITNESS:  I would say, Mr. O'Boyle, that
 6   you might have considered having your son wait
 7   until he became a Florida lawyer before you
 8   decided you needed an O'Boyle Law Firm in your
 9   very same office.
10        And that it -- that it might have been much
11   more prudent to have your son have real clients,
12   a real client, not have his father pretend to be
13   a not-for-profit and hire Mr. Chandler and
14   Mr. Grey to go make as many requests, kill shot
15   requests, as they need in order to generate cases
16   for his son's law firm.
17        And then you should have listened to
18   Mr. Chandler when he told you and Mr. O'Hare not
19   to target Gulf Stream and make it an example for
20   the state to see how you could abuse the law to
21   perpetrate a "windfall scheme" to generate monies
22   for your son.  That's not the business model that
23   your son deserved, I'm sorry.
24   BY MR. O'BOYLE:
25        Q.  Well --
```

271

```
 1        A.  And Mr. O'Boyle, tell me what fact Mr. Chandler
 2   told me that is false and isn't corroborated by the
 3   records that he provided to me, please?
 4        Q.  I certainly will.  When do you intend to depose
 5   me?
 6        A.  Well, tell me now because I'm making some very
 7   serious statements about your conduct and you've told me
 8   it's all false.  Please tell me what's false?
 9            MR. GOLDSTEIN:  There's no question.
10   BY MR. O'BOYLE:
11        Q.  If you want to agree to two dates, one where I
12   can depose you and one where you can depose me, I'm all
13   for it.  And we can make the matter anything you want.
14        But boy, the hostility that I heard from you, now
15   it gets even more clear to me why you refer to me as a
16   racketeer.
17        A.  Mr. O'Boyle --
18            MR. GOLDSTEIN:  Is there -- there's no
19   question pending.  Move to strike commentary.
20   BY MR. O'BOYLE:
21        Q.  Have you ever referred to me as a racketeer?
22        A.  You've --
23            MR. GOLDSTEIN:  Asked and answered.
24            THE WITNESS:  You've asked me that and I've
25   answered it.
```

272

```
 1   BY MR. O'BOYLE:
 2        Q.  Okay.  Have you ever referred to me as anything
 3   which would have a criminal connotation?
 4            MR. GOLDSTEIN:  Object to the form.
 5            THE WITNESS:  Calls for legal conclusion,
 6   criminal connotation.
 7        In my discussions with Mr. Hannah I did not
 8   single out individuals.  I said, this was a --
 9   based on what Mr. Chandler was describing, this
10   appeared to be a scheme to defraud under Florida
11   Statute 817.
12        I was talking to them about a Florida RICO
13   action and we were debating whether or not there
14   was a predicate act.
15        Mr. Hannah and I debated the law and
16   discussed whether this -- whether it was abuse of
17   process, whether this was a scheme to defraud.
18        So, I did discuss with Mr. Hannah the issues
19   regarding the bona fides of the conduct and
20   whether the conduct as described by Mr. Chandler.
21        I don't go around saying I believe you're a
22   racketeer, I believe you're a criminal.  I'm a
23   lawyer.  When I talk with another lawyer, I
24   discuss the facts that have been presented and
25   the legal theories that each of us believe apply
```

273

```
 1          to the facts.
 2   BY MR. O'BOYLE:
 3       Q.  Are you on a soapbox by any chance?
 4       A.  No.  And I don't bear you hostility.  I don't.
 5   I'm more sad than anything.  I wish you hadn't been
 6   thrust this in this position.
 7       Q.  Then you ought to get out of it.
 8       A.  Well, no, I mean, I have --
 9          MR. GOLDSTEIN:  There's not a question
10          pending.
11          THE COURT REPORTER:  It's 6:36.
12   BY MR. O'BOYLE:
13       Q.  You were talking about in Dade County that we --
14   that something was violated.  I don't remember --
15       A.  No, I said recently in Dade County there was a --
16   in one of the Cafi cases there was a claim for -- about
17   $10,000 in fees.  I believe the court found it was only
18   1,700 and the Appellate Court affirmed it.
19          Everything that you -- that Cafi has done is an
20   is a public record.
21       Q.  I don't think everything that they've done, but I
22   don't know, I'm not involved with Cafi.
23       A.  State wide, all the litigation, all the
24   correspondence, all of the monies that were collected,
25   they're all of public record.
```

274

```
 1       Q.  I'm not disputing.  I'm not involved in Cafi.
 2   The only people I know who are involved in Cafi are you
 3   and Mr. Chandler.
 4       A.  That was your testimony at your deposition and I
 5   filed a motion after that.
 6          MR. GOLDSTEIN:  Nothing pending.
 7   BY MR. O'BOYLE:
 8       Q.  In connection --
 9          MR. GOLDSTEIN:  Move to strike.
10   BY MR. O'BOYLE:
11       Q.  -- with Dade County, was there any crime to your
12   knowledge?
13       A.  Based on Mr. Chandler's description of the
14   "windfall scheme" and his statement repeatedly to me and
15   his description of the communications and the e-mails
16   that went back and forth where he cautioned the firm not
17   to demand multiples of what was actually incurred when
18   there was not even an argument there could be a loan
19   star multiplier because there were no contingency fee
20   agreements.
21          He also described that the firm was settling
22   these cases without his permission, filing these cases
23   without his permission.  The money all went to the law
24   firm, nothing went to Cafi.  There was never a closing
25   statement.  It was all done without his knowledge or
```

275

```
 1   approval.  He testified to or swore to, so --
 2       Q.  Why would it have to have his knowledge and/or
 3   approval?
 4       A.  Because --
 5          MR. GOLDSTEIN:  Object to the form.
 6          THE WITNESS:  -- because he was told he was
 7          going to be an executive -- he said he was told
 8          he was going to be an executive director of a
 9          real not-for-profit.
10   BY MR. O'BOYLE:
11       Q.  Did you tap our phones?
12       A.  No.
13       Q.  How do you know that?
14       A.  This is what he said.
15       Q.  Oh, I see.
16       A.  He testified --
17          MR. GOLDSTEIN:  There's no question pending.
18   BY MR. O'BOYLE:
19       Q.  I see.  I would like to just request that you go
20   to the Dade County State Attorney's Office and to the
21   FBI and explain to them what you just explained to me
22   and tell them that you would like to see this
23   investigated.  Would you do that for me?
24       A.  Is that a question?
25          MR. GOLDSTEIN:  Is there a question pending?
```

276

```
 1   BY MR. O'BOYLE:
 2       Q.  Would you do that for me is the question.
 3          MR. GOLDSTEIN:  Objection.  Move to strike,
 4          argumentative.  Now badgering the witness.
 5   BY MR. O'BOYLE:
 6       Q.  Pardon?
 7       A.  I'm not going to answer that question and I'm not
 8   going to discuss my client's communications with law
 9   enforcement with you.
10       Q.  No, I'm not asking for your client's
11   communication.  I'm asking you, which is future tense,
12   would you do that for me?
13       A.  Well, that calls for speculation.
14          MR. GOLDSTEIN:  Object to the form.  Move to
15          strike.
16   BY MR. O'BOYLE:
17       Q.  Calls for speculation?
18          MR. GOLDSTEIN:  Move to strike.
19          MR. O'BOYLE:  Would you have dinner tonight?
20          THE WITNESS:  With you or --
21   BY MR. O'BOYLE:
22       Q.  No, no.  I'm not going to invite you over to
23   Thanksgiving either.
24       A.  Am I going to have dinner tonight?  Not at the
25   rate we're going.
```

---

1    MR. HOCHMAN:  You are or are not?

2    MS. BAEZ:  I am not going to answer your

3 question.

4    MR. HOCHMAN:  Can you just please tell me if

5 we're at seven hours?

6    MS. BAEZ:  I don't have the answer.

7    MR. HOCHMAN:  I know, Ms. Baez.  But as a

8 matter of professional courtesy, you're a lawyer

9 and I'm a lawyer, I just want to find out if you

10 agree -- that you've been keeping time, you have

11 not represented anybody here, you're an observer.

12    MR. O'BOYLE:  Okay.  May I continue, please?

13    MR. HOCHMAN:  You may, but I want to ask her

14 a question.  Are we at seven hours?

15    MR. O'BOYLE:  She said she's not going to

16 answer you.

17    THE WITNESS:  The reporter's taking time.

18    MR. HOCHMAN:  I'm then going to bring up to

19 the court if you're not going to act in a

20 professional manner, I asked you a question --

21    MS. BAEZ:  I am not being unprofessional.

22 I'm not the one being deposed here.

23    MR. HOCHMAN:  I am asking you a question, do

24 you agree with me that it's approximately seven

25 hours?  If you disagree, let me know and we'll

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

1 put it on the record.  Do you disagree?

2    MR. GOLDSTEIN:  Madam court reporter, how

3 much time do you have on this depo?

4    THE COURT REPORTER:  I have that we

5 officially started at 9:25 and it is 6:41 right

6 now.  And we took one hour for lunch.

7    THE WITNESS:  So, how much time is that?  I

8 can't do the math.

9    MR. GOLDSTEIN:  About an hour half ago we

10 were at six hours.  So, by my estimation there

11 was an hour half left.

12    MR. HOCHMAN:  And if Ms. Baez disagrees with

13 me that --

14    MS. BAEZ:  Can I ask you why ask me.

15    MR. HOCHMAN:  Well, you can disagree with

16 me --

17    MR. GOLDSTEIN:  Ms. Baez --

18    MR. HOCHMAN:  If you want to disagree with

19 me and say it's not seven hours, please do so.

20    MS. BAEZ:  I am not --

21    MR. HOCHMAN:  Fine.  So, there's no

22 disagreement on that side about whether or not

23 there's seven hours.  Is anybody disagreeing?

24    MR. O'BOYLE:  I'll let you know in a moment

25 how about that.

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

1    MR. HOCHMAN:  I'll give you a moment.

2    MR. O'BOYLE:  Really?

3    THE WITNESS:  Why don't we have the court

4 reporter give us her time.

5    MR. HOCHMAN:  I want Mr. O'Boyle, if he

6 wants to put something on the record that he

7 didn't get his full-time with Mr. Sweetapple

8 that's fine.  But I want to know what's going on

9 here, what's the basis for it?

10    We've been here since 9:00 o'clock.  It's

11 quarter to 7:00, according to my --

12    MR. GOLDSTEIN:  6:40.

13    MR. HOCHMAN:  6:40.

14    THE COURT REPORTER:  I'm going to go off the

15 record.

16    (Thereupon, a recess was taken; after which

17 the following proceedings were had:)

18    MR. O'BOYLE:  Madam court reporter, we are

19 now with the permission of Mr. Goldstein and

20 Mr. Hochman, we are going to adjourn the

21 deposition, if that's the right phrase, and let

22 Mr. Sweetapple go have dinner.

23    THE WITNESS:  Well, I'm going to go to my

24 daughter's baccalaureate, but thank you very

25 much.

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

---

1    MR. GOLDSTEIN:  Mr. Sweetapple, you have the

2 right to read or waive.

3    THE WITNESS:  I'll read.

4    MR. HOCHMAN:  And when I said before I'll

5 take that excerpt, the last one from when I asked

6 for it until take to the end, okay, from the

7 marking of Exhibit Number 2 to the end.

8    MR. GOLDSTEIN:  To the end of the

9 deposition.

10    (Thereupon, the deposition was concluded at

11 6:44 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

281

```
1                    CERTIFICATE OF OATH
2
3
4
     STATE OF FLORIDA      )
5                          ) SS:
     COUNTY OF PALM BEACH  )
6
7
8         I, LISA GREENWELL, Court Reporter, Notary
9    Public, State of Florida, certify that
10   ROBERT A. SWEETAPPLE, personally appeared before
11   me on the 27th day of May, 2016 and was duly sworn.
12
13
          Signed this 18th day of June, 2016.
14
15
16   _____
          LISA GREENWELL, Merit Reporter
17
          DAUGHTERS REPORTING, INC.
18        934 North University Drive
                  Suite 224
19        Coral Springs, Florida 33071
20
21
22   Notary Public, State of Florida at Large
     My Commission expires:  April 4, 2019
23   My commission No: FF 181085.
24
25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH
COUNTY, FLORIDA

CASE NO. 502014CA004474AXXXXMB
CIRCUIT CIVIL DIVISION "AA"

MARTIN E. O'BOYLE,

      Plaintiff

vs.

TOWN OF GULF STREAM,

      Defendants.

_____/

TOWN OF GULF STREAM,
      Counter-Plaintiff

v.

MARTIN E. O'BOYLE, an individual
RYAN WITMER, an individual
CHRISTOPHER O'HARE, an individual,
WILLIAM RING, an individual,
JOHATHAN R. O'BOYLE, an individual
DENISE DEMARTINI, an individual
PUBLIC AWARENESS INSTITUTE, INC.,
CITIZENS AWARENESS FOUNDTION, INC.,
OUR PUBLIC RECORDS, LLC,
COMMERCE GROUP, INC. and THE
O'BOYLE LAW FIRM, P.C., INC.
      Counter-Defendants

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT
## ON DEFENDANT'S COUNTERCLAIM AND AFFIRMATIVE DEFENSES

    THIS MATTER came before the court for hearing on October 6, 2015, on Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim and Affirmative Defenses. The court has heard the argument of counsel, reviewed all relevant pleadings and papers filed in connection with the Motion, and is otherwise fully advised in the premises.



EXHIBIT
10

Page 2
Case No. 502014CA004474AXXXXMB
MARTIN E. O'BOYLE v. TOWN OF GULF STREAM

# I. BACKGROUND

Plaintiff, Martin E. O'Boyle ("O'Boyle"), filed this lawsuit on April 15, 2014, against Defendant, Town of Gulf Stream ("Gulf Stream" or the "the Town") pursuant to Chapter 119, Florida Statutes, (the "Public Records Act") to obtain attorney's fees arising out of a public records request.[1] Gulf Stream obtained leave to file certain enumerated affirmative defenses against O'Boyle, asserting (i) unclean hands, (ii) equitable estoppels, (iii) compliance with the Florida Public Records Act and (iv) the unlicensed practice of law.   In addition, Gulf Stream filed a counterclaim for declaratory and injunctive relief against O'Boyle and numerous other counter- defendants, including the O'Boyle Law Firm, P.C.; Ryan Witmer, an attorney formerly employed by the O'Boyle Law Firm; Christopher O'Hare, a resident of Gulf Stream; William Ring, an attorney with the O'Boyle Law Firm; Jonathan O'Boyle, founder of the O'Boyle Law Firm; Citizens Awareness Foundation, Inc. ("CAFI"); Denise DeMartini, a director of CAFI; Public Awareness Institute; and Our Public Records LLC.   Attempts by O'Boyle to strike the affirmative defenses and dismiss the counterclaim were largely denied.

O'Boyle unsuccessfully sought an immediate hearing before this court on the merits of its request for attorney's fees.  Petitions for writs of mandamus, certiorari and prohibition were then filed with the Fourth District Court of Appeals and were summarily denied on July 16, 2015. O'Boyle's motion for rehearing *en banc* and issuance of a written opinion were likewise denied by the appellate court on September 18, 2015.

Gulf Stream has also filed nearly identical counterclaims against substantially the same parties in other cases.  Those county court cases have since been transferred to the circuit court.[2]

---

[1] It has since been stipulated between the parties that all public records requested have been produced by the Town.
[2] *Martin E. O'Boyle v. Town of Gulf Stream*, Case No. 2015CA004564 and *Christopher O'Hare v. Town of Gulf Stream*, Case No. 2015CA006067.  In addition, the circuit court case of *Martin E. O'Boyle v Town of Gulf Stream*, Case No. 2014CA004474, was transferred to this division by order of Judge Hafele on July 17, 2014.

Page 3
Case No. 502014CA004474AXXXXXMB
MARTIN E. O'BOYLE v. TOWN OF GULF STREAM

They are in addition to a federal action filed on February 17, 2015, by Gulf Stream in *Town of Gulf Stream v. Martin E. O'Boyle*, Case No. 15-cv-8082-KAM, a putative class action under RICO in the Southern District of Florida, West Palm Division. That case was dismissed by Judge Marra with prejudice on June 30, 2015 (the "federal action"). [3]

Gulf Stream's counterclaim and affirmative defenses make numerous allegations, all of which relate to the actions of O'Boyle and the other counter-defendants in the filing of numerous public records requests against the Town. A common theme throughout is that these requests are frivolous, often times made using fraudulent, deceptive, and fictitious identification with the intent to extort or induce the Town to grant it special favors or risk the filing of additional lawsuits and the payment of attorney's fees as provided by Chapter 119. Among the relief requested by Gulf Stream is a temporary and permanent injunction preventing O'Boyle and the co-defendants from submitting additional public records request to the Town. To do otherwise, it is alleged, would cripple the Town and result in "the monopolization of the Town's clerk's office in fulfilling public records requests... " [4]

It is against this procedural and factual backdrop that the court considers O'Boyle's Motion for Summary Judgment.

## II. LEGAL ANALYSIS

O'Boyle raises a number of grounds upon which summary judgment should be entered, including *res judicata* and the impermissible splitting of causes of action. However, because this court finds that the entire factual underpinning of the counterclaim cannot, under any circumstances, entitle the Town to relief, the court need not address those issues. As noted above, the crux of the Town's counterclaim, whether it be for abuse of process, conspiracy, injunctive or declaratory relief, is based upon O'Boyle's conduct as it relates to his alleged filing

---

[3] *Town of Gulf Stream v. O'Boyle*, Case No. 9-15-cv-80812-KAM (S.D. Fla. June 30, 2015).
[4] Paragraph 86 of the Counterclaim.

Page 4
Case No. 502014CA004474AXXXXMB
MARTIN E. O'BOYLE v. TOWN OF GULF STREAM

of public record requests under Chapter 119.  Judge Marra, in the related federal action, was faced with identical claims and allegations, albeit in the context of a Complaint alleging violations by O'Boyle and the other defendants for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"):

> The basis for Plaintiffs' claim is the alleged filing of large numbers of frivolous public records requests, which are often intentionally inconspicuous, followed by the commencement of lawsuits when the requests are not addressed. Plaintiff alleges that Defendants then use the mails and wires to extort their victims by demanding settlement, including attorneys' fees and costs as provided by the public records statute, or face protracted litigation and a flurry of additional public records requests and lawsuits.

*Town of Gulf Stream v. O'Boyle*, No. 15-80182-CIV, 2015 WL 3970612, at *1 (S.D. Fla. June 30, 2015).

Judge Marra properly recognized that:

> Defendants could not be convicted for filing the public record requests. Under Chapter 119 of the Florida Statutes, Defendants had the absolute right under current Florida law to file public record requests and then file lawsuits if the requests went unanswered. The motive for making a public record request is irrelevant under Florida law. *See e.g., Microdecisions, Inc. v. Skinner,* 889 So.2d 871, 875 (Fla. 2d DCA 2004). Furthermore, someone requesting access to or copies of public records may not be required to disclose background information such as a name or address unless the custodian is required by law to obtain the information. *Chandler v. City of Greenacres,* 140 So.3d 1080, 1084–85 (Fla. 4th DCA 2014). The request can come from someone anonymously. *Id.* at 1085.

*Id.* at *4.

Just as Defendants' legal use of these statutes does not constitute a predicate act under RICO, it cannot, under any scenario, give rise to  a cause of action  or affirmative defense under any of the legal theories advanced by the Town.  Nowhere is this more apparent than in the Town's effort to enjoin defendants from availing themselves of rights accorded to citizens under Chapter 119.  *See, Lieberman v. Marshall,* 236 So. 2d 120, 127 (Fla. 1970) ("[w]e recognize that exercise of a valid political right may not be restrained by injunction.").

Page 5
Case No. 502014CA004474AXXXXMB
MARTIN E. O'BOYLE v. TOWN OF GULF STREAM

The court is neither unmindful nor unsympathetic with the plight of Gulf Stream, a small municipality of only 17 permanent employees, who, if the allegations are true, are being forced to divert taxpayer monies earmarked for public services in order to address the avalanche of public records requests being filed for no purpose other than to harass and shakedown the Town by fear and the threat of having to pay attorneys' fees under the statute.  While Gulf Stream may well be the poster boy for those victimized by individuals seeking to "game the system" by suing public agencies, it is hardly alone as "across the nation, public records laws [have] become a source of consternation for public servants who recognize the ideals of the public record laws, but who also endure the flaws."[5]  The unfortunate reality may be that "[a]s presently constructed, a small municipality simply cannot fully comply with the Florida public records laws when faced with a well-financed and determined adversary." *Id*. at 436.  Tempting as it might be for this court to inject itself into this dispute in an attempt to right this alleged wrong, it must reluctantly decline as prior court precedent has judicially sanctioned the root causes of the abuses complained of, namely; allowing anonymity, prohibiting the limitation of the number of requests, and forbidding any inquiry into the motive of the requester.  *See e.g., Chandler v. City of Greenacres*, 140 So. 3d 1080, 1084 (Fla. 4th DCA 2014) (Anonymous email requests were sufficient to trigger City's obligation to produce public records without regard to requester's lack of background information or motive.)

As noted by Judge Marra, any real relief is likely going to have to come from the legislature, who will have to decide whether the "sunburn" inflicted upon Gulf Stream and other State agencies warrants placing limits on the State's public records law and the public's nearly

---

[5] Keith W. Rizzardi, *Sunburned: How Misuse of the Public Records Laws Creates an Overburdened, More Expensive, and Less Transparent Government*, 44 Stetson L. Rev. 425, 436 (2015).  This Article contains a thorough analysis of the problems facing local governments, including Gulf Stream, from those who purportedly manipulate and misuse the public records law to the detriment of the public, free of any consequences.

Page 6
Case No. 502014CA004474AXXXXMB
MARTIN E. O'BOYLE v. TOWN OF GULF STREAM

limitless right to access, considered by many to be a model for open government and transparency.[6] Perhaps the magnitude of the injuries allegedly inflicted on the Town and others throughout the State will prompt the Legislature to action.[7]

Having demonstrated the absence of any genuine issues of material fact and entitlement to judgment as a matter of law, it is hereby ORDERED and ADJUDGED:

1.    Plaintiff, Martin E. O'Boyle's Motion for Summary Judgment against the Town of Gulf Stream on its Counterclaim is GRANTED.

2.    Plaintiff, Martin E. O'Boyle's Motion for Summary Judgment against the Town of Gulf Stream as to its First and Second Affirmative Defenses is GRANTED. The Motion for Summary Judgment as to the Town's Third Affirmative Defense is DENIED.[8] The court will consider any and all appropriate circumstances and events, including the reasonableness of the Town's response, in determining O'Boyle's entitlement, if any, to attorney's fees.

DONE AND ORDERED in Chambers in Palm Beach County, West Palm Beach, Florida, this 4th day of November, 2015.

Richard L. Oftedal
Circuit Judge

---

[6] As an alternative form of relief, the Town has also sought to sanction the attorneys they allege are acting unethically in bringing these actions.  Such efforts before the Florida Bar have, to date, been unsuccessful.

[7] Indeed, there are already several bills before the Florida legislature that are designed to address perceived "public records shakedowns", including Senate Bill 224 and House Bill 163.  See "*A New Scam:  Public Records Shakedown*", by Jan Pudlow, The Florida Bar News, February 1, 2015.

[8] On October 23, 2015, the court entered an agreed "Order Denying, as Moot, Plaintiff's Motion for Partial Summary Judgment on Defendant's Allegations and Claims Related to the Unlicensed Practice of Law." Accordingly, the Town's Fourth Affirmative Defense relating to the Unlicensed Practice of Law is hereby STRICKEN.

Page 7
Case No. 502014CA004474AXXXXMB
MARTIN E. O'BOYLE v. TOWN OF GULF STREAM


**Copies furnished:**
Louis Roeder, Esq.
7414 Sparkling Lake Road
Orlando, FL  32819

Joanne O'Connor, Esq.,
505 South Flagler Drive,
Suite 1100,
West Palm Beach, FL  33402

Robert A. Sweetapple, Esq.
20 S.E. 3rd Street,
 Boca Raton, FL 33432
D. Culver Smith, Esq.,
500 South Australian Avenue,
Suite 600,
West Palm Beach, FL  33401

Elaine Johnson James, Esq. and Mitchell W. Berger, Esq.,
350 East Las Olas Blvd.,
Suite 1000
Fort Lauderdale, FL 33301

Kenneth Drake, Esq.,
150 Alhambra Circle,
Coral Gables, FL  33134-4505

Daniel DeSouza, Esq.,
101 NE Third Avenue,
Suite 1500,
Fort Lauderdale, FL  33301

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:14-cv-81250-KAM

MARTIN E. O'BOYLE,

     Plaintiff,

v.

ROBERT A. SWEETAPPLE AND
MAYOR SCOTT MORGAN,

     Defendants.

_____/

## NOTICE OF CONTINUED VIDEOTAPED DEPOSITION

PLEASE TAKE NOTICE that the undersigned attorneys will take the deposition of:

| | |
|---|---|
| **Name:** | **MARTIN E. O'BOYLE** |
| **Date:** | **July 27, 2016** |
| **Time:** | **10:00 A.M.** |
| **Place of Taking:** | **Esquire Deposition Solutions, LLC** |
| | **2385 NW Executive Center #360** |
| | **Boca Raton, FL  33431** |

The official court reported will be Esquire Deposition Solutions, LLC or a Notary Public in and for the State of Florida or some other officer duly authorized by law to take depositions in the State of Florida, and the videographer will be contracted for by them. Esquire Deposition Solutions, LLC's Boca Raton address is 2385 NW Executive Center Dr #120, Boca Raton, FL 33431; however, the location of the deposition shall occur at the address stated above in this Notice. The deposition is being taken for the purpose of discovery and/or for use at trial, or for such other purposes as are permitted under the Florida Rules of Civil Procedure. The deposition will continue from day-to-day until completed.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 18th day of July, 2016 I certify that the foregoing document is being served this day on all counsel of record via email to:   **MARTIN E.**

- 1 -

**O'BOYLE,** *Pro Se*, 1280 West Newport Center Drive, Deerfield Beach, FL  33442 and

**JEFFREY L. HOCHMAN, ESQ.**, **HUDSON C. GILL,** Johnson, Anselmo, Murdoch, Burke,

Piper & Hochman, P.A., 2455 E. Sunrise Blvd., Suite 1000, Fort Lauderdale, Florida 33304.

> COLE, SCOTT & KISSANE, P.A.
> Attorneys for Defendant Sweetapple
> 222 Lakeview Avenue, Suite 120
> West Palm Beach, Florida 33401
> Telephone: (561) 383-9200
> Facsimile: (561) 683-8977
>
> By: */S/ JOSHUA A. GOLDSTEIN*
> BARRY A. POSTMAN
> FBN: 991856
> JOSHUA GOLDSTEIN
> FBN: 064834

l:\1601-0062-00\discovery\notice of depo\notice -continued notice of deposition of martin o'boyle.docx

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                   CASE NO.: 9:14-cv-81250-KAM
 3

 4    MARTIN E. O'BOYLE,

 5          Plaintiff,

 6    -vs-

 7    ROBERT A. SWEETAPPLE AND
      MAYOR SCOTT MORGAN,
 8
            Defendants.
 9    _____/

10

11

12              DEPOSITION OF JOEL CHANDLER
          Taken By Counsel for Defendant, Sweetapple
13                     Volume 1 of 2
                     (Pages 1-195)
14
                Wednesday, February 24, 2016
15                10:30 a.m. - 4:50 p.m.

16             Esquire Deposition Solutions
                  4927 Southfork Drive
17                  Lakeland, Florida

18    ---------------------------------------------

19

20

21

22    Reported By:
      Megan M. Soria
23    Notary Public
      State of Florida at Large
24    Esquire Deposition Solutions - Tampa Office
      Phone - 813.221.2535, 800.838.2814
25    Esquire Job No.  118775
```

**EXHIBIT**

11



ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1    character or something.

2        Q.   So Marty had a fair amount of animosity toward

3    Mr. Sweetapple?

4        A.   I would say so.   That was my impression.

5        Q.   How many times did you speak with my client?

6        A.   We have talked quite a few times.   It's not like

7    we hang out.   I think this is only the second time we

8    have actually seen each other face to face.   All of my

9    interactions with Bob have been very pleasant.   They've

10   been cordial.   I am confident that he and I probably see

11   the world very differently on many, many issues.   But I

12   don't -- like I say, I don't make this stuff personal.

13   Leave me and my family alone, and we are good.   Start

14   fucking with little old Black ladies, and we are going

15   to have a problem.   But other than that, I don't really

16   care.   I like Bob.   He's been nice to me.   I don't agree

17   with everything that I have heard, but I don't know that

18   everything I have heard is true.

19       Q.   And by everything you heard, you mean everything

20   you have heard from Mr. O'Boyle?

21       A.   Yes.   I mean, I think that -- I thought that the

22   -- I thought the RICO lawsuit was ill advised for a

23   whole host of reasons, not the least of which is making

24   a public records request, in and of itself, is not a

25   criminal act.   I'm not a RICO attorney, so what do I



1  know?  I watch the Sopranos, but what do I really know

2  about that kind of stuff.

3      I, frankly, have been very disappointed in the

4  approach that the establishment has taken, and Bob is

5  not the establishment, but he is an attorney for the

6  establishment, which doesn't make him a bad guy.  I,

7  like most people, try -- I think of people on the other

8  side of me, "other," as being somewhat monolithic, and I

9  recognize that's a fallacy.  But I do think the

10  establishment's taking the wrong approach to try to

11  resolve the complaints they've got with people like

12  Marty O'Boyle.

13      I vehemently disagree with -- I don't know that

14  this is necessarily Bob's doing, but the Town going

15  after Chris O'Hare, I completely disagree with that.

16  And my perception is, based particularly on a RICO

17  complaint, that there is sort of this lumping Chris and

18  Marty into the same cabal.  I just don't have any -- my

19  experience with Chris has been nothing but -- I don't

20  have anything negative to say about Chris, and I'm

21  baffled as to why he's hanging out with Marty.  But we

22  all make poor choices sometimes.

23  Q.  So you met with Mr. Sweetapple?

24  A.  Yes.

25  Q.  And I believe you testified previously that you

